COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP
Jeffrey W. Herrmann
Audra DePaolo
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Telephone: (201) 845-9600

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARVIN D. LESLIE, LAWRENCE D. CATTI, VALERIE J. FUNARI, CLYDE FREEMAN, JACOB CHERNOV, LING GONG, JILL A. ROACH, and ARTHUR S. GOLDSMITH individually and on behalf of all others similarly situated; <br><br> Plaintiffs, <br><br> v. <br><br> QUEST DIAGNOSTICS, INC. <br><br> Defendant. | Civil Action No. <br><br> **CLASS ACTION COMPLAINT** <br><br> JURY TRIAL REQUESTED |

Plaintiffs Marvin D. Leslie, Lawrence D. Catti, Valerie J. Funari, Clyde Freeman, Jacob Chernov, Ling Gong, Jill A. Roach, and Arthur S. Goldsmith (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, bring this complaint against Quest Diagnostics, Inc. ("Quest"), and allege upon information and belief, except as to the allegations that pertain to Plaintiffs and their counsel, which are based on personal knowledge, as follows:

## INTRODUCTION

1.      This is a class action on behalf of a national class defined as all persons who were charged fees for services by Quest that were in excess of the negotiated or mandated fair

market value rates established for those services between Quest and private or public insurers (the "Class").

2.      Quest is the largest U.S. laboratory, engaged in the business of providing laboratory testing services to patients nationwide.  Quest provides over 100 million laboratory tests for patients each year.

3.      The United States is undergoing a healthcare crisis.  Healthcare recipients are increasingly being required to absorb greater costs for health care, through higher insurance premiums, copays, deductibles, and exclusions.

4.      This action addresses a particularly pernicious business practice of defendant Quest.  Specifically, Quest maintains a price list of diagnostic lab tests that is grossly disproportionate to the negotiated or mandated fair market value rates Quest charges third-party payers, such as private and public healthcare insurers ("Benefit Plans").  However, when a Benefit Plan refuses to cover Quest's diagnostic lab tests, Quest overbills the patient at the excessive list prices (or "rack rates") that bear no relationship to the fair market value rates, but rather are frequently more than ten times greater than fair market value rates.

5.      For example, plaintiff Marvin D. Leslie and his wife, Vicki Leslie, were each billed by Quest $328.85 for a MTHFR genetic test (CPT code[1] 81291), conducted on November 15, 2013.  The Leslies' insurer (Aetna) denied coverage on grounds that it considered the test "experimental or investigational."  If Aetna had accepted coverage, it would have reimbursed Quest, based on negotiated fair market value rates, substantially less than the $328.85 billed to each of the Leslies.  For example, under the 2014 Clinical Laboratory Fee Schedule ("CLFS"),

---

[1]      "CPT code" means Current Procedural Terminology code, and is a commonly used medical test identification system maintained by the American Medical Association.

which lists the reimbursement rates for various laboratory tests covered by Medicare/Medicaid (the first year that the data is available), Quest would have been reimbursed $59.55 for the MTHFR genetic test.  However, because Aetna denied coverage, Quest insisted on billing the Leslies the full $328.85 each.

6.      Lawrence D. Catti was billed by Quest $218.48 for a Homocysteine test (CPT code 83090), conducted on January 7, 2017.  Mr. Catti's insurer (also Aetna) denied coverage on grounds that it considered the test "experimental or investigational," as described in an Explanation of Benefits ("EOB") dated January 21, 2017.  If Aetna had accepted coverage, it would have reimbursed Quest $15.02 and Mr. Catti would have had no copay.  However, because Aetna denied coverage, Quest insisted on billing Mr. Catti the full $218.48 – approximately 14.5 times the fair market value rate negotiated between Aetna and Quest.

7.      Valerie J. Funari was overbilled by Quest on two separate occasions.  First, she was charged the aggregate rack rate of $244.82 for five tests performed on September 9, 2016 (CPT odes 82465, 83718, 84478, 85025, and 80053).  Second, Ms. Funari was charged the rack rates of $140.61 for a Thyroxine (Thyroid Chemical) Measurement test (CPT code 84439) and $125.47 for a Blood Test, Thyroid Stimulating Hormone (Tsh) (CPT code 84443), conducted on September 19, 2016.  Medicare (Ms. Funari's insurer) denied coverage for the seven tests mentioned.  If Medicare had accepted coverage, it would have reimbursed Quest substantially less than the $244.82 for the September 9th lab services, and $266.08 for the September 19th lab services.  Indeed, under the 2016 CLFS, Quest would have been reimbursed $49.89, or 20.4% of the aggregate rack rates, for the September 9th tests, and then $12.28 for the Thyroxine (Thyroid Chemical) Measurement test and $22.89 for the Tsh test, both being performed on September 19th.  However, because Aetna denied coverage, Quest insisted on

3

billing Ms. Funari the full $244.82 and $266.08 for the lab services performed on September 9th and 19th, respectively.

8.      Clyde Freeman was billed by Quest $1,236.59 and $567.19, for eleven separate diagnostic tests conducted on April 5, 2016.  Ms. Freeman's health insurer at that time was Anthem Blue Cross and Blue Shield ("Anthem").  Quest refused to provide Ms. Freeman with any insurance discount because it stated that Quest "is no longer contracted with Anthem…."  If Quest had been contracted with Anthem, Ms. Freeman would have been entitled to a substantial discount on Quest's stated rack rates.  For example, Quest billed Ms. Freeman $215.19 for a PTH (Parathyroid Hormone), Intact test (CPT code 83970).  Under the 2016 CLFS, Quest would have been reimbursed $56.23 for that test.  However, because Ms. Freeman had insurance coverage with Anthem, and Quest was not contracted with Anthem, Quest insisted on billing Ms. Freeman the full charge of $215.19 for the PTH test (and the other tests conducted on April 5, 2016).

9.      Jacob Chernov was billed by Quest $150 for a Vitamin D 25 Hydroxy test (CPT code 82306), and $70.40 for a Glycosylated Hemoglobin Test (CPT code 83036), both conducted on November 21, 2016.  Medicare denied coverage for the two tests.  If Medicare had accepted coverage, it would have reimbursed Quest substantially less than the $220.40 billed to Mr. Chernov.  For example, under the 2016 CLFS, the Vitamin D 25 Hydroxy test would only have cost $31.54, not $150, and the Glycosylated Hemoglobin test would only have cost $13.22, not $70.40.  However, because Medicare denied coverage, Quest insisted on billing Mr. Chernov the full $220.40.

10.     Ling Gong was billed $125.84 by Quest for an HPV High-Risk test (CPT code 87624), conducted on behalf of his spouse, Xin Tan, on March 16, 2015.  Blue Cross Blue

Shield of Michigan, Mr. Gong's and Mrs. Tan's health insurer, declined coverage because the benefit was not covered "based on the reported diagnosis." Had Mr. Gong's insurance covered the HPV test, Blue Cross Blue Shield of Michigan would have paid Quest substantially less than $125.84. For example, under the 2016 CLFS, the HPV High-Risk test would have only cost $47.80. However, because Blue Cross Blue Shield of Michigan denied coverage, Quest insisted on billing Mr. Gong the full $125.84.

11.    Jill A. Roach was billed $784.14 by Quest for eights tests conducted on May 17, 2016. Ms. Roach was uninsured when the tests were completed. Had a Benefit Plan covered Ms. Roach's lab tests, the amount paid to Quest would have been substantially less than the $784.14. For example, under the 2016 CLFS, Medicare would have only paid Quest $123.23, or 16.07% of the billed amount Ms. Roach is being required to pay. However, because Ms. Roach did not have insurance, Quest insisted on billing Ms. Roach the full $784.14.

12.    Arthur S. Goldsmith was billed $136.82 by Quest for a Gonadotropin, Chorionic (Reproductive Hormone) Level test (CPT code 84702), conducted on September 25, 2015. Medicare denied coverage for this test. If Medicare had accepted coverage, it would have reimbursed Quest substantially less than the $136.82 billed to Mr. Goldsmith. Indeed, under the 2016 CLFS, a CPT code 84702 test is subject to a maximum reimbursement rate of $20.51. However, because Medicare denied coverage, Quest insisted on billing Mr. Goldsmith the full $136.82.

13.    Craig R. Dvorak was billed $1,149.65 by Quest for two allergy tests (both marked with CPT code 86003), conducted on May 19, 2016. Medicare denied coverage for the allergy tests, as did Mr. Dvorak's Medigap insurance (which is purchased with the intent of covering any claims that are not covered by Medicare) through HealthNet. Had Medicare

covered the allergy tests, it would have reimbursed Quest substantially less than the $1,149.65 billed to Mr. Dvorak. Indeed, under the 2016 CLFS, a CPT code 86003 test is subject to a maximum reimbursement rate of $7.11, meaning Quest would have received only $14.22 for the allergy tests. However, because Medicare denied coverage, Quest insisted on billing Mr. Dvorak the full $1,149.65.

14. Postings on the internet are replete with stories from Quest's patients who were denied insurance coverage and were overbilled by Quest (similar to the allegations here on behalf of Plaintiffs).

15. Compounding Quest's overbilling, Quest customarily issues invoices to patients (including Plaintiffs) that are intentionally misleading. Specifically, Quest's invoices contain only (i) the aggregate charges for multiple lab tests, (ii) the aggregate third-party payments or discounts for multiple lab tests, and (iii) the aggregate copays or deductibles or other payments billed directly to patients.

16. Patients are not informed by Quest what, if any, insurance discounts or insurance payments are being applied to each lab test, and what amounts patients are being required to pay as a copay or deductible for each lab test.

17. Nor does Quest inform patients (a) whether certain tests were disallowed by their insurer, or (b) that patients are being required by Quest to pay Quest's non-market based excessive "rack rates" for those tests, rather than negotiated fair market value rates for those disallowed tests. Further, Quest fails to disclose to patients the fair market value rates for those excluded tests negotiated at arm's-length with Benefit Plans.

18. Quest compounds its misconduct by turning invoices over to credit agencies for collection.

19.     This action seeks recovery by Plaintiffs on behalf of the Class of amounts paid by patients to Quest in excess of fair market value rates, and a declaration that Plaintiffs and members of the Class only owe Quest those amounts reflected by fair market value rates.  In the event there is no fair market value rate established for a particular Quest service by Class members' private or public insurers, Plaintiffs seek a declaration as to a reasonably comparable fair market value rate.  A fair market value rate for these purposes is defined as "the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts."  *See* IRS Publication 561.

20.     This action also seeks transparency in the manner in which Quest bills patients, and specifically requests an order directing Quest to bill patients on an individual test-by-test basis, rather than on an aggregate basis.

<u>JURISDICTION AND VENUE</u>

21.     Plaintiffs invoke the subject matter jurisdiction of this Court pursuant to 28 U.S.C. §1332(d), which confers original jurisdiction upon this Court over this class action based on diversity of citizenship: (a) there are 100 or more Class members; (b) the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; and (c) at least one Plaintiff and member of the Class is a citizen of a state different from the Defendant.

22.     This Court also has supplemental jurisdiction over Plaintiffs' state law and common law claims pursuant to U.S.C. §1367(a).

23.     This Court possesses personal jurisdiction over the Defendant based on Quest's residence, presence, transaction of business and contacts within this District.

24.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because Quest maintains its principal place of business in this District, and at all times conducted substantial

7

business in this District.

**PARTIES**

**Plaintiffs**

25.     Marvin D. Leslie is a citizen of the State of Texas.  He is proceeding on his claims against Quest individually and as assignee of the claims of his wife, Vicki Leslie.  At all times relevant hereto, Mr. and Mrs. Leslie maintained healthcare insurance through Aetna.

26.     Lawrence D. Catti is a citizen of the Commonwealth of Pennsylvania.  At all times relevant hereto, Mr. Catti maintained healthcare insurance through Aetna.

27.     Valerie J. Funari is a citizen of the State of Florida.  At all times relevant hereto, Ms. Funari maintained healthcare insurance through Medicare.

28.     Clyde Freeman is a citizen of the State of Colorado.  At all times relevant hereto, Ms. Freeman maintained healthcare insurance through Anthem Blue Cross Blue Shield.

29.     Jacob Chernov is a citizen of the State of Arizona.  At all times relevant hereto, Mr. Chernov maintained healthcare insurance through Medicare.

30.     Ling Gong is a citizen of the State of Michigan.  At all times relevant hereto, Mr. Gong maintained health insurance through Blue Cross Blue Shield of Michigan.

31.     Jill A. Roach is a citizen of the State of Maryland.  At all times relevant hereto, Ms. Roach was not insured.

32.     Arthur S. Goldsmith is a citizen of the State of Nevada.  At all times relevant hereto, Mr. Goldsmith maintained healthcare insurance through Medicare.

33.     Craig R. Dvorak is a citizen of the State of California.  At all times relevant hereto, Mr. Dvorak maintained healthcare insurance through Medicare, and Medigap insurance through HealthNet.

**Quest**

34.     Quest is a Delaware corporation with its principal place of business and headquarters located at Three Giralda Farms, Madison, NJ 07940.  Quest is the largest provider of diagnostic and clinical testing in the United States.  Quest owns and/or operates over 2000 patient service centers.  Quest's net revenue in 2015 was $7.5 billion.

35.     Quest is the parent company of numerous subsidiaries that provide laboratory testing, patient billing and related services.

## FACTUAL ALLEGATIONS

**Quest's Laboratory Testing Business**

36.     Quest is engaged in the business of providing laboratory testing services to or on behalf of individuals, doctors, hospitals, health insurers, and other health care facilities nationwide.  Quest is the industry leader in this field with operations in every major metropolitan city in the United States.  Quest serves "approximately one-third of the adult population of the United States annually, and approximately one-half of the adult population of the United States over a three-year period."  Quest 2015 Form 10-K ("10-K") at 5.

37.     Each lab test in the United States has a unique five-digit CPT code, commonly used for billing purposes.

38.     A large majority of the laboratory tests performed by Quest are completed on behalf of patients covered by Benefit Plans.  In accordance with those Benefit Plans, private health insurers, employee organizations and others sign agreements with Quest to provide laboratory testing and other health-related services to participants and beneficiaries of their Benefit Plans.  Quest also performs medical testing on patients covered by Medicare or Medicaid, federal and state governmental insurance programs designed to provide health

insurance to seniors, the disabled and the economically disadvantaged.

39.     As explained in Quest's Form 10-K (at 18), "[h]ealth plans and [independent physician associations] often require that diagnostic information services providers accept discounted fee structures…."

40.     The rates negotiated between Quest and Benefit Plans are fair market value rates – the price agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts.

41.     Nonetheless, Quest maintains rack fates for each laboratory test CPT code that are well beyond what Benefit Plans negotiate as fair market value rates.  Quest's rack rates are commercially unreasonable, and take advantage of Plaintiffs' and Class members' lack of information and bargaining power.

42.     To limit their own costs, Benefit Plans at times deny patients coverage of lab tests because, for example, the lab tests are either "experimental," "obsolete" or "not medically necessary."

43.     According to the 10-K (at page 32), "[g]overnment payers and third parties, including health plans, are taking steps to reduce utilization of, and reimbursement for, some new and innovative healthcare solutions, including new tests and other solutions that we may offer."

44.     When a patient lacks coverage or their insurer denies coverage, Quest insists that the patients pay the commercially unreasonable rack rates, rather than the negotiated or government-mandated fair market value rates.  For example, Plaintiffs' Quest invoices required payment of Quest's excessive rack rates, rather than the lower rates negotiated between Quest and Benefit Plans

45.     Quest has previously been charged with similar misconduct.  In 2011, Quest entered into a $241 million settlement to end a lawsuit by the State of California alleging that Quest had charged Medi-Cal, California's medical program for the poor, higher rates for diagnostic services than Quest had charged private insurers.

46.     Quest is also not willing to negotiate rates with Class members for lab tests that are not covered by insurance.  Instead, Quest mails multiple copies of invoices and threatening letters to patients over a period of months demanding payment, wrongly claiming delinquency, threatening to add the individuals to delinquency lists, threatening debt collection, and threatening legal action and liability for costs and expenses.

47.     Quest follows through on its threats to use outside debt collection agencies to collect and attempt to collect debts from individuals.  Worse still, Quest or the debt collectors often impose a "collection fee" or "assessment fee" of approximately $10 for each invoice when Quest employs the use of outside debt collectors.

48.     As a result of Quest's overbilling, Quest demands, attempts to collect and often receives payments from individuals far in excess of the reasonable fair market value of Quest's services.

49.     Under Medicare/Medicaid, outpatient clinical laboratory services are paid based on the CLFS (defined above).  In 2014, Congress passed the Protecting Access to Medicare Act ("PAMA"), which includes the most extensive reform of the CLFS since it was established in 1984.  Under PAMA, beginning in 2017, most rates for laboratory services on the CLFS will be derived using the weighted median private payer rates, net of discounts, rebates, coupons and other price concessions, which reflect the scope of prices paid across the laboratory industry (subject to certain phase-in limitations on test price reductions during the first several years of

implementation).  Quest is not obligated to participate in Medicare, and by doing so acknowledges that Medicare's reimbursement rates approximate fair market value.

50.    Quest also makes it as difficult as possible for patients to understand their bills. Quest aggregates all charges and insurance reductions and reimbursements, and identifies an aggregate balance that is due from the patient.  The patient cannot determine, based on the Quest invoice, whether the amounts due from the patient are co-pays, deductibles, or excessive charges based on tests that were disallowed by Benefit Plans.

51.    This is in direct contrast to Quest's representations in its Form 10-K (at 3, 4, 16, 20, 32, and 54) that it provides "transparency" to patients in billing.

52.    The New York Times' Tina Rosenberg criticized health providers' cryptic billing practices, pointing out that "[u]nlike everything else we buy, when we purchase a medical treatment, surgery or diagnostic test, we buy blind.  We do not know the cost of health procedures before we buy.  When we do get the bill, we have no idea what the charges are based on and have no way to evaluate them."  This ability to "hide the ball" has resulted in unfairly inflated rack rates, also referred to as "chargemaster prices" when discussing hospital services.  "Chargemaster prices are set by the hospital alone and reflect what the hospital would like you to pay.  They are the basis for calculating the discounts given to insurers, and they are generally what's billed to people without insurance.  These charges are commonly three times the Medicare price or more, but The Times reported that in the CMS [Centers for Medicare & Medicaid Services] data, some hospitals charged 10 or 20 times the Medicare price."  An example of the variation, "[t]he average charge for a joint replacement at a hospital in Ada, Okla., was $5,300.  The comparable charge in Monterey Park, Calif., was $223,000."[2]

---

[2]    Tina Rosenberg, *Revealing a Health Care Secret: The Price*, THE NEW YORK TIMES

53.    Finally, to ensure it receives payment, Quest at times insists patients provide credit or debit card information in advance of services, enabling Quest to charge patients for any outstanding balances remaining after an insurance claim has been processed, and leaving patients without any recourse with respect to excessive charges.

**Plaintiffs' Claims**

**Marvin D. Leslie**

54.    At all relevant times hereto, Plaintiff Marvin D. Leslie and Vicki Leslie maintained health insurance through Aetna.

55.    On November 15, 2013, Quest completed laboratory testing on blood drawn from Mr. and Mrs. Leslie. The blood had been drawn by the Leslie's physician.

56.    Quest conducted eight tests for Mr. Leslie and seven tests for Mrs. Leslie.  Seven of the tests conducted for Mr. Leslie and six of the tests for Mrs. Leslie were covered by Aetna as the Leslie's health insurer.  Quest, based on its stated rack rates, billed Mr. Leslie $494.36 for the seven tests covered by Aetna and billed Mrs. Leslie $351.59 for the six tests covered by Aetna.  Quest however discounted those rates by a combined total of $759.11 ($442.09 and $317.02, respectively), equivalent to approximately 89.7%.

57.    The 89.7% discount rate is consistent with the negotiated fair market value rates customarily negotiated between Quest and Benefit Plans.  These discounted rates are indicative of what constitutes fair market value.  As such, Quest's negotiated discount with Aetna reflected the reality that fair market value rates were substantially below Quest's rack rates.

58.    Aetna however denied coverage for the remaining test for each of Mr. and Mrs. Leslie (MTHFR CMN Variant, a genetic test with CPT code 81291), and Quest refused to

_____

(July 31, 2013).

discount its rack rate for that test ($328.85 each) to a fair market value for the service.

59.    Had Aetna covered the remaining tests, it would have reimbursed Quest substantially less than $328.85 for each of Mr. and Mrs. Leslie.  For example, under the 2014 CLFS (the first date that the data is available), Quest would have been reimbursed $59.55 by Medicare for the MTHFR genetic test.  Even under the 2017 CLFS, Quest would only have been reimbursed $59.88 for the MTHFR genetic test.

60.    Quest and the Leslies had not reached agreement in advance with respect to the fees to be charged for the one excluded test.  Rather, the Leslies reasonably assumed that, at worst, Quest would charge fair market value rates for any tests not covered by insurance.  No person would knowingly pay an excessive rate.

61.    The Leslies have been paying Quest $10 a month each, under protest, to defray the cost of that testing.

**Lawrence D. Catti**

62.    At all relevant times hereto, Plaintiff Lawrence D. Catti maintained health insurance through Aetna.

63.    Mr. Catti was prescribed by his physician to undergo a diagnostic Homocysteine test (CPT code 83090).  That test was conducted on January 7, 2017.  Quest billed Mr. Catti $218.48 for the Homocysteine test.

64.    Mr. Catti's insurer (Aetna Life Insurance Co.) denied coverage benefits in an EOB dated January 21, 2017, on grounds that Aetna considered the test "experimental or investigational."

65.    If Aetna had accepted coverage, it would have reimbursed Quest $15.02, and Mr. Catti would have had no copay.

66.     However, because Aetna denied coverage, Quest required Mr. Catti pay the full $218.48 – approximately 14.5 times the market rate negotiated between Aetna and Quest.

67.     Aetna also denied Mr. Catti coverage for two additional tests, a Lipoprotein BLD Quad Part test (CPT Code 83704) and a Lipoprotein (A) test (CPT Code 83695), both conducted on January 7, 2017.  Quest billed Mr. Catti $50 and $25 for these tests, respectively. This is well above the $28.10 and $11.53, respectively, that Aetna would have paid Quest if it were to have covered these tests.

68.     Quest and Mr. Catti had not reached agreement in advance with respect to the fees to be charged for the excluded tests.  Rather, Mr. Catti reasonably assumed that, at worst, Quest would charge fair market value rates for any tests not covered by insurance.  No person would knowingly pay an excessive rate.

**Valerie J. Funari**

69.     At all relevant times hereto, Plaintiff Valerie J. Funari maintained health insurance through Medicare.

70.     The Medicare laws and regulations provide health insurance to qualifying persons, primarily consisting of seniors over the age of 65 and the disabled.  Medicare Part A generally provides coverage for inpatient hospital expenses, while Medicare Part B typically covers outpatient health care expenses.

71.     Ms. Funari was prescribed by her physician to undergo diagnostic tests for a Thyroxine (Thyroid Chemical) Measurement test (CPT code 84439) and a Thyroid Stimulating Hormone test (Tsh) (CPT code 8443).  Those tests were conducted on September 19, 2016.

72.     Quest billed Ms. Funari $140.61 and $125.47, respectively, for those two tests.

73.     Medicare denied coverage for both tests.

74.     If Medicare had accepted coverage, it would have reimbursed Quest substantially less than the $266.08 billed to Ms. Funari.  For example, under the 2016 CLFS, Quest would have been reimbursed $12.28 for the Thyroxine (Thyroid Chemical) Measurement test, and $22.89 for the Tsh test.  However, because Aetna denied coverage, Quest insisted that Ms. Funari pay the full $266.08.

75.     Additionally, on February 14, 2017, Ms. Funari received an invoice from Quest for five lab tests performed on September 9, 2016.  The CPT codes for these five tests was 82465, 83718, 84478, 85025, and 80053.

76.     The aggregate rack rate of the five tests was $244.82.

77.     Coverage for all five tests was denied by Medicare.

78.     If Medicare had accepted coverage, it would have reimbursed Quest $49.89, or 20.38% of the aggregate rack rate ($244.82).  However, because Medicare denied coverage, Quest insisted that Ms. Funari pay the full $244.82.

79.     Quest and Ms. Funari had not reached agreement in advance with respect to the fees to be charged for the one excluded test.  Rather, Ms. Funari reasonably assumed that, at worst, Quest would charge fair market value rates for any tests not covered by insurance.  No person would knowingly pay an excessive rate.

**Clyde Freeman**

80.     At all relevant times hereto, Plaintiff Clyde Freeman maintained health insurance through Anthem Blue Cross and Blue Shield ("Anthem").

81.     Ms. Freeman was billed by Quest $1,236.59 and $567.19, for eleven separate diagnostic tests conducted on April 5, 2016.

82.     Quest refused to provide Ms. Freeman with any insurance discount because it

stated that Quest "is no longer contracted with Anthem…."

83.    If Quest had remained under contract with Anthem, Ms. Freeman would have been entitled to a substantial discount on Quest's stated rack rates.  For example, Quest billed Ms. Freeman $215.19 for a PTH (Parathyroid Hormone), Intact test (CPT code 83970).  Under the 2016 CLFS, Quest would have been reimbursed $56.23 for that test.  However, because Ms. Freeman had insurance coverage with Anthem, and Quest was no longer contracted with Anthem, Quest insisted that Ms. Freeman pay the full charge of $215.19 for the PTH test.

84.    Quest and Ms. Freeman had not reached agreement in advance with respect to the fees to be charged for any tests not covered by insurance.  Rather, Ms. Freeman reasonably assumed that, at worst, Quest would charge fair market value rates for any tests not covered by insurance.  No person would knowingly pay an excessive rate.

**Jacob Chernov**

85.    At all relevant times hereto, Plaintiff Jacob Chernov maintained health insurance through Medicare.

86.    Mr. Chernov was prescribed by his physician to have a Vitamin D 25 Hydroxy lab test (CPT code 82306) and a Glycosylated Hemoglobin (CPT code 83036) lab test performed.  Those tests were conducted on November 21, 2016.  Quest billed Mr. Chernov $150 for the Vitamin D test and $70.40 for the Hemoglobin test.

87.    Mr. Chernov's insurer (Medicare) denied coverage benefits in an EOB dated January 5, 2017.

88.    If Medicare had accepted coverage, it would have reimbursed Quest substantially less than the $220.40 billed to Mr. Chernov.

89.    For example, under the 2016 CLFS, the Vitamin D 25 Hydroxy test would only

have cost $31.54 through Medicare, not $150, and the Glycosylated Hemoglobin test would only have cost $13.22, not $70.40.

90.     However, because Medicare denied coverage, Quest insisted that Mr. Chernov pay the full $220.40.

91.     Quest and Mr. Chernov had not reached agreement in advance with respect to the fees to be charged for the excluded tests.  Rather, Mr. Chernov reasonably assumed that, at worst, Quest would charge fair market value rates for any tests not covered by insurance.  No person would knowingly pay an excessive rate.

**Ling Gong**

92.     At all relevant times hereto, Plaintiff Ling Gong and his spouse, Xin Tan, maintained health insurance through Blue Cross Blue Shield of Michigan ("BCBS of Michigan"), as sponsored by Ford Motor Company.

93.     On April 3, 2015, Mr. Gong was billed by Quest for two laboratory tests performed on his spouse on March 16, 2015.  The two lab tests totaled $227.24, $101.40 for a Pap smear (CPT code 88175) and $125.84 for an HPV test (CPT code 87624).

94.     The Pap smear was covered by BCBS of Michigan, and, as a result, the $101.40 rack-rate was discounted by $77.67, or 76.6%.  BCBS of Michigan paid only $23.73 for the Pap smear.

95.     BCBS of Michigan claimed in an EOB dated March 27, 2015, that the HPV test was "NOT A COVERED BENEFIT BASED ON THE REPORTED DIAGNOSIS."  As a result of BCBS of Michigan's denial of coverage, Quest required Mr. Gong to pay the entire $125.84 without any discount.

96.     Had BCBS of Michigan covered the lab test, the cost would have been

substantially less than the $125.84 Mr. Gong was required to pay.  For example, under the 2016 CLFS, the cost of an HPV test (CPT code 87624) would have been only $47.80, the national limit under Medicare.

97.     Quest had not reached agreement with either Mr. Gong or Mrs. Tan in advance with respect to the fees to be charged for the excluded test.  Rather, Mr. Gong and Mrs. Tan reasonably assumed that, at worst, Quest would charge fair market value rates for any tests not covered by insurance.  No person would knowingly pay an excessive rate.

**Jill A. Roach**

98.     At all relevant times hereto, Plaintiff Jill A. Roach did not have health insurance.

99.     On July 21, 2016, Ms. Roach was billed by Quest for eight lab tests conducted on her behalf on May 17, 2016, totaling $748.14.

100.     Because Ms. Roach was uninsured, Quest required she pay the entire amount for each test, offering no discount.  Indeed, Ms. Roach sought a discount by requesting financial assistance from Quest on two occasions.  However, on July 16, 2016, and August 5, 2016, Quest denied Ms. Roach's requests for financial assistance, advising her on both occasions that "[t]he amount due is your financial responsibility."

101.     Had any Benefit Plan been responsible for the charges, they would have paid substantially less than what Ms. Roach was being charged.  Indeed, had Ms. Roach been on Medicare, Quest would only have received a maximum of $123.23 for the lab services provided, which constitutes approximately 16% of the total bill amount.

102.     The line-by-line breakdown of the maximum Medicare payments for each of the tests performed by Quest on behalf of Ms. Roach, as compared to Quest's rack rates, is as follows:

| CPT Code | Test Description | Quest's Rack Rate | 2016 CLFS Maximum Payment Amount |
|---|---|---|---|
| 36415 | Venipuncture | $    19.62 | $        3.00 |
| 80053 | Comp Metabolic Panel W-O EGFR | $    84.22 | $      14.39 |
| 82105 | AFP, Tumor Marker, Serum | $  152.58 | $      22.85 |
| 82150 | Amylase, Serum | $    56.66 | $        8.83 |
| 82378 | CEA | $  158.49 | $      25.84 |
| 83690 | Lipase, Serum | $    70.96 | $        9.38 |
| 85025 | CBC (Includes Diff-PLT) | $    40.56 | $      10.59 |
| 86304 | CA 125 | $  165.05 | $      28.35 |
| | **TOTALS** | **$  748.14** | **$    123.23** |

103.    Although Quest would have received substantially less from any Benefit Plan, including Medicare, Ms. Roach is being forced to pay the full $748.14, the sum of egregious, artificially inflated rack rates.

104.    Quest had not reached agreement with Ms. Roach in advance with respect to the fees to be charged for the excluded tests.  Rather, Ms. Roach reasonably assumed that Quest would charge the fair market value rates for each test, similar to that which a Benefit Plan would be required to pay for the same or similar lab services.  No person would knowingly pay an excessive rate.

105.    Ms. Roach has been paying Quest $25 a month, under protest, to defray the cost of Quest's lab testing.

**Arthur Goldsmith**

106.    At all relevant times hereto, Plaintiff Arthur Goldsmith maintained health insurance through Medicare.

107.    Mr. Goldsmith had a Gonadotropin, Chorionic (Reproductive Hormone) Level test (CPT code 84702) completed by Quest on September 25, 2015.  Quest billed Mr. Goldsmith $136.82 for the test.

108.    Medicare, as Mr. Goldsmith's insurer, denied coverage benefits in a Claim Detail form processed on October 7, 2015.  If Medicare had accepted coverage, it would have reimbursed Quest substantially less than the $136.82 billed to Mr. Goldsmith.  In fact, under the 2016 CLFS, the Gonadotropin, Chorionic (Reproductive Hormone) Level test would only have cost Medicare $19.13 in Nevada, and would be subject to a maximum authorized payout of $20.51 in any State.  However, because Medicare denied coverage, Quest insisted that Mr. Goldsmith pay the full $136.82.

109.    Quest and Mr. Goldsmith had not reached agreement in advance with respect to the fees to be charged for the excluded test.  Rather, Mr. Goldsmith reasonably assumed that, at worst, Quest would charge fair market value rates for any tests not covered by insurance.  No person would knowingly pay an excessive rate.

**Craig R. Dvorak**

110.    Plaintiff Craig R. Dvorak had two allergy tests (both with CPT code 86003) completed by Quest on May 19, 2016.  Quest billed Mr. Dvorak $1,149.65 for the tests.

111.    Medicare, Mr. Dvorak's insurer, denied coverage benefits for the two allergy tests.  HealthNet, Mr. Dvorak's Medigap insurer, also denied coverage for both tests, as disclosed to Mr. Dvorak in an explanation of benefits for claims processed on June 22, 2016.  HealthNet did, however, cover two additional tests performed by Quest on May 19th that were listed as having an aggregate rack rate of $119.16.  Of the $119.16, HealthNet only paid Quest $24.92, or approximately 20.9% of the alleged rack rate.

112.    If Medicare had accepted coverage, it would have reimbursed Quest substantially less than the $1,149.65 billed to Mr. Dvorak.  Pursuant to the 2016 CLFS, the allergy tests (each with CPT code 86003) would only have cost Medicare $7.11 each, totaling $14.22.  However,

because Medicare denied coverage, Quest insisted that Mr. Dvorak pay the full $1,149.65.

113.    Quest and Mr. Dvorak had not reached agreement in advance with respect to the fees to be charged for the excluded tests.  Rather, Mr. Dvorak assumed that the tests were covered by insurance and that at worst, Quest would charge fair market value rates for those tests.  Mr. Dvorak would not knowingly pay an excessive rate.

114.    For each Plaintiff, besides Ms. Freeman and Ms. Roach, Quest billed them in the aggregate, without a breakdown of reimbursements from any Benefit Plan for each individual diagnostic test, although Quest was reimbursed by the Plaintiffs' respective Benefit Plans on an individual test-by-test basis.

**Other Complaints**

115.    Many consumers have voiced complaints in public forums about Quest similar to Plaintiffs' allegations:[3]

a.  G. of NV on April 15, 2014:

I had gone to my Primary Care doctor for a yearly type checkup. He ordered a number of blood tests to check and see if my medications were working properly. I was sent to their in-house lab, Quest Diagnostics. Prior to doing the tests, they demanded' that I sign a form stating that if the insurance company would not pay that I would be responsible. I thought that I had never had any difficulty with Medicare paying for blood tests, so I signed.  Well, I think they have a reason for having you sign this document up front. When bills are sent to Medicare, they adjust the amount downward typically so the patient isn't overcharged. Hmm.

Quest submitted the bill to Medicare using codes that did not match what the doctor had ordered and 95% of the items for routine blood tests were denied. Hmm. Quest rebilled me for over a thousand dollars at their full price amount. My question is do they do this on purpose? After emails and certified letters to Quest requesting their help in resolving the denial by Medicare, I received no correspondence, emails, phone call, etc. Just a new bill from a collection agency. Hmm. After reading a number of other posts regarding Quest that too seems to be their typical MO.

I guess I have no recourse except to take them to court. If anyone knows someone

---

[3]    Available at, https://www.consumeraffairs.com/health/quest_diagnostics.html.

to file a complaint with, please let me know. I recently went back to the same doctor and he needs additional blood work. I refused to go to Quest and requested an alternative. The doctor also was not that helpful in helping resolve the issue either. Hmm. Another possible question could be asked here. Does the doctor receive referral money back from Quest? I'm irritated as hell and don't need this aggravation.

b. P. of FL on Aug. 8, 2014:

When checking in for blood work, a Quest Diagnostics Rep will take your driver's license and insurance card. The customer will assume by this action, that they are validating your request. Not the case. We received a bill for nearly $4,000 in blood work (which in of itself is insane) as our United Health Care Insurance does not cover Quest (they do not cover them as they charge twice as much for the same test as other labs). If the Quest Rep had told us that they did not take our insurance, my husband would have gone to LabCorp which takes United Health Care to have his blood drawn. After looking at all the others that this has happened to, it appears to be something Quest does intentionally and requires a class action suit!

c. R. of FL on Dec. 9, 2014:

Opened a letter today stating it was a 3rd notice and is seriously late from Quest Diagnostics. It is a bill for the amount of $1,462.08 for lab work that was denied by my insurance, and not authorized by me either. I still don't even know what the charges are actually for and have not seen any bill previous to this or had any contact with Quest regarding this. The bill is dated for July 14, 2014 by a doctor who is not even practicing anymore.

After contacting Blue Cross/Blue Shield they suggest I submit an appeal along with all documentation stating the lab work was medically necessary, I was also told that the lab work would have needed their prior approval to be covered in the first place, basically, the lab work was not authorized by the insurance company or myself. This seems like some kind of fraudulent scam of billing for service not rendered and hoping the patient will pay just due to the confusing terms on the statements, in any account, due to the amount it will need to be handled by a lawyer, possibly looking into a class action suit due to other patients I have heard complaining of the same issue with Quest Diagnostics and the invisible doctor.

Updated on 12/26/2014:

AN UPDATE TO: R. of FL on Dec. 9, 2014 post - After repeatedly trying to contact Quest Diagnostics billing department by phone and email I received the following response: "Dear Mr. **, Unfortunately we are not able to discuss the testing ordered for you. Please contact a doctor's office with any further questions about the tests performed." I already told them that the doctor closed/sold his practice during the one month period that I gave a urine sample and my follow-up so I could get my prescriptions filled. He's gone, I never even got the results, had to submit to another

lab test to Logan Labs. HOW AM I SUPPOSE TO DISCUSS THE TESTING
THEY SUPPOSEDLY PERFORMED WITH A DOCTOR WHO HAS PACKED
UP AND LEFT TOWN - QUEST DIAGNOSTICS LABS ARE CROOKS!!!!

    d.  B. of NY on Jan. 9, 2015:

Went to get blood work for daughter as though she may have genetic abnormality.
Referred by our geneticist. Aetna denied the bill ($3,000). Said it was experimental.
I tried call[ing] Quest to work out a lower fee. I can't afford $3,000. The Aetna rate
would have been only $375. Neither doctor nor Quest sought prior approval from
Aetna. I can't believe I'm the first person to have Aetna and this insurance and they
knew it was going to happen. No one seems to have authority to help me. Now it is
in collections.

    e.  K. of SC on April 3, 2015:

I had my labs drawn at Any lab Test Now for the advertised price of $99 for the set
of thyroid labs I needed to have drawn. They asked if I had a doctor's order and
insurance so I gave my information believing the price would be the same. When I
got the bill from Quest, for the exact same labs, the price was $483.00 not covered
by insurance. I repeatedly requested that they adjust the price to the advertised price
and pointed out that their price exceeds other labs by hundreds of dollars. Not only
were they unwilling to adjust my bill, but responded in a rote, unconcerned and
inappropriate manner. ** responded several times telling me to take it up with my
insurance company, even though my insurer had nothing to do with the billing
discrepancy. Reasonable requests are categorically dismissed. What recourse is
there for the consumer? I intend to find out.

    f.  D. of GA on April 8, 2015:

I had genetic testing done during my pregnancy, ordered by my doctor. The doctor
ordered 19 tests. The phlebotomists at Quest Diagnostics were clueless as to what
codes to put in the system since they were not familiar with the tests and put in
some extra tests. This resulted in Quest ordering the wrong test, particularly test
code 81223, Cystic Fibrosis Full Sequence, which was NOT ordered by my
OBGYN and my insurance company AETNA denies and for which Quest charges
me $3,380.

After numerous calls to Quest to review their order when compared to my doctor's
order and fix the bill, no one knows what to do and one rep even told me that this
can't be done and I should just pay. Every reputable company has a way for the
consumer to appeal charges if he/she believes they're wrong or a result of a mistake.
Quest conveniently doesn't have that process in place and forces people to just pay
for their mistakes. Now I have engaged my doctor in trying to reach Quest as well
and appeal the charge because it was NOT what he ordered. But even he admitted
that it would be hard to get to the person at Quest who makes the decisions.  So
unfair and has caused my family so much worry in a time when we're supposed to

be happy expecting our child.

g.  M. of VA on Oct. 22, 2015:

*Satisfaction Rating*

I don't normally vent online, but I cannot comprehend how 3 lab tests that my Doctor ordered, billed to a code, my insurance company would not accept, will cost us over $1,000 from Quest Diagnostics. But had they been billed to a code accepted by our insurance company would have only cost the insurance company $166 (covered 100%). I cannot wrap my head around the discrepancy. Even the employees cannot provide a reasonable explanation.

h.  J. of GA on Oct. 29, 2015:

I received a totally unexpected bill for $218.48 from Quest in mid-August for a homocysteine test my doctor had ordered. Since I had this test at least twice before which was covered by Blue Cross HMO before I changed to Aetna, I was surprised that Aetna Medicare Advantage did not pay for it.  I called Aetna and they referred me to their website which outlines their reasons for denial of coverage of the homocysteine test.  Of course I strongly disagree with their (supposedly) science-based analysis of the merit of the homocysteine test for cardiovascular risk (and assume my doctor did also, since he ordered the test), but was helpless to change their denial of coverage in my case.

I was prepared to pay the Quest Lab bill ($218.48) for the homocysteine test until I called a local lab (Any Lab Test) and found that they only charge $89.00 for the test.  Then I checked lef.org and found the homocysteine test offered for $64.00. I then called Quest and spoke to a lady named Juanida, who told me she would research whether or not the bill could be adjusted and get back to me.  During the conversation with Juanida I emphasized the fact that the Quest bill was at least twice to three times the amount the other labs were charging for the same test. I also was very upset that I had no bargaining power at all.  I had no prior opportunity to bargain for a better price. Quest simply dictated the amount they wanted me to pay, and I had no input whatsoever about the amount. I had to pay it -- or else.

I can't think of a similar situation -- outside of healthcare billing -- where the customer is ordered to pay for an item or service without having any say at all in the price, and no ability to shop around for a better bargain. Since I didn't hear back from her over a couple of weeks, I called again on 9/21 and she said that she was hopeful, and in fact, fairly sure, the bill could be reduced, and would call me back when she got an answer.  She did not call me back, so I called her at least twice more over a period of a couple of weeks, leaving messages. Still no response.

I am extremely angry.  It is not just a matter of being billed too high a price for a service I never contracted for with Quest Labs either directly or indirectly. It is my realization that we patients as consumers have no bargaining power in the U.S. medical care system and are basically helpless.  And indeed, this whole scenario of

my dealings with Aetna and Quest seems to me symptomatic of what's wrong with healthcare in the U.S., which has degenerated into a greedy free-for-all-money-grubbing battle among insurance companies, pharmacies, laboratories, doctors, hospitals, corporate controlled medicine and big pharma for financial advantage and huge corporate profits, with patients best interests not even on the radar.

i.   M. of IL on February 26, 2016:

I am still seething after settling a blood test bill with Quest Diagnostics. What a ripoff! I have had the exact same blood work for my physical for the past 2 years. For both years the same exact amount of $674.22 was invoiced. A year ago the claim was paid by Blue Cross and Quest was paid a total amount of $76.00 as full settlement. This year Medicare only paid $42 and didn't approve all of the blood work. As a result, Quest demanded that I personally pay $358.65 or suffer the wrath of collections. They refused to accept any less. You tell me why Quest believes it's OK to charge 5 times as much just because I'm paying them instead of the insurance company. I'm counting this expense as the cost of education. Lesson learned - I'll never use Quest again. Beware my friends...

j.   S. of IN  on March 14, 2016:

Even though I got my lab work drawn in an in-network lab in my own hometown, Quest continues to bill the state of the ordering physician which is NOT in network, resulting in a $5000 bill as opposed to the $75 bill it would be if it was in-network and billed as it should be. Caution with any use of Quest labs and get it in WRITING that you will be billed as an in-network draw, regardless of how sure you are that you are doing everything correctly. Ridiculous markup on lab fees versus the discounts given to insurance companies.

k.   P. of NM on August 15, 2016:

Lab test were considered needed by my doctor, but not covered by Medicare because the incorrect code was used by Quest. Hours on the phone with my doctor's assistant who reportedly informed Quest of the proper code. No luck. They refused to change code, which if they would have been reimbursed by Medicare (a fraction of what they had charged). Out of desperation I offered to pay Quest what they would have received from Medicare. "No, they do not bargain with clients." Their charge was $194, which I decided to simply pay and get them out of my life. Tried to pay using my Visa with their online service. Wanted a zip code, but my zip code was "not valid"? Tried to call them. Estimated wait, 55 minutes!

l.   K. of FL on January 17, 2017:

I give one star because I can't put 0.  This is the worst lab, stay away.  I just got a bill of [$]1400 for a genetic pre-natal test that my insurance doesn't cover.  I did some research and my insurance compa[ny] would [have] paid less than [$]300 dollars.  Why Quest Diagnostics can give us the same price, obviously 300 is

26

enough.  This is very unfair and dishonest.  When I call them they treat me like an idiot.  When I ask about the differences about this price and the one they would get from any insurance company, they just said "well this is the test price."   Go somewhere else to do your test or at least be sure it is cover[ed] before so you can negotiate the price.  They are doing more than [$]1100 taking advantage of a pregnant woman.  They just have no ethic.

116.    The following was posted on a different website by "COD" at 6:56 PM on June

25, 2013:

We got a lab bill yesterday. $700 retail. $90 at our insurance company's contracted price. So definitely make sure you are getting the contract price.[4]

117.    A similar complaint was filed with the Better Business Bureau:

Poor customer services & inequitable billing practices. After inquiring by phone without satisfaction, we've attempted to contact Quest through their on-line feedback service -- these questions have not been responded to. We have been billed for a blood test at a rate of $1061.81, where the insured bill rate for the same test is $166. Unfortunately, though the medical specialist who requested the test insisted it was medically required, our insurance (AETNA) declined the claim, therefore leaving us to pay direct. This in and of itself would have been fine - - however, Quest is charging us as in an uninsured capacity at 6.4 times the amount. Completely unacceptable. I require a satisfactory response, and have not obtained this. [Roland, 11/23/2015][5]

## **CLASS ACTION ALLEGATIONS**

118.    Plaintiffs bring this action on behalf of themselves and on behalf of the national

Class, defined above as all persons who were charged fees for services by Quest that were in

excess of the negotiated or mandated fair market value rates established for those services

between Quest and private or public insurers.  In the event there is no fair market value rate

established for a particular Quest service by Class members' private or public insurers,

Plaintiffs seek a declaration as to a reasonably comparable fair market value rate.  A fair market

---

[4]        Available at, http://ask.metafilter.com/243590/Insurance-company-denied-coverage-for-1300-blood-work-what-now.

[5]        Available at, https://www.bbb.org/new-jersey/business-reviews/laboratories-medical/quest-diagnostics-in-madison-nj-90010452/reviews-and-complaints.

value rate for these purposes is defined as "the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts." *See* IRS Publication 561. Excluded from the Class is Quest, its parents, subsidiaries, officers, directors, employees, partners, and co-ventures.

119.    Plaintiffs also brings this action on behalf of the following Sub-Classes:

a.   All persons residing in the State of Florida who were charged fees for services by Quest that were in excess of the negotiated or mandated fair market value rates established for those services between Quest and private or public insurers (the "Florida Sub-Class");

b.   All persons residing in the Commonwealth of Pennsylvania who were charged fees for services by Quest that were in excess of the negotiated or mandated fair market value rates established for those services between Quest and private or public insurers (the "Pennsylvania Sub-Class");

c.   All persons residing in the State of Colorado who were charged fees for services by Quest that were in excess of the negotiated or mandated fair market value rates established for those services between Quest and private or public insurers (the "Colorado Sub-Class");

d.   All persons residing in the State of Arizona who were charged fees for services by Quest that were in excess of the negotiated or mandated fair market value rates established for those services between Quest and private or public insurers (the "Arizona Sub-Class");

e.   All persons residing in the State of Michigan who were charged fees for services by Quest that were in excess of the negotiated or mandated fair market value

rates established for those services between Quest and private or public insurers (the "Michigan Sub-Class");

f.   All persons residing in the State of Maryland who were charged fees for services by Quest that were in excess of the negotiated or mandated fair market value rates established for those services between Quest and private or public insurers (the "Maryland Sub-Class");

g.   All persons residing in the State of Nevada who were charged fees for services by Quest that were in excess of the negotiated or mandated fair market value rates established for those services between Quest and private or public insurers (the "Nevada Sub-Class"); and

h.   All persons residing in the State of California who were charged fees for services by Quest that were in excess of the negotiated or mandated fair market value rates established for those services between Quest and private or public insurers (the "California Sub-Class").

120.   This action is brought as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, sub-sections 23(a) and 23(b)(2) and/or (b)(3).  The Class and Sub-Classes (collectively, the "Class") satisfy the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

121.   The members of the Class are so numerous that joinder of all Class members is impracticable.  While the exact number of Class members can be determined only by appropriate discovery, Plaintiffs believe that there are thousands of Class members residing throughout the United States.  Quest claims to have performed over 100 million laboratory tests in 2015 alone.

122.    Because of the geographic dispersion of Class members, there is judicial economy arising from the avoidance of a multiplicity of actions in trying this matter as a class action.

123.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs have no interests that are adverse or antagonistic to those of the Class.  Plaintiffs' interests are to obtain relief for themselves and the Class for the harm arising out of the violations of law set forth herein.

124.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in complex and consumer class action litigation.

125.    A class action is superior to all other methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by the members of the Class may be relatively small, the expense and burden of individual litigation make it virtually impossible for Plaintiffs and members of the Class to individually seek redress for the wrongful conduct alleged.

126.    In addition, as alleged herein, Quest has acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

127.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.    Whether Quest violated the New Jersey Consumer Fraud Act, Florida Deceptive and Unfair Trade Practices Act, Colorado Consumer Protection Act,

Pennsylvania Unfair Trade Practices and Consumer Protection Law, Arizona Consumer Fraud Statute, Michigan Consumer Protection Act, Maryland Consumer Protection Act, Nevada Deceptive Trade Practices Act, California Consumers Legal Remedies Act, and California Unfair Competition Law;

b.   Whether Quest breached its contractual obligations to Plaintiffs and the Class;

c.   Whether the amount Quest is entitled to charge patients is equivalent to the fair market value of its services;

d.   Whether Quest billed Plaintiffs and members of the Class amounts in excess of the fair market value of its services;

e.   Whether Quest deceived Plaintiffs and members of the Class by billing for services at excessive rates, without disclosing that it had agreed with Benefit Plans to accept rates that reflect the fair market value of its services;

f.   The proper measure of damages to be paid to Plaintiffs and the Class;

g.   Whether Plaintiffs and the Class are entitled to injunctive or other equitable relief to remedy Quest's continuing violations of law as alleged herein; and

h.   Whether Quest has been unjustly enriched by its inequitable and unlawful conduct, and if so, whether Quest should be forced to disgorge inequitably obtained revenues or provide restitution.

128.   The Class is readily definable, and prosecution of this action and a class action will reduce the possibility of repetitious litigation.

129.   Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

130.    Reliance among Class members may be assumed because no one would knowingly pay an excessive rate.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

131.    Quest has engaged in fraudulent, misleading and deceptive efforts to conceal the true nature of its unlawful conduct from Plaintiffs and the Class.  Quest intended to and has in fact accomplished its concealment by its active misrepresentations and omissions, as described herein.

132.    Specifically, Quest mails invoices to patients that groups all lab work charges together, and only identifies the aggregate insurance discounts and Benefit Plan payments. Quest fails to inform patients of the specific instances where a Benefit Plan denies coverage. Patients are also not provided with the discounts negotiated by the Benefit Plans when paying on their own behalf.

133.    Due to Quest's fraudulent concealment, many Plaintiffs have only recently learned of the existences of their claims against Quest.

134.    Plaintiffs' lack of knowledge as to their claims against Quest were not due to any fault or lack of diligence on their part, but rather due entirely or substantially to Quest's acts designed to conceal and hide the true and complete nature of its unlawful and inequitable conduct.

## COUNT I
### Violations of the New Jersey Consumer Fraud Act,
### N.J. Stat. Ann. §56:8-1, *et seq.*
### (On behalf of Plaintiffs and the Class)

135.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

136.    Quest is a "person" as defined in the New Jersey Consumer Fraud Act

("NJCFA").  N.J.S.A. §56:8-1(d).

137.    The NJCFA states in pertinent part:

> The act, use or employment by any person of any unconscionable
> commercial practice, deception, fraud, false pretense, false
> promise, misrepresentation, or the knowing, concealment,
> suppression, or omission of any material fact with intent that others
> rely upon such concealment, suppression or omission, in
> connection with the sale or advertisement of any merchandise or
> real estate, or with the subsequent performance of such person as
> aforesaid, whether or not any person has in fact been misled,
> deceived or damaged thereby, is declared to be an unlawful
> practice; provided, however, that nothing herein contained shall
> apply to the owner or publisher of newspapers, magazines,
> publications or printed matter wherein such advertisement appears,
> or should the owner or operator of a radio or television station
> which disseminates such advertisement when the owner, publisher,
> or operator has no knowledge of the intent, design or purpose of the
> advertiser.

N.J.S.A. §56:8-2.

138.    As alleged herein and above, Quest has engaged in unconscionable commercial

practices, deception, and fraud in connection with its improper billing and debt collection for

laboratory testing and other services, including their practices of overbilling individual

consumers.  These acts and practices violate the NJCFA.

139.    Plaintiffs have been and continue to be injured as a direct and proximate result of

Quest's violations of the NJCFA.

140.    Plaintiffs and the other members of the nationwide Class either (i) paid Quest's

bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid

Quest's bill in reliance on a presumption that Quest had billed them the commercially

reasonable fair market value.  No person would have knowingly paid an excessive rate.

141.    Plaintiffs are entitled to pursue a claim against Quest pursuant to N.J.S.A.

§§56:8-2.11, 56:8-2.12 and/or 56:8-19 for damages, treble damages, equitable relief, and

attorney's fees and costs to remedy Quest's violations of the NJCFA.

## COUNT II
### Violations of the Florida Deceptive and Unfair Trade Practices Act,
### Fla. Stat. Ann. §§501.201, *et seq.*
### (On behalf of Plaintiff Funari and the Florida Sub-Class)

142.    Plaintiff Valerie J. Funari herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

143.    Quest's lab services constitute "trade or commerce" as defined in Fla. Stat. Ann. §501.203(8).

144.    The Florida Deceptive and Unfair Trade Practices Act ("DUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. Ann. §501.204(1).

145.    As alleged herein and above, Quest has engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers.  These acts and practices violate the DUTPA.

146.    Ms. Funari and the other members of the Florida Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the DUTPA.

147.    Ms. Funari and the other members of the Florida Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value.  No person would have knowingly paid an excessive rate.

148.    Ms. Funari is entitled to pursue a claim on behalf of the Florida Sub-Class against Quest pursuant to Fla. Stat. Ann. §§501.2105 and 501.211 for damages, equitable relief,

and attorney's fees and costs to remedy Quest's violations of the DUTPA.

## COUNT III
### Violations of the Colorado Consumer Protection Act
### Colo. Rev. Stat. §§6-1-101 *et seq.*
### (On behalf of Plaintiff Freeman and the Colorado Sub-Class)

149.    Plaintiff Freeman herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

150.    Quest is a "person" as defined in the Colorado Consumer Protection Act ("CCPA").  Colo. Rev. Stat. §6-1-102(6).

151.    Colo. Rev. Stat. §6-1-105 states in pertinent part:

(1)  A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person:

*        *        *

(l)  Makes false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions;

*        *        *

(u)    Fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction

*        *        *

(3)  The deceptive trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state.

152.    As alleged herein and above, Quest has engaged in a deceptive trade practice in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers.  These acts and practices violated the CCPA.

153.    Ms. Freeman and the other members of the Colorado Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the CCPA.

154.    Ms. Freeman and the other members of the Colorado Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value.  No person would have knowingly paid an excessive rate.

155.    Plaintiff Freeman is entitled to pursue a claim on behalf of the class against Quest under Colo. Rev. Stat. §6-1-113 for equitable relief to remedy Quest's violations of the CCPA.

### COUNT IV
**Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, Pa. Stat. Ann. Tit. 73, §§201-1,** *et seq.*
**(On behalf of Plaintiff Catti and the Pennsylvania Sub-Class)**

156.    Plaintiff Lawrence D. Catti herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

157.    Quest is a "person" as defined in the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL").  Pa. Stat. Ann. §201-2(2).

158.    Quest's lab services constitute "trade" or "commerce" as defined in Pa. Stat. Ann. §201-2(3).

159.    The UTPCPL declares unlawful any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," which includes, among others, "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" and "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  Pa. Stat. Ann. §§201-3, 201-2(4)(xi) and (xxi).

160.    As alleged herein and above, Quest has engaged in unfair methods of competition and unfair or deceptive acts or practices in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers.  These acts and practices violate the UTPCPL.

161.    Mr. Catti and the other members of the Pennsylvania Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the UTPCPL.

162.    Mr. Catti and the other members of the Pennsylvania Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value.  No person would have knowingly paid an excessive rate.

163.    Mr. Catti is entitled to pursue a claim on behalf of the Pennsylvania Sub-Class against Quest pursuant to Pa. Stat. Ann. §201-9.2 for damages, treble damages, equitable relief, and attorney's fees and costs to remedy Quest's violations of the UTPCPL.

### COUNT V
### Violations of the Arizona Consumer Fraud Statute,
### A.R.S. §§44-1521, *et seq.*
### (On behalf of Plaintiff Chernov and the Arizona Sub-Class)

164.    Plaintiff Jacob Chernov herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

165.    Quest is a "person" as defined in A.R.S. §44-1521.

166.    The lab services performed by Quest constitute "merchandise" as defined in A.R.S. §44-1521.

167.    A.R.S. §44-1522 states in pertinent part:

A.  The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such

concealment, suppression or omission, in connection with the sale
or advertisement of any merchandise whether or not any person has
in fact been misled, deceived or damaged thereby, is declared to be
an unlawful practice.

168.     As alleged herein and above, Quest has engaged in a deceptive or unfair act or

practice, fraud, concealment, suppression or omission of material facts with intent that others

rely on such concealment, suppression or omission in connection with its improper billing and

debt collection for laboratory testing and other services, including their practices of overbilling

individual consumers.  These acts and practices violate A.R.S. §44-1522.

169.     Mr. Chernov and the other members of the Arizona Sub-Class have been and

continue to be injured as a direct and proximate result of Quest's violations of A.R.S. §44-1522.

170.     Mr. Chernov and the other members of the Arizona Sub-Class either (i) paid

Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii)

paid Quest's bill in reliance on a presumption that Quest had billed them the commercially

reasonable fair market value.  No person would have knowingly paid an excessive rate.

171.     Pursuant to the Arizona Supreme Court, A.R.S. §44-1522 provides injured

consumers with an implied private right of action against any violator of the Consumer Fraud

Act.

172.     Mr. Chernov is entitled to pursue a claim on behalf of the Arizona Sub-Class

against Quest under A.R.S. §§44-1528, 44-1531, 44-1533, and/or 44-1534 for damages,

restitution, equitable relief, and attorney's fees and costs to remedy Quest's violations of A.R.S.

§44-1522.

## COUNT VI
### Violations of the Michigan Consumer Protection Act,
### Mich. Comp. Laws Ann. §§445.901, *et seq.*
### (On behalf of Plaintiff Gong and the Michigan Sub-Class)

173.     Plaintiff Ling Gong herein repeats and realleges each of the allegations set forth

in the foregoing paragraphs as if fully set forth herein.

174.    Quest is a "person" as defined in the Michigan Consumer Protection Act ("MCPA").  Mich. Comp. Laws Ann. §445.902(d).

175.    Quest's lab services constitute "trade or commerce" as defined in Mich. Comp. Laws Ann. §445.902(g).

176.    The MCPA prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," which includes, among others, "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions," "[c]harging the consumer a price that is grossly in excess of the price at which similar property or services are sold," and "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."  Mich. Comp. Laws Ann. §445.903(1).

177.    As alleged herein and above, Quest has engaged in an unfair, unconscionable, or deceptive method, act, or practice in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers.  These acts and practices violate the MCPA.

178.    Mr. Gong and the other members of the Michigan Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the MCPA.

179.    Mr. Gong and the other members of the Michigan Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value.  No person would have knowingly paid an excessive rate.

180.    Mr. Gong is entitled to pursue a claim on behalf of the Michigan Sub-Class

against Quest under Mich. Comp. Laws Ann. §445.911(3) for damages, equitable relief, and attorney's fees and costs to remedy Quest's violations of the MCPA.

**COUNT VII**
**Violations of the Maryland Consumer Protection Act,**
**Md. Code Ann., Com. Law §§13-101, *et seq.***
**(On behalf of Plaintiff Roach and the Maryland Sub-Class)**

181.    Plaintiff Jill A. Roach herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

182.    Quest is a "person" as defined in the Maryland Consumer Protection Act ("Md. CPA").  Md. Code Ann., Com. Law §13-101(h).

183.    The Md. CPA prohibits "any unfair or deceptive trade practice," which includes "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers," "[f]ailure to state a material fact if the failure deceives or tends to deceive," and "[f]alse or misleading representation of fact which concerns…[t]he reason for the existence or amount of a price reduction."  Md. Code Ann., Com. Law §§13-301, 303.

184.    As alleged herein and above, Quest has engaged in an unfair or deceptive trade practice in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers.  These acts and practices violate the Md. CPA.

185.    Ms. Roach and the other members of the Maryland Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the Md. CPA.

186.    Ms. Roach and the other members of the Maryland Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially

reasonable fair market value.  No person would have knowingly paid an excessive rate.

187.    Ms. Roach is entitled to pursue a claim on behalf of the Maryland Sub-Class against Quest under Md. Code Ann., Com. Law §13-408 for damages and attorney's fees and costs to remedy Quest's violations of the Md. CPA.

**COUNT VIII**
**Violations of the Nevada Deceptive Trade Practices Act,**
**Nev. Rev. Stat. §§598.0903, *et seq.***
**(On behalf of Plaintiff Goldsmith and the Nevada Sub-Class)**

188.    Plaintiff Arthur S. Goldsmith herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

189.    The Nevada Deceptive Trade Practices Act ("NDTPA") prohibits deceptive trade practices, which include "[m]ak[ing] false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of or amounts of price reductions" and "[k]nowingly makes any other false representation in a transaction."  Nev. Rev. Stat. §§41.600 & 598.0915.

190.    As alleged herein and above, Quest has engaged in an unfair or deceptive trade practice in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers.  These acts and practices violate the NDTPA.

191.    Mr. Goldsmith and the other members of the Nevada Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the NDTPA.

192.    Mr. Goldsmith and the other members of the Nevada Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value.  No person would have knowingly paid an excessive rate.

193.    Mr. Goldsmith is entitled to pursue a claim on behalf of the Nevada Sub-Class against Quest under Nev. Rev. Stat. §41.600 for damages, equitably relief, and attorney's fees and costs to remedy Quest's violations of the NDTPA.

**COUNT IX**
**Violations of the California Consumers Legal Remedies Act,**
**Cal. Civ. Code §§ 1750, *et seq*.**
**(On behalf of Plaintiff Dvorak and the California Sub-Class)**

194.    Plaintiff Dvorak herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

195.    Quest is a "person" as defined in Cal. Civ. Code § 1761(c).

196.    Quest's laboratory testing services constitute "services" under Cal. Civ. Code § 1761(b).

197.    The California Consumers Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in … services to any consumer," which occurs when, among other instances, a person is "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions" or "[i]nserting an unconscionable provision in the contract."  Cal. Civ. Code § 1770(a).

198.    As alleged herein, Quest has engaged in unfair or deceptive acts or practices in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers.  These acts and practices violate the CLRA.

199.    Plaintiff Dvorak and the other members of the California Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the CLRA.

200.    Plaintiff Dvorak and the other members of the California Sub-Class either (i) paid

42

Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value rate.  No person would have knowingly paid an excessive rate.

201.    Plaintiff Dvorak is entitled to pursue a claim against Quest on behalf of the California Sub-Class to enjoin Quest from continuing its unfair or deceptive acts or practices under Cal. Civ. Code § 1781 and § 1780, as well as to pursue costs and attorney's fees for bringing this action to remedy Quest's violations of the CLRA pursuant to § 1780(e).

202.    This claim is brought for the purposes of obtaining injunctive relief.

**COUNT X**
**Violations of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200,** *et seq.*
**(On behalf of Plaintiff Dvorak and the California Sub-Class)**

203.    Plaintiff Dvorak herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

204.    Quest is a "person" as defined in Cal. Bus. & Prof. Code § 17201.

205.    Under the California Unfair Competition Law ("UCL"), "unfair competition" is defined broadly to mean and include "any unlawful, unfair or fraudulent business act or practice…."  Cal. Bus. & Prof. Code § 17200.

206.    As alleged herein, Quest has engaged in unlawful, unfair or fraudulent business acts or practices in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers.  These acts and practices violate the UCL.

207.    Plaintiff Dvorak and the other members of the California Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the UCL.

208.    Plaintiff Dvorak and the other members of the California Sub-Class either (i) paid

Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value rate. No person would have knowingly paid an excessive rate.

209.    Plaintiff Dvorak is entitled to pursue a claim against Quest on behalf of the California Sub-Class pursuant to Cal. Bus. Prof. Code §§ 17203, 17204, 17205, and/or 17206 for damages, restitution, and equitable relief to remedy Quest's violations of the UCL, and to move under Cal. Code Civ. Proc. § 1021.5 for costs and attorney's fees for any significant benefit conferred upon the general public or a large class of persons in relation to enjoining Quest from continuing to violate the UCL.

### COUNT XI
### Breach of Contract
### (On behalf of the Class)

210.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

211.    Quest provided services to Plaintiffs and other members of the nationwide Class pursuant to an implied contract that Quest would bill Plaintiffs (if their claims were disallowed by insurance) for the reasonable fair market value of Quest's services (*quantum meruit*).

212.    Quest violated the terms of that implied contract by billing Plaintiffs and other members of the nationwide Class at excessive rates that were not based on negotiated fair market rates agreed to between Quest and Benefit Plans, or otherwise applicable to Plaintiffs and the nationwide Class.

213.    The covenant of good faith and fair dealing is an implied term in all contracts.

214.    Quest, in violation of the covenant of good faith and fair dealing, charged Plaintiffs and members of the nationwide Class excessive rack rates and failed to inform them

of the negotiated fair market value rates agreed to between Quest and Benefit Plans.

215.    By virtue of Quest's wrongful conduct, Plaintiff and the members of the nationwide Class sustained money damages.

## COUNT XII
### Common Law Unjust Enrichment
### (On behalf of the Class)

216.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

217.    As alleged herein, Quest has unjustly benefitted from its unlawful and inequitable acts resulting in monetary payments by individuals and similarly situated nationwide Class members.

218.    Quest has and is continuing to derive profits and revenues resulting from its false, misleading, deceptive, unfair, inequitable and unconscionable conduct.

219.    It would be inequitable for Quest to be permitted to retain any of the proceeds derived as a result of its unlawful conduct.

220.    Quest should be compelled to provide restitution and to disgorge all proceeds received by Quest from Plaintiffs and/or the nationwide Class as a result any unlawful or inequitable act described in this Complaint, which has inured and continues to inure to the unjust enrichment of Quest, into a common fund or constructive trust for the benefit of Plaintiffs and the nationwide Class.

221.    Quest should also be enjoined from continuing to engage in any unlawful or inequitable methods, acts and/or practices alleged in this Complaint.

222.    Plaintiffs and the nationwide Class have no adequate remedy at law for their irreparable injuries caused by Quest's inequitable conduct.

## COUNT XIII
### Common Law Fraud
### (On behalf of the Class)

223.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

224.    As alleged herein, Quest intentionally, knowingly, willfully and recklessly charged and collected fees for laboratory tests and other services in excess of fair market value rates.

225.    On its invoices, Quest does not identify claims that are rejected by Benefit Plans, the amount Benefit Plans pay for individual lab tests, what portion of the charged amounts patients are paying for individual lab tests (whether some or all), and what amount the Benefit Plan would pay for lab tests had it not rejected the claim.

226.    Quest misused its position of superior knowledge and financial strength to defraud and induce consumers into paying fees and costs Quest knew were not owed.

227.    Plaintiffs and the other members of the nationwide Class paid these fees in reliance upon the various statements, representations, and omissions of material fact made by Quest. Those statements, representations, and omissions were made for the purpose of inducing reliance thereon by Plaintiffs and the nationwide Class to pay fees not due to Quest.

228.    Plaintiffs and the other members of the nationwide Class had a right to rely on, and did reasonably rely on, Quest's statements, misrepresentations, and omissions. Each of Quest's misrepresentations and omissions were material, in that Plaintiffs and the nationwide Class would not have paid the improper rack rates if they had known that the statements and representations of Quest were false, misleading, incomplete, unfair and untrue.

229.    Each of the misrepresentations, misleading statements, and omissions made by

Quest were false, misleading, incomplete, and untrue, and were known or should have been known by Quest to be false, misleading, incomplete, and untrue when made.

230.     Each misrepresentation, misleading statement, and omission was made with intent to deceive and defraud, or to conceal the truth about Quest's deceptive billing practices, or with disregard for its truth or completeness, or in spite of the fact that it was untrue.  Each misrepresentation, misleading statement, and omission was made to induce Plaintiffs and the nationwide Class to pay fees and charges not due to Quest.

231.     Plaintiffs and the other members of the Class had no knowledge of the falsity, incompleteness, or untruth of Quest's statements and representations when they paid these fees and charges to Quest.

232.     By reason of Quest's misrepresentations, misleading statements, and omissions, Plaintiffs and the other members of the nationwide Class suffered financial injuries.

233.     The conduct of Quest in perpetrating the fraud described above was malicious, willful, wanton, and oppressive, or in reckless disregard of the rights of Plaintiffs and the other members of the nationwide Class, thereby warranting the imposition of punitive damages against Quest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Quest, jointly, and severally, as follows:

1)     Certifying the nationwide Class and the state Sub-Classes pursuant to Rule 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as representatives of the Class, and designating their counsel as counsel for the Class;

2)      Awarding Plaintiffs and the Class damages for their claims;

3)      Awarding Plaintiffs and the Class statutory and exemplary damages where permitted;

4)      Awarding Plaintiffs punitive damages;

5)      Permanently enjoining Quest from continuing to engage in the unlawful and inequitable conduct alleged herein;

6)      Declaring that Quest has engaged in the unlawful and inequitable conduct alleged herein;

7)      Ordering Quest to disgorge into a common fund or a constructive trust all monies paid by Plaintiffs and the Class to the full extent to which Quest or any one of them were unjustly enriched by their unlawful and inequitable conduct alleged herein;

8)      Granting Plaintiffs and the Class the costs of prosecuting this action and reasonable attorneys' fees; and

9)      Grading such other relief as this court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs and the Class demand a trial by jury on all issues so triable.

Dated:  March 8, 2017

COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP

By: *s/Jeffrey W. Herrmann*
Jeffrey W. Herrmann
Audra DePaolo
Park 80 West - Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
(201) 845-9600
jwh@njlawfirm.com
ad@njlawfirm.com

-and-

WOLF POPPER LLP
Robert C. Finkel
Joshua W. Ruthizer
Sean M. Zaroogian
845 Third Avenue, 12th Floor
New York, New York 10022
(212) 759-4600
rfinkel@wolfpopper.com
jruthizer@wolfpopper.com
szaroogian@wolfpopper.com

*Counsel for Plaintiffs*