COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP
Jeffrey W. Herrmann
Audra DePaolo
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Telephone: (201) 845-9600

*Liaison Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARVIN D. LESLIE, LAWRENCE D. CATTI, VALERIE J. FUNARI, CLYDE FREEMAN, JACOB CHERNOV, LING GONG, JILL A. ROACH, ARTHUR S. GOLDSMITH, and CRAIG R. DVORAK, individually and on behalf of all others similarly situated; | Civil Action No.  17-01-01590 (ES)(MAH)<br><br>Document Electronically Filed<br><br>Return Date: July 17, 2017 |
| Plaintiffs, | |
| v. | |
| QUEST DIAGNOSTICS, INC. | |
| Defendant. | |

## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... ii

PRELIMINARY STATEMENT ..............................................................1

STATEMENT OF FACTS ......................................................................4

ARGUMENT ........................................................................................12

I.   STANDARDS FOR DETERMINING MOTIONS TO DISMISS ...............12

II.  PLAINTIFFS STATE CLAIMS FOR QUASI-CONTRACT AND UNJUST
     ENRICHMENT ..............................................................................13

     A.   Quest's Recovery Against Patients Without Agreements on Fees Is
          Limited to Quantum Meruit ...............................................14

          1.   New Jersey ................................................................14

          2.   Other States' Laws ....................................................17

     B.   The Fees Payable By Plaintiffs With Insurance Should be Capped at
          the Rates Negotiated by their Benefit Plans.........................31

     C.   Payment In Full is Not Required for Plaintiffs to Establish Their
          *Quantum Meruit* or Unjust Enrichment Claims ..................33

III. PLAINTIFFS' STATE CLAIMS BASED ON COMMON LAW FRAUD
     AND STATE UNFAIR TRADE PRACTICE STATUTES .........................34

CONCLUSION .....................................................................................39

# TABLE OF AUTHORITIES

**Cases**

*In re Adoption of N.J.A.C. 11:3-29 ex rel. State Dept. of Banking & Ins.*,
  410 N.J. Super. 6 (App. Div. 2009)......................................................19

*Alhassid v. Bank of Am., N.A.*,
  60 F. Supp. 3d 1302 (S.D. Fla. 2014).................................................34

*Angel Jet Servs., LLC v. Giant Eagle, Inc.*,
  No. CV 09-1489-PHX-SRB, 2012 U.S. Dist. LEXIS 191300 (D. Ariz. Nov. 8,
  2012) .....................................................................................................28

*Baker City Medical Serv., Inc. v. Aetna Health Management, LLC*,
  31 So.3d 842 (2010) ............................................................................24

*Bank of Am., N.A. v. Jill P. Mitchell Living Trust*,
  822 F. Supp. 2d 505 (D. Md. 2011) ....................................................36

*Banner Health v. Med. Sav. Ins. Co.*,
  163 P.3d 1096 (Ariz. Ct. App. 2007) ......................................... 27, 28

*Barnert Hospital v. Horizon Healthcare Services*,
  Civil Action No.: 06-3266 (HAA), 2007 U.S. Dist. LEXIS 103455 (D.N.J.
  March 20, 2007) ...................................................................................14

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................12

*Benton v. Vanderbilt Univ.*,
  137 S.W.3d 614 (2004) ........................................................................32

*Bosland v. Warnock Dodge, Inc.*,
  197 N.J. 543 (2009) .............................................................................36

*Canestaro v. Raymour & Flanigan Furniture Co.*,
  984 N.Y.S.2d 630 (N.Y. Sup. Ct. 2013).............................................30

*Canyon Ambulatory Surgery Ctr. v. SCF Arizona,*
  239 P.3d 733 (Ariz. Ct. App. 2010) ....................................................... 22, 24, 28

*Children's Hospital Central California v. Blue Cross of California,*
  172 Cal. Rptr. 3d 861 (Cal. Ct. App. 2014) .................................................. 18, 19

*Ciser v. Nestle Waters North Am., Inc.,*
  596 Fed. Appx. 157 (2014)....................................................................30

*Ciser v. Nestle Waters North Am., Inc.,*
  596 Fed. Appx. 157 (3d Cir. 2015) .....................................................26

*Colomar v. Mercy Hosp., Inc.,*
  242 F.R.D. 671 (S.D. Fla. 2007) .........................................................30

*DiCarlo v. St. Mary Hosp.,*
  530 F.3d 255 (2008) ................................................................ 15, 33

*Doe v. HCA Health Services of Tenn., Inc.,*
  46 S.W.3d 191 (Tenn. 2001) ...............................................................21

*Donnelly v. Option One Mortgage Corp.,*
  Civil Action No.: 11-7019 (ES),
  2014 U.S. Dist. LEXIS 41924 (D.N.J. 2014)........................................ 31, 34, 35

*In re Dukes,*
  24 B.R. 404 (Bankr. E.D. Mich. 1982) ..................................................36

*Ellsworth Dobbs, Inc. v. Johnson,*
  50 N.J. 528 (1967) ..............................................................................17

*Galvan v. Northwestern Mem. Hosp.,*
  888 N.E.2d 529 (Ill. App. Ct. 2008)................................................. 29, 31

*Harnish v. Widener Univ. Sch. of Law,*
  931 F. Supp. 2d 641 (D.N.J. 2013)......................................................38

*Haygood v. De Escabedo,*
  356 S.W.3d 390 (Tex. 2010) ................................................................29

*Herrera v. JFK Med. Ctr., L.P.*,
   648 Fed. Appx. 930 (11th Cir. 2016) ........................................................... 24, 25

*Hillsborough County Hosp. Auth. v. Fernandez*,
   664 So.2d 1071 (Fla. Ct. App. 1995) ................................................................30

*Howell v. Hamilton Meats & Provisions, Inc.*
   257 P.3d 1130 (Cal. 2011) ................................................................................18

*Huntington Hosp. v. Abrandt*,
   779 N.Y.S.2d 891 (2d Dept. 2004) ...................................................................23

*Klaxon v. Stentor Elect. Mfg. Co.*,
   313 U.S. 487 (1941) .........................................................................................13

*Kolari v. N.Y.-Presbyterian Hosp.*,
   382 F. Supp. 2d 562 (S.D.N.Y. 2005) ..............................................................23

*Lawn v. Enhanced Serv. Billing, Inc.*,
   Civil Action No. 10-cv-1196, 2010 U.S. Dist. LEXIS 69738 (E.D. Pa. 2010) ..39

*Levine v. Blue Shield of Cal.*,
   117 Cal. Rptr. 3d 262 (Ct. App. 2010) ..............................................................30

*Margolis v. Sandy Spring Bank*,
   110 A.3d 784 (Md. Ct. Spec. App. 2015) ..........................................................30

*Marshall v. James B. Nutter & Co.*,
   816 F. Supp. 2d 259 (D. Md. Sept. 29, 2011) ....................................................13

*Martorella v. Deutsche Bank Nat. Trust Co.*,
   931 F. Supp. 2d 1218 (S.D. Fla. 2013) ..............................................................35

*McCoy v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*,
   388 F. Supp. 2d 760 (E.D. Texas 2005) ............................................................28

*Moran v. Prime Healthcare Management, Inc.*,
   208 Cal. Rptr. 3d 303 (Cal. App. Ct. 2016) ..................................... 19, 20, 33, 35

*Nassau Anesthesia Assocs. PC v. Chin*,
   924 N.Y.S.2d 252 (2011) .............................................................. 23, 24

*P.V. ex rel. T.V. v. Camp Jaycee*,
   962 A.2d 453 (N.J. 2008) ................................................................14

*Parkview Hosp., Inc. v. Frost*,
   52 N.E.3d 804 (Ind. Ct. App. 2016) ................................................28

*Patterson v. Lawyers Title Ins. Corp.*,
   NO. GD-03-021176, 2015 Pa. Dist. & Cnty. Dec. LEXIS 479
   (Pa. Ct. Com. Plea Dec. 29, 2015).....................................................36

*Payne v. Fujifilm U.S.A., Inc.*,
   Civil Action No. 07-385 (JAG), 2007 U.S. Dist. LEXIS 94765 (D.N.J. Dec. 28,
   2007) ...............................................................................................16

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   252 F.R.D. 83 (D. Mass. 2008).........................................................36

*Phillips v. Cnty. of Allegheny*,
   515 F.3d 224 (3d Cir. 2008) .............................................................12

*In re Processed Egg Prod. Antitrust Litig.*,
   851 F. Supp. 2d 867 (E.D. Pa. 2012).................................................13

*Queen's Med. Ctr. v. Kaiser Found. Health Plan, Inc.*,
   948 F. Supp. 2d 1131 (D. Haw. 2013) ..............................................24

*Reddix v. Chatham County Hosp. Authority*,
   216 S.E.2d 680 (Ga. Ct. App. 1975) ................................................23

*River Park Hosp., Inc. v. Bluecross Blueshield of Tenn., Inc.*,
   173 S.W.3d 43 (Tenn. Ct. App. 2002) ......................................... 21, 31

*Rockford Mem. Hosp. v. Havrilesko*,
   858 N.E.2d 56 (Ill. App. Ct. 2006).....................................................30

*Rudbart v. North Jersey Dist. Water Supply Comm'n,*
   127 N.J. 344 (1992) ...............................................................................15

*Shahin v. Mem'l Hermann Health Sys.,*
   2017 Tex. App. Lexis 5496 (Tex. Ct. App. June 15, 2017) ...............................29

*Shelton v. Duke University Health System, Inc.,*
   633 S.E.2d 113 (N.C. Ct. App. 2006) ...............................................29

*Starkey v. Estate of Nicolaysen,*
   172 N.J. 60 (2002) ...................................................................... 1, 15

*State ex rel. Coffman v. Castle Law Grp., LLC,*
   375 P.3d 128 (Co. 2016).......................................................................35

*Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc.,*
   832 A.2d 501 (Pa. Super. Ct. 2002) ........................................... 22, 24

*Valley Hosp. v. Kroll,*
   847 A.2d 636 (N.J. Super. Ct. Law Div. 2003)............................. 14, 15

*Waste Mfg. & Leasing Corp. v. Hambicki,*
   900 P.2d 1220 (Ariz. Ct. App. 1995) ...................................................36

*Watts v. Jackson Hewitt Tax Serv.,*
   579 F. Supp. 2d 334 (E.D.N.Y. 2008)..................................................38

*West v. Shelby County Healthcare Corp.,*
   459 S.W.3d 33 (Tenn. 2014) ...............................................................21

*Williams v. BASF Catalysts LLC,*
   765 F.3d 306 (3d Cir. 2014) ...............................................................13

## Statutes

Cal. Civ. Code §1770(a)(19)....................................................................20

N.J.S.A. 12A:2-302(2) ................................................................. 16, 27

**Other Authorities**

George A. Nation, III (Professor of Law and Business, Lehigh University),
   "Determining the Fair and Reasonable Value of Medical Services,"
   65:2 Baylor Law Review 425, 447........................................................... 5, 15, 19

Hall and Schneider, *Patients as Consumers: Courts, Contracts, and the New
   Medical Marketplace,* 106 Mich. L. Rev. 643, 647 (2008)............................. 6, 25

## PRELIMINARY STATEMENT

This is a consumer class action on behalf of persons who were charged without their agreement unconscionably high fees for diagnostic services by Quest Diagnostics, Inc. ("Quest").  The fees were four or five times the fair market value for those services established by arm's-length negotiations between Quest and private insurers or mandated by Medicare.

Each of the nine plaintiffs here -- residents of nine states[1] -- were provided diagnostic services by Quest at the recommendation of their physicians.  None of the nine plaintiffs had an agreement with Quest on the cost of those services. The law here is clear – that in these circumstances, Quest's right to recovery for its services is based on *quantum meruit* – what fully informed parties would agree to in an arm's-length negotiation.  Quest has the burden of demonstrating reasonable charges to collect fees from plaintiffs.  *See Starkey v. Estate of Nicolaysen*, 172 N.J. 60, 68 (2002) ("To recover under a theory of *quantum meruit*, [the party seeking recovery for its services] must establish … the reasonable value of the services.").  The best barometer of a reasonable fee is the amount Quest negotiates at arm's length to receive from third party payors – insurance companies and

_____

[1] Texas, Pennsylvania, Florida, Arizona, Michigan, Nevada, California, Colorado, and Maryland.

1

Medicare ("Benefit Plans") – rates that are 80% or more below Quest's chargemaster rates.[2] Quest cannot meet its burden of establishing any other measurement of a reasonable fee as a basis for recovery in *quantum meruit*.

Quest's motion to dismiss plaintiffs' Complaint relies primarily on cases enforcing binding agreements with patients.  Those cases do not concern the circumstance here, where there is no agreement between Quest and its patients.

Quest advocates for complete fiat to set fees, a return to *caveat emptor*, and a roll-back of common law and state consumer protection laws.  Quest argues that there are no bounds on what it can charge for a simple blood test; it can bill $12 to Benefit Plans and charge patients $200, $2,000, or $20,000 for that same test!

Further, Quest overlooks plaintiffs' allegations that eight of the nine plaintiffs did have insurance, although their insurers denied coverage of their tests.  All nine plaintiffs primarily assert claims based on *quantum meruit*, and the eight insured plaintiffs also assert claims based on unjust enrichment (although inherent in the concept of *quantum meruit* are principles of unjust enrichment).

Plaintiffs who maintain health insurance are beneficiaries of the lower rates negotiated on their behalf by their insurers and are entitled to pay the discounted rates when their benefit plans decline coverage.  Stated another way, when the

---

[2] Whereas plaintiffs' Complaint references these rates as "rack rates," the case law refers to the rates as "chargemaster rates."  This Memorandum adopts the terminology of the case law.

insurers refuse to cover the diagnostic claims, the insured plaintiffs are entitled to step into the shoes of the Benefit Plans and pay the reduced, negotiated rates.

As Quest acknowledges in its Memorandum In Support of Motion to Dismiss ("Db"), the primary reason to have insurance is to benefit from lower, negotiated rates. Db at 3. Because plaintiffs are third party beneficiaries of the lower rates negotiated on their behalf, and because there is no contrary agreement between plaintiffs and Quest for plaintiffs to pay the higher chargemaster rates, plaintiffs are entitled to the benefits of the discounted rates. Quest cannot claim prejudice from being paid the rates it negotiated with insurers or agreed to accept from Medicare, and should not be unjustly enriched by the fortuitous fact (for Quest) that the insurer denied coverage. Accordingly, Quest's motion to dismiss plaintiffs' claims for money damages must be denied.[3]

Furthermore, Quest sends out intentionally misleading invoices that demand payment of the net amount outstanding. A specimen form of invoice is annexed as Exhibit A to the Declaration of Jeffrey W. Herrmann dated June 29, 2017 ("Herrmann Decl."). A reasonable consumer cannot determine from Quest's invoices which charges are covered or not covered by insurance, and what amounts are owed based on deductibles or copays. The recipient of Exhibit A is informed

---

[3] Plaintiffs' claims present a case and controversy with respect to open payment terms, and cannot wait for a legislative fix.

that s/he owes Quest $190.03, but does not know why or for which of the nine procedures.  Although Quest could easily itemize insurance coverage by procedure, it intentionally fails to do so, so that patients cannot determine which procedures are not covered by Benefit Plans and whether they are being overcharged for procedures not covered by insurance.  Quest would prefer to keep patients in the dark and paying their bills at outrageously high rates.  Nor is it the answer that patients be required to ferret out billing information from other sources.  Scrutinizing healthcare bills should not be a full-time job.  Quest is demanding payment and has an obligation to make its invoices intelligible.

Quest's misleading invoices are disseminated to a population of sick and uninsured or underinsured persons, who can least afford to overpay for healthcare.  Quest's defenses to all plaintiffs' claims should be viewed through the prism of a healthcare provider that makes its invoices intentionally obtuse to deceive a population of persons in need of healthcare.

## STATEMENT OF FACTS

Quest is the largest U.S. laboratory in the United States, providing over 100 million laboratory tests a year.  ¶2, 36.[4]

A large majority of the Quest's laboratory tests are on behalf of patients covered by Benefit Plans.  ¶38.  The rates negotiated between Quest and Benefit

---

[4] All references to "¶" are to plaintiffs' Class Action Complaint.

Plans are fair market value rates – prices agreed to between a willing buyer and seller, with neither being required to act, and both having reasonable knowledge of the relevant facts.  ¶40.

Quest separately maintains a "chargemaster" price list for diagnostic tests that is grossly disproportionate to the negotiated or mandated fair market value rates Quest accepts from Benefit Plans.  Quest charges its chargemaster rates only to patients without insurance or whose Benefit Plans deny coverage.  Quest's chargemaster rates bear no relationship to the fair market value rates, but rather are frequently four or five times greater than fair market value rates.  ¶¶4, 57.[5]  For example, Medicare rates for genetic testing Quest performed for Marvin and Vicki Leslie were 18.1% ($59.55) of the rate Quest charged the Leslies ($328.85).  ¶59.

Although plaintiffs have not had the opportunity to take discovery there is publicly available information from which plaintiffs can estimate the relationship between Medicare payments and negotiated rates with other third-party payors.  *See* George A. Nation, III (Professor of Law and Business, Lehigh University), "Determining the Fair and Reasonable Value of Medical Services," 65:2 Baylor Law Review 425, 447 (2013) (estimating that private pay insurers pay an average of 14 percent more than Medicare for a similar patient).

---

[5] Plaintiffs estimate that a small percentage of that revenue (approximately 5%) is derived from class members who pay chargemaster rates.  *See, e.g., infra* at 18.

Quest markets its services to physician's offices.  Quest commonly does not have written contracts with patients and frequently does not even have face-to-face contact with patients.  Many of Quest's patients have blood or other samples drawn at a doctor's office or other off-site location and do not choose the diagnostic company.  *See, e.g.,* ¶55; *see also* Hall and Schneider, *Patients as Consumers: Courts, Contracts, and the New Medical Marketplace,* 106 Mich. L. Rev. 643, 647 (2008)[6] ("doctors and hospitals insist that patients accept their standard charges, and patients learn what they bought and what it cost only on receiving a bill….").

At times, Benefit Plans refuse to pay Quest on claims of its insureds, for example, because it considers the tests "experimental" or "not medically necessary."  *See* ¶¶58, 64, 67, 73, 87, 95, 108, 111.  Even when a Benefit Plan refuses to pay, it has a previously negotiated rate for that test.  ¶¶38, 40.

If the Benefit Plan advises Quest with respect to an insured that it is disclaiming coverage, Quest does not allow the insured to step into the shoes of the Benefit Plan and to pay the lower, discounted rate.  Rather, the patient is billed by Quest for the chargemaster rate.  Thus, Quest seeks to benefit from the Benefit

---

[6] Mark A. Hall is the Fred D. & Elizabeth L. Turnage Professor of Law and Public Health, Wake Forest University.  Carl E. Schneider is the Chauncey Stillman Professor of Law and Professor of Internal Medicine, University of Michigan.

Plan's disallowance of the claim by charging the insured four or five times the rate that Quest would be entitled to under Quest's agreements with the Benefit Plans.

Furthermore, invoices sent by Quest to patients are deceptive. Quest lists each procedure and the chargemaster rate for that procedure. However, Quest aggregates its chargemaster rates and any deductibles, copays, insurance discounts and payments into one net invoiced amount. *See* Exhibit A. Patients with insurance cannot determine from the invoice whether any entire claim was disallowed by the Benefit Plan or how the net amount was determined. ¶¶50, 52.

Plaintiff Marvin Leslie resides with his wife Vicki Leslie in Texas. ¶25. The Leslies each had their blood drawn by their physician and a genetic test conducted by Quest with CPT code 81291. ¶¶55, 58. The Leslies had no direct contract with Quest and did not have an agreement with Quest with respect to the fees to be charged for the genetic test. ¶60. The Leslies' insurance company (Aetna) denied coverage, and Quest refused to discount its chargemaster rate for that test ($328.85 each) to the rate Quest agreed to with Aetna or otherwise to the fair market value for that service. ¶58. Had Aetna covered the genetic test, it would have reimbursed Quest substantially less than $328.85 for each of Mr. and Mrs. Leslie. ¶59. Quest would have been reimbursed $59.55 by Medicare for that genetic test. ¶59. The rate charged the Leslies is 5.52 times the rate accepted by Medicare. Quest insisted on payment of the full chargemaster rate. Because the

Leslies are on a fixed income and could not pay the entire amount at one time, they paid Quest $10 a month each beginning in July 2014 under protest to defray the amounts billed by Quest for the genetic tests, and have only recently completed payment after 33 months.  ¶61.

Plaintiff Lawrence D. Catti resides in Pennsylvania.  ¶26.  Catti had blood drawn for a diagnostic test on January 7, 2017.  Quest billed Catti $218.48 for that test.  ¶63.  Catti's insurer (Aetna) denied coverage benefits for that test.  ¶64.  If Aetna had accepted coverage, it would have reimbursed Quest $15.02, and Catti would have had no copay.  ¶65.  Aetna also denied Catti coverage for an additional test.  Quest billed Catti $50 for that test, well above the $28.10 that Aetna would have paid Quest if it covered those tests.  ¶67.  The total fees charged by Quest ($268.48) were 6.2 times the amount that Quest would have been paid by Benefit Plans ($43.12).  Catti did not have an agreement with Quest with respect to the fees to be charged for the diagnostic tests.  ¶68.  On March 31, 2017, subsequent to the filing of the Complaint, to forestall Quest's collection efforts and to avoid having adverse consequences to his credit rating, Catti paid Quest $268.48 under protest for the contested tests.[7]

---

[7] Quest argues in error that for a plaintiff to demonstrate injury s/he must actually have paid Quest an amount in excess of the reasonable, negotiated or mandated rate. *See, e.g.,* Db at 19-20.  To the extent the Court considers the matter relevant, plaintiff would amend the Complaint to include the added payment information on behalf of plaintiffs Catti (payment in full -- $268.48), Funari ($20 a month

Plaintiff Valerie J. Funari resides in Florida.  ¶27.  Funari had blood drawn for two diagnostic tests on September 19, 2016.  ¶71.  Quest billed Funari $140.61 and $125.47, respectively, for those two tests.  ¶72.  Medicare (her healthcare insurer) denied coverage for those two tests.  ¶73.  Subsequently, Quest billed Funari $244.82 for five tests for which Medicare denied coverage.  ¶¶75-77.  If Medicare had accepted coverage, it would have reimbursed Quest $85.06.  ¶¶74, 78.  The total fees charged by Quest ($510.90) were six times the amount that would have been reimbursed by Medicare ($85.06).  Funari had not reached agreement in advance with respect to the fees to be charged for the diagnostic tests. ¶79.  To avoid persistent collection letters and any adverse reports on her credit rating, and because of her inability to pay the entire amount at any one time, Funari has been paying Quest $20 a month commencing March 2017 toward her invoices.

Plaintiff Clyde Freeman resides in Colorado.  ¶28.  Freeman did not have an agreement with Quest with respect to the fees to be charged for the diagnostic tests. ¶84.  Freeman was billed $1,236.59 and $567.19 for eleven separate diagnostic tests conducted on April 5, 2016.  ¶81.  Freeman maintained medical insurance through Anthem Blue Cross and Blue Shield.  Quest refused to provide Freeman

---

commencing March 2017), Gong (payment in full -- $125.84), Goldsmith (payment in full -- $136.82), and Dvorak ($550).  Plaintiffs also anticipate adding plaintiffs, including plaintiffs from different states.

with any insurance discount because it claimed that Quest "is no longer contracted with Anthem…." ¶82.  If Quest had accepted Anthem's coverage, Quest would have billed Freeman substantially reduced rates.  ¶83.

Plaintiff Jacob Chernov resides in Arizona.  ¶29.  Quest billed Chernov $220.40 for two diagnostic tests conducted on November 21, 2016.  ¶86.  Chernov did not have an agreement with Quest with respect to the fees to be charged for the diagnostic tests.  ¶91.  Chernov's insurer (Medicare) denied coverage benefits. ¶87.  If Medicare had accepted coverage, it would have reimbursed Quest $44.94. ¶¶88-89.  Because Medicare denied coverage, Quest insisted that Chernov pay the full $220.40.  ¶90.  The amount Quest charged Chernov ($220.40) was 4.9 times the Medicare reimbursement rate ($44.76).

Ling Gong resides in Michigan.  ¶30.  Quest billed Gong $125.84 for a laboratory test performed on his spouse on March 16, 2015.  ¶93.  Neither Gong nor his wife had an agreement with Quest with respect to the fees to be charged for the diagnostic test.  ¶97.  Gong's insurer (Blue Cross Blue Shield of Michigan ("BCBS")) declined to provide coverage for that test.  ¶95.  Had BCBS covered the lab test, the cost would have been $47.80.  ¶96.  The amount Quest charged Gong was 2.6 times the Medicare reimbursement rate.  To avoid persistent collection letters, Gong paid Quest the entire $125.84 under protest.

Plaintiff Jill Roach resides in Maryland.  ¶31.  Roach was billed $748.14 for eight separate diagnostic tests conducted on May 17, 2016.  ¶99.  Roach was uninsured at that time.  ¶100.  Roach did not have an agreement with Quest with respect to the fees to be charged for the diagnostic tests.  ¶104.  Quest refused to provide Roach with any discount.  ¶100.  If Roach were covered by Medicare, Quest would have been paid the substantially reduced rate of $123.23.  ¶102.  The amount charged Roach was 6.1 times the Medicare reimbursement rate.  Roach has been paying Quest $25 a month, and has paid $225 in total to date to Quest, to defray the cost of Quest's lab testing.  ¶105.

Arthur Goldsmith resides in Nevada.  ¶32.  Quest billed Goldsmith $136.82 for a diagnostic test.  ¶107.  Goldsmith did not have an agreement with Quest with respect to the fees to be charged for the diagnostic test.  ¶109.  Goldsmith's insurer (Medicare) denied coverage benefits.  ¶108.  If Medicare had accepted coverage, it would have reimbursed Quest approximately $19.13.  ¶108.  The amount charged Goldsmith was 7.2 times the Medicare reimbursement rate.  To avoid persistent collection letters, Goldsmith paid Quest the entire $136.82 under protest.

Craig Dvorak resides in California.[8]  ¶33.  Quest billed Dvorak $1,149.65 for two allergy tests.  ¶110.  Dvorak did not have an agreement with Quest with

---

[8] Dvorak's name was inadvertently omitted from the caption and preamble to plaintiffs' Complaint.

11

respect to the fees to be charged for the diagnostic tests.  ¶113.  Dvorak's insurers
(Medicare and HealthNet) denied coverage benefits.  ¶112.  If Medicare and
HealthNet had accepted coverage, they would have reimbursed Quest
approximately $14.22 for the two tests. ¶112.  Because Quest aggregates Medicare
allowances and payments across multiple procedures, it is not possible to
determine exactly what tests were performed that Medicare did not cover that
justified the $1,149.65 bill to Dvorak, or what Quest would have been reimbursed
by Medicare for those procedures.  Dvorak has paid Quest $550 towards the
invoice.

## ARGUMENT

## I.  STANDARDS FOR DETERMINING MOTIONS TO DISMISS

When reviewing a motion to dismiss on the pleadings, courts "accept all
factual allegations as true, construe the complaint in the light most favorable to the
plaintiff, and determine whether, under any reasonable reading of the complaint,
the plaintiff may be entitled to relief."  *Phillips v. Cnty. of Allegheny*, 515 F.3d
224, 233 (3d Cir. 2008) (quotations omitted).  The factual allegations set forth in a
complaint "must be enough to raise a right to relief above the speculative level."
*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).[9]

---

[9] Only plaintiffs' common law fraud claims and claims of fraud under state
consumer protection statutes require compliance with Rule 9(b).  *See* discussion
*infra* at 34-39.  Plaintiffs' non-fraud claims are not required to comply with Rule

## II.  PLAINTIFFS STATE CLAIMS FOR QUASI-CONTRACT AND UNJUST ENRICHMENT

Plaintiffs' first and second common law causes of action (Counts XI and XII) assert claims based on *quantum meruit* and unjust enrichment.  ¶¶210-15, 216-22.  This Court, in exercising diversity jurisdiction, is obligated to apply New Jersey law, including choice of law principles.  *Klaxon v. Stentor Elect. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Here, defendants argue that there are no material differences in the law of unjust enrichment or *quantum meruit* among the 50 states, suggesting that this Court apply New Jersey law.  *See* Db at 20 n.5; *see also Williams v. BASF Catalysts LLC*, 765 F.3d 306, 316 (3d Cir. 2014) (cited Db at 16; holding that the parties may waive issues of choice of law).

Inasmuch as New Jersey law is not fully developed, in the event the Court determines that it conflicts with the law of other states, such as California, Pennsylvania, or Arizona, the Court should apply the law of those states.  To the extent there is no conflict, the Court should apply New Jersey law.  *P.V. ex rel.*

---

9(b).  *See In re Processed Egg Prod. Antitrust Litig.*, 851 F. Supp. 2d 867, 896 n.26 (E.D. Pa. 2012) (holding that heightened pleading under Rule 9(b) is not required for state consumer fraud claims where the alleged violations were not based on fraudulent acts but conduct that led to consumers paying "artificially high" prices); *Marshall v. James B. Nutter & Co*., 816 F. Supp. 2d 259, 267 (D. Md. Sept. 29, 2011) (Maryland Consumer Protection Act claims of omissions "are not subject to the heightened pleading standards of Rule 9(b) because such allegations cannot be described in terms of the time, place, and contents of the omission.").

*T.V. v. Camp Jaycee*, 962 A.2d 453, 460 (N.J. 2008).

A.   **Quest's Recovery Against Patients Without Agreements on Fees Is Limited to Quantum Meruit**

The clear trend of case law is in favor of applying *quantum meruit* to healthcare costs in the absence of a binding contract to the contrary.

1.   **New Jersey**

Under New Jersey law, Quest's fees are govern by *quantum meruit*. *See Valley Hosp. v. Kroll*, 847 A.2d 636, 652 (N.J. Super. Ct. Law Div. 2003) (limiting the plaintiff's "measure of damages" to "*quantum meruit,* which equates to the reasonable value of services rendered by the hospital to decedent.")."[I]t is well settled that where one performs services for another at his request, but without any agreement or understanding as to wages or remuneration, the law implied a promise on the part of the party requesting the services to pay a just and reasonable compensation." *Barnert Hospital v. Horizon Healthcare Services*, Civil Action No.: 06-3266 (HAA), 2007 U.S. Dist. LEXIS 103455, at *13 (D.N.J. March 20, 2007) (remanding action to state court; citations and quotations omitted).

If the patient is not insured, Quest can only charge reasonable market rates to be determined after discovery and trial. Quest's rates to uninsured patients who do not have signed agreements with Quest must be set at a reasonable percentile of the amounts Quest actually receives for those procedures. Quest has the burden of

proving the reasonableness of its charges.  *See Starkey*, 172 N.J. 60 at 68 (quoted *supra*, at 2).

In *Valley Hosp.*, the New Jersey Superior Court refused to enforce as a "contract of adhesion" a guarantee of payment form requiring that a patient pay "the full and entire amount due for all services received by me."  847 A.2d at 651 (citing the New Jersey Supreme Court's opinion in *Rudbart v. North Jersey Dist. Water Supply Comm'n,* 127 N.J. 344, 356 (1992)).  The factors considered by the New Jersey state court, in finding for the patient, were "the subject matter of the contract, the standardized form of the document, the relative bargaining positions of the parties, the degree of economic compulsion motivating the 'adhering' party, the take-it-or-leave it nature, and the public interests affected").  *Id.* at 651; *see also* Nation, 65:2 Baylor Law Review at 429 (chargemaster rates are "grossly inflated because they are set to be discounted rather than paid.").

The Third Circuit reached a contrary decision in *DiCarlo v. St. Mary Hosp.*, ruling for the medical provider where the uninsured patient signed a guarantee of payment form saying, "I also guarantee payment of all charges and collection costs for services rendered…."  530 F.3d 255, 259 (2008).  The Third Circuit affirmed the District Court's holding that the guarantee was enforceable because "the consent form contained a definite price term."  *Id.* at 259.  The Third Circuit apparently was not made aware of the healthcare profession's misuse of

15

chargemaster rates, or New Jersey law on unconscionability.  Regardless, *DiCarlo* is limited to its facts where the plaintiff signed an acknowledgement agreement, in addition to not being representative of New Jersey law.

N.J.S.A. 12A:2-302 requires that a New Jersey court or federal court sitting in diversity apply the following principles to the enforcement of business practices alleged to be unconscionable:

> (1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

> (2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

*See Payne v. Fujifilm U.S.A., Inc*., Civil Action No. 07-385 (JAG), 2007 U.S. Dist. LEXIS 94765, at *12 (D.N.J. Dec. 28, 2007) ("This Court, applying § 12A:2-302 to the allegations in the Complaint, holds that Plaintiff has alleged sufficient facts to withstand a motion to dismiss, pursuant to Rule 12(b)(6), on her unconscionability claim."); *see also Cape Reg'l Med. Ctr. v. Sanchez*, No. CPM DC 109-11, at 7, 9, 11 (N.J. Super. Ct. Law Dev. Mar. 26, 2012) (Herrmann Decl., Exhibit B) (deciding the case on other grounds, but indicating its willingness to find the plaintiff's chargemaster rates unconscionable:  "Those without insurance

16

pay rates far exceeding the negotiated rates of the large organizations."  "[T]he authorization form for payment is in reality a blank check with the numbers to be filled in…."  "This Court has seen far too many occasions where an unsuspecting patient … was given no advance warning on cost yet ended up having to pay because they did not context a large bill in court"); *Ellsworth Dobbs, Inc. v. Johnson,* 50 N.J. 528, 554 (1967) ("Grossly unfair contractual obligations resulting from the use of such expertise or control by the one possessing it, which result in assumption by the other contracting party of a burden which is at odds with the common understanding of the ordinary and untrained member of the public, are considered unconscionable and therefore unenforceable.").

Given the New Jersey statute and progressive case law, and given the rapidly developing case law outside of New Jersey, it is highly unlikely that New Jersey's highest Court would sanction Quest's business practices of charging excessive chargemaster rates to uninsured patients addressed herein.

## 2. Other States' Laws

Other states that have addressed this issue, including courts in California, Tennessee, Pennsylvania, New York, Georgia, and Florida, have applied principles of *quantum meruit* to healthcare charges.

The Supreme Court of California (plaintiff Dvorak's state of residence) recognized in *Howell v. Hamilton Meats & Provisions, Inc.* that consumers lack the advantages of insurers in negotiating healthcare costs:

> Private health insurers are well equipped to conduct sophisticated arm's-length price negotiations, whereas patients individually suffer inherent disadvantages that significantly impede negotiating prices with medical care providers:  difficulty of gathering information, lack of choice and bargaining power, and possible physical and emotion disabilities relating to the injury or illness…. Given this state of medical economics, how a market value other than that produced by negotiation between the insurer and the provider could be identified is unclear.

257 P.3d 1130, 1142 (Cal. 2011).

*Children's Hospital Central California v. Blue Cross of California* concerned a stub period where defendant's contract to pay the plaintiff discounted rates had expired and the Court was required to set the appropriate rate for medical services based on *quantum meruit*.  172 Cal. Rptr. 3d 861 (Cal. Ct. App. 2014). The Court rejected the hospital's contention that "the reasonable and customary value" of the hospital's services were "the total amount of the charges it billed Blue Cross." *Id.* at 867.  The court observed that "in 2007 and 2008, less than 5 percent of the payors paid [plaintiff] the full billed charges." *Id.* at 867.  The court concluded that in applying *quantum meruit*, "[r]easonable value is market value, i.e., what Hospital normally receives from the relevant community for the services it provides.  Hospital rarely receives payment based on its published charge master

rates....  The scope of the rates accepted by or paid to Hospital by other payors indicates the value of those services in the marketplace."  *Id.* at 874-75.

Similarly, here, the Court or jury, after discovery and trial, should set Quest's reimbursement rate at a reasonable percentile of what Quest actually charges for each diagnostic procedure, or other such reasonable rate.[10]

In *Moran v. Prime Healthcare Management, Inc.*, the plaintiff, an individual without health insurance, claimed that the defendant's emergency room bill was "substantially [4 to 6 times] more [for him] … than one who is covered by either a government-sponsored program or private insurance."  208 Cal. Rptr. 3d 303, 307, 315 (Cal. App. Ct. 2016).  The plaintiff claimed that "the rate defendants charge self-pay patients … exceed the reasonable value of the treatment, and are 'artificially inflated and grossly excessive.'"  *Id.* at 307.

---

[10]  Quest argues it would put an unreasonable burden on this Court to meddle in rate setting (Db at 1), but does not dispute that discovery is likely to establish that Quest collects data on what it charges and collects for each service by CPT code and that a fair payment can be established at a reasonable percentile of those charges or collections.  *See* discussion in Nation, 65:2 Baylor Law Review at 460-65 (advocating that chargemaster rates be established at 10-15% above average third-party payor reimbursement rates); *see also In re Adoption of N.J.A.C. 11:3-29 ex rel. State Dept. of Banking & Ins.,* 410 N.J. Super. 6, 17 (App. Div. 2009) (noting that by December 2010, "the amount charged on the Explanation of Benefits (EOB) form was 'almost always higher than the payment to the provider by the health benefit carrier,'" justifying that reimbursement rates be set at the 75th percentile of "paid fees rather than billed fees").  In any event, Quest has the burden on *quantum meruit* of proving a reasonable rate.  Plaintiffs are confident this Court can fashion an appropriate remedy for plaintiffs' claims.

In reversing a trial court's decision to sustain a demurrer, the appellate court ruled that the plaintiff had sufficiently pled claims for violations of California's Unfair Competition Law ("UCL") and Consumer Legal Remedies Act ("CLRA"). *Id.* at 307. The court determined that the UCL allegations were sufficiently pled under the unlawful and unfair prongs based on the court's finding that the price term in the contract was unconscionable. The court – consistent with New Jersey law, discussed *supra* at 15-17 – found that the contract was one of adhesion because the more powerful party (the defendant-hospital) imposed its terms and drafted the document, providing the plaintiff with a "take it or leave it" scenario. *Id.* at 316.

The court was also persuaded that the price term (to pay the hospital's chargemaster rate) was substantively unconscionable because it "far exceed[ed] the actual cost of care and provide[d] for a large profit margin ... for treatment to persons particularly vulnerable because they are in need of emergency medical care." *Id.* at 316. The court further found that the CLRA allegations were sufficient to survive dismissal because of Cal. Civ. Code §1770(a)(19), which declares it unlawful to insert a substantively unconscionable provision in a contract. *Id.* at 318-19. Of course, this Court need not go as far as *Moran*, because here there was no contract between the parties.

*Doe v. HCA Health Services of Tenn., Inc.* addressed a written contract that required patients to pay "charges" not covered by insurance.  46 S.W.3d 191, 193 (Tenn. 2001) (cited Db at 11).  The plaintiffs were billed $6,731 based on the defendant's "Charge Master."  The chargemaster was "considered confidential proprietary information and [was] not shown to anyone other than [representatives] of the hospital." *Id.* at 194.  The plaintiffs' healthcare provider paid 80% of the bill.  The Does refused to pay the 20% ($1,346) copay on grounds the bill was "unreasonable."

The Tennessee Supreme Court held that "[b]ecause the agreement does not refer to a document or extrinsic facts by which the price will be determined ... the price term in the agreement between Jane Doe and [defendant] is indefinite." *Id.* at 197.  Accordingly, the Court held that the price should be determined by *quantum meruit* based on "the reasonable value of goods and services provided to another." *Id.*

Subsequently, the Supreme Court of Tennessee held that hospitals can only maintain liens based on amounts that are actually collected, not "non-discounted charges." *West v. Shelby County Healthcare Corp.*, 459 S.W.3d 33 (Tenn. 2014); *see also River Park Hosp., Inc. v. Bluecross Blueshield of Tenn., Inc.*, 173 S.W.3d 43, 61 (Tenn. Ct. App. 2002) (affirming the trial court's findings that "there was neither an express contract nor a contract implied in fact between the parties," that

21

neither parties' rate terms controlled, and it was up to the "trial court to determine a reasonable rate or reimbursement for services provided" by the plaintiff).

In *Canyon Ambulatory Surgery Ctr. v. SCF Arizona,* the court similarly found that because there was no contract specifying the rates to be paid by a workmen's compensation insurer, the rate should be "what a seller actually accepts from a willing buyer."  239 P.3d 733, 742 (Ariz. Ct. App. 2010).  The Arizona court affirmed the trial court's dismissal of the hospital's claims because the defendant-insurer had already paid 40% of plaintiff's charges, which exceeded "the overall rate of payment accepted from other payors for the same services."  *Id.* at 742-43.  The court further stated that the "doctrine of *quantum meruit* is based on the concept that a person shall not be unjustly enriched by obtaining or retaining money or benefits that properly belong to another."  *Id.* at 741.

Similarly, in *Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc.*, the Superior Court held that because there was no contract between the hospital and a health maintenance organization for services, "the law implies a promise to pay a reasonable fee for a health provider's services."  832 A.2d 501, 508 (Pa. Super. Ct. 2002) (citing *Eagle v. Snyder*, 412 Pa. Super. 557, 604 A.2d 253 (Pa. Super. Ct. 1992)).  The appellate court determined the plaintiff-hospital was entitled to "its average collection rate for each year in question."  *Id.* at 509; *see also id.* at 510 ("The Hospital's contention that it can unilaterally set a price for

its services that bears no relationship to the amount typically paid for those service[s] is untenable.…  In the absence of an express contract, the law requires the payment of reasonable value.  Reasonable value is what someone normally receives for a given service in the ordinary course of its business from the community that it serves.").

In *Nassau Anesthesia Assocs. PC v. Chin*, the court limited a provider's payment to "the average amount that [the provider] would have accepted as full payment from third-party payors such as private insurers and federal healthcare programs."  924 N.Y.S.2d 252 (2011).[11]

In Georgia, "in the absence of an agreement … as to the amount of the charges made to the 'account' of the defendant patient, the plaintiff hospital would have to prove the charges were reasonable and the value thereof."  *Reddix v. Chatham County Hosp. Authority*, 216 S.E.2d 680, 682 (Ga. Ct. App. 1975) ("failure to prove the reasonable value of the services … was also fatal to a recovery as plaintiff had not carried its burden of proof.").

---

[11]  To the extent New York cases have been decided in favor of healthcare providers, those cases are distinguishable.  *See Kolari v. N.Y.-Presbyterian Hosp.*, 382 F. Supp. 2d 562 (S.D.N.Y. 2005) (dismissing claims asserting a private right of action under I.R.S. §501(c)(3)); *Huntington Hosp. v. Abrandt*, 779 N.Y.S.2d 891 (2d Dept. 2004) (finding on summary judgment that the defendant had failed to rebut plaintiff's *prima facie* showing that the hospital's chargemaster rates were "fair and reasonable").

23

In *Queen's Med. Ctr. v. Kaiser Found. Health Plan, Inc.*, the plaintiff medical center continued to perform services after its contract with a health insurer terminated.  948 F. Supp. 2d 1131, 1150, 1153 (D. Haw. 2013).  The court held that whether the plaintiff was entitled to recover its chargemaster rates was an issue of fact to be determined at trial.  *Id.* (citing *Temple Univ., supra,* 832 A.2d at 508-09; *Canyon, supra*, 239 P.3d 733, 743 (upholding a trial court's decision after evaluating the evidence regarding the reasonable value of services); *Baker City Medical Serv., Inc. v. Aetna Health Management, LLC,* 31 So.3d 842, 844-46 (2010) (noting that a Florida statute regarding reasonable charges requires findings of fact when determining fair market value of services); and *Nassau Anesthesia,* 924 N.Y.S.2d at 255 ("[T]he Court as fact-finder … declines plaintiff's request for an award of damages based upon its so-called 'usual and customary' fee schedule.")).

In *Herrera v. JFK Med. Ctr., L.P.*, plaintiffs brought a class action alleging that they were charged unreasonable fees for radiological services.  648 Fed. Appx. 930 (11th Cir. 2016) (applying Florida law).  The Eleventh Circuit found that it was premature for the trial court to find that liability issues would not be common to the class because:

- "While the rates [of services] varied from hospital to hospital, Plaintiffs argue that the fees were many times greater than the Florida Medicare rates

24

for the same services, thus easing problems with determining

reasonableness." *Id.* at 935.

- Because defendants (similar to Quest) charge the same rates for each

   procedure "across the board" and because Medicare provides standard

   reimbursement benchmarks for those procedures (which were approximately

   6% of the rates charged uninsured patients) "[d]iscovery could reveal that it

   is relatively easy to determine that these rates are unreasonable across the

   board without having to resort to analyzing subtle differences between

   hospitals."

*Id.* at 936; *see also* Hall, 106 Mich. L. Rev. at 647:

> Patients can rarely amass enough information about services and price
> to make good decisions about hiring doctors and buying care….
> Providers regularly present and aggressively collect staggering bills
> unrelated to their costs or to the prices they negotiate with insurers.
> This is a market few can negotiate widely, but in which missteps can
> destroy patients economically.  No surprise, then, that the costs of
> illness – particularly medical bills – contribute to more than half of the
> personal bankruptcies in the United States.  [Citations omitted].

Quest argues that it is entitled to charge uninsured patients and patients

whose claims are denied by their insurers four or five times more than what it

collects from Benefit Plans (i) because Benefit Plans drive volume of insured

patients to Quest's diagnostic services, and (ii) because of the certainty and

promptness of payments from Benefit Plans.  *See, e.g.,* Db at 8-9.

Neither motive, however, justifies recovering from patients under *quantum meruit* four to six times more than the fees Quest negotiates with Benefit Plans. Pursuant to Quest's agreements with Benefit Plans, much of the negotiated rates are paid by patients because of deductible and copay obligations. Quest assumes the same risk on those insured patients as it does on uninsured patients, with the primary difference that the insured patients are required to pay reasonable rates and presumably the rate of payment on reasonable rates is higher than the rate of payments on unreasonable rates.[12]

Furthermore, the benefits of charging reasonable fees to drive volume applies equally to insured and uninsured patients. Presumably Quest is interested in driving volume of all patients, including uninsured patients, to its services. The only difference between insured and uninsured patients is that uninsured patients lack the sophistication and access to information to negotiate the same reasonable rates as Benefit Plans have. Taking advantage of less sophisticated consumers is not a protected interest under principles of *quantum meruit*.

---

[12] Patients should also have been given the option of making prompt payment (as Ling Gong, Lawrence Catti and Arthur Friedman did) or pre-payment, or being penalized for delay. Any such late payment penalties must be reasonable (not four or five times the market rate). *See Ciser v. Nestle Waters North Am., Inc.*, 596 Fed. Appx. 157 (3d Cir. 2015) (approving $15 late fee).

Further, Quest's business interests in inducing insured patients to use its services would apply as well to insured patients whose claims were rejected by insurance (including eight of the nine plaintiffs).  Quest, by negotiating rates with Benefit Plans, obtained the benefit of those plaintiffs' patronage and is required to bill those patients whose claims are denied at the same rates negotiated with the Benefit Plans.[13]

The cases cited by Quest are inapposite because they concern circumstances where (i) the patient had signed a form agreeing to pay whatever fees Quest charges, and (ii) there was no third party agreement between the healthcare provider and patient that specified the cost of the procedure.

*Banner Health v. Med. Sav. Ins. Co.*, an intermediate appellate court decision decided on summary judgment, is distinguishable because there the patients were uninsured and the agreements signed by the patients were sufficiently specific to incorporate publicly available chargemasters.  163 P.3d 1096 (Ariz. Ct. App. 2007) (cited Db at 8, 9, 10 and 18).  Those chargemasters were required to "be posted in a conspicuous place" and to "be available for inspection by the

---

[13] What premium if any is Quest entitled to on billing to uninsured patients should be determined after discovery and expert submissions.  *See, e.g.*, Nation advocating that rates be set at 10-15% above the average rates negotiated with third-party payors; *see also* N.J.S.A. 12A:2-302(2) (quoted *supra* at 17; affording plaintiffs a "reasonable opportunity to present evidence of unconscionability").

public at all times." *Id.* at 1100 (internal quotations and citations omitted).  No

such chargemasters have been presented by Quest.[14]

In *McCoy v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, Plaintiffs brought suit

on behalf of "uninsured and indigent patients," arguing that the hospital's "pattern

and practice of charging inordinate and inflated rates" violated its IRS §501(c)(3)

charitable designation.  388 F. Supp. 2d 760, 762 (E.D. Texas 2005) (applying

Texas law).  The so-called 25 cases cited in *McCoy* that defendants argue support

its motion to dismiss, Db at 9, were similarly limited to patients' third party efforts

to enforce §501(c)(3) designations and are inapposite where, as here, there are no

agreements between the parties.

---

[14] The Arizona court in *Canyon* distinguished *Banner* on grounds that in *Canyon* "no evidence was presented regarding the contents of the admission contracts." 239 P.3d at 742 n.18; *see also Angel Jet Servs., LLC v. Giant Eagle, Inc.*, No. CV 09-1489-PHX-SRB, 2012 U.S. Dist. LEXIS 191300 (D. Ariz. Nov. 8, 2012) (following *Doe* and distinguishing *Banner* where the plaintiff "admits that its rates were not published…; rather they had been filed and were 'on record'…."); *Parkview Hosp., Inc. v. Frost*, 52 N.E.3d 804, 806 (Ind. Ct. App. 2016) (holding that where the plaintiff-hospital "did not obtain signature on any written contract … at the time of [defendant's] inpatient stay," "evidence of discounts provided to patients who either have private health insurance or are covered by government healthcare reimbursement programs is relevant, admissible evidence regarding the determination of reasonable charges….").

In neither *McCoy* nor *Galvan v. Northwestern Mem. Hosp.*, 888 N.E.2d 529 (Ill. App. Ct. 2008), did the healthcare patient deny that they had signed an agreement to pay the hospital's rates.[15]

> An insured patient by definition has medical insurance either paid by him directly or by his employer as a benefit. In return for the insurance premiums, his insurance company contracts with a hospital for medical services at a reduced rate.

Moreover, *McCoy* is limited by the Texas Supreme Court's subsequent decisions concerning healthcare reimbursement. *See Haygood v. De Escabedo*, 356 S.W.3d 390, 393-94 (Tex. 2010) ("health care providers in general, feel financial pressure to set their full charges ... as high as possible, because the higher the 'full charge' the greater the reimbursement amount the hospital receives since reimbursement rates are often set as a percentage of the hospital's full charge.… The providers testified the charges billed to Haygood were reasonable, even though those charges were four times the amount they were entitled to collect.") (internal quotations and citations omitted); *Shahin v. Mem'l Hermann Health Sys.*, 2017 Tex. App. Lexis 5496, at *14 (Tex. Ct. App. June 15, 2017) ("Whether or not the rate a hospital may charge patients is reasonable is a question of fact").

---

[15] *See also Shelton v. Duke University Health System, Inc.*, 633 S.E.2d 113 (N.C. Ct. App. 2006) (trial court cited Db at 18) (noting that plaintiff signed agreement obligating her to pay her "Hospital account … in accordance with the regular rates and terms of the Hospital").

Each of defendant's other cases are also distinguishable.  *Hillsborough County Hosp. Auth. v. Fernandez,* 664 So.2d 1071 (Fla. Ct. App. 1995) (trial); *Rockford Mem. Hosp. v. Havrilesko,* 858 N.E.2d 56 (Ill. App. Ct. 2006) (trial); and *Colomar v. Mercy Hosp., Inc.*, 242 F.R.D. 671 (S.D. Fla. 2007) (class certification) were decided on full factual records.  In *Margolis v. Sandy Spring Bank*, the defendant had disclosed its allegedly unfair banking practices.  110 A.3d 784 (Md. Ct. Spec. App. 2015).  *Levine v. Blue Shield of Cal.* did not concern chargemaster rates but rather the manner in which the insureds had structured their insurance agreement with full notice of defendants' rates.  117 Cal. Rptr. 3d 262 (Ct. App. 2010).  In *Canestaro v. Raymour & Flanigan Furniture Co.*, the plaintiff alleged that defendant failed to advise plaintiffs that they would pay a higher price if they requested 0% financing.  984 N.Y.S.2d 630 (N.Y. Sup. Ct. 2013).  The New York trial court dismissed the complaint because the plaintiff knew what he was paying and had the opportunity to negotiate a different price.  In *Ciser v. Nestle Waters North Am., Inc.*, the Third Circuit held that a knowing and voluntary payment of a $15 late fee was not an unlawful penalty.  596 Fed. Appx. 157 (2014).

Each of the nine plaintiffs lacked an agreement with Quest as to their payment of fees and each is required to pay Quest only reasonable rates based on *quantum meruit* and the principles of unjust enrichment.

**B.      The Fees Payable By Plaintiffs With Insurance Should be
         Capped at the Rates Negotiated by their Benefit Plans**

Count XII asserts additional claims for unjust enrichment.  To state a claim

for unjust enrichment, a plaintiff must show that "(1) at plaintiff's expense; (2)

defendant received a benefit and (3) such benefit was received under circumstances

that would make it unjust for defendant to retain benefit without paying."

*Donnelly v. Option One Mortgage Corp.*, Civil Action No.: 11-7019 (ES), 2014

U.S. Dist. LEXIS 41924, at *41 (D.N.J. 2014)*; see also River Park Hosp.*, 173

S.W.3d at 57 ("Actions brought upon theories of unjust enrichment, quasi contract,

contracts implied in law, and *quantum meruit* are essentially the same.").

Eight of the nine plaintiffs are beneficiaries of insurance contracts and their

fees should be based, in the alternative, on the contract terms negotiated on their

behalf by their Benefit Plans.  When the patient is insured and the Benefit Plan

denies coverage, the insured is entitled to step into the Benefit Plan's shoes and

pay Quest charges at the negotiated, discounted rates.

Defendants acknowledge that the primary reason to have insurance in the

United States is so your insurer can negotiate reasonable medical rates on your

behalf.  Db at 2.  Why then shouldn't insureds be entitled to those rates even when

the insurer disclaims coverage?  *See Galvan*, 382 Ill. App. 3d at 267 ("An insured

patient by definition has medical insurance either paid by him directly or by his

31

employer as a benefit.  In return for the insurance premiums, his insurance company contracts with a hospital for medical services at a reduced rate.").

The Tennessee Supreme Court's opinion in *Benton v. Vanderbilt Univ.* is almost directly on point.  137 S.W.3d 614 (2004).  In *Benton*, the plaintiff-insured commenced action against the defendant-hospital alleging that pursuant to an agreement between the defendant and plaintiff's insurer, the "reimbursement" the hospital received from the insurer "shall represent the maximum amount payable for Covered Services...."  *Id.* at 616.  The Tennessee Supreme Court held that the plaintiff was a third party beneficiary of the contract between the hospital and the insurer and was entitled to the benefits and burdens of that contract.  *Id.* at 618 (citations omitted):

> A third party is an intended third-party beneficiary of a contract, and thus entitled to enforce the terms of a contract, where (1) the parties to the contract have not otherwise agreed, (2) recognition of the third-party's right to performance is appropriate to effectuate the parties' intent, and (3) terms or circumstances indicate that performance of the promise is intended or will satisfy an obligation owed by the promise to the third party.

Plaintiffs and other class members should not be subject to a double whammy.  When plaintiffs' Benefit Plans deny coverage, plaintiffs are required to pay for their own healthcare, but they should be allowed to pay for that healthcare at the negotiated rates that (according to Quest) incentivized them to use Quest as

their healthcare provider.  Plaintiffs should not suffer a twofold blow by having to

(i) pay for their own healthcare (ii) at undiscounted, unconscionable rates.

### C. Payment In Full is Not Required for Plaintiffs to Establish Their *Quantum Meruit* or Unjust Enrichment Claims

Quest argues that plaintiffs lack standing to assert their *quantum meruit* and

unjust enrichment claims because not all plaintiffs have paid their laboratory

bills.  Db at 19-21.[16]  *See* discussion *supra at* 8 n.7.

Courts have rejected arguments similar to Quest's even where the plaintiffs'

bills were not paid.  In *DiCarlo v. St. Mary's Hospital*, the District Court rejected

the argument that plaintiffs must pay first prior to suing for unjust enrichment:

> [T]he Court must reject Defendants' argument that Plaintiff's breach of contract claim fails because, not having paid the hospital charges, Plaintiff has suffered no damages.  To have standing to assert a breach of contract claim, plaintiffs need not wait until lawsuits against them were filed or collection agents began harassing them or their credit files were red-flagged.  The expense is incurred, whether paid or not . . . ." (internal quotation marks and citations omitted).

CIVIL ACTION NO. 05-1665 (DRD-SDW), 2006 U.S. Dist. LEXIS 49000, at *7-

8 (D.N.J. July 19, 2006); *see also Moran*, 208 Cal. Rptr. 3d 303 at 311-12 (plaintiff

had standing to bring claims against defendant-hospital for charging unreasonable

rates, even though the hospital "had not begun any collection activity," because

"the existence of an enforceable obligation, without more, ordinarily constitutes

---

[16] Defendants do not contend, with respect to the various state consumer statutes, or common law fraud claim, that plaintiffs lack an ascertainable loss.

actual injury or injury in fact") (internal quotation marks omitted); *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1321-22 (S.D. Fla. 2014) (refusing to dismiss plaintiffs' claim that the defendant was unjustly enriched by charging improperly assessed mortgage fees, even though the plaintiffs did not pay the fees, as the unpaid fees were added to the plaintiffs' outstanding loan balances and "receivable balances are typically treated as assets by financial institutions," and as the issue of whether the improperly assessed fees conferred a benefit for unjust enrichment purposes was "a question of fact that cannot be resolved at the motion to dismiss stage").

### III. PLAINTIFFS STATE CLAIMS BASED ON COMMON LAW FRAUD AND STATE UNFAIR TRADE PRACTICE STATUTES

Plaintiffs assert Counts I through X based on state consumer protection statutes and Count XIII based on common law fraud.

To establish a claim under the New Jersey Consumer Fraud Act ("NJCFA"), plaintiffs must plead "(a) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal relationship between the unlawful conduct and the loss." *Donnelly,* 2014 U.S. Dist. LEXIS 41924, at *15 (citations omitted). "[T]he Act shall be construed liberally in favor of consumers." *Id.* (citations omitted).

Similarly, the elements of common law fraud (Count XIII) are: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or

belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Id.* at *31-32 (citations omitted).

Plaintiffs' allegations of fraud are two-fold.  First, that Quest failed to disclose to plaintiffs at the time it performed services that it would charge patients without insurance or patients whose insurer denied coverage non-market rates. This claim is essentially the same as plaintiffs' *quantum meruit* claim in that in the absence of agreement, Quest's entitlement to payment is limited to reasonable, market rates.

Plaintiffs have also sufficiently pled claims for violations of the various states' consumer protection statutes.  Courts in the plaintiffs' various states of residence have sustained similar claims:

- *Moran v. Prime Healthcare Management, Inc.*, 208 Cal. Rptr. 3d 303 (Cal. App. Ct. 2016) (California's Consumer Legal Remedies Act and Unfair Competition Law claims for billing uninsured patient substantially more for emergency room services than patients covered by private insurance or government-sponsored healthcare programs);

- *State ex rel. Coffman v. Castle Law Grp., LLC*, 375 P.3d 128, 130 (Co. 2016) (Colorado Consumer Protection Act claim for charging prices there "were not, in fact, the 'actual, necessary, and reasonable' costs for ... services");

- *Martorella v. Deutsche Bank Nat. Trust Co.*, 931 F. Supp. 2d 1218, 1224 (S.D. Fla. 2013) (viable Florida Deceptive and Unfair Trade Practices Act claim for charging excessive and/or unreasonable amounts for forced place insurance).

35

- *In re Dukes*, 24 B.R. 404, 413 (Bankr. E.D. Mich. 1982) (Michigan Consumer Protection Act claim for charging consumers an unconscionable amount "grossly in excess of the price for which similar services are sold");

- *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 108 (D. Mass. 2008) (Nevada Deceptive Trade Practices Act claim for grossly inflating the prices of drugs and causing plaintiffs to overpay);

- *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543 (2009) (New Jersey Consumer Fraud Act claim for inserting hidden overcharges in car purchasers' bills);

- *Patterson v. Lawyers Title Ins. Corp.*, NO. GD-03-021176, 2015 Pa. Dist. & Cnty. Dec. LEXIS 479 (Pa. Ct. Com. Plea Dec. 29, 2015) (Pennsylvania Unfair Trade Practices and Consumer Protection Act claim for deceptively overcharging for title insurance);

- *Bank of Am., N.A. v. Jill P. Mitchell Living Trust*, 822 F. Supp. 2d 505, 535–36 (D. Md. 2011) (Maryland Consumer Protection Act claim for failing to disclose the manner in which a substantial fee was calculated);

- *Waste Mfg. & Leasing Corp. v. Hambicki*, 900 P.2d 1220, 1224 (Ariz. Ct. App. 1995) ("The purpose of the [Arizona Consumer Fraud] Act is to provide injured consumers with a remedy to counteract the disproportionate bargaining power often present in consumer transactions.");

The second fraud claim, relates to Quest's fraudulent invoicing of claims.

*See* Herrmann Decl., Exh. A.

Quest "aggregates all charges and insurance reductions and reimbursements, and identifies an aggregate balance that is due from the patient." ¶50; *see also* ¶15. Quest's invoices do not inform "what, if any, insurance discounts or insurance

payments are being applied to each lab test, and what amounts patients are being required to pay as a copay or deductible for each lab test." ¶16.  Quest also does not inform patients whether a test was disallowed by the insurer, or whether the patient is being charged the excessive non-market chargemaster rate as opposed to the rate negotiated by the patient's insurer (or what that negotiated, fair market rate is).  ¶17.

Defendant's argument that the Complaint fails to allege why or how these invoices were misleading and deceptive (Db at 5) fails.  The Complaint alleges that Quest aggregates charges for tests, total insurance discounts, and a total payment due, such that a patient cannot identify what tests were disallowed by a Benefit Provider, or what the patient is paying (copay, deductible, chargemaster rate).  *E.g.* ¶50.  The Complaint also alleges that the invoices do not include information on what the insurance rate is, as opposed to the chargemaster rate. ¶17.  This is clearly on its face a deceptive practice.

Quest's further argument that plaintiffs failed to allege Quest knew in advance that insurance providers would not cover particular tests misses the point.  Whether or not Quest knew insurers would deny coverage is immaterial to the question of whether Quest's bills are deceptive.  Defendant's argument that Plaintiffs fail to allege they were misled also misses the point.  The fact that Plaintiffs were aware that insurers might not cover tests is irrelevant to the

37

allegations that Quest charges an unfair price and bills Plaintiffs for those services through a misleading, summary invoice.

Quest's arguments that plaintiffs have failed to allege that Quest's wrongful concealment and deceptive practices caused harm also fails.

Without proper information, plaintiffs are unable to scrutinize their invoices properly and determine whether their insurer withheld coverage, and if so, whether it was rightful or not, or reimbursed plaintiffs at the correct rate.  Plaintiffs have no way of determining whether they are being overcharged for procedures net of insurance.

This deception is intentional in that the information is available to Quest and Quest chooses not to disclose the truth to induce patients to pay the invoice rather than contest the legitimacy of the chargemaster rates for claims not covered by insurance.  *See Harnish v. Widener Univ. Sch. of Law*, 931 F. Supp. 2d 641, 651 (D.N.J. 2013) (cited Db at 3, 5) (sustaining fraud claim under NJCFA on grounds that defendants' aggregation of employment data "gave false assurance to prospective students…."); *Watts v. Jackson Hewitt Tax Serv.*, 579 F. Supp. 2d 334 (E.D.N.Y. 2008) ("the defendants' non-itemized general bill made it extremely difficult for customers including plaintiffs, who are not well-acquainted with the preparation of tax returns, to determine how and whether they were overcharged.").

In *Lawn v. Enhanced Serv. Billing, Inc.,* the court sustained a claim concerning a deceptive invoice under Pennsylvania's consumer protection statute. Civil Action No. 10-cv-1196, 2010 U.S. Dist. LEXIS 69738 (E.D. Pa. 2010). The court found it significant that the bill did not mention either defendant until the fifth page of the six page bill, and that the first page, which listed the total amount due, only referred to the defendants collectively as "other providers."

Quest's harm is also ongoing. Quest continues to issue misleading invoices for services performed. Which lab company is used is commonly dictated by insurers and physicians. Plaintiffs and the Class have little choice but to have their lab work conducted by Quest. Nor is it a defense to plaintiffs' fraud and deception claims that the misrepresented or omitted information could possibly be pieced together using other sources. Quest's invoices demand payment within twenty-one days of the invoice date. Scrutinizing invoices should not be a full-time job. Patients should not be required to look elsewhere to comprehend their invoice.

## CONCLUSION

Plaintiffs have established claims for quasi-contract (*quantum meruit*), unjust enrichment, fraud, and under state consumer protection laws. In the absence of a contract, Quest's recovery from patients is limited to the reasonable value of its services, which it, rather than plaintiffs, has the burden to prove. The most salient benchmark of reasonable value is what Quest negotiates with third party

payors or accepts from Medicare.  Certainly, those plaintiffs who have insurance, but whose insurers have denied coverage, should be entitled to "step into the shoes" of the insurer and claim the benefit of those negotiated rates.

Application of principles of *quantum meruit* and unjust enrichment are required by New Jersey case law and statute, and supported by the increasing number of higher state courts imposing limitations on healthcare billing (including state courts in California, Pennsylvania, and Arizona, where plaintiffs reside).

Further, Quest's invoices are misleading.  Quest should be required to itemize what patients are required to pay, after insurance coverage, deductibles, and copays, for each procedure, rather than have Quest aggregate these offsets and provide patients with only one net amount.

In the event the Court dismisses any part of the Complaint, plaintiffs respectfully request leave to amend.  *See Phillips*, 515 F.3d at 245.

Dated: June 29, 2017                    COHN LIFLAND PEARLMAN
                                        HERRMANN & KNOPF LLP

                                        By: *s/Jeffrey W. Herrmann*
                                        Jeffrey W. Herrmann
                                        Audra DePaolo
                                        Park 80 West - Plaza One
                                        250 Pehle Avenue, Suite 401
                                        Saddle Brook, New Jersey 07663
                                        (201) 845-9600
                                        jwh@njlawfirm.com
                                        ad@njlawfirm.com

                                        *Liaison Counsel for Plaintiffs*

OF COUNSEL:

WOLF POPPER LLP
Robert C. Finkel
Joshua W. Ruthizer
Robert S. Plosky
Sean M. Zaroogian
Elissa M. Hachmeister*
845 Third Avenue, 12th Floor
New York, New York 10022
(212) 759-4600
rfinkel@wolfpopper.com
jruthizer@wolfpopper.com
rplosky@wolfpopper.com
szaroogian@wolfpopper.com
ehachmeister@wolfpopper.com

***Lead Counsel for Plaintiffs***

 * Passed the New York bar; admission pending.