**Not for Publication**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **MARVIN D. LESLIE, et al.,** | : |
| Plaintiffs, | : Civil Action No. 17-1590 (ES) (MAH) |
| v. | : OPINION |
| **QUEST DIAGNOSTICS, INC.,** | : |
| Defendant. | : |

**SALAS, DISTRICT JUDGE**

Pending before the Court is Defendant Quest Diagnostics, Inc.'s ("Quest") motion to dismiss Plaintiffs' Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (D.E. No. 11). The Court has considered the parties' submissions[1] and decides the matter without oral argument under Federal Rule of Civil Procedure 78(b). For the following reasons, the Court GRANTS Quest's motion and DISMISSES Plaintiffs' Complaint *without prejudice*.

## I. Background

Quest is the largest provider of diagnostic and clinical testing in the United States. (D.E. No. 1, Compl. ¶ 34). Plaintiffs are nine individuals who received testing services from Quest. (*Id.* ¶¶ 25-33). At all relevant times, eight of the Plaintiffs maintained healthcare insurance and one Plaintiff did not. (*Id.*). For the Plaintiffs who maintained healthcare insurance, each of their insurers declined to cover some or all of Quest's procedures. (*Id.* ¶¶ 5-10, 11-13). Plaintiffs bring this putative class action to challenge Quest's pricing and billing practices for non-covered procedures. (*See generally id.*).

---

[1] (*See* D.E. Nos. 11-1 ("Def. Mov. Br."), 18 ("Pl. Opp. Br.") & 21 ("Def. Reply Br.")).

In particular, Plaintiffs allege that Quest charges individuals without healthcare insurance (or whose healthcare insurer declines coverage) far more than it charges private and public healthcare insurers, like Aetna or Medicare. (*See, e.g.*, *id.* ¶¶ 1, 4-14, 19, 44, 118). Plaintiffs contend that Quest should charge these consumers the same amount it charges insurers—what Plaintiffs call the "fair market value rate." (*See id.* ¶¶ 4, 19). Instead, Quest charges these consumers "rack rates",[2] which are "frequently more than ten times greater" than the rates Quest charges private and public insurers. (*Id.* ¶¶ 4, 41). For example, Quest charged Plaintiff Marvin D. Leslie $328.85 for a particular genetic test, but would have charged Aetna (if Aetna did not decline to cover the test) only $59.55. (*Id.* ¶ 5).

Plaintiffs also allege that Quest's invoices for these procedures are intentionally misleading because they "contain only (i) the aggregate charges for multiple lab tests, (ii) the aggregate third-party payments or discounts for multiple lab tests, and (iii) the aggregate copays or deductibles or other payments billed directly to patients." (*Id.* ¶ 15). As a result, "[p]atients are not informed by Quest what, if any, insurance discounts or insurance payments are being applied to *each lab test*, and what amounts patients are being required to pay as a copay or deductible for *each lab test*." (*Id.* ¶ 16) (emphasis added).

Plaintiffs further allege that Quest fails to inform patients (i) "whether certain tests were disallowed by their insurer," or (ii) "that patients are being required by Quest to pay Quest's non-market based excessive 'rack rates' for those tests, rather than negotiated fair market value rates for those disallowed tests." (*Id.* ¶ 17). Finally, Plaintiffs allege that Quest "fails to disclose to patients the fair market value rates for those excluded tests negotiated at arm's-length with Benefit Plans." (*Id.*).

---

[2] Plaintiffs' Complaint refers to these rates as "rack rates," but Plaintiffs' opposition brief "adopts the terminology of the case law" and refers to these rates as "chargemaster rates." (*See* Pl. Opp. Br. at 2 n.2).

Plaintiffs bring this putative class action "on behalf of [a] national Class defined . . . as all persons who were charged fees for services by Quest that were in excess of the negotiated or mandated fair market value rates established for those services between Quest and private or public insurers." (*Id.* ¶ 118). Plaintiffs add that "[i]n the event there is no fair market value rate established for a particular Quest service by Class members' private or public insurers, Plaintiffs seek a declaration as to a reasonably comparable fair market value rate." (*Id.*). Plaintiffs define "fair market value" as "the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonably knowledge of the relevant facts." (*Id.*) (citing I.R.S. Publication 561).

Plaintiffs assert violations of the consumer protection laws of their respective home states: the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.*; the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.*; the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.*; the Pennsylvania Unfair Trade Practices and Consumer Protection Law, Pa. Stat. Ann. Tit. 73, § 201-1, *et seq.*; the Arizona Consumer Fraud Statute, A.R.S. § 44-1521, *et seq.*; the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, *et seq.*; the Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-101, *et seq.*; the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*; the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; and the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* (*Id.* ¶¶ 135-209). Plaintiffs also assert common law claims for breach of contract, unjust enrichment, and fraud. (*See id.* ¶¶ 210-33).[3]

---

[3] The Court applies New Jersey law to Plaintiffs' common law claims. *See Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); (*see also* Def. Mov. Br. at 16-21; Pl. Opp. Br. at 13).

## II. Legal Standard

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted).

"When reviewing a motion to dismiss, all allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (citation and internal quotation marks omitted). But the court need not accept "legal conclusions" as true. *See Iqbal*, 556 U.S. at 678. And "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

Finally, Federal Rule of Civil Procedure 9(b) imposes a heightened pleading requirement for allegations of fraud or mistake. *See Giercyk v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 13-6272, 2015 WL 7871165, at *2-3 (D.N.J. Dec. 4, 2015). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). A plaintiff may satisfy Rule 9(b) by pleading the "date, place or time of the fraud, or through alternative means of injecting precision and some measure of substantiation into their allegations

of fraud." *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004) (citation omitted); *see also United States v. Eastwick Coll.*, 657 F. App'x 89, 93 (3d Cir. 2016) ("In order to satisfy Rule 9(b), a complaint must provide all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.") (citations and internal quotation marks omitted).

**III. Analysis**

    **A. Consumer-Fraud Statutes**

In Counts 1 through 10, Plaintiffs assert claims under ten different consumer-fraud statutes. (*See* Compl. ¶¶ 135-41 (Count 1: New Jersey), ¶¶ 142-48 (Count 2: Florida), ¶¶ 149-55 (Count 3: Colorado), ¶¶ 156-63 (Count 4: Pennsylvania), ¶¶ 164-72 (Count 5: Arizona), ¶¶ 173-80 (Count 6: Michigan), ¶¶ 181-87 (Count 7: Maryland), ¶¶ 188-93 (Count 8: Nevada), and ¶¶ 194-209 (Counts 9 & 10: California)).[4]

To state a cause of action under these consumer-fraud statutes, a plaintiff must show at least (i) a deceptive or unfair business practice (ii) that caused (iii) actual loss or damage to the consumer. *See, e.g.*, *Ciser v. Nestle Waters N. Am. Ins. Inc.*, 596 F. App'x 157, 160 (3d Cir. 2015) (citation omitted).[5] Quest argues that these claims must be dismissed because (i) "differential or

---

[4] Count 1 is asserted on behalf of Plaintiffs and the Class; Count 2 is asserted on behalf of Plaintiff Funari and the Florida Sub-Class; Count 3 is asserted on behalf of Plaintiff Freeman and the Colorado Sub-Class; Count 4 is asserted on behalf of Plaintiff Catti and the Pennsylvania Sub-Class; Count 5 is asserted on behalf of Plaintiff Chernov and the Arizona Sub-Class; Count 6 is asserted on behalf of Plaintiff Gong and the Michigan Sub-Class; Count 7 is asserted on behalf of Plaintiff Roach and the Maryland Sub-Class; Count 8 is asserted on behalf of Plaintiff Goldsmith and the Nevada Sub-Class; and Counts 9 and 10 are asserted on behalf of Plaintiff Dvorak and the California Sub-Class. (*See id.*).

[5] *See also Shibata v. Lim*, 133 F. Supp. 2d 1311, 1317 (M.D. Fla. 2000); *Crowe v. Tull*, 126 P.3d 196, 201 (Colo. 2006); *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004); *Holeman v. Neils*, 803 F. Supp. 237, 242 (D. Ariz. 1992); *Montgomery v. Kraft Foods Glob., Inc.*, No. 12-0149, 2012 WL 6084167, at *4 (W.D. Mich. Dec. 6, 2012); *Hardaway v. Equity Residential Mgmt., LLC*, No. 13-0149, 2016 WL 3957648, at *9 (D. Md. July 22, 2016); *Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 658 (D. Nev. 2009); *Californians for Disability Rights v. Mervyn's, LLC*, 138 P.3d 207, 209 (Cal. 2006); *Richter v. CC-Palo Alto, Inc.*, 176 F. Supp. 3d 877, 899 (N.D. Cal. 2016).

'high' pricing does not constitute an unfair or deceptive trade practice"; and (ii) "Plaintiffs have failed to plead their concealment claims with the particularity required by Rule 9(b)." (Def. Mov. Br. at 6-7).

1. **Differential or High Pricing**

The Court agrees with Quest that allegations of differential pricing, by themselves, do not constitute unfair or deceptive trade practices. *See Bouffard v. Lab. Corp. of Am. Holdings*, Civ. No. 17-0193, D.E. No. 32 at 12 (M.D.N.C. Mar. 28, 2018) ("[T]here is simply no support for the proposition that a failure to charge a rate at or below that charged each Plaintiff's insurer . . . is unfair or deceptive."); *Banner Health v. Med. Sav. Ins. Co.*, 163 P.3d 1096, 1102 (Ariz. Ct. App. 2007) ("[T]he fact that hospitals routinely accept reduced payments on behalf of many patients [does not] mean that the published and billed rates are unreasonable."); *Hillsborough Cty. Hosp. Auth. v. Fernandez*, 664 So. 2d 1071, 1072 (Fla. Dist. Ct. App. 1995) (holding that "evidence of [] contractual discounts, standing alone, is insufficient to prove that [the hospital's] charges were unreasonable"); *see also Huntington Hosp. v. Abrandt*, 779 N.Y.S.2d 891, 892 (N.Y. App. Div. 2004) ("The fact that lesser amounts for the same services may be accepted from commercial insurers or government programs as payment in full does not indicate that the amounts charged to defendant were not reasonable.") (citation omitted).

This makes sense because, as Quest persuasively argues, insurers and uninsured (or underinsured) patients are not similarly situated. (Def. Mov. Br. at 8-9); *see also Galvan v. Nw. Mem'l Hosp.*, 888 N.E.2d 529, 538-39 (Ill. App. Ct. 2008) (explaining that insured and uninsured patients are not similarly situated). Quest argues that "insurers can provide a medical laboratory like [Quest] with valuable advantages." (Def. Mov. Br. at 8). For example, insurers "can provide contractual assurances that [Quest] will not only be paid, but paid promptly, for the services

[Quest] provides to covered patients." (*Id.* at 8-9). Quest can also "reasonably expect, based on the insurer's market share, that a significant number of the insurers' members will use [Quest] for their testing needs." (*Id.* at 9). Thus, as one court explained, "[t]here is nothing illegal or unauthorized . . . about hospitals contracting with insurers and government entities to accept reduced payments in satisfaction of their published rates, in return for an anticipated volume of business and prompt payments." *Banner Health*, 163 P.3d at 1101-02.

The Court also agrees with Quest that allegations of high pricing, by themselves, do not constitute unfair or deceptive trade practices. *See Margolis v. Sandy Spring Bank*, 110 A.3d 784, 794 (Md. Ct. Spec. App. 2015) (affirming dismissal of consumer-fraud claim based only on allegations of excessive pricing); *Canestaro v. Raymour & Flanigan Furniture Co.*, No. 12-1639, 2013 WL 6985415, at *3 (N.Y. Sup. Ct. May 20, 2013) ("[E]ven charging 'excessive prices' is not itself actionable under [New York's consumer-fraud statute]."); *Quigley v. Esquire Dep. Servs., LLC*, 975 A.2d 1042, 1048 (N.J. Sup. Ct. App. Div. 2009) ("Sellers of goods and services generally may charge whatever the market will bear so long as they do not engage in deceptive or other unfair sales practices."); *Rockford Mem'l Hosp. v. Havrilesko*, 858 N.E.2d 56, 64 (Ill. App. Ct. 2006) ("Charging unconscionably high prices is not, by itself, unfair under [Illinois's consumer-fraud statute].").

That said, Plaintiffs may be able to state consumer-fraud claims based on excessive pricing if they address other factors relevant to whether Quest's pricing is deceptive or fraudulent. *See, e.g.*, *State ex rel. Coffman v. Castle Law Grp., LLC*, 375 P.3d 128, 134 (Colo. 2016) (relevant factors include the defendant's actual costs and other vendors' prices); *Moran v. Prime Healthcare Mgmt., Inc.*, 208 Cal. Rptr. 3d 303, 316 (Cal. App. Ct. 2016) (relevant factors include "not only the market price, but also the cost of the goods or services to the seller, the inconvenience imposed

on the seller, and the true value of the product or service") (citation omitted); *Colomar v. Mercy Hosp., Inc.*, 461 F. Supp. 2d 1265, 1269 (S.D. Fla. 2006) (considering, among other factors, "(1) an analysis of the relevant market for hospital services (including the rates charged by other similarly situated hospitals for similar services); (2) the usual and customary rate [the defendant] charges and receives for its hospital services; and (3) [the defendant's] internal cost structure"); *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 198 (Tenn. 2001) (relevant factors include "similar charges of other hospitals in the community" and "hospital's internal factors"); *In re Dukes*, 24 B.R. 404, 413 (Bankr. E.D. Mich. 1982) (fraud claim for excessive pricing was allowed when the amount was shown to be "grossly in excess of the price for which similar services are sold" by competitors). Although Plaintiffs' opposition relies on many of these cases (*see* Pl. Opp. Br. at 36), Quest correctly points out that Plaintiffs' Complaint does not address any of these factors. (*See* Def. Reply Br. at 3-4). The Court will therefore grant Plaintiffs leave to amend their Complaint so they may address these factors. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002).

### 2. Deceptive Billing Practices

Plaintiffs characterize their fraud claims as two-fold. *First*, Plaintiffs allege that "Quest failed to disclose to plaintiffs at the time it performed services that it would charge patients without insurance or patients whose insurer denied coverage non-market rates." (Pl. Opp. Br. at 35). *Second*, Plaintiffs allege that Quest "does not inform patients whether a test was disallowed by the insurer, or whether the patient is being charged the excessive non-market" rack rate. (*Id.* at 37). Plaintiffs further allege that Quest's invoices "do not inform 'what, if any, insurance discounts or insurance payments are being applied to each lab test, and what amounts patients are being required to pay as a copy or deductible for each lab test.'" (*Id.* at 36-37) (citing Compl. ¶ 16).

- 8 -

Quest argues that Plaintiffs' concealment claims are inadequately pleaded because (i) Plaintiffs cannot show Quest concealed its use of differential pricing; (ii) Plaintiffs do not allege Quest concealed material facts on its invoices; (iii) Plaintiffs fail to allege that Quest's non-disclosures caused harm; and (iv) Plaintiffs' allegations are not pleaded with particularity for purposes of Rule 9(b). (*See* Def. Mov. Br. at 11-15).

In the Court's view, Plaintiffs' allegations that Quest failed to advise them of the non-discounted rates—even when viewed in Plaintiffs' favor—do not constitute a deceptive or unfair trade practice under the state consumer-fraud statutes. Quest provides the Court with ample authority supporting this proposition. (*See id.* at 12-13); *see also Canestaro*, 2013 WL 6985415, at *4 (finding no deceptive trade practice, in part, because "a merchant need not disclose to each potential buyer with whom it may negotiate a deeper discount under some other payment scenario"); *Levine v. Blue Shield of Cal.*, 117 Cal. Rptr. 3d 262, 277-78 (Cal. Ct. App. 2010) (finding no fraudulent or unfair business practice because "Blue Shield did not owe the [plaintiffs] a duty to disclose the lower premiums that it was willing to accept"); *Rockford Mem'l Hosp. v. Havrilesko*, 858 N.E.2d 56, 63 (Ill. App. Ct. 2006) ("[W]e are skeptical that the mere failure of a hospital to volunteer its rates is actionable . . . . Even viewing the allegation in the [plaintiffs'] favor, we are given no basis for construing the omission as deceptive."). Furthermore, the cases Plaintiffs rely on are generally distinguishable for the reasons discussed above regarding "excessive pricing." (*See* Pl. Opp. Br. at 25-26). In those cases, the plaintiffs alleged facts suggesting the prices charged were not the actual, necessary, or reasonable costs for the services. *See, e.g.*, *State ex rel. Coffman*, 375 P.3d at 130. Plaintiffs do not make any such allegations here.

Plaintiffs' claims regarding Quest's invoices fare no better. As Quest aptly notes in its reply brief, Plaintiffs' argument "wrongly assumes that Plaintiffs have adequately alleged some

sort of 'overcharging' uninsured patients." (Def. Reply Br. at 4). To the contrary, Plaintiffs have not identified any misrepresentations or omissions by Quest that appear actionable under the consumer-fraud statutes. Plaintiffs also do not allege that "the adjustments are incorrect or that [Quest] has refused to provide any further breakdown of the adjustments upon request." *See Bouffard*, Civ. No. 17-0193, D.E. No. 32 at 13. For this reason, Plaintiffs reliance on *Watts v. Jackson Hewitt Tax Serv.* is misplaced. (Pl. Opp. Br. at 38) (citing 579 F. Supp. 2d 334 (E.D.N.Y 2008)). In *Watts*, the plaintiffs alleged that Jackson Hewitt, a tax-preparation service, misrepresented their fees and then buried their actual fees in non-itemized general bills. 579 F. Supp. 2d at 341-42. The court found that the plaintiffs stated a claim under New York's consumer-fraud statute because "the defendants' non-itemized general bill made it extremely difficult for customers including plaintiffs, who are not well-acquainted with the preparation of tax returns, to determine how and whether they were *overcharged*." *Id.* at 347 (emphasis added). Here, Plaintiffs have not sufficiently alleged that they were overcharged.

Plaintiffs' reliance on *Lawn v. Enhanced Serv. Billing, Inc.* is also misplaced. (*See* Pl. Opp. Br. at 39) (citing No. 10-1196, 2010 WL 2773377 (E.D. Pa. July 13, 2010)). In *Lawn*, the plaintiff alleged that he relied on a misrepresentation in paying for a service he neither ordered nor received. *See* 2010 WL 2773377 at *5. Here, Plaintiffs do not allege that Quest failed to provide the services they requested. Nor do Plaintiffs allege, as Quest correctly points out, "that there were any issues with the timeliness or quality of the services" Quest provided. (*See* Def. Mov. Br. at 1). Similarly, Plaintiffs rely on *Harnish v. Widener Univ. Sch. of Law*, which involved misleading advertisements about a law school's post-graduate employment rates. (*See* Pl. Opp. Br. at 38) (citing 931 F. Supp. 2d 641 (D.N.J. 2013)). That case is also distinguishable. In *Harnish*, the court explained that certain omissions in the law school's posted and disseminated employment rate were material

because they failed to include notice "that the employment rate refers to all types of employment" (and not just law-related employment) and "that the rate may have been inflated by selectively disregarding employment data" (because the data did not incorporate graduates who were "not seeking work"). 931 F. Supp. 2d at 652. These facts are distinguishable from Plaintiffs' allegations.[6]

Accordingly, the Court dismisses Counts 1 through 10 *without prejudice*.

**B.  Fraud**

In Count 13, Plaintiffs assert a claim for common law fraud. (Compl. ¶¶ 223-33). To prevail on a fraud claim, a plaintiff must allege five elements: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 317 (3d Cir. 2014) (citing *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 260 (N.J. 2005)).

As discussed above, Plaintiffs have inadequately alleged that Quest made any material misrepresentations—or engaged in any fraudulent or deceptive conduct—about its services or prices. For this reason, the Court dismisses Count 13 *without prejudice.*

**C.  Breach of Contract**

In Count 11, Plaintiffs assert a claim for common law breach of contract. (Compl. ¶¶ 210-15). Plaintiffs allege that Quest provided services "pursuant to an implied contract that Quest would bill Plaintiffs (if their claims were disallowed by insurance) for the reasonable fair market value of Quest's services (*quantum meruit*)." (*Id.* ¶ 211). Plaintiffs then allege that "Quest

---

[6]  After the parties briefed Quest's motion, Plaintiffs submitted as supplemental authority *Forth v. Walgreen Co.*, Civ. No. 17-2246, 2018 WL 1235015 (N.D. Ill. Mar. 9, 2018). (D.E. No. 28). Quest has not responded to Plaintiffs' filing. The Court has considered this authority and finds it distinguishable from the facts here.

violated the terms of that implied contract by billing Plaintiffs and other members of the nationwide class at excessive rates that were not based on negotiated fair market rates agreed to between Quest and [insurers], or otherwise applicable to Plaintiffs and the nationwide Class." (*Id.* ¶ 212).

To state a claim for breach of contract, a plaintiff must allege "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007) (citation omitted).

The Court finds that Plaintiffs fail to state a claim for breach of contract. In particular, Plaintiffs' Complaint does not contain any facts to support their allegations that Quest promised, through an implied contract, to bill Plaintiffs "for the reasonable fair market value of Quest's services." (*See* Compl. ¶ 211). As Quest persuasively argues, Plaintiffs "do not allege that they ever asked [Quest] about price; they do not allege that [Quest] ever made any sort of representation to them about price; and they do not allege that [Quest] ever stated that they would be entitled to a discount . . . ." (Def. Mov. Br. at 18). With no factual support, Plaintiffs' allegations about an implied contract with terms reflecting discounted (or "reasonable fair market value") rates are merely conclusory.

To the extent that Plaintiffs' breach-of-contract claim is based on a theory of *quantum meruit*, the Court finds that Plaintiffs have failed to state such a claim. "*Quantum meruit* is a form of quasi-contractual recovery and rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Starkey, Kelly, Blaney & White v. Estate of Nicolaysen*, 796 A.2d 238, 242 (N.J. 2002) (citations and internal quotation marks omitted). "In *quantum meruit*, 'it is well settled that where one performs services for another at his request, but

without any agreement or understanding as to wages or remuneration, the law implies a promise on the part of the party requesting the services to pay a just and reasonable compensation.'" *Barnert Hosp. v. Horizon Healthcare Servs., Inc.*, No. 06-3266, 2007 WL 1101443, at *6 (D.N.J. Apr. 11, 2007) (quoting *Kopin v. Orange Prods., Inc.*, 688 A.2d 130, 137 (N.J. Sup. Ct. App. Div. 1997)). Plaintiffs contend that, under New Jersey law, Quest's fees are governed by *quantum meruit*. (*See* Pl. Opp. Br. at 14).

As an initial matter, Plaintiffs argue that Quest bears the burden of showing its prices are reasonable for purposes of Plaintiffs' *quantum meruit* claim. (*See id.* at 14-15) (citing *Starkey*, 796 A.2d at 242). Plaintiffs' argument appears unsupported by law. As Quest points out, "[n]either the authorities Plaintiffs cite, nor the allegations Plaintiffs make, support their burden-shifting theory." (*See* Def. Reply Br. at 7). Indeed, Plaintiffs rely on cases where the *performing party* brings the lawsuit, not the other way around. *See, e.g.*, *Barnert Hosp.*, 2007 WL 1101443, at *6 (explaining that hospital brought suit "to recover the reasonable value of the services rendered"); *Valley Hosp. v. Kroll*, 847 A.2d 636, 638 (N.J. Super. Ct. Law Div. 2003) (explaining that hospital brought suit to collect "for services rendered to [the defendant's] late husband"); *Starkey*, 796 A.2d at 239 (explaining that attorney brought suit "to collect either a fee or an award based on the principle of *quantum meruit* for services rendered"). And as Quest correctly notes, Plaintiffs are not the performing party that conferred a benefit—Quest is. (*See* Def. Reply Br. at 6-7). The Court therefore rejects Plaintiffs' burden-shifting argument.

Next, the Court is not persuaded Plaintiffs can even bring a *quantum meruit* claim because they are not the performing party. (*See id.*); *see Canadian Nat. Ry. v. Vertis, Inc.*, 811 F. Supp. 2d 1028, 1033 (D.N.J. 2011) ("Quantum meruit is a form of quasi-contract that enables the *performing party* to recover the reasonable value of the services rendered.") (emphasis added);

- 13 -

*Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 285 (N.J. 1992) (explaining that *quantum meruit* "entitles the *performing party* to recoup the reasonable value of services rendered") (emphasis added). But even if Plaintiffs could bring such a claim, Plaintiffs' Complaint—as it currently stands—does not adequately allege a basis for one. Plaintiffs acknowledge that Quest "maintains rack [r]ates for each laboratory test CPT code" and that insurers "at times deny patients coverage of lab tests." (Compl. ¶¶ 41-42). And although Plaintiffs allege that Quest's rack rates are "commercially unreasonable" (*id.* ¶ 41), the Court already explained why such allegations, by themselves, are insufficient to demonstrate unreasonableness. *See also Bouffard*, Civ. No. 17-0193, D.E. No. 32 at 17-20 (dismissing plaintiffs' claim for *quantum meruit* in an analogous case). Thus, the Court finds that Quest's retention of its rack rates would not be inequitable. *See Starkey*, 796 A.2d at 242 (noting that *quantum meruit* is a doctrine of equity). Plaintiffs' Complaint therefore fails to state a claim for *quantum meruit*.

Accordingly, the Court dismisses Count 11 *without prejudice*.

### D. Unjust Enrichment

In Count 12, Plaintiffs assert a claim for common law unjust enrichment. (Compl. ¶¶ 216-22). "Under New Jersey law, a claim under the quasi-contractual theory of unjust enrichment has two essential elements: (1) that the defendant has received a benefit from the plaintiff, and (2) that the retention of the benefit by the defendant is inequitable." *Siegmeister v. Benford*, No. 15-7099, 2017 WL 2399573, at *7 (D.N.J. Jun. 1, 2017) (citation and internal quotation marks omitted).

Plaintiffs' unjust-enrichment claim is virtually identical to their *quantum meruit* claim. Because the Court has already found that Quest's retention of its rack rates would not be inequitable, the Court dismisses Count 12 *without prejudice*.

## IV. CONCLUSION

For these reasons, the Court GRANTS Quest's motion to dismiss. Plaintiffs' Complaint is DISMISSED *without prejudice*. An appropriate Order accompanies this Opinion.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**