COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP
Jeffrey W. Herrmann
Audra DePaolo
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Telephone: (201) 845-9600

*Liaison Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JENNIFER BENNETT, LAWRENCE CATTI, JACOB CHERNOV, DIANA DANNELLY, CRAIG DVORAK, CLYDE FREEMAN, VALERIE FUNARI, ARTHUR GOLDSMITH, EDIE GOLIKOV, LING GONG, DOLORES HERRMANN, LONNIE HODGES, JR., MARVIN AND VICKIE LESLIE, LILY MARTYN, RYSZARD POJAWIS, JILL ROACH, CAROLYN SCOTT, and STEPHEN TIMM, individually and on behalf of all others similarly situated, | Civil Action No.    17-01590  (ES)(MAH)  JURY TRIAL REQUESTED |
| Plaintiffs, | |
| v. | |
| QUEST DIAGNOSTICS, INC., | |
| Defendant. | |

## AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

JURISDICTION AND VENUE ................................................................................. 6

PARTIES ...................................................................................................................... 6

    A.    Plaintiffs .......................................................................................................... 6

    B.    Defendant ....................................................................................................... 8

FACTUAL ALLEGATIONS ...................................................................................... 9

    A.    Quest Diagnostics and the Clinical Lab Testing Industry ........................... 9

    B.    Quest's Business Model ............................................................................... 10

    C.    Quest's Annual Revenues ........................................................................... 12

    D.    Quest's Internal Cost Structure .................................................................. 14

    E.    Quest's Tenuous Relationship with Patients .............................................. 16

    F.    List Prices for Healthcare Services, Generally .......................................... 17

    G.    Quest Chooses to do Business Without Written Customer Agreements ................... 21

    H.    Determining the Actual Market Rate for Clinical Lab Testing Services ................... 22

            1.    Medicare Rates for Clinical Lab Testing Services are Based on  Actual Third-Party Payer Rates ....................................................... 24

            2.    Medicaid Rates are Based on State-Specific Determinations of Reasonable Rates ....................................................................... 27

            3.    Private Third-Party Payer Rates are Considered Proprietary and Maintained as Closely Guarded Secrets ...................................... 29

            4.    Quest's List Prices Greatly Exceed Market Rates ......................... 29

    I.    In the Absence of an Agreement, The Court Should Establish the Reasonable Price of Quest's Services ....................................................... 30

    J.    Plaintiffs' Claims ........................................................................................ 32

    K.    Quest's Unreasonable List Prices .............................................................. 66

L.   Quest's Other Business Practices Deceive or Harass Customers Into Paying Excessive Bills .......................................................................................... 75

   1.   Aggregating Insurance Discounts and Payments Deceives Patients into Believing that Their Clinical Lab Testing is Fully Covered by Insurance ..... 75

   2.   Quest Sends Out Threatening Letters Demanding Payment........................... 77

M.   Other Complaints About Quest's Billing Practices .................................... 77

N.   There is No Burden on the Physician or Patient to Determine Insurance Coverage or the Market Rate of Clinical Lab Tests .................................... 87

CLASS ALLEGATIONS ........................................................................................ 92

CAUSES OF ACTION ........................................................................................... 96

PRAYER FOR RELIEF ....................................................................................... 116

JURY DEMAND ................................................................................................... 117

Plaintiffs Jennifer Bennett, Lawrence Catti, Jacob Chernov, Diana Dannelly, Craig

Dvorak, Clyde Freeman, Valerie Funari, Arthur Goldsmith, Edie Golikov, Ling Gong, Dolores

Herrmann, Lonnie Hodges, Jr., Marvin and Vickie Leslie, Lily Martyn, Ryszard Pojawis, Jill

Roach, Carolyn Scott, and Stephen Timm (collectively, "Plaintiffs" and each individual

"Plaintiff"), individually and on behalf of all others similarly situated, bring this complaint

against Quest Diagnostics, Inc., inclusive of all subsidiaries and affiliates ("Quest," the

"Company," or "Defendant").  Plaintiffs' allegations are based upon information and belief,

including the investigation of counsel, except as to the allegations that pertain to Plaintiffs, which

are based on their personal knowledge.

## INTRODUCTION

1.      Quest is the largest medical laboratory service provider in the United States.  Its

core business performs clinical lab testing services for patients nationwide.  In total, Quest

processed over 164 million lab test requisitions (orders) in 2017.

2.      This Action is brought as a class action on behalf of all Quest patients in the

United States who, without any express contract with Quest that establishes the amount of fees to

be paid to Quest, were charged fees for clinical lab testing services performed by Quest that were

in excess of the reasonable market rates for the same services (the "Class").

3.      Plaintiffs and the Class seek a declaratory judgment that because no express

contract exists between Quest and the members of the Class, the parties are subject to a contract

either implied-in-law or implied-in-fact, pursuant to which Quest is entitled to recover only a

reasonable price for its clinical lab testing services.  *See* Restatement (Second) of Contracts, §§ 5

and 204.  Plaintiffs and the Class also seek a declaratory judgment that Quest's list prices are not

a reasonable price for its services because the list prices far exceed the usual and customary rate

for the services provided, *i.e.*, the market rates typically paid for the same services by third-party

payers who are responsible for an overwhelming majority of Quest's revenue (approximately 93% on a fee-for-service basis), and include a grossly excessive markup on Quest's cost to provide the services.

4.      Plaintiffs also assert claims against Quest for unjust enrichment/restitution and unfair and deceptive trade practices in violation of state statutes.

5.      The Class consists of patients who make up less than 1% of Quest's clinical lab testing volume, but contribute up to 3% of Quest's net revenue.  These patients are charged Quest's list prices for clinical lab tests, which are up to ten times higher than the negotiated rates paid by third-party payers, such as private insurers or Medicare.  While healthcare service providers such as Quest maintain exorbitant list prices for their services, those list prices are never *paid* by sophisticated third parties.  The list prices are solely a starting point to negotiate with third-party payers (*e.g.*, insurance companies) who obtain huge discounts, and for charging patients whose insurance denies coverage or are uninsured (*e.g.*, the Class members).

6.      Typically, physicians write prescriptions for clinical lab tests and the specimens are collected either at the physician's office or at a Quest location.  Either way, Quest is provided with the medical diagnosis code and/or CPT code[1] or HCPCS code[2] for each prescribed clinical lab test, as well as the patient's insurance information (for insured patients).  Quest performs the prescribed clinical lab tests whether the billing information is correct or complete and, if the service is covered by insurance, Quest bills the third-party payer at a negotiated rate.  If the

---

[1] "CPT code" means Current Procedural Terminology code, and is a set of medical codes for healthcare-related laboratory procedures, and is maintained by the American Medical Association ("AMA").

[2] "HCPCS code" means Healthcare Common Procedure Coding System code, which is a major code set for healthcare services and was developed by the Centers for Medicare and Medicaid Services ("CMS").

service is not covered by insurance, there is no express agreement as to the appropriate price and Quest chooses to bill the patient at its exorbitant list rate.

7.     Insurance denies coverage when clinical lab tests, in the opinion of the insurer as opposed to the physician, are not "medically necessary" or otherwise violates the insurer's protocol for allowable testing.  Except in certain instances, including under Medicare regulations, the patient is not advised in writing of the list price of the service or whether insurance is likely to cover the service prior to the clinical lab testing services being performed.

8.     Quest's list prices are substantially above the rates Quest customarily charges and receives from its customers.  List prices are only demanded from the unwary 1% or so of customers whose insurance either denied coverage of their claims or who are uninsured.  Third-party payers, who contribute an overwhelming majority of Quest's net revenue (approximately 93% on a fee-for-service basis), pay negotiated rates that are substantially lower than Quest's list prices.

9.     Quest's list prices are also substantially above the rates customarily received by other similarly situated lab companies for similar services.  For instance, when comparing the list prices Quest charged Plaintiffs to the median third-party payer rate across the United States (as reported by the Centers for Medicare and Medicaid Services ("CMS")) in relation to Medicare's 2017 rates), the implied markup averaged 3.32 times the third-party payer rates, with a median of 3.18 times.  Comparing the same list prices to the 2018 Medicare rates, which are equal to the median third-party payer rates derived from data produced by large independent clinical lab testing service providers (such as Quest) following a governmental finding that Medicare was overpaying for clinical lab tests, the implied markup averaged 5.29 times the 2018 rates, with a median of 5.23 times.

10.     This is consistent with Quest's own statistics.  Whereas only approximately 1% of Quest's patients are self-pay, they contribute 3% of Quest's net revenue.  Thus, Quest charges self-pay patients between 2.6 and 3.8 times the rate per test requisition as it collects from third-party payers.  *See infra* ¶¶ 58-59.

11.     Moreover, considering Quest's internal cost structure, Quest's list prices are substantially in excess of cost.  For example, the negotiated rates paid by third-party payers are highly profitable.  Indeed, Quest reported a gross profit margin (which reflects the percent of net revenue after subtracting the cost of services) of approximately 38.79% for 2017, with approximately 93% of its net revenue being contributed by third-party payers.  Inasmuch as the list prices charged to self-pay patients is 2.6 to 3.8 times (or approximately 3 times) greater than the rates expected to be paid by insured customers, the implied cost of service to self-pay patients is 20.4% (61.21% divided by 3), and the gross profit margin to self-pay patients is an astounding 79.6%.

12.     Plaintiffs do not dispute Quest's right to charge its patients high rates, but rather contend that Quest *must* secure patients' consent in advance of demanding payment of those rates.  Absent a written agreement to pay list prices, Quest's rates *must* be limited to reasonable prices.

13.     Notably, Quest does not attempt to enter into an arrangement to collect its egregious list prices until *after* services are performed and adjudication—the process of billing any financially responsible third-party payer for its negotiated rate—is completed and the patient is deemed financially responsible for one or more of Quest's clinical lab tests.  Although the list prices are exorbitant amounts intended only as a tool for negotiating with equally sophisticated third-party payers and are generally not paid, Quest remains unwilling to meaningfully negotiate

the amount owed by its least sophisticated consumers who lack any real bargaining power.  *See* Catti discussion ¶158; Dvorak discussion at ¶199; Goldsmith discussion at ¶230; Golikov discussion at ¶238; Hodges discussion at ¶288; Pojawis discussion at  ¶326; Roach discussion at ¶340; Timm discussion at ¶372, *infra*.

14.     To make matters worse, the amounts Quest is typically paid for its services by third-party payers (other than government payers such as Medicare and Medicaid) are deemed proprietary information and considered highly confidential.  In fact, at the outset of this Action, Magistrate Judge Hammer denied plaintiffs' application for discovery of those rates precisely because Quest argued that the rates are proprietary.  *See* Dkt. 27.  These market-based rates are therefore unavailable to patients and physicians, which creates an opaque marketplace that fails to reflect the true value of the services being invoiced.

15.     As a result, patients receiving Quest's outrageous bills are left with limited recourse given that the lab tests have already been performed and there is no marketplace from which to calculate a reasonable price.  They are forced to either pay Quest outrageous amounts or endure Quest's collection efforts, which includes being barred from receiving clinical lab testing services from Quest in the future, threats of the debt being sold to a collection agency, and the risk of a negative report being submitted to credit rating agencies.  *See infra* ¶389 and citations therein.

16.     Plaintiffs and the Class are therefore entitled to relief in the form of a declaratory judgment declaring the rights and obligations of Quest and the Class to pay a reasonable price under an implied contract (whether in-law or in-fact).

17.     This Action is also brought on behalf of a sub-class of all Quest patients in the United States who, without any express contract with Quest that establishes the amount of fees to

be paid to Quest, were charged fees for clinical lab testing services performed by Quest that were in excess of the reasonable market rates for the same services (the "Payor Sub-Class").  The Payor Sub-Class is seeking restitution or disgorgement, to prevent Quest from being unjustly enriched, equal to the amount of overcharge (the difference between the amount paid and the reasonable market rate).

18.     Additionally, there are numerous sub-classes asserting state-specific claims under applicable consumer protection statutes.

## JURISDICTION AND VENUE

19.     Plaintiffs invoke the subject matter jurisdiction of this Court pursuant to 28 U.S.C. §1332(d), which confers original jurisdiction upon this Court over this class action based on diversity of citizenship: (a) there are 100 or more Class members; (b) the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; and (c) at least one Plaintiff and member of the Class is a citizen of a state different from the Defendant.

20.     This Court also has supplemental jurisdiction over Plaintiffs' state law and common law claims pursuant to U.S.C. §1367(a).

21.     This Court possesses personal jurisdiction over the Defendant based on Quest's residence, presence, transaction of business and contacts within this District.

22.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because Quest maintains its principal place of business in this District, and at all times conducted substantial business herein.

## PARTIES

### A.   PLAINTIFFS

23.     Jennifer Bennett resides in Illinois.  At all relevant times, Plaintiff Bennett and her son maintained health insurance through Aetna.

24.     Lawrence Catti resides in Pennsylvania.  At all relevant times, Plaintiff Catti maintained health insurance through Aetna.

25.     Jacob Chernov resides in Arizona.  At all relevant times, Plaintiff Chernov maintained health insurance through Medicare.

26.     Diana Dannelly resides in California.  At all relevant times, Plaintiff Dannelly was uninsured.

27.     Craig Dvorak resides in California.  At all relevant times, Plaintiff Dvorak maintained health insurance through Medicare and Medigap insurance through HealthNet.

28.     Clyde Freeman resides in Colorado.  At all relevant times, Plaintiff Freeman maintained health insurance through Anthem Blue Cross Blue Shield.

29.     Valerie Funari resides in Florida.  At all relevant times, Plaintiff Funari maintained health insurance through Medicare.

30.     Arthur Goldsmith resides in Nevada.  At all relevant times, Plaintiff Goldsmith maintained health insurance through Medicare.

31.     Edie Golikov resides in California.  At all relevant times, Plaintiff Golikov maintained health insurance through Aetna.

32.     Ling Gong resides in Michigan.  At all relevant times, Plaintiff Gong maintained health insurance through Blue Cross Blue Shield of Michigan.

33.     Dolores Herrmann resides in Pennsylvania.  At all relevant times, Plaintiff Herrmann maintained health insurance through Medicare.

34.     Lonnie Hodges, Jr. resides in California.  However, the clinical lab testing services at issue herein were performed in Pennsylvania.  At all relevant times, Plaintiff Hodges maintained health insurance through UnitedHealthcare.

7

35.     Marvin and Vickie Leslie reside in Texas.  Plaintiff Marvin Leslie is proceeding on his claims against Quest individually and as assignee of the claims belonging to his wife, Vicki Leslie. At all relevant times, Mr. and Mrs. Leslie maintained health insurance through Aetna.

36.     Lily Martyn resides in New York.  However, the clinical lab testing services at issue herein were performed in North Carolina, which was her primary place of residence at that time.  At all relevant times, Plaintiff Martyn was uninsured.

37.     Ryszard Pojawis resides in Connecticut.  Plaintiff Pojawis is proceeding on his claims against Quest individually and as assignee of any claims belonging to his wife, Teresa Pojawis.  At all relevant times, Pojawis, his wife, and his daughter maintained health insurance through Anthem BlueCross BlueShield.

38.     Jill Roach resides in Maryland.  At all relevant times, Plaintiff Roach was uninsured.

39.     Carolyn Scott and Cheryl Banker reside in Florida.  Plaintiff Scott is the mother and assignee of the claim of Cheryl Banker.  At all relevant times, Banker maintained health insurance through Medicare.

40.     Stephen Timm resides in California.  At all relevant times, Timm maintained health insurance through Anthem Blue Cross and Blue Shield.[3]

**B.    DEFENDANT**

41.     Quest is a Delaware corporation with its principal place of business and headquarters located at 500 Plaza Drive, Secaucus, New Jersey 07094.  It is one of the largest

---

[3] Liang Yu's claims asserted in the Initial Complaint (Doc. 1) have been omitted from this Amended Complaint because she has since been reimbursed for the amount paid, mooting her claims.

providers of diagnostic and clinical testing services in the United States, operating over 2,200 patient service centers.  Quest is the parent company of numerous subsidiaries that provide lab testing, patient billing and related services.  Quest is a publicly traded company and is listed and traded on the New York Stock Exchange under the ticker symbol "DGX."

## FACTUAL ALLEGATIONS

### A.   QUEST DIAGNOSTICS AND THE CLINICAL LAB TESTING INDUSTRY

42.   According to Quest's most recent 10-K for the year ended December 31, 2017 (the "10-K"), "[c]linicians use clinical testing for predisposition, screening, monitoring, diagnosis, prognosis and treatment choices of diseases and other medical conditions."  [10-K at 15].  There are two categories of clinical testing, clinical laboratory testing and anatomic pathology services.

43.   Clinical laboratory testing "generally is performed on whole blood, serum, plasma and other body fluids, such as urine, and specimens such as a microbiology samples."  [10-K at 15].  Routine clinical tests "measure[] various important bodily health parameters such as the functions of the kidney, heart, liver, thyroid and other organs."  [*Id.*]  These include blood chemistries, urinalysis, allergy tests and complete blood cell counts.  Anatomic pathology services, on the other hand, "are performed on tissues, such as biopsies, and other samples, such as human cells."  [*Id.*].

44.   Throughout the United States, clinical lab testing services generally must be prescribed by a physician.  For example, pursuant to 42 CFR 410.32, Medicare require lab tests "be ordered by the physician who is treating the beneficiary."  Diagnostic testing is prescribed by a combination of medical diagnoses codes and CPT codes or HCPCS codes.

B.    QUEST'S BUSINESS MODEL

45.    Quest is "the world's leading provider of diagnostic information services" and "the leading provider in the United States of clinical laboratory and anatomic pathology testing, and related services."  [10-K at 9].  It processed approximately 164 million requisitions in 2017. [*Id.*].  Moreover, Quest's patients "comprise approximately one-third of the adult population of the United States annually, and approximately one-half of the adult population in the United States over a three-year period."  [*Id.* at 11].

46.    Quest's Chief Executive Officer (CEO) and Chief Financial Officer (CFO)—Stephen H. Rusckowski and Mark J. Guinan, respectively—both maintain their offices in New Jersey.  *All* major issues regarding billing and collection practices of patients, and other members of the Class, emanate from New Jersey.

47.    Quest consists of two different businesses: (1) Diagnostic Information Services ("DIS") and (2) Diagnostic Solutions ("DS").   The DIS business "develops and delivers diagnostic information services" by performing and analyzing clinical lab tests (such as those at issue in this Complaint).  [10-K at 14].  The DS business "includes [Quest's] risk assessment services business, which offers solutions for insurers, and [Quest's] healthcare information technology businesses, which offers solutions for healthcare providers."  [*Id.*].  Only the DIS business is relevant to the allegations included herein.

48.    Quest's DIS business maintains clinical testing laboratories, offices, data centers, call centers, distribution centers and patient service centers throughout the United States.  [10-K at 44].  Its principal testing facilities are located throughout the United States in: Sacramento, California; West Hills, California; San Juan Capistrano, California; Tampa, Florida; Atlanta, Georgia; Chicago, Illinois; Marlborough, Massachusetts; Baltimore, Maryland; Teterboro, New

Jersey; Philadelphia, Pennsylvania; Dallas, Texas; Chantilly, Virginia; Lenexa, Kansas; Greensboro, North Carolina; Lewisville, Texas; and Cleveland, Ohio.  [*Id.* at 45].

49.     Quest is able "to increase [its] share of the overall diagnostics information services industry" because of its "large network[] and lower cost structure[]."  [10-K at 26.  As such, the Company has been actively consolidating the clinical lab testing industry through strategic acquisitions of other diagnostic information service providers.  For example, the following acquisitions were completed in 2017:

    a.   the outreach laboratory service business of PeaceHealth Laboratories on May 1, 2017;

    b.   Med Fusion, LLC and Clearpoint Diagnostic Laboratories LLC on July 14, 2017;

    c.   the outreach laboratory service businesses of two hospitals of Hartford HealthCare Corporation, The William W. Backus Hospital, and The Hospital of Central Connecticut on September 28, 2017;

    d.   Cleveland HeartLab, Inc. on December 1, 2017; and

    e.   certain assets of the clinical and anatomic pathology laboratory business of Shiel Holdings, LLC on December 7, 2017.

50.     Quest's services are primarily provided under the Quest brand, but also the following brands: AmeriPath®, Dermpath Diagnostics®, Athena Diagnostics®, ExamOne®, and Quanum®.  [10-K at 16].

51.     Frequently insurance mandates that patients utilize Quest's lab services. Accordingly, patients have little choice but to use Quest's services, even when insurance does not pay.

52.     Quest's customers consist of health plans, clinicians, hospitals, employers, and emergency retail healthcare providers, as well as, to a much lesser extent, patients and other laboratories.  [10-K at 22-25].  Quest "generally bill[s]" health plans and other third-party payers, such as hospitals, for clinical lab testing services based upon a negotiated rate for services performed (a "fee-for-service" structure).  [*Id.* at 23-24, 28].

53.     Quest's business model resulted in high revenues and large profits for Quest in 2017.

## C.     QUEST'S ANNUAL REVENUES

54.     Quest reported $7.71 billion in total net revenue for 2017, $7.515 billion in 2016, and $7.493 billion in 2015.  [10-K at F-4].  This amount is broken down in the 10-K by major services provided as follows (figures in millions):

| Major Service Category | 2017 | 2016 | 2015 |
|---|---|---|---|
| Routine clinical lab testing services | $  4,309 | $  4,179 | $  4,078 |
| Gene-based and esoteric (including advanced diagnostics) testing services | 2,449 | 2,335 | 2,256 |
| Anatomic pathology testing services | 612 | 624 | 631 |
| All other | 339 | 377 | 528 |
| Total net revenues | $  7,709 | $  7,515 | $  7,493 |

55.     In reporting its net revenue figures, Quest "recognizes revenue for services rendered upon completion of the testing process."  [10-K at F-9].  "Billings for services reimbursed by third-party payers, including Medicare and Medicaid, are recorded as revenues net of allowances for differences between amounts billed and the estimated receipts from such payers."  [*Id.*].

56.     As the above table demonstrates, Quest's DIS (Diagnostic Information Services) business—which is responsible for routine clinical lab testing services, gene-based and esoteric

testing services, and anatomic pathology testing services—earned around 96% of Quest's net revenue in 2017, equal to approximately $7.37 billion.  [10-K at 60].

The following table breaks down the percent of DIS's volume and revenue by customer group. [10-K at 63]:

| Customer Group | % of DIS Volume | % of DIS Revenues |
|---|---|---|
| Healthcare Insurers (including patients' coinsurance and deductible responsibilities) | 47 | 51 |
| Government Payers | 15 | 17 |
| Client Payers[4] | 37 | 29 |
| Patients | 1 | 3 |

57.     As is demonstrated by the table above, 97% of Quest's revenues are derived from third-party payers, not patients.

58.     Being that Quest processed approximately 164 million clinical lab test requisitions in 2017 [10-K at 9], and reported $7.71 billion in total net revenue for the same period, the average payment amount per requisition, per customer group is as follows:

| Customer Group | Average Payment Per Requisition |
|---|---|
| Healthcare Insurers (including patients' coinsurance and deductible responsibilities) | $51.01 |
| Government Payers | $53.28 |
| Client Payers | $36.85 |
| Patients | $141.04 |

59.     Based on this information alone, patients are charged 2.6 to 3.8 times the amount paid per requisition by other third-party payers.

---

[4] "Client payers include physicians, hospitals, ACOs, IDNs, employers, other commercial laboratories and institutions for which services are performed on a wholesale basis, and are billed based on a negotiated fee schedule."  [10-K at 64].  While client payers are responsible for 37% of Quest's clinical lab testing volumes, they only contribute 29% of its revenue.  This demonstrates that the negotiated rates paid by "client payers" are below other third-party payers, such as health insurers and government payers.

D.  QUEST'S INTERNAL COST STRUCTURE

60.  Quest's business model is highly profitable.  While reporting net revenue of $7.71 billion in 2017, Quest's cost of services were only $4.719 billion (61.2% of net revenue).  This yields a gross profit of $2.99 billion, and a gross profit margin of approximately 38.8% of net revenue.  [10-K at F-44].

61.  "Cost of services consists principally of costs for obtaining, transporting and testing specimens as well as facility costs used for the delivery of [Quest's] services."  [10-K at 70].

62.  Additionally, Quest's selling, general and administrative expenses were approximately $1.75 billion in 2017, which consisted of costs for "sales and marketing efforts, billing operations, bad debt expense, and general management and administrative support as well as administrative facility costs."  [*Id.*].  Deducting $75 million from Quest's net revenue for amortization of intangible assets and other net operating expenses, Quest's total operating income for 2017 was equal to $1.165 billion, or an operating margin of 15.11%.

63.  Quest also reported that the operating earnings attributable to its DIS business were $1.313 billion.  [10-K at F-42].  As such, the operating margin for Quest's DIS business was approximately 17.82%.

64.  After accounting for non-operating expenses, income taxes, profits earned through investments in other companies, and the net income attributable to non-controlling interests, Quest's 2017 net income was equal to approximately $772 million, or an overall profit margin of approximately 10%.  [10-K at 67].

65.     Below is a breakdown of Quest's net income for 2015 through 2017, as reported

in its 10-K.  [10-K at F-4].

### QUEST DIAGNOSTICS INCORPORATED AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF OPERATIONS
### FOR THE YEARS ENDED DECEMBER 31, 2017, 2016 AND 2015
#### (in millions, except per share data)

|  | 2017 | 2016 | 2015 |
|---|---|---|---|
| Net revenues | $ 7,709 | $ 7,515 | $ 7,493 |
| Operating costs and expenses and other operating income: |  |  |  |
| Cost of services | 4,719 | 4,616 | 4,657 |
| Selling, general and administrative | 1,750 | 1,681 | 1,679 |
| Amortization of intangible assets | 74 | 72 | 81 |
| Gain on disposition of business | — | (118) | (334) |
| Other operating expense (income), net | 1 | (13) | 11 |
| Total operating costs and expenses, net | 6,544 | 6,238 | 6,094 |
| Operating income | 1,165 | 1,277 | 1,399 |
| Other income (expense): |  |  |  |
| Interest expense, net | (151) | (143) | (153) |
| Other income (expense), net | 16 | (48) | (143) |
| Total non-operating expenses, net | (135) | (191) | (296) |
| Income before income taxes and equity in earnings of equity method investees | 1,030 | 1,086 | 1,103 |
| Income tax expense | (241) | (429) | (373) |
| Equity in earnings of equity method investees, net of taxes | 35 | 39 | 23 |
| Net income | 824 | 696 | 753 |
| Less: Net income attributable to noncontrolling interests | 52 | 51 | 44 |
| Net income attributable to Quest Diagnostics | $ 772 | $ 645 | $ 709 |

66.     Quest's profitability is also evidenced by its return of capital to stockholders, who

have received quarterly dividends that were increased from $0.40 to $0.45 per share in the fourth

quarter of 2016, and from $0.45 to $0.50 per share as declared in January 2018.  [10-K at 46].

Additionally, in December 2015 and 2016, respectively, Quest's Board of Directors authorized

the Company to repurchase $500 million and $1 billion worth of Quest common stock,

respectively.  As of December 31, 2017, Quest had repurchased approximately $600 million

worth of common stock.  [*Id.* at 75].  According to *Bloomberg*, as of May 8, 2018, Quest had

135.8 million common shares outstanding and a market capitalization of $13.7 billion.

67.     Further, in its Notice of 2018 Annual Meeting and Proxy Statement [at 37], dated April 4, 2018, Quest reported that its CEO, Stephen H. Rusckowski, earned a total compensation package in 2015, 2016, and 2017 equal to approximately $9.71 million, $10.25 million, and $10.35 million, respectively.  Such high compensation is indicative of a highly profitable enterprise.

68.     Quest's profitability is expected to continue growing through cost reduction.  The Company has been implementing a multi-year program called Invigorate, "which is designed to reduce [Quest's] cost structure and improve [Quest's] performance."  Indeed, from 2011 to 2017, the Invigorate program has generated "run-rate savings in excess of $1.3 billion."  [10-K at 61].

E.     QUEST'S TENUOUS RELATIONSHIP WITH PATIENTS

69.     Quest institutes inequitable and unjust practices to collect excessive amounts from patients who are financially responsible for paying for their own clinical lab testing services.

70.     Self-pay patients are only financially responsible for 1% of Quest's total testing volume, and were the sources of approximately 3% of Quest's total net revenue in 2017.[5]  As Quest recognizes, patients are "bearing increased financial responsibility for their healthcare." [10-K at 25].  However, patients are also Quest's only customers who are required to pay Quest's list prices in full.

71.     As provided in ¶¶ 58-59, *supra*, self-pay patients pay, on average, significantly more per clinical lab test requisition than Quest's other customers.

72.     Physicians are Quest's "primary referral source."  [10-K at 23].  By Quest's own estimates, it serves "approximately half of the physicians and half of the hospitals in the United States."  [*Id.* at 11].

---

[5] Quest does not break out separate income figures for self-pay patients.

73.     Additionally, Quest has negotiated to become the exclusive provider under Aetna and Qualcare insurance plans (among others).  Patients with Aetna or Qualcare insurance are therefore required to use Quest if they want any of their clinical lab tests covered by their Aetna insurance policy.  For these individuals, they have no other option but to use Quest or pay out-of-network clinical lab testing fees.  To the extent the insurer denies coverage on a claim, these patients have no recourse other than to pay Quest's excessive list price.

74.     Whether a patient has insurance or not, Quest's actions leave them at risk of receiving invoices demanding full payment of list prices, far in excess of what an overwhelming majority (93% [6]) of Quest's customers actually pay for its services.  Indeed, Quest "perform[s] the requested testing and report[s] results regardless of whether the billing information is correct *or complete*."  [10-K at 28] (emphasis added).

## F.     LIST PRICES FOR HEALTHCARE SERVICES, GENERALLY

75.     "Fee schedule rate," "list price" and "chargemaster rate" are used interchangeably herein and form the basis for the amounts charged by healthcare service providers.  [10-K at 64].

76.     Within the healthcare industry, Quest and other healthcare service providers, such as hospitals and physicians, maintain fee schedules for their services, referred to as "list prices" or, in the hospital setting, "chargemaster rates."  The "defining feature [of a list price or chargemaster rate] is that it is 'devoid of any calculation related to cost' and is not based on market transactions."  Barak D. Richman, JD, PhD; Nick Kitzman, JD; Arnold Milstein, MD,

---

[6] The 93% figure is derived from the fact that 97% of DIS's net revenue was earned from third-party payers (not patients), but 4% of that revenue was earned through "capitated payment arrangements."  [10-K at 61].  Under a capitated payment arrangement, Quest "provides services at a predetermined monthly reimbursement rate for each covered member, generally regardless of the number or cost of services provided."  [10-K at 23].  As such, the 4% of revenue earned as a result of capitated payment arrangements is excluded from the discussion of Quest's revenue earned on a fee-for-service basis, which is how Quest billed Plaintiffs and the Class.

MPH; and Kevin A. Shulman, MD, *Battling the Chargemaster: A Simple Remedy to Balance Billing for Unavoidable Out-of-Network Care*, The American Journal of Managed Care, Vol. 23, No. 4, e100-e105, at e101 (April 2017).  Indeed,

> [h]ospital accounting experts agree that hospital billing practices "encourage manipulation of the [chargemaster] to maximize revenue" and have created a "legal fiction" that now serves as the basis of billing uninsured and OON [out-of-network] patients.  In determining the amount that providers accept from third-party payers, "[c]hargemaster rates, in reality, serve nothing more than the [hospital's] starting point for negotiations."

> *Id.* at e101 (citations omitted).

77.     Another article discussing healthcare billing practices similarly found that "list or chargemaster prices are exorbitant and unfair, because they reflect prices that are set to be discounted and not paid."  George A. Nation III, *Healthcare and the Balance-Billing Problem: The Solution Is the Common Law of Contracts and Strengthening the Free Market for Healthcare*, 61 Vill. L. Rev. 153, 153 (2016) (citing cases).  For example, "chargemaster rates that hospitals claim are usual and customary are instead exorbitant amounts, arbitrarily set by hospitals, as a starting point for negotiating huge discounts with insurers."  *Id.* at 154. Additionally, the list prices "bear no relationship to the hospital's cost, and, if they are paid, yield truly enormous profits to the hospital."  *Id.* at 162.  As a result, "while hospitals claim that the chargemaster rates reflect their usual and customary *charge* for services, they certainly do not represent the usual price actually *paid* for the listed goods and services."  *Id.* at 158 n.28 (citation omitted and emphasis in original).  In fact, "no sane person properly informed would agree to pay them."  *Id.* at 187.  Accordingly, "chargemaster or list prices are not fair or reasonable."  *Id.* at 158 n.28.

78.     Another article reached the same conclusion that list prices "often have no basis in either the cost of the service or in genuinely negotiated prices (the ones secured by insurers)."

Mark A. Hall & Carl E. Schneider, *Patients as Consumers: Courts, Contracts, and the New Medical Marketplace*, 106 Mich. L. Rev. 643, 676 (2008).   Indeed, "doctors' and especially hospitals' prices are so complex and arbitrary that patients could not hope to understand them were they revealed." *Id.* at 666.  As a result, "prices go beyond mere unreasonability and become unconscionable." *Id.* at 676.

79.     Additionally, The New York Times released a report, dated May 8, 2013, summarizing findings from data released for the first time by the CMS.  This data "show[ed] that hospitals charge Medicare wildly differing amounts — sometimes 10 to 20 times what Medicare typically reimburses — for the same procedure, raising questions about how hospitals determine prices and why they differ so widely."  Barry Meier, Jo Craven McGinty and Julie Creswell, *Hospital Billing Varies Wildly, Government Data Shows*, THE NEW YORK TIMES (May 8, 2013). According to the article, neither Medicare nor private insurers pay the chargemaster rates; it is the uninsured and those with inadequate insurance that are forced to pay these rates.  As reported in The Times, "the people who can afford it least — those with little or no insurance — are getting hit with extremely high hospitals bills that may bear little connection to the cost of treatment." *Id.*

80.     In his testimony before Congress on March 15, 2006, Gerard F. Anderson—a Professor in the Bloomberg School of Public Health and in the School of Medicine at Johns Hopkins University, as well as the Director of the Johns Hopkins Center for Hospital Finance and Management—explained:

> List prices are established by the hospitals and physicians without any market constraints. Too often list prices have no relationship to the prices that are actually being paid by insurers. The prices should reflect the market place and should not be dictated by only the hospitals and physicians.

What's the Cost?: Proposals to Provide Consumers with Better Information about Healthcare

Service Costs, 109th Cong. 103, Serial No. 109-70 (March 15, 2006) (testimony of Gerard F.

Anderson, Director, Johns Hopkins Center for Health Finance and Management) (hereinafter,

"Anderson Testimony") at 100.

81.     Professor Anderson continued, "***Under the current system hospitals and***

***physicians have the ability to post any price they choose. There is not a requirement that***

***anyone ever pays that posted price and in fact the posted price is seldom paid.***" *Id.* at 105

(emphasis in original).  This is because "***[t]he hospital or hospital system has complete***

***discretion to set each and every charge on the charge master file.*** The hospitals often do not

know how they set each charge on the charge master file." *Id.* at 106 (emphasis in original).

Professor Anderson concluded that "***charges are not set by market forces or using a systematic***

***methodology.***" *Id.*  (emphasis in original).

82.     TIME magazine published an extensive article that presented striking examples of

the unreasonableness of list prices.  In one particularly relevant example, an individual was

charged $15,000 for "blood and other lab tests" that, "[h]ad [the individual] been old enough for

Medicare, [the lab service provider] would have been paid a few hundred dollars for all those

tests."  Steven Brill, *Bitter Pill: Why Medical Bills Are Killing Us*, TIME, Feb. 20, 2013.  In

attempting to decipher how the list prices were derived, the reporter "quickly found" that,

> although every hospital has a chargemaster, officials treat it as if it were an eccentric
> uncle living in the attic. Whenever I asked, they deflected all conversation away
> from it.  They even argued that it is irrelevant.  I soon found that they have good
> reason to hope that outsiders pay no attention to the chargemaster or the process
> that produces it.  For there seems to be no process, no rationale, behind the core
> document that is the basis for hundreds of billions of dollars in health care bills.

*Id.* As one hospital spokesman admitted, "[t]hose are not our real rates," and that the chargemaster list is simply "a list we use internally in certain cases, but most people never pay those prices. I doubt that [the CEO] has even seen the list in years." *Id.*

83.    As aptly stated in a Seton Hall Legislative Journal article:

> The stories are neither new nor surprising to the American public at large. These are stories of the excessive billing practices by American hospitals of the nation's uninsured - typically the segment of our population least able to pay for medical care. These billing practices and subsequent collection actions can be directly linked to increasing rates of personal bankruptcies caused by medical debt.  They are also the source of the uninsured's reluctance to seek care due to the fear of facing bills so overwhelming that they cause financial ruin.

Tamara R. Coley, *Extreme Pricing of Hospital Care for the Uninsured*, 34 Seton Hall Legis. J. 275, 276 (2010).

84.    Adding insult to injury, patients are generally not privy to actual payment information, which is considered proprietary.  Healthcare service providers negotiate these rates with third-party payers, then conceal the rates resulting from those market-based negotiations. The combination of these practices—inflated list prices and confidential payment amounts—results in the United States healthcare marketplace being uncharacteristically opaque.

**G.    QUEST CHOOSES TO DO BUSINESS WITHOUT WRITTEN CUSTOMER AGREEMENTS**

85.    Quest's specimens are typically collected for testing either at the physician's or Quest's office.  Quest customarily performs the lab testing services prior to processing the billing information and determining the anticipated price or financially responsible party.  Price and paying party information is determined during the claims adjudication process, which involves potential third-party payers (*e.g.*, an insurance company) determining the extent of its financial responsibility on behalf of a patient.  It is during the claims adjudication process that coverage and price is determined, although the price for third-party payers is generally derived from a negotiated fee schedule in place with the third-party payer for whom Quest is in-network.

86.     If the third-party payer decides to deny or reduce payment to Quest, it is typically because the lab testing services were either not covered under the patient's healthcare insurance plan, or the billed service level was not appropriate for the medical diagnosis or procedure codes included on the claim submission.

87.     Quest does not seek to enter into agreements in advance with patients in the event the patient is financially responsible for making payment.  As such, the amount such a patient is charged is not a negotiated or contractual rate, but Quest's arbitrary list price.  [*See* 10-K at 64].

88.     However, Quest does not display its list prices on line or at its diagnostic centers, although these are the prices that Quest charges patients financially responsible for making payment.

## H.     DETERMINING THE ACTUAL MARKET RATE FOR CLINICAL LAB TESTING SERVICES

89.     A market rate is defined as "the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts."  *See* IRS Publication 561.  *See also* Restatement (Second) of Contracts, § 204.

90.     Accordingly, the market rate for clinical lab testing services can be determined by analyzing the amounts *paid* by third-party payers who reimburse service providers on a fee-for-service basis (which represent approximately 93% of Quest's revenue), in contrast to the amounts *charged* for similar services, which are rarely paid and based on arbitrary, unilaterally imposed list prices.

91.     There is substantial support for this conclusion.  As Gerard Anderson testified before Congress:  "***prices need to be reasonable. By reasonable I mean the prices must reflect what is being paid in the market place.***"  *See* Anderson Testimony at 102 (emphasis in original).  The "standard of comparison to see if the amount is reasonable," and therefore reflective of

market prices, must be based upon "what insurers actually pay and what the [healthcare service providers] are willing to accept." *Id.* at 109. Because "virtually no public or private insurer actually pays full charges," list prices are "an unrealistic standard for comparison." *Id.* "The amount *charged* is determined solely by one party in the transaction – the [healthcare service provider]. *It is not a market transaction*. The amount *paid* that is determined by both parties in the transaction is a reasonable amount. These are the rates determined in a negotiation between insurers and hospitals." *Id.* (emphasis added).

92.    As one article concluded, "[t]he fair and reasonable value of medical expenses must be based on the usual amount actually paid to the provider, not by the amount billed by the provider." *See Healthcare and the Balance-Billing Problem supra* ¶77 at 188. The paid amounts reflect market rates because "the prices chosen by health plans are probably best regarded as being determined by demand and supply," s*ee Patients as Consumers supra* ¶78 at 661 (citation omitted), not a unilaterally imposed arbitrary figure that lacks any relation to cost or market forces and is rarely paid in reality.

93.    Healthcare service providers such as Quest are generally paid by private third-party payers (*e.g.*, insurers or hospitals) or government payers (*i.e.*, Medicare or Medicaid). The actual paid amounts are generally based on a negotiated rate or, in the case of government payers, a statutorily mandated rate. Where there is no agreement as to the rate for clinical lab testing services, reasonable market rates can be calculated via expert analysis of, for example, the following: (A) Medicare rates; (B) Medicaid rates; and (C) private third-party payer proprietary rates. Plaintiffs intend to obtain Quest's private third-party payer proprietary rates in discovery.

94.     Alternatively, reasonable rates can be determined by using the actual rates negotiated by a Plaintiff's healthcare insurer, adjusted by a reasonable multiple to compensate for the cost, risk, and delay of collection.

**1.      Medicare Rates for Clinical Lab Testing Services are Based on Actual Third-Party Payer Rates**

95.     Medicare reimburses clinical lab testing service providers based upon the rates included in the Clinical Laboratory Fee Schedule ("CLFS"), as published by the Centers for Medicare and Medicaid Services ("CMS").  The CLFS provides a reliable reference point for analyzing the reasonableness of list prices associated with clinical lab testing services, as well as determining the market rates thereof, because *the CLFS rates are based upon the actual paid amounts of third-party payers*.

96.     In June 2013, the United States Department of Health and Human Services ("HHS"), Office of Inspector General published a report, *Comparing Lab Test Payment Rates: Medicare Could Achieve Substantial Savings*, that analyzed payment data collected from 50 state Medicaid programs and three Federal Employees Health Benefits (FEHB) plans that pay for clinical lab testing services on a fee-for-service basis.  The data was collected for the period beginning on January 1, 2011, through March 31, 2011, and included 20 high-volume and/or high-expenditure lab tests.  Upon an analysis of the data received, the Office of Inspector General found that Medicare was paying between 18- and 30-percent more than other insurers were paying for the same clinical lab testing services.  HHS recommended the CMS "seek legislation that would allow it to establish lower payment rates for lab tests . . ."  In other words, Medicare had been *overpaying* for clinical lab testing services.

97.     Thereafter, Congress passed the Protecting Access to Medicare Act of 2014 ("PAMA"), Pub. L. No. 113-93, 128 Stat. 1053 (2014).  Under Section 216 of PAMA, codified

at 42 U.S.C. § 1395m-1, Congress directed the Secretary of HHS to update the methodology by which Medicare reimbursed medical lab service providers for clinical lab testing services. The process for updating Medicare's reimbursement structure included two parts: (1) collecting payment data from certain laboratories that participated in the Medicare program, and (2) relying upon the payment data collected to establish a new CLFS.

98.     Prior to implementing PAMA, *e.g.*, for calendar year 2017, Medicare paid for lab services based on the local geographic area. The CLFS rates were established based on charge data obtained from laboratories in each geographic area, and reimbursement rates were equal to the lesser of (a) the amount billed by the lab service provider, (b) the local reimbursement rates included on the CLFS, or (c) a national limitation amount ("NLA"), which was equal to 74-percent of the median of all local fee schedule amounts that were used in deriving the NLA for any lab test for which the NLA was established before January 1, 2001, and 100-percent of the median of all local fee schedule amounts for any lab test for which the NLA was established after January 1, 2001. *See* CMS, *Clinical Laboratory Fee Schedule: Payment System Series*, ICN 006818 (September 2017). Notably, CMS's published CLFS included the local reimbursement rate, national limit, and private third-party payer median payment amount for each laboratory test, identified by CPT code.

99.     On June 23, 2016, the Secretary of HHS released its final rules governing the methodology by which Medicare would reimburse clinical lab testing service providers for lab tests beginning January 1, 2018. *See* 81 Fed. Reg. 41036. As described therein, the "Medicare payment amount for a test on the CLFS generally will be equal to the weighted median of the private payor rates determined for the test, based on the data that is collected during a data collection period and is reported to CMS during a data reporting period." *See Summary of Data*

*Reporting for the Medicare Clinical Laboratory Fee Schedule (CLFS) Private Payor Rate-Based Payment Plan* (the "Medicare CLFS Update"), released by CMS on or around September 22, 2017.  The data collection period ran from January 1, 2016, through June 30, 2016.  The "data reporting period" ran from January 1, 2017, through March 31, 2017.

100.    The Medicare CLFS Update stated that the CLFS rates would be based upon "applicable information" collected from "reporting entities."  The "applicable information" included "(1) the Healthcare Common Procedure Code System (HCPCS) code for the test; (2) each private payer rate for the test described by that HCPCS code for which final payment has been made and (3) the associated volume of tests performed corresponding to each private payer rate."[7]

101.    A "reporting entity" was defined as any medical laboratory that bills Medicare under its own National Provider Identifier (NPI) number, receives more than 50-percent of its Medicare revenues from the Physician Fee Schedule or CLFS, and receives at least $12,500 of its Medicare revenues under the CLFS.  *See* 42 CFR 414.502.  Although the definition of reporting entity excludes hospital laboratories that do not operate under their own NPI and smaller laboratories that receive less than $12,500 of its Medicare revenues under the CLFS, CMS found that "because CLFS payments will be based on the weighted median of private payor rates, additional reporting may not be likely to change the weighted median private payor rate, irrespective of how many additional smaller laboratories are required to report, if, as our analysis suggests, the largest laboratories dominate the market and therefore most significantly affect the payment rate."  81 Fed. Reg. 41,078 (June 23, 2016).

---

[7] Although CMS required reporting entities to include the HCPCS test codes within the information it reports, the publicly available CLFS provides reimbursement rates based on CPT code for each clinical lab test.

102.    Notably, Quest has represented itself as "the leading provider in the United States of clinical laboratory and anatomic pathology testing, and related services" [10-K at 9].  The CLFS rates are "most significantly affect[ed]" by the amounts entities such as Quest are actually paid for providing clinical lab testing services.

103.    Data collection, data reporting, and payment rate updating is scheduled to occur every three years.

104.    Ultimately, for purposes of determining its 2018 CLFS reimbursement rates, CMS reported receipt of data from 1,942 "reporting entities in every state, the District of Columbia, and Puerto Rico," consisting of over 4.9 million records covering almost 248 million lab tests. According to the Medicare CLFS Update, "CMS confirmed that additional data reporting would not have made a significant impact on the preliminary payment rates."

### 2.    Medicaid Rates are Based on State-Specific Determinations of Reasonable Rates

105.    Medicaid also provides a reliable reference point for analyzing the reasonableness of list prices associated with medical lab services.

106.    The United States Social Security Administration describes Medicaid as "a jointly funded, Federal-State health insurance program for low-income and needy people.  It covers children, the aged, blind, and/or disabled and other people who are eligible to receive federally assisted income maintenance payments."

107.    As of January 2018, nearly 68 million people were covered by Medicaid.

108.    States establish and administer their own Medicaid programs.  However, federal law requires that states provide mandatory coverage in certain circumstances, including some clinical lab testing services.

109.     Each state uses its own method for deriving its reimbursement rates.  For example, some states, such as California, reimburse lab service providers based upon the payments received from other payers for clinical lab services in that state.  In regard to California, "[i]t is the intent of the [California] Legislature that the department develop reimbursement rates for clinical laboratory or laboratory services that are comparable to the payment amounts received from other payers for clinical laboratory or laboratory services."  Cal. Code, Welfare and Institution Code § 14105.22(2)(b)(1).

110.     The rates under the California Medicaid Program (also known as "Medi-Cal") generally fall ***below*** the federal Medicare rates listed in the CLFS.  This demonstrates the reasonableness of the Medicare rates, which would presumably be equal to the Medi-Cal rates (*i.e.*, the Medi-Cal rates would be as high as legally authorized) if they were not comparable to the payment amounts received from other payers for clinical laboratory services.

111.     Other states aim to reimburse clinical lab testing service providers based upon other factors.  For example, in Texas, lab tests are reimbursed at the lower of the provider's usual customary charge or the maximum fee determined by the Texas Health and Human Services Commission.  1 Tex. Admin. Code § 355.8610.  The maximum fee is calculated based upon an independent analysis of financial and statistical data reported to the state from lab service providers.  *See id.* at § 355.10(c)(2).  The Texas Medicaid rates, for the most part, fell in line with the 2017 Medicare national limit, although some reimbursement rates were significantly lower.

112.     Similar to the Medicare CLFS, Medicaid rates are generally available to the public.

### 3.     Private Third-Party Payer Rates are Considered Proprietary and Maintained as Closely Guarded Secrets

113.     As described above, private third-party payers typically pay significantly less than a healthcare service provider's list prices.  The clinical lab testing industry is no different.  As Quest has acknowledged in its 10-K, it accepts negotiated rates on a fee-for-service basis from the overwhelming majority of their customers.  [*See* 10-K at 23-24].  Indeed, only self-pay patients without insurance or whose insurance deny coverage are charged rates based upon a "patient fee schedule," [*id.* at 64], *i.e.*, the arbitrarily inflated and unilaterally determined list price.

114.     Because the actual payment rates that result from negotiations with private third-party payers are considered proprietary and treated as highly confidential, the private third-party payer rates are unattainable absent discovery and subpoenas.  However, the Medicare and certain Medicaid rates are derived from private third-party payer data, and therefore provide insight into the actual payment amounts received by Quest for its clinical lab testing services.

### 4.     Quest's List Prices Greatly Exceed Market Rates

115.     As the publicly available government payer data demonstrates, Quest's list prices are across the board unreasonable and, thus, not indicative of market rates.  *See* QUEST'S UNREASONABLE LIST PRICES *infra* at Section K.  The market rate for Quest's clinical lab testing services can be determined based on the actual payment amounts received by Quest from private third-party payers.  The payment rates are expected to be listed on internal fee schedules within Quest's possession, which were created as a result of negotiations between Quest and each third-party payer.  The volume of clinical lab tests performed at each rate is expected to be maintained within Quest's accounting files.

116.     Plaintiffs also anticipate relying upon an expert to analyze the private third-party payer and government payer data to develop a formula to calculate the market rate for any given clinical lab test.  Plaintiffs currently expect the market rate formula to be based upon a discount to Quest's list price, or a markup on the Medicare CLFS rate.

I.     **IN THE ABSENCE OF AN AGREEMENT, THE COURT SHOULD ESTABLISH THE REASONABLE PRICE OF QUEST'S SERVICES**

117.     None of Plaintiffs had express agreements with Quest with respect to the cost of their clinical lab tests.

118.     Each of the clinical lab tests at issue in this action were prescribed by a medical professional as medically necessary.

119.     Plaintiffs with insurance coverage reasonably assumed that because the clinical lab tests were medically necessary in their physician's opinion, the tests would be covered by insurance.  Indeed, physicians are responsible for dispensing medical advice and patients customarily accept that medical advice.  Imposing on physicians a burden of becoming experts on every insurance policy its patients may have, as well as the many different protocols under those insurance policies, and to access Quest's list of prices if the procedure is not covered by insurance, would impose a burden on the medical profession that is inconsistent with a physician's obligation to practice medicine.  *See infra* Section N.

120.     Members of the Class who were uninsured also relied upon their respective physician's determination that the clinical lab tests were medically necessary and, thus, needed to be performed.

121.     Quest conducts millions of clinical lab tests each year and regularly interacts with physicians and insurers on issues of insurance coverage for clinical lab tests.  Quest is in the best

position to advise Plaintiffs whether their tests were likely to be covered by insurance and, if not, what rates Quest would charge.

122.   For instance, Quest routinely provides patients on Medicare with information on coverage prior to performing services pursuant to Advance Beneficiary Notices, as mandated by Medicare.

123.   Nevertheless, no express agreement was entered into outlining the services that Quest would be performing.  There was therefore no opportunity to negotiate or enter into an agreement as to price.

124.   The course of conduct between Quest and its patients establishes an implied contract that the patient would reasonable prices for those tests not covered by insurance.

125.   Restatement (Second) of Contracts, § 5 (entitled "Terms of Promise, Agreement or Contract"), states, in Comment b, that in the absence of an express agreement to an essential term of a contract (express or implied), that term may be "supplied by law":

> *Contract terms supplied by law*.  Much contract law consists of rules which may be varied by agreement of the parties. Such rules are sometimes stated in terms of presumed intention, and they may be thought of as implied terms of an agreement. They often rest, however, on considerations of public policy rather than on manifestation of the intention of the parties. In the Restatement of this Subject, such rules are stated in terms of the operative facts which make them applicable.

126.   Section 204 of the Restatement (Second) of Contracts (entitled "Supplying an Omitted Essential Term") adds that:

> When the parties to a bargain sufficiently defined to be a ***contract*** have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.

127.   *Comment d to section 204* discusses the process of supplying a missing term:

> Sometimes it is said that the search is for the term the parties would have agreed to if the question had been brought to their attention. Both the meaning of the words used and the probability that a particular term would have been used if the question had been raised may be factors in determining what term is reasonable in the

31

circumstances.  But where there is in fact no agreement, the court should supply a term which comports with community standards of fairness and policy rather than analyze a hypothetical model of the bargaining process. . . . Where there is a **contract** for the sale of goods but nothing is said as to price the price is a reasonable price at the time for delivery.

**J.**   **PLAINTIFFS' CLAIMS**

**Jennifer Bennett (Illinois)**

128.   At all relevant times hereto, Bennett and her son maintained health insurance through Aetna.

129.   On November 28, 2014, Bennett's son had blood drawn at a Quest facility for the purposes of laboratory testing.  Bennett had the testing done on the recommendation of her son's physician, who advised Bennett that the testing was medically necessary.

130.   Quest and Bennett had not reached any agreement in advance with respect to the fees to be charged for any tests not covered by Aetna.

131.   The parties' conduct established an implied contract that if any of her diagnostic tests were not covered by Aetna, then she would pay reasonable prices for those tests.

132.   Aetna denied coverage on one of the blood tests on grounds that it lacked medical necessity.

133.   Quest billed Bennett its inflated list price of $58.41 for the single laboratory test not covered by Aetna – an "Allergen Specific IGG" test (CPT code 86001).

134.   Based on the rate disclosed by Aetna in its explanation of benefits ("EOB") related to the allergy test, Quest would have been compensated only $5.02, or 8.6% of the list price, had Aetna covered the test.

135.    Based on publicly available data, Medicare would have paid Quest $7.12 for the test (the "National Limit") based on a "Mid Point" of $9.62.[8]

136.    Aetna did, however, cover an "Allergen Specific LGE" test performed on behalf of her dependent son on the same day, which had an aggregate list price of $1,003.84; Aetna compensated Quest only $160.64 for this test, or about 16% of Quest's list price.

137.    Regardless of the fact that Aetna and Medicare would have paid an amount substantially less than Quest's list price, and Aetna had reimbursed Quest amounts substantially below Quest's list prices, Quest demanded Bennett pay the full list price of $58.41.

138.    Bennett, under protest, and to avoid injury to her credit rating, paid Quest's list price in its entirety.

139.    Bennett demands restitution.

**Lawrence D. Catti (Pennsylvania)**

140.    On January 7, 2017, Quest performed lab services on behalf of Catti.

141.    Catti maintained Aetna health insurance through his employer.

142.    As stated in a Quest invoice dated January 21, 2017, the lab services were prescribed by Catti's physician, Dr. Anthony J. Bazzan, as medically necessary.  Dr. Bazzan is a specialist in integrative and internal medicines.

143.    Dr. Bazzan requested that Quest, on behalf of Catti, perform 20 clinical laboratory tests, including a diagnostic homocysteine assay test (CPT code 83090).  That specific lab test was prescribed because Catti had been diagnosed with coronary artery disease and hyperlipidemia (as indicted on the Catti invoice – medical diagnosis codes (ICD 125.10; E03.9; E66.9; and E78.9)).

---

[8] http://www.upmc.com/healthcare-professionals/physicians/Documents/lab-fee-schedule.pdf.

144.     At the time his blood was drawn, Catti provided Quest with information on his health insurance, his physician's medical diagnoses, and the prescription for the tests to be conducted.

145.     Quest and Catti had not reached any agreement in advance with respect to the fees to be charged for any tests not covered by Aetna.

146.     The parties' conduct established an implied contract that if any of his diagnostic tests were not covered by Aetna, then he would pay reasonable prices for those tests.

147.     Quest conducts millions of diagnostic tests a year and regularly interacts with physicians and insurers on issues of insurance coverage for diagnostic tests.  Quest (as opposed to Catti or Dr. Bassan) was in the best position to advise Catti whether his tests were covered by his Aetna insurance and, if not, what rates Quest would charge.

148.     Quest routinely provides patients on Medicare with that information on insurance coverage pursuant to Advance Beneficiary Notices ("ABN") mandated by Medicare.

149.     Although there was no contract or agreement with Catti, Quest nevertheless performed the clinical laboratory tests requested by Dr. Bazzan out of its laboratories in Horsham, Pennsylvania; Exton, Pennsylvania; and San Juan Capistrano, California.

150.     Quest knew what services were requested by Dr. Bassan and had unilateral access to Quest's list prices prior to performing those services.

151.     Thereafter, Catti received an invoice in which Quest demanded payment of $268.48.

152.     The invoice itemized the 20 lab tests performed by Quest, along with the list price for each.  The aggregate total for the 20 lab tests was $2,440.95.  However, the invoice unexplainably aggregated all applicable "insurance discount[s]" into two adjustments provided at

the bottom of the invoice, which amounted to $1,922.20 and $25.00.  The invoice also aggregated the total amount that "insurance [Aetna] paid" for all of the tests it covered, providing a single figure at the bottom of the invoice amounting to $225.27.  The result was a net amount listed under "patient owes" of $268.48 (more than what Aetna paid for the 18 tests it covered).[9]

153.    The invoice did not identify any tests that had been denied by Aetna for coverage.

154.    Only by going to Aetna's website to view his EOB was Catti able to determine that Aetna had denied coverage for two lab tests, including the homocysteine test.  Based upon the EOB, Catti learned (for the first time) that Aetna would not cover his homocysteine test on grounds that Aetna considered the test "experimental or investigational."  As a result, Quest was seeking to hold Catti responsible for the list price for that test, *i.e.*, $218.48.  According to the EOB, if Aetna had accepted coverage, it would have reimbursed Quest just $15.02, and Catti would have had no copay.

155.    Aetna also denied coverage for a Lipoprotein BLD Quad Part test (CPT Code 83704).  The Aetna EOB stated that the charge was denied because "the service does not meet [the] requirement" that it was "reasonable and appropriate based on professional standards of safety and effectiveness for diagnosis, care or treatment."  Quest demanded payment of $50 for that test, although Aetna would have paid Quest $28.10 if the test was covered.

156.    The market for diagnostic tests is not transparent and there is no easy way for the consumer to compare cost.  If Catti had not been diligent and sought out the EOB online, he would have paid Quest's $258.48 without knowledge that reimbursement had been denied by Aetna for two tests and he was being charged list prices without discount.

_____

[9] Pursuant to a request from Aetna, Quest withdrew a $25 request for payment on one of the 20 tests.

157.     It is likely that thousands of Quest customers pay invoices without knowledge that their insurers denied coverage and that they are paying list prices without discount.  If Quest broke out its rates, insurance allowances, and insurance payment on a test-by-test basis, patients would know what claims were denied and conduct an appropriate investigation.

158.     As described in more detail below, Quest's $218.48 list price is far in excess of any reasonable charge for a CPT code 83090 lab test.  In fact, $218.48 is approximately 14.5 times the market rate negotiated between Aetna and Quest, and 9.4 times the reimbursement rate provided by Medicare for the same test.  The unreasonableness of Quest's list price is further evidenced by comparing the actual list prices for each of the tests Quest charged Catti (as well as the other Plaintiffs) to the negotiated rates (where obtainable), Medicare reimbursement rates, Medicaid reimbursement rates, and payment data provided by third-party sources for the same CPT codes.  *See* QUEST'S UNREASONABLE LIST PRICES *supra* Section K.

159.     Catti called Quest immediately upon assessing the situation and asked the Quest representative whether he could pay Quest the $15.02 that would have been paid by Aetna if it had covered the test, or whether he could pay Aetna the $15.02 and have Aetna reimburse Quest directly.  The Quest representative rejected Catti's offer and insisted he pay the full list price of $218.48.

160.     Catti made the same offer to pay Quest the $28.10 for the Lipoprotein test, which Quest also refused.

161.     In a letter dated January 24, 2017, Catti reiterated his request to pay Quest the $15.02 for the homocysteine test that Quest had agreed to accept from Aetna.  That letter went unanswered.

162.     In a letter dated March 31, 2017, after receiving a second invoice for $268.48, and becoming concerned with the impact on his credit rating, Catti capitulated and paid the full $268.48 list prices under protest.

163.     Quest has been unjustly enriched by receiving an amount that far exceeds any reasonable value for the services provided (and not covered by Aetna) without any contract allowing for Quest to receive such an excessive amount.

164.     Catti demands restitution.

**Jacob Chernov (Arizona)**

165.     At all relevant times hereto, Plaintiff Chernov maintained health insurance through Medicare.

166.     Chernov was prescribed by his physician to have a Vitamin D 25 Hydroxy lab test (CPT code 82306) and a Glycosylated Hemoglobin (CPT code 83036) lab test performed.  His physician considered the tests medically necessary.  Those tests were conducted on November 21, 2016.

167.     Chernov has no recollection that he was provided with an ABN advising him that it was probable that Medicare would disallow his claim for the blood test or that the cost Quest would charge for the blood test if Medicare disallowed the claim would exceed $200.

168.     Quest billed Chernov $150 for the Vitamin D test and $70.40 for the Hemoglobin test.

169.     Chernov's insurer (Medicare) denied coverage benefits in an EOB dated January 5, 2017.

170.     If Medicare had accepted coverage, it would have reimbursed Quest substantially less than the $220.40 billed to Chernov.

171.     For example, under the 2016 CLFS, the Vitamin D 25 Hydroxy test would only have cost $31.54 through Medicare, not $150, and the Glycosylated Hemoglobin test would only have cost $13.22, not $70.40.

172.     However, because Medicare denied coverage, Quest insisted that Chernov pay the full $220.40.

173.     Quest and Chernov had not reached any agreement in advance with respect to the fees to be charged for the excluded tests.

174.     The parties' conduct established an implied contract that if any of his diagnostic tests were not covered by Medicare, then he would pay reasonable prices of those tests.

### Diana Dannelly (California)

175.     At all relevant times hereto, Plaintiff Diana Dannelly was uninsured.

176.     On August 24, 2016, Dannelly had blood drawn at a Quest facility.  She was not provided any rates in advance of Quest performing laboratory services.  Her physician had prescribed the tests and considered the tests medically necessary.

177.     Quest and Dannelly had not reached any agreement in advance with respect to the fees to be charged for any of Quest's laboratory services.

178.     The parties' conduct established an implied contract that she would pay reasonable prices for those tests.

179.     Quest billed Dannelly its inflated list prices for its services, demanding payment of $1,902.19 for seventeen laboratory tests performed on August 24, 2016.

180.     Because Dannelly was uninsured, she was responsible for the entire amount owed to Quest for the seventeen tests it performed.

181.    Under the 2016 CLFS, Quest would have received only $309.97 for the same lab services, or about 16.3% of its aggregate list price, had Dannelly been covered by Medicare.  The chart below demonstrates the egregious discrepancy between what Dannelly was charged and what Quest would have received from Medicare for the exact same lab services:

| CPT Code | Quest's Chargemaster Rate | 2016 CLFS Maximum Payment Amount |
|---|---|---|
| 82465 | $ 36.77 | $ 5.92 |
| 82627 | $ 205.50 | $ 30.29 |
| 82746 | $ 113.57 | $ 20.03 |
| 83718 | $ 63.81 | $ 11.16 |
| 84439 | $ 140.61 | $ 12.28 |
| 84478 | $ 41.10 | $ 7.83 |
| 84443 | $ 125.47 | $ 22.89 |
| 82607 | $ 115.73 | $ 20.54 |
| 36415 | $ 20.55 | $ - |
| 82172 | $ 25.00 | $ 21.11 |
| 85025 | $ 40.56 | $ 10.59 |
| 86141 | $ 50.00 | $ 17.63 |
| 80053 | $ 62.58 | $ 14.39 |
| 84305 | $ 192.52 | $ 28.96 |
| 82306 | $ 232.54 | $ 40.33 |
| 83090 | $ 218.48 | $ 22.95 |
| 84481 | $ 217.40 | $ 23.07 |
| **TOTALS** | **$ 1,902.19** | **$ 309.97** |

182.    Moreover, Dannelly's doctor's office advised her that Quest would have billed them $430 for the same services.  Thereafter, on two separate occasions, Dannelly offered to pay Quest the $430 directly; however, Quest refused to accept the $430 as payment-in-full and continued demanding payment of its egregious list prices.

183.    Absent an agreement with Quest, Dannelly has not yet paid Quest for its laboratory services and continues to be subjected to Quest's debt collection practices.

184.    Quest has since referred Dannelly's invoice to a third party collection agency –

American Medical Collection Agency.  On June 7, 2017, American Medical Collection Agency

("AMCA") sent Dannelly a collections notice.

185.    The AMCA letter violated the Fair Debt Collection Practices Act in that

Anderson's alleged debt was not "expressly authorized by the agreement creating the debt or

permitted by law."  *See* 15 U.S.C. §808(a).

**Craig R. Dvorak (California)**

186.    Dvorak maintains Medicare health insurance.

187.    In May 2016, Dvorak was under the care of a dermatologist (Carmen Huerta) for

treatment of a skin rash.  Dr. Huerta prescribed a blood test to assess whether Dvorak suffered

from an allergic reaction.  Prior to prescribing the blood test, Dr. Huerta had prescribed various

drugs for treatment of the rash, all of which proved unsuccessful.

188.    Dr. Huerta considered the blood test medically necessary.

189.    Dvorak had the blood drawn on May 19, 2016 at a Quest facility.  Dvorak has no

recollection that he was provided with an ABN either by Dr. Huerta or Quest advising him that it

was probable that Medicare would disallow his claim for the blood test or that the cost Quest

would charge for the blood test if Medicare disallowed the claim would exceed $1,000.

190.    Dvorak never "dreamed" the blood test would not be covered by insurance.

191.    Quest completed two allergy tests (both with CPT code 86003) on Dvorak's blood

samples on May 19, 2016.

192.    Dvorak subsequently received an invoice from Quest, dated January 24, 2017, for

$1,149.65 ($773.25 for one test; $376.40 for the other test).

193.    Medicare denied these two claims based on a Local Coverage Determination (L34313).  Information available on line with respect to L34313 is lengthy and complex.[10]

194.    HealthNet, Mr. Dvorak's Medigap insurer, also denied coverage for both tests.

195.    Quest's January 24, 2017 invoice billed Dvorak in the aggregate, without a breakdown of reimbursements from Medicare for each individual diagnostic test, although Quest was reimbursed by Medicare on an individual test-by-test basis.

196.    Dvorak called Quest and informed the company that he was a retiree on a fixed income and that the $1,149.65 invoice was equivalent to approximately 40% of his monthly income.  Dvorak asked Quest to discount the bill and Quest refused.

197.    Dvorak started with a $500 payment on May 1, 2017, then $50 on June 1, 2017, $50 on June 10, 2017, $100 on August 29, 2017; then Dvorak received notice from Quest that they would turn the debt over to a collection agency (notice dated August 25, 2017) so Dvorak paid Quest the balance of $449.65 on Aug 29, 2017.

198.    The August 25 "Fourth Notice" stated "Please make payment immediately to prevent your account from being forwarded to a collection agency for further collection efforts. If further action is necessary, you may also be liable for additional expenses and costs, as permitted by law, which can substantially increase the amount you owe.  Please contact us today to make payment and prevent further collection efforts."

199.    HealthNet covered two other tests, performed by Quest on May 19, 2016, that were listed as having an aggregate list price of $119.16 ($21.63 and $97.23).  Of the $119.16,

---

[10] https://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?LCDId=34313&ver=7&Date=&DocID=L34313&bc=iAAAABAAAAAA&

HealthNet paid Quest only $24.92, or approximately 20.9% of the alleged list price.  The balance ($94.24) of those two charges were written off by Quest as an "insurance discount."

200.    If Medicare had accepted coverage on the two allergy tests, it would have reimbursed Quest substantially less than the $1,149.65 billed to Mr. Dvorak.  Pursuant to the 2016 CLFS, the allergy tests (each with CPT code 86003) would have cost Medicare only $7.11 each, totaling $14.22.  However, because Medicare denied coverage, Quest insisted that Mr. Dvorak pay the full $1,149.65.

201.    Quest and Mr. Dvorak had not reached any agreement in advance with respect to the fees to be charged for the excluded tests.

202.    The parties' conduct established an implied contract that if any of his diagnostic tests were not covered by Medicare, then he would pay reasonable prices for those tests.

203.    Dvorak seeks restitution.

### Clyde Freeman (Colorado)

204.    At all relevant times hereto, Freeman maintained health insurance through Anthem Blue Cross and Blue Shield ("Anthem").

205.    Freeman was billed by Quest $1,236.59 and $567.19 (a combined $1,803.78), for nineteen diagnostic tests conducted on April 5, 2016.  Freeman's physician prescribed the blood tests as medically necessary and directed that she have her blood drawn at a Quest diagnostic center.

206.    Quest initially refused to provide Freeman with any insurance discount because it stated that Quest "is no longer contracted with Anthem…."

207.    If Quest had remained under contract with Anthem, Freeman would have been entitled to a substantial discount on Quest's list prices.  For example, Quest billed Freeman

$215.19 for a PTH (Parathyroid Hormone), intact test (CPT code 83970).  Under the 2016 CLFS, Quest would have been reimbursed $56.23 for that test.  However, because Freeman had insurance coverage with Anthem, and Quest was no longer contracted with Anthem, Quest insisted that Freeman pay the full charge for the nineteen diagnostic tests, including the $215.19 for the PTH test.

208.    Anthem subsequently agreed to reimburse Freeman for the diagnostic tests because her in-network medical provider had directed her to have the blood drawn at Quest. However, in an EOB, Anthem represented that two of the tests (in the amounts of $173.45 and $17.41) were "considered an integral part of the primary service for which we are providing benefits" and were "not eligible for separate payment."  With respect to the remaining 17 diagnostic tests, Anthem established a "plan allowance" based on "allowable charges for covered services by non-participating professional providers" of $322.83, equivalent to 17.9% of Quest's list prices.

209.    Freeman paid Quest whatever reimbursement she received from Anthem toward the balances of her two invoices.

210.    Quest and Freeman had not reached any agreement in advance with respect to the fees to be charged for any tests not covered by insurance.

211.    The parties' conduct established an implied contract that if any of Freeman's diagnostic tests were not covered by Anthem, then she would pay reasonable prices for those tests.

212.    On May 29, 2017, Freeman received a collection letter from AMCA.

213.    The AMCA letter violated the Fair Debt Collection Practices Act in that Freeman's alleged debt was not "expressly authorized by the agreement creating the debt or permitted by law." *See* 15 U.S.C. §808(a).

**Valerie J. Funari (Florida)**

214.    At all relevant times hereto, Funari maintained health insurance through Medicare.

215.    Funari was prescribed by her physician to undergo diagnostic tests for a Thyroxine (Thyroid Chemical) Measurement test (CPT code 84439) and a Thyroid Stimulating Hormone test (Tsh) (CPT code 8443).  Those tests were conducted on September 19, 2016.  Her physician considered those tests medically necessary.

216.    Quest billed Funari $140.61 and $125.47, respectively, for those two tests.

217.    Medicare denied coverage for both tests.

218.    If Medicare had accepted coverage, it would have reimbursed Quest substantially less than the $266.08 billed to Funari.  For example, under the 2016 CLFS, Quest would have been reimbursed $12.28 for the Thyroxine (Thyroid Chemical) Measurement test, and $22.89 for the Tsh test.  However, because Aetna denied coverage, Quest insisted that Funari pay the full $266.08.

219.    Additionally, on February 14, 2017, Funari received an invoice from Quest for five lab tests performed on September 9, 2016.  The CPT codes for these five tests were 82465, 83718, 84478, 85025, and 80053.  Funari's physician considered those tests medically necessary.

220.    The aggregate list price for the five tests was $244.82.

221.    Coverage for all five tests was denied by Medicare.

222.    If Medicare had accepted coverage, it would have reimbursed Quest $49.89, or 20.38% of the aggregate list price ($244.82).  However, because Medicare denied coverage, Quest insisted that Funari pay the full $244.82.

223.    Quest and Funari had not reached any agreement in advance with respect to the fees to be charged for the excluded tests.

224.    The parties' conduct established an implied contract that if any of her diagnostic tests were not covered by Medicare, then she would pay reasonable prices for those tests.

225.    Prior to reaching agreement with Quest that it would cease collection efforts during the pendency of this lawsuit, Funari had paid $10 a month on both invoices for five months (a total of $100) through July 2017.

226.    Funari demands restitution.

**Arthur Goldsmith (Nevada)**

227.    At all relevant times hereto, Goldsmith maintained health insurance through Medicare.

228.    Goldsmith had a Gonadotropin, Chorionic (Reproductive Hormone) Level test (CPT code 84702) completed by Quest on September 25, 2015.  The test was performed at the direction of Goldsmith's physician, who considered the test medically necessary.

229.    Quest billed Goldsmith $136.82 for the test.

230.    Medicare, as Goldsmith's insurer, denied coverage benefits in a Claim Detail form processed on October 7, 2015.  If Medicare had accepted coverage, it would have reimbursed Quest substantially less than the $136.82 billed to Goldsmith.  In fact, under the 2016 CLFS, the Gonadotropin, Chorionic (Reproductive Hormone) Level test would only have cost Medicare $19.13 in Nevada, and would be subject to a maximum authorized payout of $20.51 in

45

any State.  However, because Medicare denied coverage, Quest insisted that Goldsmith pay the full $136.82.

231.    Quest and Goldsmith had not reached any agreement in advance with respect to the fees to be charged for the excluded test.

232.    The parties' conduct established an implied contract that if any of his diagnostic tests were not covered by Medicare, then he would pay reasonable prices for those tests.

233.    Goldsmith requested that Quest discount the cost of the test because based on the amounts paid to Quest on the other tests, which were substantially less than Quest's list price. Goldsmith considered the list price he was billed excessive.  Quest refused.

234.    Goldsmith subsequently paid the full $136.82 to avoid harm to his credit rating, under protest and with full reservation of rights.

235.    Goldsmith demands restitution.

**Edie Golikov (California)**

236.    At all relevant times, Edie Golikov maintained health insurance through Aetna.

237.    On December 1, 2015, and November 1, 2016, Golikov had blood drawn at a Quest facility using her Aetna insurance card.  Golikov's physician prescribed those blood tests as medically necessary.

238.    Quest and Golikov had not reached any agreement in advance with respect to the fees to be charged for any tests not covered by Aetna.

239.    The parties' conduct established an implied contract that if any of her diagnostic tests were not covered by Aetna, then she would pay reasonable prices for those tests.

240.    Quest billed Golikov its inflated list prices of $140.61 for a "CA 19-9" test (CPT code 86301) performed on December 1, 2015, and $337.07 for a "MTHFR CMN Variants" test

46

(CPT code 81291) performed on November 1, 2016, Golikov was subsequently informed that neither of these tests were covered by Aetna.

241.    Golikov requested a reduction in the invoice to what insurance would have paid, but Quest demanded Golikov pay its full list price for each test not covered by Aetna.  For example, on November 1, 2016, when Golikov sought additional blood work, Quest demanded Golikov pay the $140.61 for the services performed on December 1, 2015, or else Quest would not perform any services on her behalf.  Because Golikov's insurance was Aetna and Quest was the exclusive lab service provider for Aetna, Golikov had no option but to pay Quest's excessive rates.

242.    Had Aetna covered the two tests, it would have paid substantially less than the list prices.  For example, had Medicare covered the tests, under the 2016 CLFS, Quest would have been compensated only $28.35 for the CPT code 86301 test, and $59.46 for the CPT code 81291 test.  The maximum Medicare reimbursement of $87.81 is equal to 18.38% of the $477.68 aggregate list price Quest demanded Golikov pay.

243.    Golikov, under protest, paid the December 1, 2015 bill in its entirety, and has paid Quest $59.46 for the November 2016 test.  Quest has refused to accept the $59.46 as payment-in-full and continues to demand further payment in the amount of $277.61 for its services.

244.    Aetna did cover seventeen laboratory tests performed on Golikov's behalf on December 1, 2015, which had an aggregate list price of $1,292.76. Quest accepted $172.88 for those services, or 13.37% of the aggregate list price.

245.    Aetna also covered eleven tests performed on Golikov's behalf on November 1, 2016, which had an aggregate list price of $1,140.49.  Quest accepted $176.87 for those services, or 15.51% of the aggregate list price.

246.     In sum, the aggregate list price for the twenty-eight tests Aetna covered on behalf of Golikov was $2,433.25.  Quest accepted $349.75 from Aetna, or 14.37%, of the aggregate list price.

247.     Additionally, Quest billed Golikov in the aggregate, without a breakdown of reimbursements from Aetna for each individual diagnostic test, although Quest was reimbursed by Aetna on an individual test-by-test basis.  For example, Golikov's Quest invoice included the list price for each line item, but only the aggregate "Insurance Discount" and "Insurance Paid" amounts.  The failure to disclose the actual amount paid for each line item concealed the fact that Golikov was actually being charged an excessive rate for a single test not covered by Aetna, while Aetna paid substantially reduced rates, *i.e.*, the fair market value, for the tests it did cover.

248.     Golikov demands restitution.

**Ling Gong (Michigan)**

249.     At all relevant times hereto, Plaintiff Gong and his spouse, Xin Tan, maintained health insurance through Blue Cross Blue Shield of Michigan ("BCBS of Michigan").

250.     On April 3, 2015, Gong was billed as the responsible party by Quest for two laboratory tests performed on behalf of his spouse on March 16, 2015.  The lab tests were prescribed by Tan's physician, who considered the tests medically necessary.  The two lab tests totaled $227.24, $101.40 for a Pap smear (CPT code 88175) and $125.84 for an HPV test (CPT code 87624).

251.     The Pap smear was covered by BCBS of Michigan, and, as a result, the $101.40 list rate was discounted by $77.67, or 76.6%.  BCBS of Michigan paid only $23.73 for the Pap smear.

252.     BCBS of Michigan claimed in an EOB dated March 27, 2015, that the HPV test was "NOT A COVERED BENEFIT BASED ON THE REPORTED DIAGNOSIS."  As a result of BCBS of Michigan's denial of coverage, Quest required Gong to pay the entire $125.84 without any discount.

253.     Gong paid the $125.84 under protest to avoid injury to his credit rating.

254.     Had BCBS of Michigan covered the lab test, the cost would have been substantially less than the $125.84 Gong was required to pay.  For example, under the 2016 CLFS, the cost of an HPV test (CPT code 87624) would have been only $47.80, the national limit under Medicare.

255.     Quest had not reached any agreement with either Gong or Tan in advance with respect to the fees to be charged for the excluded test.  Rather, the parties' conduct established an implied contract that if any of Tan's diagnostic tests were not covered by insurance, then Gong would pay reasonable prices for those tests.

256.     Gong demands restitution.

**Dolores Herrmann (Pennsylvania)**

257.     At all relevant times hereto, Plaintiff Dolores Herrmann maintained health insurance through Medicare.

258.     On April 17, 2014, Herrmann had blood drawn at a Quest facility.  Quest subsequently performed laboratory services.  Herrmann's physician prescribed those tests as medically necessary.

259.     Quest and Herrmann had not reached any agreement in advance with respect to the fees to be charged for any tests not covered by Medicare.

260.   The parties' conduct established an implied contract that if any of her diagnostic tests were not covered by Medicare, then she would pay reasonable prices for those tests.

261.   Quest billed Herrmann its list price of $71.39 for a single laboratory test that Medicare did not cover—a "Hemoglobin, Glycosylated" test (CPT code 83036)—rather than the reasonable value for its services.

262.   Herrmann, under protest, and out of concern for injury to her credit rating, paid Quest's list price in its entirety.

263.   Herrmann has no recollection that she was provided with an Advance Beneficiary Notice (ABN) advising her that it was probable that Medicare would disallow her claim for the blood test (CPT code 83036) or that Quest would charge her $71.39 for the blood test if Medicare disallowed the claim.

264.   Had Medicare covered the CPT code 83036 test, it would have paid an amount substantially less than the list price.  For example, under the 2016 CLFS, Quest would have been compensated only $13.22, or about 18.52% of its list price, had Medicare covered the test.

265.   Herrmann had the exact same diagnostic test conducted in 2018 (CPT code 83036) and for that test Medicare reimbursed Quest $11.99.

266.   Medicare did cover nine other laboratory tests Quest performed on behalf of Herrmann on April 17, 2014, which had an aggregate list price of $499.  Of the aggregate list price, Quest accepted $69.95 from Medicare, or about 14.3% of Quest's list price.

267.   Herrmann demands restitution.

**Lonnie Hodges, Jr. (Pennsylvania)**

268.   On July 12, 2016, Hodges elected to have nine diagnostic tests performed at a Quest location in California through an online website – stdtestexpress.com ("stdexpress").

269.    Stdexpress employs a physician to write the prescription for the lab test.  The stdexpress physician considered the blood tests to be medically appropriate.

270.    Hodges had the option on the stdexpress website to elect to be billed directly as a cash-pay customer or to bill the diagnostic tests through insurance.

271.    At that time, Hodges did not have health insurance and elected to be billed for those diagnostic tests as a cash-pay customer through stdexpress.

272.    Stdexpress gave Hodges a choice of lab locations on its website, all of which were Quest locations.

273.    Stdexpress billed Hodges $65.00 for physician's services, $134.24 for patient management support services, and $49.74 for Quest's diagnostic tests.

274.    The $49.74 was the negotiated rate between Quest and stdexpress passed along to Hodges.

275.    On March 15, 2017, Hodges had ten diagnostic tests performed through stdexpress (including one test not included by stdexpress in July 2016), this time at a Quest facility in Pennsylvania.

276.    At this time, however, Hodges had insurance with his employer through UnitedHealthcare, and rather than electing on the website to be a cash pay customer, he elected to have stdexpress bill UnitedHealthcare directly.

277.    Again, stdepxress provided Hodges with a list of exclusively comprised of Quest lab facilities where the tests could be conducted.

278.    Hodges had the lab test conducted at one of those Quest lab facilities.

279.    That Quest facility required that Hodges make a co-payment of $40.

280.     Quest and Hodges had not reached any agreement in advance with respect to the fees to be charged for any tests not covered by UnitedHealthcare.  Rather, at most, the parties' conduct established an implied contract that if any of his diagnostic tests were not covered by UnitedHealthcare, then he would pay reasonable prices for those tests.

281.     The rates that had been charged in July 2016 were market rates – rates established between a willing buyer (stdexpress) and a willing seller (Quest).

282.     UnitedHealthcare, however, disclaimed coverage because unbeknownst to Hodges at the time, his insurance required that he had lab tests conducted at Laboratory Corporation of America Holdings.  Quest knew or was reckless in failing to know that Hodges' insurance (UnitedHealthcare) was out-of-network with Quest and that Hodges' insurer would not cover any part of Hodges' lab tests.

283.     Quest billed Hodges $1,021.54 for the ten lab tests.

284.     Excluding the CPT Code 97661 from the tests performed in March 15, 2017 (because that test was not performed in July 2016),  Quest billed Hodges $848.31 in March 2017 for the same tests that Quest billed Hodges $49.74 in July 2016 – a 17.1 times mark-up.

285.     There is no rationale for Hodges to pay a different rate because the 2016 invoice was paid through a third party website (stdexpress) rather than attempting in March 2017 to pay the bill through his insurer.

286.     Quest and Hodges had not reached any agreement in advance with respect to the fees to be charged for any excluded tests.

287.     Had UnitedHealthcare covered the ten laboratory tests, it would have paid an amount substantially less than Quest's list prices.

288.    For example, under the 2017 CLFS, Quest would have been compensated only $264.69, or about 25.91% of its list prices, had Medicare covered the ten tests performed in March 2017.

289.    The egregious disparity between Quest's list prices and Medicare's reimbursement rate, as well as Hodges's previous payment amount, is demonstrated by reference to the nine overlapping tests that were performed in both March 2017 and July 2016 in the chart below:

| CPT Code | Quest's Chargemaster Rate (03/15/2017) | 2017 CLFS Maximum Payment Amount | 2016 Self Pay Rate (07/12/2016) |
|---|---|---|---|
| 87340 | $ 84.36 | $ 14.17 | $ 3.50 |
| 36415 | $ 21.37 | $ 3.00 | $ 3.50 |
| 86695 | $ 107.14 | $ 18.09 | $ 2.87 |
| 86696 | $ 136.96 | $ 26.55 | $ 2.87 |
| 86803 | $ 145.11 | $ 19.57 | $ 6.00 |
| 87491 | $ 103.49 | $ 48.14 | $ 10.00 |
| 87591 | $ 103.48 | $ 48.14 | $ 10.00 |
| 86592 | $ 38.24 | $ 5.86 | $ 2.00 |
| 87389 | $ 108.16 | $ 33.03 | $ 9.00 |
| **TOTALS** | **$ 848.31** | **$ 216.55** | **$ 49.74** |

290.    Hodges sought unsuccessfully to negotiate his March 15, 2017 invoice with Quest.

291.    On August 5, 2017, Hodges paid Quest the full amount demanded pursuant to his March 15th invoice ($981.54; net of the $40 copay) to avoid any further collection attempts and damage to his credit rating.

292.    Hodges was acting under a mistake of fact in having his lab tests conducted by Quest, where Quest knew or should have known that Hodges insurance would deny any claim submitted by Quest, and failed to apprise Hodges of his mistake of fact.

293.    Hodges seeks restitution.

**Marvin and Vickie Leslie (Texas)**

294.    In 2013, the Leslie's physician recommended that they each be tested for a MTHFR gene variant.  Their physician considered the lab test medically necessary.

295.    The Leslies had routine blood work performed at their annual physical, as well as the test for the MTHFR gene variant.

296.    The Leslies had no involvement in designating Quest as the laboratory to conduct the blood tests and had no agreement with Quest relating to the diagnostic tests to be performed by Quest.

297.    Quest conducted eight tests for Mr. Leslie and seven tests for Mrs. Leslie.

298.    Seven of the tests conducted for Mr. Leslie and six of the tests for Mrs. Leslie were covered by Aetna as the Leslies' health insurer.

299.    Quest, based on its stated list prices, billed Mr. Leslie $494.36 for the seven tests covered by Aetna and billed Mrs. Leslie $351.59 for the six tests covered by Aetna.

300.    Quest however discounted those rates by a combined total of $759.11 ($442.09 and $317.02, respectively), equivalent to approximately 89.7%.

301.    The 89.7% discounted rate is consistent with the typical market rates Quest customarily receives from third-party payers.

302.    These discounted rates are indicative of what constitutes fair market value.

303.    Quest's negotiated discount with Aetna reflected the reality that fair market value rates were substantially below Quest's list prices.

304.    The parties' conduct established an implied contract that if any of their diagnostic tests were not covered by Aetna, then the Leslies would pay reasonable prices for those tests.

305.    Aetna denied coverage for one test for each of Mr. and Mrs. Leslie (MTHFR CMN Variant, a genetic test with CPT code 81291).

306.    Quest refused to discount its list price for that test ($328.85 each) to a fair market value for the service.

307.    Had Aetna covered the remaining tests, it would have reimbursed Quest substantially less than $328.85 for each of Mr. and Mrs. Leslie.

308.    For example, under the 2014 CLFS (the first date that the data is available), Quest would have been reimbursed $59.55 by Medicare for the MTHFR genetic test.

309.    Even under the 2017 CLFS, Quest would only have been reimbursed $59.88 for the MTHFR genetic test.

310.    Mr. Leslie was told by Aetna that it would have paid Quest $95.21 for the genetic test if it had been covered by insurance.

311.    The Leslies paid Quest $10 a month each, under protest, beginning in July 2014, until the invoice was paid in full, to defray the cost of that testing and to avoid injury to their credit rating.

312.    The Leslies demand restitution.

**Lily Martyn (North Carolina)**

313.    Martyn graduated from Duke University in May 2016.  While a student, Martyn had health insurance.  However, after she graduated, her insurance lapsed.  Accordingly, in September 2016, Lily Martyn was uninsured.

314.    On September 19, 2016, Martyn had blood drawn at her doctor's office for purposes of laboratory testing.  The laboratory services were subsequently performed by Quest. Martyn's physician considered the tests medically necessary.

315.     Martyn did not know that the lab tests were being performed by Quest, as opposed to some other lab company.

316.     Quest billed Martyn its inflated list price rather than a reasonable price for its services, demanding payment of $123.51 for a single laboratory test – a "Comp, Functional Act" test (CPT code 86161).

317.     Because Martyn was uninsured, she was responsible for the entire amount owed to Quest.

318.     Indeed, had Martyn been covered by Medicare, under the 2016 CLFS, Quest would have been paid only $16.35 for the same lab test, or about 13.24% of Quest's list price.

319.     On February 4, 2017, Martyn's father, Byron Martyn, under protest, and to avoid any harm to her credit rating, paid the full $123.51 on Lily's behalf.

320.     Quest and Martyn had not reached any agreement in advance with respect to the fees to be charged for any of Quest's laboratory services.  Rather, the parties' conduct established an implied contract that she would pay reasonable prices for her lab tests.

321.     Martyn demands restitution.

**Ryszard Pojawis (Connecticut)**

322.     At all relevant times hereto, Plaintiff Ryszard Pojawis, his wife (Teresa) and his daughter (Anna) maintained health insurance through Anthem BlueCross BlueShield ("Anthem").[11]

---

[11] The Anthem plan was obtained through Teresa's employer.  As a result, Teresa was identified as the responsible party on the Quest invoice at issue.  Nevertheless, Mr. Pojawis is bringing this claim individually and as assignee of any claim Teresa may have related to the Quest invoice at issue here.

323.    On April 9, 2013, Pojawis's daughter had blood drawn at a Quest facility.  Quest subsequently performed laboratory services.  The laboratory tests were prescribed by Pojawis's daughter's physician, who considered the lab tests to be medically necessary.

324.    At all relevant times, Pojawis's daughter was his dependent, and therefore Pojawis and his wife were responsible for the payment of any of Anna's laboratory services that were not covered by Anthem.

325.    Neither Pojawis nor his wife had reached any agreement with Quest in advance with respect to the fees to be charged for any tests not covered by Anthem.

326.    The parties' conduct established an implied contract that if any of his daughter's tests were not covered by insurance, then Pojawis would pay reasonable prices for those tests.

327.    Quest billed Pojawis its list price of $316.20 for a single laboratory test that Anthem did not cover—a "MTHFR CMN VARIANTS" test (CPT code 81291)—rather than a reasonable value for its services.

328.    Had Anthem covered the CPT code 81291 test, it would have paid an amount substantially less than the list price.  For example, under the 2016 CLFS, Quest would have been compensated only $59.46, or about 18.8% of its list price, had Medicare covered the test.

329.    Pojawis requested a reduction in the invoice, but Quest refused to reduce its list rates.

330.    Pojawis, under protest, and out of concern for his credit rating, paid Quest's list price in its entirety.

331.    Anthem did cover ten other laboratory services Quest performed on behalf of Anna on April 9, 2013, which had an aggregate list price of $2,232.88.  Of the aggregate list

price, Quest accepted $135.48 from Anthem (with $27.10 of the aggregate negotiated rate being paid by Pojawis, presumably as co-insurance), or about 6.07% of Quest's list price.

332.    Additionally, Quest billed Pojawis in the aggregate, without a breakdown of reimbursements from Anthem for each individual diagnostic test, although Quest was reimbursed by Anthem on an individual test-by-test basis.  For example, Pojawis's invoice demanded he pay Quest $343.30 for its services.  Pojawis's invoice included eleven line items with an aggregate list price of $2,549.08.  Quest applied an aggregate "Insurance Discount" of $2,097.40 (without breaking the amount down on test-by-test basis) to the aggregate list price, and then reduced the bill by $108.38 for "Insurance Paid" (again, without breaking down the amount on a test-by-test basis).  Given that no single line item equaled $343.30, and the fact that the "Insurance Discount" and "Insurance Paid" amounts were not broken down test-by-test, it was impossible for Pojawis to understand from the invoice what he was being charged for (without reference to his insurer's EOB); *i.e.*, – whether copays, deductibles, or tests that were not covered by Anthem.  *See* Exhibit A.  Quest's materially deficient disclosures on its invoice concealed the fact that it was charging Pojawis an excessive rate on a test not covered by insurance.

333.    Only by making further inquiries was Pojawis able to determine the basis for Quest's invoices.  Other Class members receiving a similar invoice, with co-insurance payments, likely would not have realized that insurance had disclaimed coverage of a claim and were tricked into paying the bill in full without first making reasonable inquiries as to why insurance had disclaimed coverage for a lab test.

334.    Pojawis demands restitution.

**Jill Roach (Maryland)**

335.    At all relevant times hereto, Roach did not have health insurance.

336.     On July 21, 2016, Roach was billed by Quest for eight lab tests conducted on her behalf on May 17, 2016, totaling $748.14.  The lab tests were prescribed by her physician as medically necessary.  Roach had the blood drawn in her doctor's office by a phlebotomist employed by Quest.

337.     Quest had not reached any agreement with Roach in advance with respect to the fees to be charged for the tests.  Because she was uninsured, Roach inquired of the Quest phlebotomist at the time her blood was drawn as to the costs of the test and was advised by the phlebotomist that she would get a bill and that Quest did not have that information on price there.

338.     Had an insurer been responsible for the charges, they would have paid substantially less than what Roach was being charged.  Indeed, had Roach been on Medicare, Quest would have received a maximum of $123.23 for the lab services provided, which constitutes approximately 16% of the total bill amount.

339.     Roach twice sought a discount on the invoice by requesting financial assistance from Quest, including on August 4, 2016.

340.     Quest denied Roach's requests for financial assistance, advising her on both occasions that "[t]he amount due is your financial responsibility."

341.     Shortly after her request for reduction of the invoice was denied, Roach received a threatening letter from Quest titled in large, capital, bolded letters:

# FOURTH NOTICE

342.     This was not the fourth collection notice from Quest.  Rather, Roach had been working with Quest since the first invoice (dated July 21, 2016) in an effort to get Quest to reduce the bill.

343.     The notice threatened Roach with harm to her credit rating if she did not pay the invoice "in the next 14 days":

> This letter is our last attempt to contact you prior to referring your past due account to our collection agency.  We performed laboratory testing on your behalf at the request of your physician.  We have sent three invoices to you asking for payment.  If we do not receive payment or an explanation from you in the next 14 days your account will be referred to our Collection Agency.  We would like to prevent taking action which could negatively affect your credit rating or cause you unnecessary expense.

344.     Commencing in October 2016, Roach paid Quest $25 a month for twelve months (a total of $300), through September 2017, under protest, to defray the cost of Quest's lab testing.

345.     Subsequently, after litigation ensued on the amount of Quest's invoice, Roach's medical practice agreed to reimburse Roach for the cost of two of the lab tests (Amylase, Serum ($56.66) and CEA ($158.49), totaling $215.15), which it determined were not medically necessary.  Thus, only the remaining six tests are at issue.

346.     Although Quest would have received substantially less from any insurer, including Medicare, Roach has already paid $300 and was being forced to pay the remaining balance of $448.14 (offset by the $215.15 she was reimbursed by her medical practice for the two medically unnecessary lab tests).

347.     The line-by-line breakdown of the maximum Medicare payments for each of the tests performed by Quest on behalf of Roach, as compared to Quest's list prices (excluding the reimbursed tests), is as follows:

| CPT Code | Test Description | Quest's Chargemaster Rate | 2016 CLFS Maximum Payment Amount |
|---|---|---|---|
| 36415 | Venipuncture | $    19.62 | $        3.00 |

| 80053 | Comp Metabolic Panel W-O EGFR | $ | 84.22 | $ | 14.39 |
|---|---|---|---|---|---|
| 82105 | AFP, Tumor Marker, Serum | $ | 152.58 | $ | 22.85 |
| 83690 | Lipase, Serum | $ | 70.96 | $ | 9.38 |
| 85025 | CBC (Includes Diff-PLT) | $ | 40.56 | $ | 10.59 |
| 86304 | CA 125 | $ | 165.05 | $ | 28.35 |
| | **TOTALS** | **$** | **532.99** | **$** | **88.56** |
| | Difference | | | $ | 444.43 |
| | Maximum Medicare Would Pay (%) | | | | 16.62% |

**Carolyn Scott as Assignee of Cheryl Banker (Florida)**

348.    Carolyn Scott is the mother and assignee of the claim of Cheryl Banker asserted herein.  The assignment was made pursuant to an Assignment of Claim dated May 3, 2018.  Scott also holds a power of attorney from Banker, executed August 14, 2014.

349.    In July 2016, Banker was under the care of a psychiatrist (David Dada).  Dr. Dada prescribed a HCPCS G0479 test as medically necessary.

350.    At the time, Banker had medical insurance through Medicare.  Humana Gold Choice administered Banker's Medicare Advantage fee-for-service plan.

351.    Banker explained to Dr. Dada that she did not have sufficient assets to pay for the drug test if it was not covered by insurance.

352.    Banker provided the urine sample at a Quest location.  To Banker's recollection, Banker was not provided with an Advance Beneficiary Notice (ABN) and did not know that the procedure would not be covered by Medicare or that she would be charged Quest's list price for performing the drug test.

353.    Quest and Banker had not reached any agreement in advance with respect to the fees to be charged for any tests not covered by insurance.

354.    The parties' conduct established an implied contract that if any of her diagnostic tests were not covered by Medicare, then Banker would pay reasonable prices for those tests.

355.    Subsequently, Quest mailed Banker an invoice, dated September 9, 2016, for the urine test conducted on July 25, 2016.  The invoice stated that the "charge" for the drug test was $687.85.  The invoice did not state whether Banker had signed an ABN or whether insurance would cover the charge.

356.    Separately, Banker received a Notice of Denial of Payment from Humana.  The Notice stated that the "services/supplies are not considered reasonable or necessary under original Medicare payment standards and are not covered under the Medicare Advantage Plan."

357.    Neither the Quest invoice nor the Humana notice stated whether Banker had signed an ABN.

358.    According to information available on the internet, the reimbursement rate for G0479 for Medicare in 2016 was $79.25, or approximately 11.5% of Quest's list price.[12]

359.    Banker subsequently explained to a representative at Quest that she would not have taken the test if she knew that insurance would not cover the test or that she would be charged the list price for the test, rather than the Medicare rate.  The Quest representative refused to discount the rate.

360.    Banker agreed to pay the outstanding invoice under protest to avoid injury to her credit rating.

361.    Banker seeks restitution.

---

[12] http://www.upmc.com/healthcare-professionals/physicians/Documents/lab-fee-schedule-2016.pdf.

**Stephen Timm (California)**

362.    At all relevant times hereto, Plaintiff Stephen Timm maintained health insurance through Anthem Blue Cross.

363.    On April 28, 2016, Timm had blood drawn at a Quest facility.  Quest subsequently performed laboratory services.  Timm's physician prescribed those laboratory tests as medically necessary.  Timm was advised at the facility that the estimated net cost of the lab tests ordered by his physician after insurance was $25.  Quest took an imprint of Timm's credit card and said that it would use it to bill Timm if the amount was $50 or less.

364.    Quest and Timm did not reach any agreement in advance with respect to the fees to be charged for any tests not covered by Anthem in excess of $50.  Rather, the parties' conduct established an implied contract that if any clinical lab tests were not covered by Medicare, then Banker would pay the reasonable prices for those tests.

365.    Quest billed Timm its list price of $168.24 for a single laboratory test not covered by Anthem—a "Qualitative or Semiquantitative Immunoassays" test (CPT code 86001)—rather than a reasonable value for its services.  Anthem denied coverage, according to the Anthem EOB, because "investigational procedures are not covered."

366.    The Quest representative who advised Timm that his total cost would be approximately $25 was apparently unfamiliar with Anthem's coverage issue and Quest's pricing for that test.

367.    Had Anthem covered the CPT code 86001 test, Quest would have been compensated substantially less than its list price.  For example, according to the 2017 CLFS, Quest would have been compensated only $7.16, or about 4.26% of its list price, had Medicare covered the same test.

368.    Anthem did cover eight laboratory services performed by Quest on April 28, 2016, which had an aggregate list price of $845.54.  Quest accepted $108.96 for those tests, or about 12.89% of Quest's aggregate list price.  Timm had a copay obligation of 20% of the negotiated rate between Quest and Anthem ($21.79 out of $108.96).

369.    Indeed, the windfall Quest seeks by charging its list price (when compared to the Medicare reimbursement rate) would likely be even greater using Anthem's negotiated rate (although unknown at this time) given the fact that Anthem paid *less* than the maximum Medicare reimbursement rates on the eight laboratory services it did cover:

| CPT Code | Quest's Chargemaster Rate | 2017 CLFS Maximum Payment Amount | Insurance Rate |
|---|---|---|---|
| 86038 | $ 84.36 | $ 16.58 | $ 10.79 |
| 82164 | $ 140.61 | $ 20.03 | $ 13.03 |
| 85652 | $ 37.12 | $ 3.70 | $ 2.41 |
| 36415 | $ 22.50 | $ 3.00 | $ 2.10 |
| 86431 | $ 58.49 | $ 7.78 | $ 5.07 |
| 86140 | $ 75.37 | $ 7.10 | $ 4.62 |
| 86609 | $ 346.20 | $ 88.35 | $ 57.50 |
| 86606 | $ 80.89 | $ 20.65 | $ 13.44 |
| **TOTALS** | **$ 845.54** | **$ 167.19** | **$ 108.96** |

370.    Additionally, Quest billed Timm in the aggregate, without a breakdown of reimbursements from Anthem for each individual diagnostic test, although Quest was reimbursed by Anthem on an individual test-by-test basis.  For example, Timm's invoice demanded he pay Quest $190.03 for its services.  Timm's invoice included nine line items with an aggregate list price of $1,013.78.  Quest applied an aggregate "Insurance Discount" of $736.58 (without breaking the amount down on test-by-test basis) to the aggregate list price, and then reduced the bill by $87.17 for "Insurance Paid" (again, without breaking down the amount on a test-by-test basis).  Given that no single line item equaled $190.03, and the fact that the "Insurance

Discount" and "Insurance Paid" amounts were not broken down test-by-test, it was impossible for Timm to understand from the invoice what he was being charged for – whether copays, deductibles, or tests that were not covered by Anthem.  *See* Exhibit B.  As such, Quest's materially deficient disclosures on its invoice concealed the fact that it was charging Timm an excessive rate well above a reasonable value for its services.

371.    Because Timm could not determine which test(s) were not covered by insurance from the Quest invoice alone, and because he was familiar with his coinsurance obligations under his insurance contract, he suspected that Anthem had denied coverage of one or more tests.

372.    The Anthem website only showed the bill submitted and his cost on its summary page.  The website did not show the discount or denied charges.  The Quest bill appeared on Anthem's website with a total submitted charge of $1013 and his responsibility being $190.  That looked real close to the copay he had of 20%.  Timm had to persevere and go into a line item details page on the website to get the actual information on which test was excluded from coverage by Anthem.   Timm determined to join this action when he researched the excluded claim and estimated that the reasonable market price for the blood test that Quest had billed him $168.24 for was about $14.00.

373.    A less sophisticated patient would have paid the invoice without recognizing or making inquiry as to insurance coverage or the reasonable cost of the excluded claim.

374.    Timm asked Quest to drop the price of the excluded test twice – once after he obtained the Anthem EOB, and again after he received the Quest invoice and estimated the reasonable market price of the test.  He even talked to a supervisor the second time.  Quest would not budge on their charges.

375. Timm, under protest, paid the full amount Quest claimed was due in order to avoid further collection attempts and damage to his credit rating.

376. Timm demands restitution.

**K.      QUEST'S UNREASONABLE LIST PRICES**

377. Observing the difference between the 2017 and 2018 CLFS rates and Quest's list prices demonstrates the inherent unreasonableness of Quest's list prices.  This comparison provides a reliable proxy for demonstrating unreasonableness because (a) the 2017 and 2018 Medicare CLFS rates are derived from actual paid amounts received from third-party payers by the largest clinical lab test service providers, such as Quest, and (b) the actual private third-party payer payment rates are considered proprietary information and are therefore unattainable outside of discovery.

378. Specifically, for the services for which Plaintiffs were held financially accountable, a comparison of Quest's list prices to the 2017 national limit (separated by CPT code) yielded an average markup of 481.5% (4.81 times the national limit), and a median markup of 461.5% (4.62 times the national limit).  Comparing the list amounts to the 2017 third-party payer median payment amount, as disclosed by CMS, yielded an average markup of 333.9% (3.34 times the median rate), and a median markup of 318.3% (3.18 times the median rate).  Lastly, comparing the list prices to the 2018 CLFS rate yielded an average markup of 529.4% (5.29 times the 2018 rate), and a median markup of 522.5% (5.23 times the 2018 rate).  Below provides a test-by-test breakdown of the implied markup when comparing Quest's list prices with the 2017 Medicare national limit, 2017 Medicare third-party payer (TPP) median payment amount, and 2018 Medicare CLFS rate:

| CPT Code | Quest's List Price | 2017 Medicare Rates | | | | 2018 Medicare Rate | Markup on 2018 Rate |
|---|---|---|---|---|---|---|---|
| | | National Limit | Markup on National Limit | TPP Median | Markup on TPP Median | | |
| **Marvin Leslie** | | | | | | | |
| 81291 | $328.85 | $59.88 | 449.2% | $59.88 | 449.2% | $65.34 | 403.3% |
| **Vicki Leslie** | | | | | | | |
| 81291 | $328.85 | $59.88 | 449.2% | $59.88 | 449.2% | $65.34 | 403.3% |
| **Lawrence Catti** | | | | | | | |
| 83090 | $218.48 | $23.14 | 844.2% | $31.27 | 598.7% | $20.83 | 948.9% |
| 83704 | $50.00 | $43.28 | 15.5% | $58.48 | -14.5% | $38.95 | 28.4% |
| **Valerie Funari** | | | | | | | |
| 80053 | $62.58 | $14.49 | 331.9% | $19.59 | 219.4% | $13.04 | 379.9% |
| 82465 | $36.77 | $5.97 | 515.9% | $8.07 | 355.6% | $5.37 | 584.7% |
| 83718 | $63.81 | $11.24 | 467.7% | $15.19 | 320.1% | $10.12 | 530.5% |
| 84439 | $140.61 | $12.37 | 1036.7% | $16.72 | 741.0% | $11.13 | 1163.3% |
| 84443 | $125.47 | $23.05 | 444.3% | $31.15 | 302.8% | $20.75 | 504.7% |
| 84478 | $41.10 | $7.88 | 421.6% | $10.65 | 285.9% | $7.09 | 479.7% |
| 85025 | $40.56 | $10.66 | 280.5% | $14.41 | 181.5% | $9.59 | 322.9% |
| **Clyde Freeman** | | | | | | | |
| 82310 | $17.41 | $7.08 | 145.9% | $9.57 | 81.9% | $6.37 | 173.3% |
| 83970 | $215.19 | $56.62 | 280.1% | $76.51 | 181.3% | $50.96 | 322.3% |
| 86060 | $69.16 | $10.01 | 590.9% | $13.53 | 411.2% | $9.01 | 667.6% |
| 86160 | $92.19 | $16.46 | 460.1% | $22.24 | 314.5% | $14.81 | 522.5% |
| 86160 | $92.20 | $16.46 | 460.1% | $22.24 | 314.6% | $14.81 | 522.6% |
| 86162 | $150.20 | $27.88 | 438.7% | $37.67 | 298.7% | $25.09 | 498.6% |
| 86317 | $53.71 | $20.56 | 161.2% | $27.79 | 93.3% | $18.50 | 190.3% |
| 86704 | $86.02 | $16.53 | 420.4% | $22.34 | 285.0% | $14.88 | 478.1% |
| 86708 | $86.02 | $16.99 | 406.3% | $22.96 | 274.7% | $15.29 | 462.6% |
| 86803 | $156.40 | $19.57 | 699.2% | $26.45 | 491.3% | $17.61 | 788.1% |
| 87340 | $90.76 | $14.17 | 540.5% | $19.15 | 373.9% | $12.75 | 611.8% |
| **Jacob Chernov** | | | | | | | |
| 82306 | $150.00 | $40.61 | 269.4% | $54.88 | 173.3% | $36.55 | 310.4% |
| 83036 | $70.40 | $13.32 | 428.5% | $18.00 | 291.1% | $11.99 | 487.2% |
| **Ling Gong** | | | | | | | |
| 87624 | $125.84 | $48.14 | 161.4% | $65.06 | 93.4% | $43.33 | 190.4% |
| **Jill Roach** | | | | | | | |
| 36415 | $19.62 | $3.00 | 554.0% | - | - | $3.00 | 554.0% |
| 80053 | $84.22 | $14.49 | 481.2% | $19.59 | 329.9% | $13.04 | 545.9% |
| 82105 | $152.58 | $23.01 | 563.1% | $31.10 | 390.6% | $20.71 | 636.7% |
| 82150 | $56.66 | $8.89 | 537.3% | $12.01 | 371.8% | $8.00 | 608.3% |

| CPT Code | Quest's List Price | 2017 Medicare Rates | | | | 2018 Medicare Rate | Markup on 2018 Rate |
|---|---|---|---|---|---|---|---|
| | | National Limit | Markup on National Limit | TPP Median | Markup on TPP Median | | |
| 82378 | $158.49 | $26.01 | 509.3% | $35.16 | 350.8% | $23.41 | 577.0% |
| 83690 | $70.96 | $9.45 | 650.9% | $12.77 | 455.7% | $8.51 | 733.8% |
| 85025 | $40.56 | $10.66 | 280.5% | $14.41 | 181.5% | $9.59 | 322.9% |
| 86304 | $165.05 | $28.55 | 478.1% | $38.58 | 327.8% | $25.70 | 542.2% |
| **Arthur Goldsmith** | | | | | | | |
| 84702 | $136.82 | $20.65 | 562.6% | $27.91 | 390.2% | $18.59 | 636.0% |
| **Craig Dvorak[13]** | | | | | | | |
| 86003 | $773.25 | $7.16 | 10699.6% | $9.68 | 7888.1% | $6.44 | 11907.0% |
| 86003 | $376.40 | $7.16 | 5157.0% | $9.68 | 3788.4% | $6.44 | 5744.7% |
| **Jennifer Bennett** | | | | | | | |
| 86003 | $58.41 | $7.16 | 715.8% | $9.68 | 503.4% | $6.44 | 807.0% |
| **Diana Dannelly** | | | | | | | |
| 36415 | $20.55 | $3.00 | 585.0% | - | - | $3.00 | 585.0% |
| 80053 | $62.58 | $14.49 | 331.9% | $19.59 | 219.4% | $13.04 | 379.9% |
| 82172 | $25.00 | $21.26 | 17.6% | $28.73 | -13.0% | $21.09 | 18.5% |
| 82306 | $232.54 | $40.61 | 472.6% | $54.88 | 323.7% | $36.55 | 536.2% |
| 82465 | $36.77 | $5.97 | 515.9% | $8.07 | 355.6% | $5.37 | 584.7% |
| 82607 | $115.73 | $20.68 | 459.6% | $27.94 | 314.2% | $18.61 | 521.9% |
| 82627 | $205.50 | $30.50 | 573.8% | $41.22 | 398.5% | $27.45 | 648.6% |
| 82746 | $113.57 | $20.17 | 463.1% | $27.26 | 316.6% | $18.15 | 525.7% |
| 83090 | $218.48 | $23.14 | 844.2% | $31.27 | 598.7% | $20.83 | 948.9% |
| 83718 | $63.81 | $11.24 | 467.7% | $15.19 | 320.1% | $10.12 | 530.5% |
| 84305 | $192.52 | $29.17 | 560.0% | $39.42 | 388.4% | $26.25 | 633.4% |
| 84439 | $140.61 | $12.37 | 1036.7% | $16.72 | 741.0% | $11.13 | 1163.3% |
| 84443 | $125.47 | $23.05 | 444.3% | $31.15 | 302.8% | $20.75 | 504.7% |
| 84478 | $41.10 | $7.88 | 421.6% | $10.65 | 285.9% | $7.09 | 479.7% |
| 84481 | $217.40 | $23.24 | 835.5% | $31.40 | 592.4% | $20.92 | 939.2% |
| 85025 | $40.56 | $10.66 | 280.5% | $14.41 | 181.5% | $9.59 | 322.9% |
| 86141 | $50.00 | $17.76 | 181.5% | $24.00 | 108.3% | $15.98 | 212.9% |

---

[13] Data for Craig Dvorak was excluded from the average and median calculations above.  Upon review of the CPT code and associated charges related to Craig Dvorak, it is unclear what the basis is for the charged amount, *i.e.*, whether the charged amount was an aggregation of CPT code 86003 tests.  The lack of a reliable foundation as to the basis for the charged amount would potentially distort any comparison between the Medicare data (which is based on a single CPT code 86003 test) and Mr. Dvorak's data, therefore justifying its exclusion.

| CPT Code | Quest's List Price | 2017 Medicare Rates | | | | 2018 Medicare Rate | Markup on 2018 Rate |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | National Limit | Markup on National Limit | TPP Median | Markup on TPP Median | | |
| **Edie Golikov** | | | | | | | |
| 81291 | $337.07 | $59.88 | 462.9% | $59.88 | 462.9% | $65.34 | 415.9% |
| 86301 | $140.61 | $28.55 | 392.5% | $38.58 | 264.5% | $25.70 | 447.1% |
| **Dolores Herrmann** | | | | | | | |
| 83036 | $71.39 | $13.32 | 436.0% | $18.00 | 296.6% | $11.99 | 495.4% |
| **Lonnie Hodges Jr.** | | | | | | | |
| 36415 | $21.37 | $3.00 | 612.3% | - | - | $3.00 | 612.3% |
| 86592 | $38.24 | $5.86 | 552.6% | $7.92 | 382.8% | $5.27 | 625.6% |
| 86695 | $107.14 | $18.09 | 492.3% | $24.45 | 338.2% | $16.28 | 558.1% |
| 86696 | $136.96 | $26.55 | 415.9% | $35.88 | 281.7% | $23.90 | 473.1% |
| 86803 | $145.11 | $19.57 | 641.5% | $26.45 | 448.6% | $17.61 | 724.0% |
| 87340 | $84.36 | $14.17 | 495.3% | $19.15 | 340.5% | $12.75 | 561.6% |
| 87389 | $108.16 | $33.03 | 227.5% | $44.64 | 142.3% | $29.73 | 263.8% |
| 87491 | $103.49 | $48.14 | 115.0% | $65.06 | 59.1% | $43.33 | 138.8% |
| 87591 | $103.48 | $48.14 | 115.0% | $65.06 | 59.1% | $43.33 | 138.8% |
| 87661 | $173.23 | $48.14 | 259.8% | $65.06 | 166.3% | $43.33 | 299.8% |
| **Lily Martyn** | | | | | | | |
| 86161 | $123.51 | $16.46 | 650.4% | $22.41 | 451.1% | $14.81 | 734.0% |
| **Ryszard Pojawis** | | | | | | | |
| 81291 | $316.20 | $59.88 | 428.1% | $59.88 | 428.1% | $65.34 | 383.9% |
| **Stephen Timm** | | | | | | | |
| 86001 | $168.24 | $7.16 | 2249.7% | $9.60 | 1652.5% | $7.82 | 2051.4% |
| **Liang Yu** | | | | | | | |
| 36415 | $21.37 | $3.00 | 612.3% | - | - | $3.00 | 612.3% |
| 86480 | $336.34 | $85.02 | 295.6% | $114.89 | 192.7% | $76.52 | 339.5% |
| 86592 | $38.24 | $5.86 | 552.6% | $7.98 | 379.2% | $5.27 | 625.6% |
| 87591 | $103.49 | $48.14 | 115.0% | $65.06 | 59.1% | $43.33 | 138.8% |

379.    As discussed above in Section H(2), ¶¶ 109-111, California and Texas conduct their own independent analyses for purposes of calculating the rates paid under their respective Medicaid programs.  Comparing Quest's list prices to California's and Texas's 2018 Medicaid rates further demonstrates the unreasonableness of Quest's list prices.  For example, the markup on California's Medi-Cal rate when compared to Quest's list prices for the tests each Plaintiff is

financially responsible for yields an average markup of 793.3% (7.93 time the Medi-Cal rate), with a median of 777.2% (7.77 times the Medi-Cal rate). Conducting the same analysis using the 2018 Texas Medicaid rates yields an average markup of 493.8% (4.94 times the Texas Medicaid rate), with a median of 460.1% (4.6 times the Texas Medicaid rate). Below is the data on a test-by-test basis, excluding any tests that there was no data for under either the Medi-Cal or Texas Medicaid programs.

| CPT Code | Quest's List Price | 2018 Medi-Cal Rates | Markup on Cal Rate | 2018 TX Medicaid Rates | Markup on Texas Rate |
|---|---|---|---|---|---|
| **Marvin Leslie** | | | | | |
| 81291 | $328.85 | - | - | $59.88 | 449.18% |
| **Vicki Leslie** | | | | | |
| 81291 | $328.85 | - | - | $59.88 | 449.18% |
| **Lawrence Catti** | | | | | |
| 83090 | $218.48 | $15.18 | 1339.26% | $23.14 | 844.17% |
| 83704 | $50.00 | $34.34 | 45.60% | $43.28 | 15.53% |
| **Valerie Funari** | | | | | |
| 80053 | $62.58 | $9.28 | 574.35% | $14.49 | 331.88% |
| 82465 | $36.77 | $3.89 | 845.24% | $5.97 | 515.91% |
| 83718 | $63.81 | $6.75 | 845.33% | $11.24 | 467.70% |
| 84439 | $140.61 | $7.91 | 1677.62% | $12.37 | 1036.70% |
| 84443 | $125.47 | $14.76 | 750.07% | $23.05 | 444.34% |
| 84478 | $41.10 | $5.02 | 718.73% | $7.88 | 421.57% |
| 85025 | $40.56 | $6.75 | 500.89% | $10.66 | 280.49% |
| **Clyde Freeman** | | | | | |
| 82310 | $17.41 | $4.10 | 324.63% | $7.08 | 145.90% |
| 83970 | $215.19 | $34.84 | 517.65% | $56.62 | 280.06% |
| 86060 | $69.16 | $6.49 | 965.64% | $10.01 | 590.91% |
| 86160 | $92.19 | $10.51 | 777.16% | $16.46 | 460.09% |
| 86160 | $92.20 | $10.51 | 777.26% | $16.46 | 460.15% |
| 86162 | $150.20 | $22.12 | 579.02% | $25.79 | 482.40% |
| 86317 | $53.71 | $13.52 | 297.26% | $20.56 | 161.24% |
| 86704 | $86.02 | $10.83 | 694.28% | $16.53 | 420.39% |
| 86708 | $86.02 | $11.26 | 663.94% | $16.99 | 406.30% |
| 86803 | $156.40 | $12.57 | 1144.23% | $19.57 | 699.18% |
| 87340 | $90.76 | $9.12 | 895.18% | $14.17 | 540.51% |

| CPT Code | Quest's List Price | 2018 Medi-Cal Rates | Markup on Cal Rate | 2018 TX Medicaid Rates | Markup on Texas Rate |
|---|---|---|---|---|---|
| **Jacob Chernov** | | | | | |
| 82306 | $150.00 | $24.79 | 505.08% | $37.28 | 302.36% |
| 83036 | $70.40 | $8.54 | 724.36% | $13.32 | 428.53% |
| **Ling Gong** | | | | | |
| 87624 | $125.84 | $35.05 | 259.03% | $48.14 | 161.40% |
| **Jill Roach** | | | | | |
| 80053 | $84.22 | $9.28 | 807.54% | $14.49 | 481.23% |
| 82105 | $152.58 | $12.03 | 1168.33% | $23.01 | 563.10% |
| 82150 | $56.66 | $5.73 | 888.83% | $8.89 | 537.35% |
| 82378 | $158.49 | $17.28 | 817.19% | $26.01 | 509.34% |
| 83690 | $70.96 | $6.08 | 1067.11% | $9.45 | 650.90% |
| 85025 | $40.56 | $6.75 | 500.89% | $10.66 | 280.49% |
| 86304 | $165.05 | $18.71 | 782.15% | $28.55 | 478.11% |
| **Arthur Goldsmith** | | | | | |
| 84702 | $136.82 | $13.24 | 933.38% | $11.98 | 1042.07% |
| **Craig Dvorak[14]** | | | | | |
| 86003 | $773.25 | $4.65 | 16529.03% | $6.56 | 11687.35% |
| 86003 | $376.40 | $4.65 | 7994.62% | $6.56 | 5637.80% |
| **Jennifer Bennett** | | | | | |
| 86003 | $58.41 | $4.65 | 1156.13% | $6.56 | 790.40% |
| **Diana Dannelly** | | | | | |
| 80053 | $62.58 | $9.28 | 574.35% | $14.49 | 331.88% |
| 82172 | $25.00 | $13.15 | 90.11% | $21.26 | 17.59% |
| 82306 | $232.54 | $24.79 | 838.04% | $37.28 | 523.77% |
| 82465 | $36.77 | $3.89 | 845.24% | $5.97 | 515.91% |
| 82607 | $115.73 | $13.33 | 768.19% | $20.68 | 459.62% |
| 82627 | $205.50 | $19.62 | 947.40% | $30.50 | 573.77% |
| 82746 | $113.57 | $13.25 | 757.13% | $20.17 | 463.06% |
| 83090 | $218.48 | $15.18 | 1339.26% | $23.14 | 844.17% |
| 83718 | $63.81 | $6.75 | 845.33% | $11.24 | 467.70% |
| 84305 | $192.52 | $18.39 | 946.87% | $29.17 | 559.99% |
| 84439 | $140.61 | $7.91 | 1677.62% | $12.37 | 1036.70% |
| 84443 | $125.47 | $14.76 | 750.07% | $23.05 | 444.34% |
| 84478 | $41.10 | $5.02 | 718.73% | $7.88 | 421.57% |
| 84481 | $217.40 | $14.97 | 1352.24% | $23.24 | 835.46% |

---

[14] Data for Craig Dvorak was excluded from the average and median calculations. *See supra* n.13.

| CPT Code | Quest's List Price | 2018 Medi-Cal Rates | Markup on Cal Rate | 2018 TX Medicaid Rates | Markup on Texas Rate |
|---|---|---|---|---|---|
| 85025 | $40.56 | $6.75 | 500.89% | $10.66 | 280.49% |
| 86141 | $50.00 | $11.19 | 346.83% | $17.76 | 181.53% |
| **Edie Golikov** | | | | | |
| 81291 | $337.07 | - | - | $59.88 | 462.91% |
| 86301 | $140.61 | $18.98 | 640.83% | $28.55 | 392.50% |
| **Dolores Herrmann** | | | | | |
| 83036 | $71.39 | $8.54 | 735.95% | $13.32 | 435.96% |
| **Lonnie Hodges Jr.** | | | | | |
| 86592 | $38.24 | $3.84 | 895.83% | $5.86 | 552.56% |
| 86695 | $107.14 | $11.80 | 807.97% | $18.09 | 492.26% |
| 86696 | $136.96 | $17.20 | 696.28% | $26.55 | 415.86% |
| 86803 | $145.11 | $12.57 | 1054.42% | $19.57 | 641.49% |
| 87340 | $84.36 | $9.12 | 825.00% | $14.17 | 495.34% |
| 87389 | $108.16 | $20.26 | 433.86% | $33.03 | 227.46% |
| 87491 | $103.49 | - | - | - | - |
| 87591 | $103.48 | $31.07 | 233.05% | $48.14 | 114.96% |
| 87661 | $173.23 | $30.54 | 467.22% | $48.14 | 259.85% |
| **Lily Martyn** | | | | | |
| 86161 | $123.51 | $13.06 | 845.71% | $16.46 | 650.36% |
| **Ryszard Pojawis** | | | | | |
| 81291 | $316.20 | - | - | $59.88 | 428.06% |
| **Stephen Timm** | | | | | |
| 86001 | $168.24 | $5.68 | 2861.97% | $6.56 | 2464.63% |
| **Liang Yu** | | | | | |
| 86480 | $336.34 | $55.04 | 511.08% | $85.02 | 295.60% |
| 86592 | $38.24 | $3.84 | 895.83% | $5.86 | 552.56% |
| 87591 | $103.49 | $31.07 | 233.09% | $48.14 | 114.98% |

380.    Additionally, the actual payment rates private third-party payers (insurance companies) paid Quest for clinical lab tests for certain Plaintiffs was discernable from the respective Plaintiff's EOBs, or through contact with the third-party payer.  Comparing the observed negotiated rate data to Quest's list prices further demonstrates that Quest's list prices are grossly excessive.  *First*, the observed rates Quest negotiated with private third-party payers were nearly always **below** the 2017 Medicare national limit and 2018 Medicare CLFS rates –

72

thus establishing the Medicare rates as a conservative metric to establish reasonable pricing. *Second*, the average markup when comparing Quest's list prices to the negotiated rates was 856.39% (8.56 times the negotiated rate), with a median of 734.26% (or 7.34 times the negotiated rate).   Below provides a test-by-test breakdown of the implied markup when comparing Quest's list prices with the observed negotiated rates, as well as comparison of the negotiated rates to the 2017 Medicare national limit and 2018 Medicare CLFS rates:

| CPT Code | Quest's List Price | 2017 Medicare National Limit | 2018 Medicare Rate | Observed Negotiated Rate | Markup on Negotiated Rate |
|---|---|---|---|---|---|
| Lawrence Catti | | | | | |
| 82172 | $25.00 | $21.26 | $21.09 | $13.80 | 81.16% |
| 82627 | $205.50 | $30.50 | $27.45 | $19.81 | 937.35% |
| 82670 | $215.24 | $38.32 | $34.49 | $24.89 | 764.76% |
| 83036 | $71.39 | $13.32 | $11.99 | $8.49 | 740.87% |
| 83090 | $218.48 | $23.14 | $20.83 | $15.02 | 1354.59% |
| 83695 | $25.00 | $17.76 | $15.98 | $11.53 | 116.83% |
| 83704 | $50.00 | $43.28 | $38.95 | $28.10 | 77.94% |
| 84153 | $142.77 | $25.23 | $22.71 | $16.38 | 771.61% |
| 84270 | $143.85 | $29.81 | $26.83 | $19.36 | 643.03% |
| 84305 | $192.52 | $29.17 | $26.25 | $18.93 | 917.01% |
| 84403 | $190.36 | $35.41 | $31.87 | $23.00 | 727.65% |
| 84439 | $140.61 | $12.37 | $11.13 | $8.03 | 1651.06% |
| 84481 | $217.40 | $23.24 | $20.92 | $15.09 | 1340.69% |
| Clyde Freeman | | | | | |
| 83970 | $215.19 | $56.62 | $50.96 | $56.23 | 282.70% |
| 86060 | $69.16 | $10.01 | $9.01 | $7.67 | 801.69% |
| 86162 | $150.20 | $27.88 | $25.09 | $27.68 | 442.63% |
| 86317 | $53.71 | $20.56 | $18.50 | $20.42 | 163.03% |
| 86704 | $86.02 | $16.53 | $14.88 | $16.41 | 424.19% |
| 86708 | $86.02 | $16.99 | $15.29 | $16.87 | 409.90% |
| Ling Gong | | | | | |
| 88175 | $101.40 | $36.34 | $32.71 | $23.73 | 327.31% |
| Edie Golikov | | | | | |
| 82306 | $232.54 | $40.61 | $36.55 | $26.37 | 781.84% |
| 83516 | $81.12 | $15.82 | $14.24 | $10.27 | 689.87% |
| 83525 | $50.00 | $15.68 | $14.11 | $10.19 | 390.68% |
| 83721 | $50.00 | $13.09 | $11.78 | $8.49 | 488.93% |

| CPT Code | Quest's List Price | 2017 Medicare National Limit | 2018 Medicare Rate | Observed Negotiated Rate | Markup on Negotiated Rate |
|---|---|---|---|---|---|
| 84550 | $41.10 | $6.20 | $5.58 | $4.02 | 922.39% |
| 85025 | $40.56 | $10.66 | $9.59 | $6.19 | 555.25% |
| 85610 | $35.69 | $5.39 | $4.85 | $3.49 | 922.64% |
| 85730 | $49.75 | $8.24 | $7.42 | $5.35 | 829.91% |
| 86038 | $81.12 | $16.58 | $14.92 | $10.77 | 653.20% |
| 86039 | $46.51 | $15.31 | $13.78 | $9.94 | 367.91% |
| 86140 | $72.47 | $7.10 | $6.39 | $4.61 | 1472.02% |
| 86235 | $81.12 | $24.60 | $22.14 | $15.98 | 407.63% |
| 86235 | $81.12 | $24.60 | $22.14 | $15.98 | 407.63% |
| 86376 | $87.61 | $19.96 | $17.96 | $12.96 | 576.00% |
| 86803 | $139.53 | $19.57 | $17.61 | $12.71 | 997.80% |
| 87340 | $81.12 | $14.17 | $12.75 | $9.20 | 781.74% |
| **Ryszard Pojawis** | | | | | |
| 36415 | $19.76 | $3.00 | $3.00 | $1.80 | 997.78% |
| 82139 | $746.72 | $23.14 | $20.83 | $14.50 | 5049.79% |
| 83519 | $752.96 | $18.53 | $18.40 | $30.36 | 2380.11% |
| 86038 | $78.00 | $16.58 | $14.92 | $10.39 | 650.72% |
| 86235 | $78.00 | $24.60 | $22.14 | $15.41 | 406.16% |
| 86255 | $145.60 | $16.53 | $14.88 | $10.36 | 1305.41% |
| 86359 | $183.39 | $51.75 | $46.58 | $12.28 | 1393.40% |
| 86360 | $228.45 | $64.45 | $58.01 | $40.38 | 465.75% |
| **Stephen Timm** | | | | | |
| 36415 | $22.50 | $3.00 | $3.00 | $2.10 | 971.43% |
| 82164 | $140.61 | $20.03 | $18.03 | $13.03 | 979.13% |
| 85652 | $37.12 | $3.70 | $3.33 | $2.41 | 1440.25% |
| 86038 | $84.36 | $16.58 | $14.92 | $10.79 | 681.84% |
| 86140 | $75.37 | $7.10 | $6.39 | $4.62 | 1531.39% |
| 86431 | $58.49 | $7.78 | $7.00 | $5.07 | 1053.65% |
| 86606 | $80.89 | $20.65 | $18.59 | $13.44 | 501.86% |
| 86609 | $346.20 | $17.67 | $15.90 | $57.50 | 502.09% |

381.    Finally, Quest's financial statements acknowledge that Quest receives average net revenue per service for self-pay patients that is at least 2.6 to 3.8 times the average net revenue per service received from third-party payers.  Thus, while the gross profit margin for third party

payers is approximately 38.79%, the gross profit margins for self-pay patients is approximately 79.6%.

L.   **QUEST'S OTHER BUSINESS PRACTICES DECEIVE OR HARASS CUSTOMERS INTO PAYING EXCESSIVE BILLS**

382.   In addition to charging excessive prices, Quest has a number of business practices that deceive and harass customers into paying excessive prices, such as aggregating insurance discounts and payments, and sending out threatening collection letters.

1.   **Aggregating Insurance Discounts and Payments Deceives Patients into Believing that Their Clinical Lab Testing Is Fully Covered By Insurance**

383.   The New York Times' Tina Rosenberg criticized health providers' cryptic billing practices, pointing out that "[u]nlike everything else we buy, when we purchase a medical treatment, surgery or diagnostic test, we buy blind.  We do not know the cost of health procedures before we buy.  When we do get the bill, we have no idea what the charges are based on and have no way to evaluate them."  Tina Rosenberg, *Revealing a Health Care Secret: The Price*, THE NEW YORK TIMES (July 31, 2013).

384.   Quest's invoices include only the date of service, a brief description of each service performed, the list price for each service, and then blank entries for adjustments, payments made by Medicare or Medicaid, insurer payments, patient payments (such as copays), and the balance for which the patient is responsible.  Quest's invoices, however, aggregate third-party payer discounts and payments, which prevents a patient from being able determine from the invoice which individual tests were covered or not covered by insurance.  For example, annexed as Exhibit A is Ryszard Pojawis's invoice in the amount of $2,549.08.  As is demonstrated, the invoice fails to identify which, if any, procedures were not covered by Pojawis's insurance.  *See also* Exhibit B (Timm invoice, *supra* at ¶370).

385.     Pojawis and Timm are particularly sophisticated consumers and had the wherewithal to investigate further and determine that insurance had disclaimed coverage on specific claims.  *See* discussion, *supra*, at ¶¶333, 371-373.  However, most consumers would assume by the presentation of the invoice, that insurance had covered a portion of all clinical lab tests and the remaining bill is the balance correctly due and owing to Quest.

386.     There is no reason for Quest to aggregate adjustments and payments and not provide a test-by-test summary other than to create a misleading picture to consumers.  Reimbursement from third-party payers is conducted on a fee-for-service basis, which provides Quest with payment on a test-by-test basis.  In fact, certain Quest regional operations, such as Sonora Quest, provide patients with disaggregated information.  *See* Exhibit C (Chernov invoice).

387.     Commonly, insurance disclaims coverage because the physician made a coding error in identifying the medical diagnosis or because Quest is charging for a service that has already been covered by a different clinical lab test (*see* Freeman discussion, *supra*, ¶208).  It is no justification that a patient may be able to discern this information by calling Quest or reviewing an EOB.  The invoice itself demands payment and therefore should provide sufficient information to inform the recipient as to whether the invoice is accurate.

388.     As an analogy, if you go to a supermarket that provides discounts on certain products, and the register tape only aggregates those discounts, there would be no way to determine if you received the appropriate discounts.  Is it a sufficient justification that the consumer can obtain a disaggregated register tape from customer service or does the mere fact that the register tape was aggregated deter consumers from checking their receipts?  Is there any reason why healthcare costs should not be as transparent as a supermarket?

76

389.    The above facts create a strong inference that Quest intentionally omits material information on its invoices to induce self-pay patients to pay egregiously inflated amounts for its services.

### 2.    Quest Sends Out Threatening Letters Demanding Payment

390.    Quest sends out threatening invoices to customers threatening harm to their credit ratings and the risk of being foreclosed from future Quest services.  These threats are particularly troubling to those patients whose physicians or insurers require exclusive use of Quest's services. *See, e.g.,* Golikov discussion at ¶238.

391.    Quest further sells past due accounts to an outside collection agency, American Medical Collections Agency (AMCA), who mail harassing letters threatening to ruin a patient's credit rating and foreclose the patient from receiving future medical services unless they pay Quest's excessive bills.  *See*, *e.g.*, Dannelly discussion, *supra*, at ¶184; Freeman discussion, *supra*, at ¶212.  *See also* Dvorak discussion, *supra*, at ¶197; Roach discussion, *supra*, at ¶341-343.

392.    Quest is precluded from using a debt collector because Plaintiffs' alleged debt was not "expressly authorized by the agreement creating the debt or permitted by law."  *See* 15 U.S.C. §808(a).  There is no express agreement between Quest and patients creating a debt.

### M.    OTHER COMPLAINTS ABOUT QUEST'S BILLING PRACTICES

393.    Many consumers have voiced complaints in public forums about Quest similar to Plaintiffs' allegations:[15]

       a.   G. of NV on April 15, 2014:

---

[15] Available at, https://www.consumeraffairs.com/health/quest_diagnostics.html (last visited May 10, 2018).

I had gone to my Primary Care doctor for a yearly type checkup. He ordered a number of blood tests to check and see if my medications were working properly. I was sent to their in-house lab, Quest Diagnostics. Prior to doing the tests, they demanded' that I sign a form stating that if the insurance company would not pay that I would be responsible. I thought that I had never had any difficulty with Medicare paying for blood tests, so I signed.  Well, I think they have a reason for having you sign this document up front. When bills are sent to Medicare, they adjust the amount downward typically so the patient isn't overcharged. Hmm.

Quest submitted the bill to Medicare using codes that did not match what the doctor had ordered and 95% of the items for routine blood tests were denied. Hmm. Quest rebilled me for over a thousand dollars at their full price amount. My question is do they do this on purpose. After emails and certified letters to Quest requesting their help in resolving the denial by Medicare, I received no correspondence, emails, phone call, etc. Just a new bill from a collection agency. Hmm. After reading a number of other posts regarding Quest that too seems to be their typical MO.

I guess I have no recourse except to take them to court. If anyone knows someone to file a complaint with, please let me know. I recently went back to the same doctor and he needs additional blood work. I refused to go to Quest and requested an alternative. The doctor also was not that helpful in helping resolve the issue either. Hmm. Another possible question could be asked here. Does the doctor receive referral money back from Quest? I'm irritated as hell and don't need this aggravation.

b.  P. of FL on Aug. 8, 2014:

When checking in for blood work, a Quest Diagnostics Rep will take your driver's license and insurance card. The customer will assume by this action, that they are validating your request. Not the case. We received a bill for nearly $4,000 in blood work (which in of itself is insane) as our United Health Care Insurance does not cover Quest (they do not cover them as they charge twice as much for the same test as other labs).  If the Quest Rep had told us that they did not take our insurance, my husband would have gone to LabCorp which takes United Health Care to have his blood drawn. After looking at all the others that this has happened to, it appears to be something Quest does intentionally and requires a class action suit!

c.  R. of FL on Dec. 9, 2014:

Opened a letter today stating it was a 3rd notice and is seriously late from Quest Diagnostics. It is a bill for the amount of $1,462.08 for lab work that was denied by my insurance, and not authorized by me either. I still don't even know what the charges are actually for and have not seen any bill previous to this or had any contact with Quest regarding this. The bill is dated for July 14, 2014 by a doctor who is not even practicing anymore.

After contacting Blue Cross/Blue Shield they suggest I submit an appeal along with all documentation stating the lab work was medically necessary, I was also told that the lab work would have needed their prior approval to be covered in the first place, basically, the lab work was not authorized by the insurance company or myself. This seems like some kind of fraudulent scam of billing for service not rendered and hoping the patient will pay just due to the confusing terms on the statements, in any account, due to the amount it will need to be handled by a lawyer, possibly looking into a class action suit due to other patients I have heard complaining of the same issue with Quest Diagnostics and the invisible doctor.

Updated on 12/26/2014:

AN UPDATE TO: R. of FL on Dec. 9, 2014 post - After repeatedly trying to contact Quest Diagnostics billing department by phone and email I received the following response: "Dear **, Unfortunately we are not able to discuss the testing ordered for you. Please contact a doctor's office with any further questions about the tests performed." I already told them that the doctor closed/sold his practice during the one month period that I gave a urine sample and my follow-up so I could get my prescriptions filled. He's gone, I never even got the results, had to submit to another lab test to Logan Labs. HOW AM I SUPPOSE TO DISCUSS THE TESTING THEY SUPPOSEDLY PERFORMED WITH A DOCTOR WHO HAS PACKED UP AND LEFT TOWN - QUEST DIAGNOSTICS LABS ARE CROOKS!!!!

    d.  B. of NY on Jan. 9, 2015:

Went to get blood work for daughter as though she may have genetic abnormality. Referred by our geneticist. Aetna denied the bill ($3,000). Said it was experimental. I tried call[ing] Quest to work out a lower fee. I can't afford $3,000. The Aetna rate would have been only $375. Neither doctor nor Quest sought prior approval from Aetna. I can't believe I'm the first person to have Aetna and this insurance and they knew it was going to happen. No one seems to have authority to help me. Now it is in collections.

e.  K. of SC on April 3, 2015:

I had my labs drawn at Any lab Test Now for the advertised price of $99 for the set of thyroid labs I needed to have drawn. They asked if I had a doctor's order and insurance so I gave my information believing the price would be the same. When I got the bill from Quest, for the exact same labs, the price was $483.00 not covered by insurance. I repeatedly requested that they adjust the price to the advertised price and pointed out that their price exceeds other labs by hundreds of dollars. Not only were they unwilling to adjust my bill, but responded in a rote, unconcerned and inappropriate manner. ** responded several times telling me to take it up with my insurance company, even though my insurer had nothing to do with the billing discrepancy. Reasonable requests are categorically dismissed. What recourse is there for the consumer? I intend to find out.

f.  D. of GA on April 8, 2015:

I had genetic testing done during my pregnancy, ordered by my doctor. The doctor ordered 19 tests. The phlebotomists at Quest Diagnostics were clueless as to what codes to put in the system since they were not familiar with the tests and put in some extra tests. This resulted in Quest ordering the wrong test, particularly test code 81223, Cystic Fibrosis Full Sequence, which was NOT ordered by my OBGYN and my insurance company AETNA denies and for which Quest charges me $3,380.

After numerous calls to Quest to review their order when compared to my doctor's order and fix the bill, no one knows what to do and one rep even told me that this can't be done and I should just pay. Every reputable company has a way for the consumer to appeal charges if he/she believes they're wrong or a result of a mistake. Quest conveniently doesn't have that process in place and forces people to just pay for their mistakes. Now I have engaged my doctor in trying to reach Quest as well and appeal the charge because it was NOT what he ordered. But even he admitted that it would be hard to get to the person at Quest who makes the decisions.  So unfair and has caused my family so much worry in a time when we're supposed to be happy expecting our child.

g.  M. of VA on Oct. 22, 2015:

*Satisfaction Rating*

I don't normally vent online, but I cannot comprehend how 3 lab tests that my Doctor ordered, billed to a code, my insurance

company would not accept, will cost us over $1,000 from Quest Diagnostics. But had they been billed to a code accepted by our insurance company would have only cost the insurance company $166 (covered 100%). I cannot wrap my head around the discrepancy. Even the employees cannot provide a reasonable explanation.

    h.   J. of GA on Oct. 29, 2015:

I received a totally unexpected bill for $218.48 from Quest in mid-August for a homocysteine test my doctor had ordered. Since I had this test at least twice before which was covered by Blue Cross HMO before I changed to Aetna, I was surprised that Aetna Medicare Advantage did not pay for it.  I called Aetna and they referred me to their website which outlines their reasons for denial of coverage of the homocysteine test.  Of course I strongly disagree with their (supposedly) science-based analysis of the merit of the homocysteine test for cardiovascular risk (and assume my doctor did also, since he ordered the test), but was helpless to change their denial of coverage in my case.

I was prepared to pay the Quest Lab bill ($218.48) for the homocysteine test until I called a local lab (Any Lab Test) and found that they only charge $89.00 for the test.  Then I checked lef.org and found the homocysteine test offered for $64.00. I then called Quest and spoke to a lady named Juanida, who told me she would research whether or not the bill could be adjusted and get back to me.  During the conversation with Juanida I emphasized the fact that the Quest bill was at least twice to three times the amount the other labs were charging for the same test. I also was very upset that I had no bargaining power at all.  I had no prior opportunity to bargain for a better price. Quest simply dictated the amount they wanted me to pay, and I had no input whatsoever about the amount. I had to pay it -- or else.

I can't think of a similar situation -- outside of healthcare billing -- where the customer is ordered to pay for an item or service without having any say at all in the price, and no ability to shop around for a better bargain. Since I didn't hear back from her over a couple of weeks, I called again on 9/21 and she said that she was hopeful, and in fact, fairly sure, the bill could be reduced, and would call me back when she got an answer.  She did not call me back, so I called her at least twice more over a period of a couple of weeks, leaving messages. Still no response.

I am extremely angry.  It is not just a matter of being billed too high a price for a service I never contracted for with Quest Labs either

directly or indirectly. It is my realization that we patients as consumers have no bargaining power in the U.S. medical care system and are basically helpless. And indeed, this whole scenario of my dealings with Aetna and Quest seems to me symptomatic of what's wrong with healthcare in the U.S., which has degenerated into a greedy free-for-all-money-grubbing battle among insurance companies, pharmacies, laboratories, doctors, hospitals, corporate controlled medicine and big pharma for financial advantage and huge corporate profits, with patients best interests not even on the radar.

    i.  M. of IL on February 26, 2016:

I am still seething after settling a blood test bill with Quest Diagnostics. What a ripoff! I have had the exact same blood work for my physical for the past 2 years. For both years the same exact amount of $674.22 was invoiced. A year ago the claim was paid by Blue Cross and Quest was paid a total amount of $76.00 as full settlement. This year Medicare only paid $42 and didn't approve all of the blood work. As a result, Quest demanded that I personally pay $358.65 or suffer the wrath of collections. They refused to accept any less. You tell me why Quest believes it's OK to charge 5 times as much just because I'm paying them instead of the insurance company. I'm counting this expense as the cost of education. Lesson learned - I'll never use Quest again. Beware my friends...

    j.  S. of IN  on March 14, 2016:

Even though I got my lab work drawn in an in-network lab in my own hometown, Quest continues to bill the state of the ordering physician which is NOT in network, resulting in a $5000 bill as opposed to the $75 bill it would be if it was in-network and billed as it should be. Caution with any use of Quest labs and get it in WRITING that you will be billed as an in-network draw, regardless of how sure you are that you are doing everything correctly. Ridiculous markup on lab fees versus the discounts given to insurance companies.

    k.  P. of NM on August 15, 2016:

Lab test were considered needed by my doctor, but not covered by Medicare because the incorrect code was used by Quest. Hours on the phone with my doctor's assistant who reportedly informed Quest of the proper code. No luck. They refused to change code, which if they would have been reimbursed by Medicare (a fraction of what they had charged). Out of desperation I offered to pay Quest what they would have received from Medicare. "No, they do not bargain

with clients." Their charge was $194, which I decided to simply pay and get them out of my life. Tried to pay using my Visa with their online service. Wanted a zip code, but my zip code was "not valid"? Tried to call them. Estimated wait, 55 minutes!

    l.   K. of FL on January 17, 2017:

I give one star because I can't put 0.  This is the worst lab, stay away. I just got a bill of [$]1400 for a genetic pre-natal test that my insurance doesn't cover.  I did some research and my insurance compa[ny] would [have] paid less than [$]300 dollars.  Why Quest Diagnostics can give us the same price, obviously 300 is enough. This is very unfair and dishonest.  When I call them they treat me like an idiot.  When I ask about the differences about this price and the one they would get from any insurance company, they just said "well this is the test price."  Go somewhere else to do your test or at least be sure it is cover[ed] before so you can negotiate the price. They are doing more than [$]1100 taking advantage of a pregnant woman.  They just have no ethic.

    m.  C. of AR on March 14, 2017

My experience with Quest Diagnostics has been horrible. They have not filed or followed through to help collect debt through my insurance carrier. It has been a battle all the way. I am just now paying final invoices from early 2016. No wonder insurance cost are so high. As one example, I was billed $1104.35 for lab work dated July 2016. I worked and worked to get this filed through the proper insurance process. They discounted the $1104.35 by $952.03 and then insurance paid $121.85, leaving me $30.47 to pay. So, if I happened to be a non-aggressive person and took things at face value, I would have paid over a $1,000 for nothing. This overstatement of cost incurred has occurred on every statement and invoice I have received from them. No wonder people are going broke and cannot pay medical cost and insurance prices have sky-rocketed. Who takes up for the consumer/patient? This process will frustrate you to no end!

    n.  S. of PA on Oct. 24, 2017

This is just adding to the heap of reviews from people who feel that this company has acted unethically, unconscionably, and without regard to what makes a good society. This company preys on the weak. They charge exorbitant prices when you have insurance, knowing full well that whenever there is confusion or dispute, the costs will be passed along to the powerless consumer who has no recourse. It is absurd that routine tests should have prices that differ

based on the insurance that you have. No other industry works this way. If I go to the corner store and they tell me that a pack of gum costs 1000% of the market price, I can refuse to pay and go somewhere else.

What Quest did in this case is that I had routine blood work ordered by my doctor for an annual exam. Quest charged nearly $1000 to the insurance company, who then offered to pay them $114. They accepted. This means that they are doing tests that cost them less than $114 and charging nearly $1000. This is unconscionable, predatory, and unjustifiable. Of course, there was one test that my insurance company did not pay for and then Quest insists that I owe them $250. I am sure that they would accept less than $25 from the insurance company, but if I have to pay for it then it's 10 times as much. Makes sense, right?

I called them multiple times explaining that I needed more time to get the doctor's office to convince the insurance company that the test was "medically necessary" and they told me every time that they would give me another 30 days. Then, they sent the account to collections anyway only two weeks after my most recent phone call. I know that I am powerless, but any opportunity I have to hurt their business I will take it. I will forever insist that I only see providers that do not deal with Quest and if I ever have the option, I will insist that Quest not be given my business. I will encourage everyone I know to do the same. These are horrible people.

    o.  L. of TX on Oct. 24, 2017

No matter how you pay, at the doctor, with insurance, without, with credit card. One thing is for sure, Quest Diagnostics WILL send you a bill, regardless if you have paid for it, insurance covered it - it does not matter. These greedy PIGS will always send you a bill for either the same amount or more, something ridiculous like $149 for an A1C test and claim it's YOUR responsibility of the bill. Even though your insurance already paid $100 for this $25 test. GREEDY PIGS. Then, they will send you to collection and chase you until the end of time.

    p.  J. of PA on Feb. 10, 2018

I dropped off a sample per my doctor's directions at Quest as it's the lab my insurance tells me to use. I was shocked when I got my bill that insurance hadn't covered $481 because they said it was experimental because Quest used the wrong code. I called Quest several times to work with them to have insurance cover it by changing to the correct code. Each time I called I asked for them to

change the due date to allow for insurance to process the claim. The first bill was due on January 2 but they pushed the due date back to February 10. On February 9 I got a call from a collection agency harassing me for not paying the bill. I was stunned because I had just called Quest two days earlier to check in and make sure things were being adjusted to allow for my insurance to process the claim.

q.   L. of CT on April 13, 2018

Billing issues, rec'd numerous bills and seems I have overpaid and unable to resolve issue. I have called with no resolve, also went to Derby location to try and get contact information, was given number to call and did. Was given address to send letter. Sent letter in Feb 2018, rec'd, called and was told still looking into matter and as of today 4/13/2018 I have not heard anything further. It's very frustrating that one has to go through hoops to try and resolve billing issues and make payments to Quest Diagnostic. I'm also receiving mail from collection agency when I feel I have overpaid and would like issue resolve. Quest Diagnostic needs to have better customer service, they are horrible. I have never experience any issues with payments with any other medical company.

r.   C. of FL on April 16, 2018

Went to Quest for lab work in February. I was told that I had a balance - after I was sitting with the plastic band tight on my arm - and if I didn't pay the full amount, I can't get bloodwork done. I told the lady I have never received a bill. She didn't care. She told me she can't go further in the system unless I pay in full. I paid with my credit card. Didn't even get a statement in the mail, nothing to tell me what I just paid for. Fast forward less than 2 months later, I go to get follow up tests done. I am told I owe almost $200 and unless I paid right away, I can't get blood tests done. That's after waiting for 2 hours. I had to leave without having them done because I didn't have the full amount.

I offered to make a partial payment, despite not knowing what or why I owed, just I could get my tests done, they refused. Since it was the weekend, I waited and until Monday to call Billing. They admitted sending the invoices to an old address that I haven't used in 7 years. Despite making sure I confirm my address every time. The guy on the phone told it doesn't matter that they made a mistake, I still owe what I owe and that's my problem, not theirs. And unless I paid it, I will never receive service from Quest Diagnostics. I just don't get it. I am furious and Quest needs to be stopped with their practices. He told me that I will be sent to a collection agency for a

85

bill that I never received and didn't know that I owed. And we, the consumers have nowhere and no one to report them to.

394.    The following was posted on a different website by "COD" at 6:56 PM on June 25, 2013:  "We got a lab bill yesterday. $700 retail. $90 at our insurance company's contracted price. So definitely make sure you are getting the contract price."[16]

395.    Similar complaints were filed with the Better Business Bureau:[17]

> Poor customer services & inequitable billing practices. After inquiring by phone without satisfaction, we've attempted to contact Quest through their on-line feedback service -- these questions have not been responded to. We have been billed for a blood test at a rate of $1061.81, where the insured bill rate for the same test is $166. Unfortunately, though the medical specialist who requested the test insisted it was medically required, our insurance (AETNA) declined the claim, therefore leaving us to pay direct. This in and of itself would have been fine - - however, Quest is charging us as in an uninsured capacity at 6.4 times the amount. Completely unacceptable. I require a satisfactory response, and have not obtained this. [Roland, 11/23/2015]

*     *     *

> Quest diagnostics on Congress Ave. They have increased my bill, AGAIN! I have insurance and decided since they have always padded the bill with my insurance decided to pay cash. Well again they have padded the bill. Thinking I was paid in full leaving the facility a few weeks later received a bill. They have some excuse of needing further testing on the quoted fees I paid cash for. Well they seem to make any excuse to increase the bill because looking at the first test there was nothing to perform second test because everything was fine. I have ran into this issue more than once and they are not only ripping off the cash patients but I can only imagine what they are doing to the insurance companies. I will no longer use any of these facilities. This is the last time they are going to quote one price and months later decide they will charge me more!

---

[16] Available at, http://ask.metafilter.com/243590/Insurance-company-denied-coverage-for-1300-blood-work-what-now (last visited August 17, 2017).

[17] Available at, https://www.bbb.org/new-jersey/business-reviews/laboratories-medical/quest-diagnostics-in-madison-nj-90010452/reviews-and-complaints (last visited May 10, 2018).

396.     Plaintiffs' counsel continues to be contacted by Class members expressing interest in joining this action as a named plaintiff.  Plaintiffs reserve the right to propose subsequent amendments to add plaintiffs, including plaintiffs from different states, to the complaint.

**N.     THERE IS NO BURDEN ON THE PHYSICIAN OR PATIENT TO DETERMINE INSURANCE COVERAGE OR THE MARKET RATE OF CLINICAL LAB TESTS**

397.     Given the nature of the healthcare marketplace, it would be impractical for a patient to determine what the reasonable value for healthcare services are when a physician refers them to have clinical lab testing performed.

398.     ***First***, as described above, the healthcare marketplace is opaque, leaving patients (and even physicians) in the dark as to market rates for certain healthcare services.  The vast majority of payments received by healthcare service providers are deemed proprietary, but are substantially below the list prices.  The very small percentage of patients that may get stuck with the financial responsibility for healthcare services, such as clinical lab testing, have no way of knowing what the actual market rate is or should be, and are thus forced to accept whatever the lab service provider indicates is the market rate.

399.     Patients have no duty under the law to take on the responsibility of becoming a healthcare financial analyst.  Patients are armed only with their personal financial information and lack specialized knowledge as to their medical wellbeing or the available healthcare options.  To require a patient to make medical judgments based only on an arbitrary dollar figure is an inequitable result.

400.     Indeed, Patients are unable to comprehend what prescribed medical services actually entail or the costs associated therewith.  In his testimony before Congress, Professor Anderson provided the following example:

> Imagine going into a grocery store or a department store and
> not understanding: (1) what most of the products you are purchasing

actually do, (2) what is actually on the bill, and (3) having no idea what you are going to buy when you enter the store. In this case you would not be a good comparative shopper even if you knew the prices. ***You need to understand what you are buying before you make the purchase.***

In health care there is often an additional factor. Imagine that you are not even the person picking out the goods in the grocery store or the department store. ***Imagine that someone else is making the decisions about what to buy for you***. Health professionals, most commonly doctors, make most of the decisions when you go to the doctor's office or the hospital. For many clinical conditions this will always be the case.

Anderson Testimony at 103 (emphasis in original).

401. Ultimately, the service provider (*e.g.*, Quest) is in the best position to access pricing information. As published in an Emory Law Journal article:

the provider clearly has better access to pricing information than the patient.[] Providers know what codes they will use to bill for their services.[] And providers are the ones that have either set the rates (uninsured patients), negotiated the rates (privately insured patients), or been informed of the rates (publicly insured patients). While patients do have some options—for instance, they can call their insurance companies and get a sense of cost for various procedures—providers are undoubtedly better situated to do so.[] Providers are the repeat players, here, with far better and less costly access to information than patients do.

Wendy Netter Epstein, *Price Transparency and Incomplete Contracts in Health Care*, 67 Emory L.J. 1, 46 (2017) ("Epstein Article") (internal citations omitted).

402. ***Second***, patients, who are not sophisticated as to health-related care, are entitled to trust their physician's recommendations and referrals. Indeed, patients and physicians have a special doctor-patient relationship that confers fiduciary duties upon the physician to act in the best interest of the patient. However, there is no requirement among these duties that the physician consider insurance coverage or pricing when making medical determinations. In fact, "[m]edical ethics has traditionally held that the physician should not withhold beneficial

88

treatments because of cost."  Epstein Article, 67 Emory L.J. at 13 n.65 (quoting Kevin R. Riggs & Peter A. Ubel, *Overcoming Barriers to Discussing Out-of-Pocket Costs with Patients*, 174 JAMA INTERNAL MED. 849, 849 (2014)).

403.    According to the American Medical Association ("AMA"), the largest association of physicians—both Medical Doctors and Osteopathic Doctors—and medical students in the United States, "[t]he medical profession has long subscribed to a body of ethical statements developed primarily *for the benefit of the patient*.  As a member of this profession, *a physician must recognize responsibility to patients first and foremost*, as well as to society, to other health professionals, and to self."  (Emphasis added).

404.    The AMA Principles of Medical Ethics include nine tenets.  Notably absent, as is relevant to this litigation, is any requirement to consider insurance coverage or pricing:

> I.      A physician shall be dedicated to providing competent medical care, with compassion and respect for human dignity and rights.
>
> II.     A physician shall uphold the standards of professionalism, be honest in all professional interactions, and strive to report physicians deficient in character or competence, or engaging in fraud or deception, to appropriate entities.
>
> III.    A physician shall respect the law and also recognize a responsibility to seek changes in those requirements which are contrary to the best interests of the patient.
>
> IV.     A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law.
>
> V.      A physician shall continue to study, apply, and advance scientific knowledge, maintain a commitment to medical education, make relevant information available to patients, colleagues, and the public, obtain consultation, and use the talents of other health professionals when indicated.
>
> VI.     A physician shall, in the provision of appropriate patient care, except in emergencies, be free to choose whom to serve, with

whom to associate, and the environment in which to provide medical care.

VII.    A physician shall recognize a responsibility to participate in activities contributing to the improvement of the community and the betterment of public health.

VIII.    A physician shall, while caring for a patient, regard responsibility to the patient as paramount.

IX.    A physician shall support access to medical care for all people.

405.    To ensure patients are fully informed, the AMA's Code of Medical Ethics Opinion 11.2.4 requires full disclosure as to material facts, such as potential financial conflicts of interest, *i.e.*, "the existence of payment models, financial incentives; and formularies, guidelines or other tools that influence treatment recommendations and care."  No requirement for the consideration of insurance coverage or pricing is included.

406.    Moving beyond ethical considerations and into a legal realm, "the physician-patient relationship creates special responsibilities for doctors."  Thomas L. Hafemeister and Selina Spinos in *Lean on Me: A Physician's Fiduciary Duty to Disclose an Emergent Medical Risk to the Patient*, 86 WASH. U. L. REV. 1167, 1186 (2009).  In *Lean on Me*, the authors describe the foundation underlying this special relationship between physicians and their patients:

> Because physicians have superior medical knowledge and skill and are the gatekeepers to medical services, patients are dependent on them.[] Patients lack the knowledge or skill to assess their own health conditions. Instead, they must depend on their physicians to provide critical information about their medical well-being. Patients rely on doctors to assist and direct them in choosing necessary medical treatment.
>
> *                *                *
>
> This dependence is enhanced by the anxiety that patients typically feel about their health, the vulnerability that they experience from a sickness or injury, and the challenge of finding a new doctor if a patient concludes that the present doctor is providing inadequate

> services.[]  Because patients are so vulnerable and dependent on their physicians, the law imposes a 'trust' on doctors--a fiduciary responsibility stemming from the dependence and vulnerability of the patient, and from the disparity between a patient's and a physician's knowledge and ability to act.[]

*Id.* at 1186-87 (citations omitted).

407.    This special relationship transforms the physician into a fiduciary, whose duty of loyalty demands the physician place the interests of the patient above their own.  "Because patients generally seek the services of a physician when they are sick, injured, or concerned about their health, because doctors have unique access to a patient's medical information and superior insight into a patient's medical condition, and because physicians control patients' ability to obtain needed medical treatment, patients are highly dependent on their physicians *and should be able to rely on their physicians to protect and promote their well-being*.[]"  *Id.* at 1188 (citation omitted and emphasis added).

408.    As Mark A. Hall & Carl E. Schneider described in *Patients as Consumers: Courts, Contracts, and the New Medical Marketplace*, 106 MICH. L. REV. 643 (2008), "Patients rarely abandon doctors, reject doctors' recommendations, or demand second opinions."  *Id.* at 652.  In fact, "[d]octor and patient develop information about and confidence in each other, information and confidence that must laboriously be re-created when the patient changes doctors."  *Id.* at 652-53.  Therefore, "[t]he patient should . . . be able to trust that the physician will act in the best interests of the patient thereby protecting the sanctity of the physician-patient relationship.[]"  *Id.* at 668 (citation omitted).

409.    In sum, for a patient to be presumed to know whether insurance would cover clinical lab testing and, if not, the list price for the lab tests, they must fully comprehend the purpose and alternatives to the medical services being recommended, and the actual market rates

paid for those services.  Since neither are practically available to the patient, any such analysis would be futile.

410.    As published in the Epstein Article, "Patients suffer from both an imbalance of information and an imbalance of power."  67 Emory L.J. at 3.  "Many health services would be both easy and inexpensive to price *ex ante*. For instance, a hospital should easily be able to price a standard x-ray, even with the minor complication that different insurers have negotiated different rates . . . . Information asymmetry is high. Providers have far superior access to price information than patients, particularly in a world where health pricing varies tremendously in unpredictable ways and where it is so dependent on understanding a complex numerical code for medical procedures.[]"  *Id.* at 7.

## CLASS ALLEGATIONS

411.    Plaintiffs bring this action on behalf of themselves and on behalf of a national Class, defined above as all Quest patients in the United States who, without any express contract with Quest that establishes the amount of fees to be paid to Quest, were charged fees for clinical lab testing services performed by Quest that were in excess of the reasonable market rates for the same services.  Excluded from the Class is Quest, its parent(s), subsidiaries, affiliates, officers, directors, employees, partners, and co-ventures.

412.    Plaintiffs also brings this action on behalf of the following Sub-Classes:

a.    all Quest patients in the United States who, without any express contract with Quest that establishes the amount of fees to be paid to Quest, were charged fees and paid Quest for clinical lab testing services at rates in excess of the reasonable market rates for the same services (the Payor Sub-Class);

b.    All persons residing in the State of Arizona who, without any express contract with Quest that establishes the amount of fees to be paid to Quest, were charged fees for

clinical lab testing services performed by Quest that were in excess of the reasonable market rates for the same services (the "Arizona Sub-Class");

c.   All persons residing in the State of California who, without any express contract with Quest that establishes the amount of fees to be paid to Quest, were charged fees for clinical lab testing services performed by Quest that were in excess of the reasonable market rates for the same services (the "California Sub-Class");

d.   All persons residing in the State of Colorado who, without any express contract with Quest that establishes the amount of fees to be paid to Quest, were charged fees for clinical lab testing services performed by Quest that were in excess of the reasonable market rates for the same services (the "Colorado Sub-Class");

e.   All persons residing in the State of Florida who, without any express contract with Quest that establishes the amount of fees to be paid to Quest, were charged fees for clinical lab testing services performed by Quest that were in excess of the reasonable market rates for the same services (the "Florida Sub-Class");

f.   All persons residing in the State of Illinois who, without any express contract with Quest that establishes the amount of fees to be paid to Quest, were charged fees for clinical lab testing services performed by Quest that were in excess of the reasonable market rates for the same services (the "Illinois Sub-Class");

g.   All persons residing in the State of Maryland who, without any express contract with Quest that establishes the amount of fees to be paid to Quest, were charged fees for clinical lab testing services performed by Quest that were in excess of the reasonable market rates for the same services (the "Maryland Sub-Class");

h.   All persons residing in the State of Michigan who, without any express contract with Quest that establishes the amount of fees to be paid to Quest, were charged fees for clinical lab testing services performed by Quest that were in excess of the reasonable market rates for the same services (the "Michigan Sub-Class");

i.   All persons residing in the State of Nevada who, without any express contract with Quest that establishes the amount of fees to be paid to Quest, were charged fees for clinical lab testing services performed by Quest that were in excess of the reasonable market rates for the same services (the "Nevada Sub-Class");

j.   All persons residing in the State of North Carolina who, without any express contract with Quest that establishes the amount of fees to be paid to Quest, were charged fees for clinical lab testing services performed by Quest that were in excess of the reasonable market rates for the same services (the "North Carolina Sub-Class"); and

k.   All persons residing in the State of Pennsylvania who, without any express contract with Quest that establishes the amount of fees to be paid to Quest, were charged fees for clinical lab testing services performed by Quest that were in excess of the reasonable market rates for the same services (the "Pennsylvania Sub-Class").

413.   This action is brought as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, sub-sections 23(a) and 23(b)(2) and/or (b)(3).  The Class and Sub-Classes (collectively referred to as the "Class") satisfy the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

414.   **Numerosity**.  The members of the Class are so numerous that joinder of all Class members is impracticable.  While the exact number of Class members can be determined only by appropriate discovery, Plaintiffs believe that there are thousands of Class members residing

94

throughout the United States.  Quest claims to have performed over 164 million clinical lab test requisitions in 2017 alone.

415.    Because of the geographic dispersion of Class members, there is judicial economy arising from the avoidance of a multiplicity of actions in trying this matter as a class action.

416.    **Commonality**.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.   Whether a contract implied-in-law or a contract implied-in-fact exists between Quest and each member of the Class;

b.   Whether Quest is entitled only to receive compensation from each member of the Class in an amount equal to the reasonable value of the clinical lab testing services performed;

c.   Whether Quest's list prices, as derived from its patient fee schedule, are a reasonable value for its clinical lab testing services;

d.   Whether the Payor Sub-Class is entitled to restitution for having paid Quest amounts above the reasonable value for its clinical lab testing services;

e.   The proper measure of restitutionary damages to be paid to members of the Payer Sub-Class;

f.   Whether Plaintiffs and the Class are entitled to injunctive or other equitable relief to remedy Quest's continuing violations of law as alleged herein; and

g.   Whether Quest violated the various consumer protection laws of New Jersey, Arizona, California, Colorado, Florida, Illinois, Maryland, Michigan, Nevada, North Carolina and Pennsylvania.

417.   **Typicality**.  Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs have no interests that are adverse or antagonistic to those of the Class.  Plaintiffs' interests are to obtain relief for themselves and the Class for the harm arising out of the violations of law set forth herein.

418.   **Adequacy**.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in complex and consumer class action litigation.

419.   **Superiority**.  A class action is superior to all other methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by the members of the Class may be relatively small, the expense and burden of individual litigation make it virtually impossible for Plaintiffs and members of the Class to individually seek redress for the wrongful conduct alleged.

420.   In addition, as alleged herein, Quest has acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

421.   The Class and Sub-Classes are readily definable, and prosecution of this Action as a class action will reduce the possibility of repetitious litigation.

422.   Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### COUNT I
**Declaratory Judgment Based on Principles of Implied Contract**
**(On behalf of Plaintiffs and the Class)**

423.   Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

424.    Plaintiffs seek relief under New Jersey's Uniform Declaratory Judgment Act, N.J. Stat. § 2A:16-50 *et seq.*  This act allows parties to sue for a judicial declaration in order to declare and settle the rights and obligations of the parties.

425.    As alleged above, Quest performed clinical lab testing services on behalf of each Plaintiff and Class member pursuant to the prescription and referral of a physician.

426.    Plaintiffs and the Class accepted the clinical lab testing services performed by Quest.

427.    As indicated by the invoices sent to Plaintiffs, Quest had an expectation of being compensated for its clinical lab testing services.

428.    However, there was no express agreement and there was no mutual agreement or intent to promise between Quest and any Plaintiff or member of the Class prior or subsequent to the performance of the clinical lab testing services at issue herein.  As a result, no express contract was created.

429.    Plaintiffs therefore seek a declaratory judgment that a contract implied-in-law (also referred to as a *quasi*-contract or constructive contract) or a contract implied-in-fact with an omitted essential term (price) exists between Quest and each Plaintiff and Class member.

430.    Plaintiffs seek a declaratory judgment that Quest's rights under a contract implied-in-law or a contract implied-in-fact with an omitted essential term entitle Quest only to compensation equal to the reasonable value of the clinical lab testing services at the time they were rendered, and that Plaintiffs and the Class are therefore only obligated to compensate Quest for the reasonable value of the services performed.

431.    Moreover, as alleged in detail above, Quest demanded Plaintiffs and the Class pay an amount equal to the list price, as derived from Quest's internal patient fee schedule.

However, the list prices as derived from Quest's internal patient fee schedule are significantly higher than the amount Quest is typically paid for the same clinical lab testing services.

432.    Plaintiffs and the Class therefore seek a declaratory judgment that Quest's list prices are not a reasonable value for the clinical lab testing services rendered because of the reasons alleged herein, including but not limited to the substantially lower amounts third-party payers (including private and government payers) typically pay for the same services.

433.    Plaintiffs and the Class are entitled under N.J. Stat. § 2A:16-52 to a declaratory judgment declaring their rights and obligations regardless of whether further relief is or could be claimed pursuant to the below Causes of Action.

434.    This claim is asserted on behalf of a national Class under New Jersey law.  New Jersey law properly applies because this Action was brought within the state of New Jersey, and the law for contracts implied-in-law (whether referred to as *quasi*-contract or constructive contract) and contracts implied-in-fact among the various states do not conflict with New Jersey law.  Absent any conflicts of law, New Jersey law is applicable to the national Class.

## COUNT II
### Breach of Implied Contract or Unjust Enrichment
**(On behalf of Plaintiffs Bennett, Catti, Dvorak, Funari, Goldsmith, Golikov, Gong, Herrmann, Hodges, Leslie, Martyn, Pojawis, Scott, Timm and the Payor Sub-Class)**

435.    Plaintiffs  Bennett, Catti, Dvorak, Funari, Goldsmith, Golikov, Gong, Herrmann, Hodges, Leslie, Martyn, Pojawis, Scott, and Timm (the "Plaintiff Payors") repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

436.    The Plaintiff Payors and Payor Sub-Class members have each paid Quest its list prices for clinical lab testing services performed.

437.    There was no express agreement and there was no mutual agreement as to price between Quest and any Plaintiff Payor or Payor Sub-Class member prior or subsequent to the performance of the clinical lab testing services.

438.    As a result, the relationship between Quest and the members of the Payor Sub-Class is subject to a contract implied-in-law (also referred to as a *quasi*-contract or constructive contract) or a contract implied-in-fact with an omitted essential term (the price of services). Pursuant to a contract implied-in-law or a contract implied-in-fact with an omitted essential term, Quest is only entitled to compensation equal to the reasonable value of the clinical lab testing services at the time they were rendered.

439.    However, due to the nature of the healthcare marketplace, as alleged herein, including but not limited to the concealment of actual payment rates by Quest, the Plaintiff Payors and Payor Sub-Class members were prevented from determining the actual market rates (or the reasonable value) for the clinical lab testing services performed and from negotiating with Quest (a party with significantly more sophistication and bargaining power).

440.    Accordingly, Quest invoiced, demanded, and received payment in amounts equal to its list prices, as derived from its internal patient fee schedule, from the Plaintiff Payors and Payor Sub-Class members.  As alleged above, Quest's list prices are significantly higher than the amount Quest is typically paid for the same clinical lab testing services.

441.    Plaintiff Payors and Payor Sub-Class members made payment to stop Quest's collection efforts from continuing and to protect their credit ratings, or mistakenly believed that the list prices were reasonable rates due to their lack of sophistication and the opacity of the marketplace.

442.     If a contract implied-in-fact with an omitted essential term (price of services) is found to exist between the Plaintiff Payors/Payor Sub-Class members and Quest, that contract has been breached by Quest's demand and receipt of its egregious list prices for the performance of clinical lab testing services.  As a result, the Plaintiff Payors and Payor Sub-Class members are entitled to restitution equal to the amount paid that exceeds the reasonable value of the clinical lab testing services rendered.

443.     Alternatively, if a contract implied-in-law is found to exist, Quest has been unjustly enriched to the detriment of the Plaintiff Payors and Payor Sub-Class members by demanding and receiving payment in an amount that grossly exceeds the reasonable value of the services rendered.  It would be inequitable to allow Quest to retain the excess payment amounts. Quest should therefore be ordered to disgorge the amounts paid by the Plaintiff Payors and Payor Sub-Class members that exceeds the reasonable value of the clinical lab testing services rendered.

444.     This claim is asserted on behalf of a national Payor Sub-Class under New Jersey law.  New Jersey law properly applies because this Action was brought within the state of New Jersey, and the law for implied contracts (whether in-law or in-fact), unjust enrichment, restitution and disgorgement among the various states do not conflict with New Jersey law. Absent any conflicts of law, New Jersey law is applicable to the national Payor Sub-Class.

### COUNT III
**Violations of the New Jersey Consumer Fraud Act,**
**N.J. Stat. Ann. §56:8-1, *et seq.***
**(On behalf of Plaintiffs and the Class)**

445.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

446. Quest is a "person" as defined in the New Jersey Consumer Fraud Act ("NJCFA"). N.J.S.A. §56:8-1(d).

447. The NJCFA states in pertinent part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice…

> N.J.S.A. §56:8-2.

448. As alleged herein and above, Quest has engaged in unconscionable commercial practices, deception, and fraud in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers. These acts and practices violate the NJCFA.

449. Plaintiffs have been and continue to be injured as a direct and proximate result of Quest's violations of the NJCFA.

450. Plaintiffs and the other members of the nationwide Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value. No person would have knowingly paid an excessive rate.

451. Plaintiffs are entitled to pursue a claim against Quest pursuant to N.J.S.A. §§56:8-2.11, 56:8-2.12 and/or 56:8-19 for damages, treble damages, equitable relief, and attorneys' fees and costs to remedy Quest's violations of the NJCFA.

## COUNT IV
### Violations of the Arizona Consumer Fraud Statute,
### A.R.S. §§44-1521, *et seq.*
### (On behalf of Plaintiff Chernov and the Arizona Sub-Class)

452.    Plaintiff Jacob Chernov herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

453.    Quest is a "person" as defined in A.R.S. §44-1521.

454.    The lab services performed by Quest constitute "merchandise" as defined in A.R.S. §44-1521.

455.    A.R.S. §44-1522 states in pertinent part:

> A.  The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

456.    As alleged herein and above, Quest has engaged in a deceptive or unfair act or practice, fraud, concealment, suppression or omission of material facts with intent that others rely on such concealment, suppression or omission in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers.  These acts and practices violate A.R.S. §44-1522.

457.    Chernov and the other members of the Arizona Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of A.R.S. §44-1522.

458.    Chernov and the other members of the Arizona Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value.  No person would have knowingly paid an excessive rate.

459.     Pursuant to the Arizona Supreme Court, A.R.S. §44-1522 provides injured consumers with an implied private right of action against any violator of the Consumer Fraud Act.

460.     Chernov is entitled to pursue a claim on behalf of the Arizona Sub-Class against Quest under A.R.S. §§44-1528, 44-1531, 44-1533, and/or 44-1534 for damages, restitution, equitable relief, and attorney's fees and costs to remedy Quest's violations of A.R.S. §44-1522.

### COUNT V
**Violations of the California Consumers Legal Remedies Act,**
**Cal. Civ. Code §§ 1750, *et seq*.**
**(On behalf of Plaintiffs Dannelly, Dvorak, Golikov, Timm and the California Sub-Class)**

461.     Plaintiffs Diana Dannelly, Craig Dvorak, Edie Golikov and Stephen Timm herein repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

462.     Quest is a "person" as defined in Cal. Civ. Code § 1761(c).

463.     Quest's laboratory testing services constitute "services" under Cal. Civ. Code § 1761(b).

464.     The California Consumers Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in … services to any consumer," which occurs when, among other instances, a person is "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions" or "[i]nserting an unconscionable provision in the contract."  Cal. Civ. Code § 1770(a).

465.     As alleged herein, Quest has engaged in unfair or deceptive acts or practices in connection with its improper billing and debt collection for laboratory testing and other services,

including their practices of overbilling individual consumers.  These acts and practices violate the CLRA.

466.    Dannelly, Dvorak, Golikov, Timm and the other members of the California Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the CLRA.

467.    Dannelly, Dvorak, Golikov, Timm and the other members of the California Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value rate.  No person would have knowingly paid an excessive rate.

468.    Dannelly, Dvorak, Golikov and Timm are entitled to pursue a claim against Quest on behalf of the California Sub-Class for damages, to enjoin Quest from continuing its unfair or deceptive acts or practices under Cal. Civ. Code § 1781 and § 1780, as well as to pursue costs and attorneys' fees for bringing this action to remedy Quest's violations of the CLRA pursuant to § 1780(e).

**COUNT VI**
**Violations of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On behalf of Plaintiffs Dannelly, Dvorak, Golikov, Timm and the California Sub-Class)**

469.    Plaintiffs Diana Dannelly, Craig Dvorak, Edie Golikov and Stephen Timm herein repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

470.    Quest is a "person" as defined in Cal. Bus. & Prof. Code § 17201.

471.     Under the California Unfair Competition Law ("UCL"), "unfair competition" is defined broadly to mean and include "any unlawful, unfair or fraudulent business act or practice…."  Cal. Bus. & Prof. Code § 17200.

472.     As alleged herein, Quest has engaged in unlawful, unfair or fraudulent business acts or practices in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers.  These acts and practices violate the UCL.

473.     Dannelly, Dvorak, Golikov, Timm and the other members of the California Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the UCL.

474.     Dannelly, Dvorak, Golikov, Timm and the other members of the California Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value rate.  No person would have knowingly paid an excessive rate.

475.     Dannelly, Dvorak, Golikov and Timm are entitled to pursue a claim against Quest on behalf of the California Sub-Class pursuant to Cal. Bus. Prof. Code §§ 17203, 17204, 17205, and/or 17206 for damages, restitution, and equitable relief to remedy Quest's violations of the UCL, and to move under Cal. Code Civ. Proc. § 1021.5 for costs and attorneys' fees for any significant benefit conferred upon the general public or a large class of persons in relation to enjoining Quest from continuing to violate the UCL.

## COUNT VII
### Violations of the Colorado Consumer Protection Act
### Colo. Rev. Stat. §§6-1-101 *et seq*.
### (On behalf of Plaintiff Freeman and the Colorado Sub-Class)

476.    Plaintiff Clyde Freeman herein repeats and realleges each of the allegations set

forth in the foregoing paragraphs as if fully set forth herein.

477.    Quest is a "person" as defined in the Colorado Consumer Protection Act

("CCPA").  Colo. Rev. Stat. §6-1-102(6).

478.    Colo. Rev. Stat. §6-1-105 states in pertinent part:

> (1)  A person engages in a deceptive trade practice when, in the
> course of the person's business, vocation, or occupation, the person:

> \*       \*       \*

> (l)  Makes false or misleading statements of fact concerning
> the price of goods, services, or property or the reasons for,
> existence of, or amounts of price reductions;

> \*       \*       \*

> (u)  Fails to disclose material information concerning goods,
> services, or property which information was known at the
> time of an advertisement or sale if such failure to disclose
> such information was intended to induce the consumer to
> enter into a transaction

> \*       \*       \*

> (3)  The deceptive trade practices listed in this section are in addition
> to and do not limit the types of unfair trade practices actionable at
> common law or under other statutes of this state.

479.    As alleged herein and above, Quest has engaged in a deceptive trade practice in

connection with its improper billing and debt collection for laboratory testing and other services,

including their practices of overbilling individual consumers.  These acts and practices violated

the CCPA.

480.     Freeman and the other members of the Colorado Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the CCPA.

481.     Freeman and the other members of the Colorado Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value.  No person would have knowingly paid an excessive rate.

482.     Freeman is entitled to pursue a claim on behalf of the class against Quest under Colo. Rev. Stat. §6-1-113 for equitable relief to remedy Quest's violations of the CCPA.

## COUNT VIII
**Violations of the Florida Deceptive and Unfair Trade Practices Act,
Fla. Stat. Ann. §§501.201, *et seq.*
(On behalf of Plaintiffs Funari, Scott and the Florida Sub-Class)**

483.     Plaintiffs Valerie J. Funari and Carolyn Scott herein repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

484.     Quest's lab services constitute "trade or commerce" as defined in Fla. Stat. Ann. §501.203(8).

485.     The Florida Deceptive and Unfair Trade Practices Act ("DUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. Ann. §501.204(1).

486.     As alleged herein and above, Quest has engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers.  These acts and practices violate the DUTPA.

487.     Funari, Scott and the other members of the Florida Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the DUTPA.

488.     Funari, Scott and the other members of the Florida Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value.  No person would have knowingly paid an excessive rate.

489.     Funari and Scott are entitled to pursue a claim on behalf of the Florida Sub-Class against Quest pursuant to Fla. Stat. Ann. §§501.2105 and 501.211 for damages, equitable relief, and attorney's fees and costs to remedy Quest's violations of the DUTPA.

<u>**COUNT IX**</u>
**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 Ill. Comp. Stat. § 505 *et seq.***
**(On behalf of Plaintiff Bennett and the Illinois Sub-Class)**

490.     Plaintiff Jennifer Bennett herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

491.     Quest is a "person" as defined in the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFDBPA").  815 Ill. Comp. Stat. § 505/1(c).

492.     Under 815 Ill Comp. Stat. § 505/2, the CFDBPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices," including, *inter alia*:

> the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, … in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

493.     The CFDBPA also prohibits violations of the Uniform Deceptive Trade Practices Act (815 Ill. Comp. Stat. § 510 *et seq.*), which includes, *inter alia*, when a person "makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price

reductions," or a person "engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

494.    As alleged herein and above, Quest has engaged in unfair methods of competition and unfair or deceptive acts or practices in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers.  These acts and practices violated the CFDBPA.

495.    Bennett and the other members of the Illinois Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the CFDBPA.

496.    Bennett and the other members of the Illinois Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value.  No person would have knowingly paid an excessive rate.

497.    Bennett is entitled to pursue a claim on behalf of the class against Quest for actual damages, punitive damages, and equitable relief to remedy Quest's violations of the CFDBPA under 815 Ill. Comp. Stat. § 505/10a, which also entitles Bennett to costs and attorneys' fees.

498.    Bennett is also entitled to pursue injunctive relief and attorneys' fees and costs against Quest for violations of the Uniform Deceptive Trade Practices Act pursuant to 815 Ill. Comp. Stat. § 510/3.

## COUNT X
### Violations of the Maryland Consumer Protection Act,
### Md. Code Ann., Com. Law §§13-101, *et seq.*
### (On behalf of Plaintiff Roach and the Maryland Sub-Class)

499.    Plaintiff Jill A. Roach herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

500.     Quest is a "person" as defined in the Maryland Consumer Protection Act ("Md. CPA").  Md. Code Ann., Com. Law §13-101(h).

501.     The Md. CPA prohibits "any unfair or deceptive trade practice," which includes "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers," "[f]ailure to state a material fact if the failure deceives or tends to deceive," and "[f]alse or misleading representation of fact which concerns…[t]he reason for the existence or amount of a price reduction."  Md. Code Ann., Com. Law §§13-301, 303.

502.     As alleged herein and above, Quest has engaged in an unfair or deceptive trade practice in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers.  These acts and practices violate the Md. CPA.

503.     Roach and the other members of the Maryland Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the Md. CPA.

504.     Roach and the other members of the Maryland Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value.  No person would have knowingly paid an excessive rate.

505.     Roach is entitled to pursue a claim on behalf of the Maryland Sub-Class against Quest under Md. Code Ann., Com. Law §13-408 for damages and attorney's fees and costs to remedy Quest's violations of the Md. CPA.

## COUNT XI
### Violations of the Michigan Consumer Protection Act,
### Mich. Comp. Laws Ann. §§445.901, *et seq.*
### (On behalf of Plaintiff Gong and the Michigan Sub-Class)

506.    Plaintiff Ling Gong herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

507.    Quest is a "person" as defined in the Michigan Consumer Protection Act ("MCPA").  Mich. Comp. Laws Ann. §445.902(d).

508.    Quest's lab services constitute "trade or commerce" as defined in Mich. Comp. Laws Ann. §445.902(g).

509.    The MCPA prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," which includes, among others, "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions," "[c]harging the consumer a price that is grossly in excess of the price at which similar property or services are sold," and "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."  Mich. Comp. Laws Ann. §445.903(1).

510.    As alleged herein and above, Quest has engaged in an unfair, unconscionable, or deceptive method, act, or practice in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers.  These acts and practices violate the MCPA.

511.    Gong and the other members of the Michigan Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the MCPA.

512.    Gong and the other members of the Michigan Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid

Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value.  No person would have knowingly paid an excessive rate.

513.     Gong is entitled to pursue a claim on behalf of the Michigan Sub-Class against Quest under Mich. Comp. Laws Ann. §445.911(3) for damages, equitable relief, and attorney's fees and costs to remedy Quest's violations of the MCPA.

**COUNT XII**
**Violations of the Nevada Deceptive Trade Practices Act,**
**Nev. Rev. Stat. §§598.0903, *et seq.***
**(On behalf of Plaintiff Goldsmith and the Nevada Sub-Class)**

514.     Plaintiff Arthur S. Goldsmith herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

515.     The Nevada Deceptive Trade Practices Act ("NDTPA") prohibits deceptive trade practices, which include "[m]ak[ing] false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of or amounts of price reductions" and "[k]nowingly makes any other false representation in a transaction."   Nev. Rev. Stat. §§41.600 & 598.0915.

516.     As alleged herein and above, Quest has engaged in an unfair or deceptive trade practice in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers.  These acts and practices violate the NDTPA.

517.     Goldsmith and the other members of the Nevada Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the NDTPA.

518.     Goldsmith and the other members of the Nevada Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid

Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value.  No person would have knowingly paid an excessive rate.

519.    Goldsmith is entitled to pursue a claim on behalf of the Nevada Sub-Class against Quest under Nev. Rev. Stat. §41.600 for damages, equitably relief, and attorney's fees and costs to remedy Quest's violations of the NDTPA.

## COUNT XIII
**Violations of the North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. §§ 75-1, et seq.**
**(On behalf of Plaintiff Martyn and the North Carolina Sub-Class)**

520.    Plaintiff Lily Martyn herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

521.    Quest's laboratory testing services are "in or affecting commerce" under N.C. Gen. Stat. § 75-1.1(a).

522.    The North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") declares unlawful any "unfair or deceptive acts or practices in or affecting commerce."  N.C. Gen. Stat. § 75-1.1(a).

523.    As alleged herein, Quest has engaged in unfair or deceptive acts or practices in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers.  These acts and practices violate the UDTPA.

524.    Each invoice sent by Quest that overbills Plaintiffs and each member of the Class and North Carolina Sub-Class establishes a separate offense of the UDTPA pursuant to N.C. Gen. Stat. § 75-8.

525.    Martyn and the other members of the North Carolina Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the UDTPA.

526.     Martyn and the other members of the North Carolina Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value rate.  No person would have knowingly paid an excessive rate.

527.     Martyn is entitled to pursue a claim on behalf of the North Carolina Sub-Class against Quest seeking actual damages and treble damages pursuant to N.C. Gen. Stat. § 75-16, which provides:

> [i]f any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict.

528.     Martyn and the other members of the North Carolina Sub-Class are also entitled to seek attorneys' fees for bringing this action to remedy Quest's violations of the UDTPA, under N.C. Gen. Stat. § 75-16.1.

## COUNT XIV
### Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, Pa. Stat. Ann. Tit. 73, §§201-1, *et seq.* (On behalf of Plaintiffs Catti, Herrmann, Hodges and the Pennsylvania Sub-Class)

529.     Plaintiff Lawrence Catti, Dolores Herrmann, and Lonnie Hodges Jr. herein repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

530.     Quest is a "person" as defined in the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL").  Pa. Stat. Ann. §201-2(2).

531.     Quest's lab services constitute "trade" or "commerce" as defined in Pa. Stat. Ann. §201-2(3).

532.     The UTPCPL declares unlawful any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," which includes, among others, "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" and "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  Pa. Stat. Ann. §§201-3, 201-2(4)(xi) and (xxi).

533.     As alleged herein and above, Quest has engaged in unfair methods of competition and unfair or deceptive acts or practices in connection with its improper billing and debt collection for laboratory testing and other services, including their practices of overbilling individual consumers.  These acts and practices violate the UTPCPL.

534.     Catti, Herrmann, Hodges and the other members of the Pennsylvania Sub-Class have been and continue to be injured as a direct and proximate result of Quest's violations of the UTPCPL.

535.     Catti, Herrmann, Hodges and the other members of the Pennsylvania Sub-Class either (i) paid Quest's bill under duress, (ii) refused to pay Quest's bill because of its excessive rates, or (iii) paid Quest's bill in reliance on a presumption that Quest had billed them the commercially reasonable fair market value.  No person would have knowingly paid an excessive rate.

536.     Catti, Herrmann and Hodges are entitled to pursue a claim on behalf of the Pennsylvania Sub-Class against Quest pursuant to Pa. Stat. Ann. §201-9.2 for damages, treble

damages, equitable relief, and attorneys' fees and costs to remedy Quest's violations of the UTPCPL.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Quest as follows:

A.      Certifying the nationwide Class and the Payer Sub-Class pursuant to Rule 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as representatives of the Class, and designating their counsel as counsel for the Class;

B.      Awarding Plaintiffs and the Class declaratory judgment as requested herein;

C.      Awarding Payor Plaintiffs and the Payor Sub-Class restitutionary damages and ordering Quest to disgorge into a common fund or a constructive trust all monies paid by Plaintiffs and the Class to the full extent to which Quest was unjustly enriched or paid to Quest in excess of the reasonable value for the clinical lab testing services performed;

D.      Awarding Plaintiffs and the Class and Sub-Classes statutory and exemplary damages where permitted;

E.      Permanently enjoining Quest from continuing to engage in the unlawful and inequitable conduct alleged herein;

F.      Granting Plaintiffs and the Class and the Sub-Classes the costs of prosecuting this action and reasonable attorneys' fees; and

G.      Granting such other relief as this Court may deem just and proper under the circumstances.

**JURY DEMAND**

Plaintiffs, the Class, and the Sub-Classes demand a trial by jury on all issues so triable.

Dated:  May 11, 2018

COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP

By:  */s/ Jeffrey W. Herrmann*
Jeffrey W. Herrmann
Audra DePaolo
Park 80 West - Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
(201) 845-9600
jwh@njlawfirm.com
ad@njlawfirm.com

*Liaison Counsel for Plaintiffs*

OF COUNSEL:

WOLF POPPER LLP
Robert C. Finkel
Sean M. Zaroogian
845 Third Avenue, 12th Floor
New York, New York 10022
(212) 759-4600
rfinkel@wolfpopper.com
szaroogian@wolfpopper.com

*Counsel for Plaintiffs*

# Exhibit A

Page 1 of 2

# Laboratory Invoice
For services not included in your physician's bill

## Quest Diagnostics
P.O. Box 7306
Hollister, MO 65673-7306

| Invoice Date: | Amount Due: | Due Date: |
|---|---|---|
| Aug. 27, 2013 | $343.30 | Sep. 17, 2013 |

| Invoice Number | Lab Code |
|---|---|
| 8559488673 | WCT |

AT 01 031408 25652B 93 A**3DGT

զիկրդ||զ||զ||||զ||արալից||զ||վ||ոզիկ||ז|||վ||զ

WCT 22223300 0010828   8559488673 R
TERESA POJAWIS

Patient Name:      ANNA POJAWIS
Responsible Party: TERESA POJAWIS
Date of Service:   April 09, 2013

**Lab Results and Diagnosis Questions Must Be Answered By Your Physician.**



**Customer Service**
Go to www.QuestDiagnostics.com/bill to conveniently pay your invoice, provide updated insurance information, or take a patient survey. **LIVE CHAT NOW AVAILABLE!**

## Laboratory Tests Were Requested By:

Referring Physician:   OTH001AIETA,FRANK L
Physician Address:     301 N MAIN ST
                       WEST HARTFORD, CT 06117




**Phone** 1-800-933-2009
**Fax** 1-800-795-6260
WEEKDAYS 08:30 AM - 05:00 PM EST

## Most Recent Insurance Claim Filed To:

Insurance Name:   BS OF CT
Insurance ID:     NEH121028
Group Number:

*Please have your invoice available for reference.*

These charges are for tests ordered by the referring physician listed and are separate from the physician's fees. Your insurance carrier denied payment, indicating the services provided are not covered under your policy. Please contact your insurance carrier with any questions regarding the processing of your claim. The amount due is your financial responsibility. Thank you for using our laboratory.

| Date | CPT Code * | Test Description | Charge | Insurance Discount | Insurance Paid | Medicare/ Medicaid Paid | Patient Paid | Patient Owes |
|---|---|---|---|---|---|---|---|---|
| 04/09/13 | 83519 | ACETYLCHOLINE RECEPT | $232.96 | | | | | |
| 04/09/13 | 86255 | STRIATED MUSCLE AB S | $145.60 | | | | | |
| 04/09/13 | 82139 | AMINO ACIDS;6->6,QNT EA S | $746.72 | | | | | |
| 04/09/13 | 36415 | VENIPUNCTURE | $19.76 | | | | | |
| 04/09/13 | 86235 | SCL-70 ANTIBODY | $78.00 | | | | | |
| 04/09/13 | 86359 | T CELLS, TOTAL COUNT | $183.39 | | | | | |
| 04/09/13 | 86360 | TCELLS;ABS CD4&8,INC RATI | $228.45 | | | | | |
| 04/09/13 | 86038 | CENTROMERE B ANTIBOD | $78.00 | | | | | |
| 04/09/13 | 81291 | MTHFR CMN VARIANTS | $316.20 | | | | | |
| | | *Continued on Next Page* | | | | | | |

**Tax ID:** 06-1460613   **ICD-9 Codes:** 710.1 780.79 719.40 716.90

Services Performed by: QUEST DIAGNOSTICS/NICHOLS SJC SAN JUAN C SAN JUAN CAPISTRANO, CA
Services Performed by: QUEST DIAGNOSTICS AVON AVON, CT
Services Performed by: QUEST DIAGNOSTICS, LLC WALLINGFORD CL 00 WALLINGFORD, CT
* The CPT codes provided are based on AMA guidelines and without regard to specific payor requirements

▲ Please fold and tear along perforation and remit with payment in the envelope provided. ▲



## Quest Diagnostics

**LIVE CHAT NOW AVAILABLE!**
Pay your bill securely at
www.QuestDiagnostics.com/bill
or call 1-800-933-2009.
Quest Diagnostics also accepts:






**Please make checks payable to Quest Diagnostics.**
Be sure to include invoice number on your check.

☐ Check here if address has changed.
Please provide your new address information on the back.
*Quest Diagnostics reserves the right to assign this receivable to any of its affiliates.*

Lab Code: WCT

| **Amount Due:** | **$343.30** |
|---|---|

Due Date: Sep. 17, 2013   **Invoice Number: 8559488673**

Patient Name: ANNA POJAWIS

| **Amount Enclosed:** | **$** |
|---|---|

*If you received an explanation of benefits showing your responsibility is less than the amount shown on this bill, please pay the lesser amount. To fully resolve your invoice, please provide a copy of your explanation of benefits.*

**MAIL PAYMENTS ONLY TO:**

QUEST DIAGNOSTICS
P.O. BOX 71310
PHILADELPHIA, PA 19176-1310

ارարվիզիզիզի||զիկ||||զ||զ||վ||վ||վ||||ليזիզи

01WCT630185594886730003433000827106021264405300000008

**Quest Diagnostics**
*(no return address below)*
P.O. Box 7306
Hollister, MO 65673-7306

# Laboratory Invoice
For services not included in your physician's bill

| Invoice Date: | Amount Due: | Due Date: |
|---|---|---|
| Aug. 27, 2013 | $343.30 | Sep. 17, 2013 |

| Invoice Number | Lab Code |
|---|---|
| 8559488673 | WCT |

| Lab Results and Diagnosis Questions Must Be Answered By Your Physician. |
|---|

Patient Name: ANNA POJAWIS
Responsible Party: TERESA POJAWIS
Date of Service: April 09, 2013

| Date | CPT Code * | Test Description | Charge | Insurance Discount | Insurance Paid | Medicare/ Medicaid Paid | Patient Paid | Patient Owes |
|---|---|---|---|---|---|---|---|---|
| 04/09/13 | 83519 | ACETYLCHOLINE RECEPT | $287.04 | | | | | |
| 04/09/13 | 83519 | ACETYLCHOLINE RECEPT | $232.96 | | | | | |
| 05/16/13 | | PAID BY INSURANCE | | | ($108.38) | | | |
| 05/17/13 | | ADJUSTMENT | | ($2,097.40) | | | | |
| **Tax ID: 06-1460613   ICD-9 Codes: 710.1 780.79 719.40 716.90** | | | **$2,549.08** | **($2,097.40)** | **($108.38)** | **$0.00** | **$0.00** | **$343.30** |

Services Performed by: QUEST DIAGNOSTICS/NICHOLS SJC SAN JUAN C SAN JUAN CAPISTRANO, CA
Services Performed by: QUEST DIAGNOSTICS AVON AVON, CT
Services Performed by: QUEST DIAGNOSTICS, LLC WALLINGFORD CL 00 WALLINGFORD, CT
* The CPT codes provided are based on AMA guidelines and without regard to specific payor requirements

# Exhibit B

Do not use address below:
P.O. Box 7306

## Laboratory Invoice
For services not included in your physician's bill

| May. 31, 2017 | $190.03 | Jun. 21, 2017 |
|---|---|---|

| Invoice Number | Lab Code |
|---|---|
| **4985677775** | **WHC** |

AB 01 004197 50771 B 11 A

WHC 92660003 0000758   4985677775 R

Patient Name:
Responsible Party:
Date of Service:   April 28, 2017

**Lab Results and Diagnosis Questions Must Be Answered By Your Physician.**



**Customer Service**
LOG ON NOW at www.QuestDiagnostics.com/bill to conveniently pay your invoice, provide updated insurance information, or take a patient survey.

**Phone: 1-800-758-6047**
MON-TH 8:30AM-5PM;FRI 09:00 AM - 04:00 PM PST
Se Habla Espanol!

### Laboratory Tests Were Requested By:

Referring Physician:
Physician Address:

### Most Recent Insurance Claim Filed To:

| | |
|---|---|
| Insurance Name: | BLUE CROSS OOS |
| Insurance ID: | IEDAN3894578 |
| Group Number: | 003330081 |

*Please have your invoice available for reference.*

These charges are for tests ordered by the referring physician listed and are separate from the physician's fees. Your insurance carrier denied payment, indicating the services provided are not covered under your policy. Please contact your insurance carrier with any questions regarding the processing of your claim. The amount due is your financial responsibility. Thank you for using our laboratory.

| Date | CPT Code * | Test Description | Charge | Insurance Discount | Insurance Paid | Medicare/ Medicaid Paid | Patient Paid | Patient Owes |
|---|---|---|---|---|---|---|---|---|
| 04/28/17 | 86038 | ANA SCREEN, IFA | $84.36 | | | | | |
| 04/28/17 | 82164 | ANGIOTENSIN I ENZYME | $140.61 | | | | | |
| 04/28/17 | 85652 | SED RATE,AUTOMATED | $37.12 | | | | | |
| 04/28/17 | 36415 | VENIPUNCTURE | $22.50 | | | | | |
| 04/28/17 | 86431 | RHEUM FACTOR (QN) | $58.49 | | | | | |
| 04/28/17 | 86140 | C-REACTIVE PROTEIN | $75.37 | | | | | |
| 04/28/17 | 86609 | S. RECTIVIRGULA | $346.20 | | | | | |
| 04/28/17 | 86606 | ASPERGILLUS AB | $80.89 | | | | | |
| 04/28/17 | 86001 | AUREOBASIDIUM PULLUL | $168.24 | | | | | |
| | | Continued on Next Page | | | | | | |

Tax ID: 71-0897031   ICD Codes: R07.9

Services Performed by: QUEST DIAGNOSTICS WEST HILLS WEST HILLS, CA
Services Performed by: QUEST DIAGNOSTICS/NICHOLS SJC SAN JUAN C SAN JUAN CAPISTRANO, CA
Services Performed by: QUEST DIAGNOSTICS LONG BEACH - WOODRUFF LONG BEACH, CA
* The CPT codes provided are for information purposes only, and are based on AMA guidelines without regard to specific payer requirements

**Laboratory Invoice**

For services not included in your physician's bill

| Date: | | |
|---|---|---|
| May. 31, 2017 | $190.03 | Jun. 21, 2017 |

| Invoice Number | Lab Code |
|---|---|
| 4985677775 | WHC |

Patient Name:
Responsible Party:
Date of Service: April 28, 2017

Lab Results and Diagnosis Questions Must Be
Answered By Your Physician.

| Date | CPT Code * | Test Description | Charge | Insurance Discount | Insurance Paid | Medicare/ Medicaid Paid | Patient Paid | Patient Owes |
|---|---|---|---|---|---|---|---|---|
| 05/16/17 | | PAID BY INSURANCE | | | ($87.17) | | | |
| 05/17/17 | | ADJUSTMENT | | ($736.58) | | | | |
| **Tax ID: 71-0897031** | | **ICD Codes: R07.9** | $1,013.78 | ($736.58) | ($87.17) | $0.00 | $0.00 | $190.03 |

Services Performed by QUEST DIAGNOSTICS WEST HILLS WEST HILLS, CA
Services Performed by QUEST DIAGNOSTICS/NICHOLS SJC SAN JUAN C SAN JUAN CAPISTRANO, CA
Services Performed by QUEST DIAGNOSTICS LONG BEACH - WOODRUFF LONG BEACH, CA
* The CPT codes provided are for information purposes only, and are based on AMA guidelines without regard to specific payer requirements

<u>Exhibit C</u>

# Sonora Quest Laboratories™

A Subsidiary of Laboratory Sciences of Arizona
1255 W. WASHINGTON STREET
TEMPE, AZ 85281

**Laboratory Invoice**
For services not included in your physician's bill

| Accession# | Amount Due |
|---|---|
| NL18217304 | $220.40 |

Date of Service: 11/21/16    Invoice Date: 01/04/2017
Payment Due Upon Receipt    Patient Lab ID:

**Customer Service**
LOG ON NOW at www.sonoraquest.com to conveniently pay your invoice online.
Phone: 1-800-853-4288   Fax: 1-602-685-5903
Weekdays 7AM - 5PM Se Habla Español
Please have your invoice available for reference.

**Laboratory Testing Information**

Referring Physician: JOHN BATTERSBY

Patient Name: JACOB CHERNOV

**Most Recent Insurance Claim Filed To:**

Primary Insurance: MEDICARE

Secondary Insurance:

Responsible Party:

1 AT   *A-02-L74-GM-06310-24

JACOB CHERNOV
12400 N B ST
EL MIRAGE AZ 85335-3302

2800

SECOND NOTICE The balance on your account is now considered past due. Please send your payment today. If we do not receive payment in full within the next 15 days, we will turn your account over to an outside agency to pursue collections.

## Lab Results and Diagnosis Questions Must be Answered By Your Physician

| Date of Service | Units | CPT CODE* | Procedure Description | Charge | Insurance Discount | Insurance Paid | Medicare/ AHCCCS Paid | Patient Paid | Patient Owes |
|---|---|---|---|---|---|---|---|---|---|
| 11/21/16 | 1 | 80053 | COMPREHEN METABOLIC PANEL | $31.76 | $-23.94 | | $-7.82 | | $0.00 |
| 11/21/16 | 1 | 80061 | LIPID PANEL | $69.93 | $-52.71 | | $-17.22 | | $0.00 |
| 11/21/16 | 1 | 81003 | URINALYSIS AUTO W/O SCOPE | $24.09 | $-21.09 | | $-3.00 | | $0.00 |
| 11/21/16 | 1 | 82306 | VITAMIN D 25 HYDROXY | $150.00 | | | | | $150.00 |
| 11/21/16 | 1 | 83036 | GLYCOSYLATED HEMOGLOBIN TEST | $70.40 | | | | | $70.40 |
| 11/21/16 | 1 | 84443 | ASSAY THYROID STIM HORMONE | $56.70 | $-34.27 | | $-22.43 | | $0.00 |
| 11/21/16 | 1 | 85025 | COMPLETE CBC W/AUTO DIFF WBC | $27.51 | $-18.94 | | $-8.57 | | $0.00 |
| | | | **Total Amt Due:** | $430.39 | $-150.95 | $0.00 | $-59.04 | $0.00 | $220.40 |

Tax Id: 860872873    ICD Codes: E66.01, K58.9, R53.83    LIS # 2371-A00365
*The CPT codes provided are based on AMA guidelines and without regard to specific payor requirements



Diag. Code E66.01
K58.09
R53.83.

MATHI—Sonora quest

---

▲ Please fold and tear payment coupon along perforation and remit with payment in the envelope provided ▲

# Sonora Quest Laboratories™
A Subsidiary of Laboratory Sciences of Arizona

## Payment Coupon
**Due Upon Receipt**

For Web Payments Use: Accession Number: NL18217304

| Amount Due: | $220.40 |
|---|---|

**LOG ON NOW:** Pay your bill online securely anytime - day or night at www.sonoraquest.com or call 1-800-853-4288
Sonora Quest Laboratories, LLC also accepts

 

Please make your check payable to Sonora Quest Laboratories, LLC.
Be sure to include your accession number on your check.

☐ Check here if paying by credit card or address change.
Please provide information on back.

Patient Name: JACOB CHERNOV

| Amount Enclosed: | |
|---|---|

If you received an explanation of benefits showing your responsibility is less than the amount shown on this bill, please pay the lesser amount. To fully resolve your invoice, please provide a copy of your explanation of benefits.

**MAIL PAYMENTS ONLY TO:**

SONORA QUEST LABORATORIES
PO BOX 52880
PHOENIX AZ 85072-2880

99PHX0801000000000000NL182173040002204060104085385072288806