**NOT FOR PUBLICATION**

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JENNIFER BENNETT, LAWRENCE CATTI, JACOB CHERNOV, DIANA DANNELLY, CRAIG DVORAK, CLYDE FREEMAN, VALERIE FUNARI, ARTHUR GOLDSMITH, EDIE GOLIKOV, LING GONG, DOLORES HERRMANN, LONNIE HODGES, JR., MARVIN AND VICKI LESLIE, LILY MARTYN, RYSZARD POJAWIS, JILL ROACH, CAROLYN SCOTT, and STEPHEN TIMM, on behalf of himself and those similarly situated, | Civil Action No. 17-1590 **OPINION** |
| *Plaintiffs*, | |
| v. | |
| QUEST DIAGNOSTICS, INC., | |
| *Defendant*. | |

**PADIN, District Judge.**

Plaintiffs are a putative class of patients who allege that Defendant Quest Diagnostics, Inc. ("Quest") charged excessive prices for clinical laboratory testing without securing patients' consent. D.E. 31 ("Am. Compl.") ¶¶ 2, 12. Plaintiffs move for class certification pursuant to Federal Rule of Civil Procedure 23. D.E. 145 ("Mot."). Quest opposes the motion. D.E. 162 ("Opp'n"). The Court has reviewed all relevant submissions and considered the motion without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the following reasons, the Court will DENY the motion.

I.      **BACKGROUND**[1]

Quest is a diagnostic information service provider that conducts clinical testing for patients throughout the United States.[2]  Am. Compl. ¶ 1.  Plaintiffs are patients who allege that Quest engaged in surprise billing by charging unreasonable prices for clinical testing without any express contract regarding fees.  *Id.* ¶¶ 2, 13-15.  Plaintiffs assert that Quest breached an implied contract to provide diagnostic information services at a reasonable rate.  *Id.* ¶¶ 3, 16.  According to Plaintiffs, Quest's surprise billing also violated state consumer protection statutes.  *Id.* ¶¶ 4, 18.

In the Amended Complaint, Plaintiffs outlined the various classes and subclasses that sought relief for Quest's alleged surprise billing.   In addition to a national class of patients, Plaintiffs sought relief on behalf of state subclasses that were charged unreasonable prices without consent.  *Id.* ¶¶ 411–12.  Plaintiffs also sought relief on behalf a national subclass of patients who ultimately paid the unreasonable and nonconsensual prices that were billed.  *Id.*  Plaintiffs offered various theories of liability for these classes, including that Quest breached implied-in-law or implied-in-fact contracts and that Quest violated state consumer protection statutes by engaging in fraud, deception, and overbilling.  *Id.* ¶¶ 423-536.

On September 25, 2019, the Court dismissed portions of the Amended Complaint.  D.E. 51.  Among other things, the Court dismissed claims for breach of implied-in-law contract.  D.E. 50 at 14-16.  The Court also dismissed claims for violation of state consumer protection statutes that were based on theories of fraud or deception.  *Id.* at 9-10.

---

[1] This section is based on allegations set out in the Amended Complaint.  At this stage, the Court does not accept the class allegations as true.

[2] Although the Court does not accept the class allegations as true, this factual allegation was admitted by Quest in the Answer to the Amended Complaint.  *See* D.E. 54 at 2.

On April 28, 2022, Plaintiffs filed the present motion for class certification. Plaintiffs seek to certify classes of patients who were billed at the patient list price ("PLP"), or the rate that Quest may charge when an individual is denied coverage or uninsured. D.E. 145-5 ("Br.") at 1, 6. Specifically, Plaintiffs seek to certify a national class of patients who were billed PLP without an express contract, in breach of an implied-in-fact contract to charge reasonable prices for tests ("PLP Class"). *Id.* at 2.

Plaintiffs also seek to certify four state subclasses of patients who were "victimized by these alleged practices" in violation of state consumer protection statutes. *Id.* at 2-4. First, Plaintiffs seek to certify a subclass of patients who "received an estimate of their financial responsibility from Quest's 'Easy Pay' system or no estimate at all" and were billed PLP without prior disclosure, in violation of California, Colorado, Illinois, Maryland, and Pennsylvania consumer protection statutes ("Easy Pay Subclass"). *Id.* at 3. Second, Plaintiffs seek to certify a subclass of patients who "received Advanced Written Notifications ('AWNs') from Quest" but were billed PLP without prior disclosure, in violation of the Florida consumer protection statute ("AWN Subclass"). *Id.* Third, Plaintiffs seek to certify a subclass of patients who "were billed for a lipid panel test" but charged separately for each component, in violation of Colorado and Florida consumer protection statutes ("Lipid Panel Subclass"). *Id.* at 3-4. Fourth, Plaintiffs seek to certify a subclass of patients who "were billed twice for the same service" after insurance deemed the second test duplicative of the first test, in violation of the Colorado consumer protection statute ("Duplicative Test Subclass"). *Id.* at 4; D.E. 145-8 ("Proposed Order") at 3.[3]

---

[3] Quest argues that "none of the legal theories underlying these subclasses were pled or even mentioned in the Amended Complaint," but Plaintiffs insist that "claims underlying the subclasses are not different, just more specific." Opp'n at 30; D.E. 164 ("Reply") at 14. The Court need not decide whether Plaintiffs have raised novel theories of liability, because the subclasses cannot be authorized for certification under Rule 23, as detailed below. But even if the Court did decide the

Plaintiffs move to certify the PLP Class pursuant to Rule 23(b)(2).  Mot. at 2; Br. at 2.  For these claims, Plaintiffs intend to seek a declaratory judgment that, "with an open price term, Quest is only entitled to a reasonable price for its tests, not the unreasonable PLPs."  Br. at 2.  Plaintiffs also intend to seek injunctive relief "barring Quest from billing patients a PLP without prior written notice and patient consent" and "prohibiting Quest from seeking collection of PLP."  *Id.*

Additionally, Plaintiffs move to certify the Easy Pay, AWN, Lipid Panel, and Duplicative Test Subclasses pursuant to Rule 23(b)(3).  Mot. at 2; Br. at 2-4.  Plaintiffs intend to seek damages for these claims.  Br. at 2.  Plaintiffs have also expressed an intent to seek injunctive relief and a declaratory judgment for the state subclasses and to obtain certification under Rule 23(b)(2).  *Id.* at 4; Proposed Order at 2.  However, Plaintiffs only move to certify the state subclasses under Rule 23(b)(2), not Rule 23(b)(2).[4]  Mot. at 2.

Following submission of the opposition and reply briefs, Quest filed a sur-reply with the approval of the Court.  D.E. 171 ("Sur-Reply").  The parties also filed supplemental briefs with the Court's approval to address purportedly new merits discovery.  D.E. 191 ("Pls.' Supp. Br."); D.E. 201 ("Quest's Supp. Br. Resp."); D.E. 203 ("Pls.' Supp Br. Reply"); D.E. 204 ("Quest's Supp. Br. Reply").

## II.   LEGAL STANDARDS

A "party proposing class-action certification bears the burden of affirmatively demonstrating by a preponderance of the evidence [its] compliance with the requirements of Rule

---

issue, it would find in favor of Quest.  Although Plaintiffs are correct that "the Amended Complaint included all of the relevant state consumer protection statutes," it does not appear that the subclasses "are all based on the same essential facts and theories included in the Amended Complaint . . . ."  Reply at 13 n.18.  Easy Pay, AWNs, lipid panels, and duplicative tests inform the facts and theories underlying the subclasses, but these systems, notices, and services are nowhere mentioned in the Amended Complaint.

[4] Nevertheless, the Court has considered Plaintiffs' request, as detailed below.

23." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015), *as amended* (Apr. 28, 2015) (citing *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013)).  Specifically, "every putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)."  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012).

Under Rule 23(a), a class may be certified only if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a)(1)-(4).  These requirements are, respectively, referred to as the numerosity, commonality, typicality, and adequacy requirements.  *See, e.g.*, *Marcus*, 687 F.3d at 590-91.

A party seeking class certification under Rule 23(b)(2) must satisfy one additional requirement: the proponent must show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  This additional requirement is referred to as the cohesiveness requirement.  *See, e.g.*, *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 264 (3d Cir. 2011).

Alternatively, a party who seeks class certification under Rule 23(b)(3) must satisfy three additional requirements.  First, the party seeking certification must show that "questions of law or fact common to class members predominate over any questions affecting only individual members . . . ."  Fed. R. Civ. P. 23(b)(3).  Second, the proponent must show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  *Id.*  Third, "[a] plaintiff seeking certification of a Rule 23(b)(3) class must prove by a preponderance of the evidence that the class is ascertainable."  *Byrd*, 784 F.3d at 163.  These additional requirements

are, respectively, referred to as the predominance, superiority, and ascertainability requirements. *See, e.g.*, *Byrd*, 784 F.3d at 161 n.4, 162, 164.

## III.   ANALYSIS

The PLP Class and the Easy Pay, AWN, Lipid Panel, and Duplicative Test Subclasses do not satisfy Rule 23.  First, the national class and some of the state subclasses fail the numerosity and commonality requirements of Rule 23(a).  Second, the national class fails the cohesiveness requirement of Rule 23(b)(2).  Third, the state subclasses fail the predominance, ascertainability, and superiority requirements of Rule 23(b)(3).  Fourth, certification of the state subclasses cannot be authorized under Rule 23(b)(2).

### A.  The National Class and State Subclasses Do Not Satisfy Rule 23(a)

The PLP Class and the Easy Pay, AWN, Lipid Panel, and Duplicative Test Subclasses do not satisfy Rule 23(a).  Although the national class and state subclasses satisfy the typicality and adequacy requirements, these classes do not uniformly satisfy the numerosity and commonality requirements.

#### 1.   *The Numerosity Requirement is Not Satisfied by the Duplicative Test Subclass*

"No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."  *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001).  Importantly, "numerosity—like all Rule 23 requirements—must be proven by a preponderance of the evidence."  *Marcus*, 687 F.3d at 595.

Here, Plaintiffs have not demonstrated that the number of Duplicative Test Subclass members is likely to exceed 40, let alone that any significant number of individuals would be members of this class.  Plaintiffs assert that "it is Quest's practice to double bill patients for a test

6

when the patient's insurance denies coverage on 'integral test' grounds." Br. at 38. But Plaintiffs' only support for this supposed policy is the testimony of a single witness that does not concern integral test denials.    *See* D.E. 157 at 10-13 (Koehler Tr. 19:22-21:21).[5]    Moreover, Quest's Director of Compliance, Diligence, and Integration Angie Esquibell testified that when insurance denies coverage for duplicative tests, Quest does not always bill the patient. D.E. 162-38 at 6-7 (Esquibell Decl. ¶ 13). Esquibell also testified that a sample review of requisitions showed no patients who were billed for duplicative tests. *Id.* at 8-10 (Esquibell Decl. ¶¶ 17-23). Even if Ms. Esquibell is not credited, Plaintiffs' unsupported assertion regarding double billing fails to prove the numerosity of the Duplicative Test Subclass.[6]

Nevertheless, Plaintiffs have demonstrated that the PLP Class and the Easy Pay, AWN, and Lipid Panel Subclasses likely contain at least 40 members each. For the PLP Class, Plaintiffs have illustrated that 2% of approximately 187 million requisitions were billed to individual patients in 2020, as opposed to billing healthcare insurers, government payers, and client payers. Br. at 37-38; Quest Diagnostics Inc., Form 10-K for FY 2020 at 9, 69. For the Easy Pay Subclass, Plaintiffs have demonstrated that Easy Pay estimates are not available for every test. Br. at 38; D.E. 146 at 104-05 (Pruitt Tr. 93:10-94:4).[7] For the AWN Subclass, Plaintiffs have illustrated that over 1,200 patients received AWNs for one test in one month. Br. at 38; D.E. 150 at 41. And for

---

[5] Deborah Koehler was Quest's Senior Director of Compliance during the relevant period.

[6] Plaintiffs argue that Esquibell's sample review of requisitions did not examine the code used by insurers to deny duplicative tests or occasions when Quest was responsible for payment, but Esquibell merely testified that she did not analyze one possibly relevant designation. Reply at 18; *see also* D.E. 164-4 at 292-335 (Esquibell Tr. 24:13-25:21, 97:5-98:17, 113:18-114:6, 141:18-142:13). Plaintiffs also argue that Esquibell's sample review was limited to a single day in 2021 and that it failed to account for requisitions billed on separate days. Reply at 18. Even if this challenge casts doubt on the reliability of Esquibell's sample review, it does not demonstrate that it is Quest's practice to double bill patients.

[7] Priscilla Pruitt was Quest's National Patient Services Director during the relevant period.

the Lipid Panel Subclass, Plaintiffs have demonstrated that insurers deny 1% to 2% of the over 10 million lipid panels that Quest performs each year.  Br. at 38; D.E. 150 at 9-14.

### 2. The Commonality Requirement is Not Satisfied by the PLP Class, the Easy Pay Subclass, or the Lipid Panel Subclass

"'The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.'"  *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 596-97 (3d Cir. 2009) (quoting *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)).  Additionally, the common question "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Plaintiffs fail to demonstrate that members of the PLP Class share a question of law.  Plaintiffs assert that the legal question common to the national class is whether Quest is "entitled to be paid only the reasonable value of its services in performing the test" when it enters an implied-in-fact contract without a specified price.  Br. at 39.  However, different states have different laws that govern implied-in-fact contracts without specified prices, so the ultimate legal question posed will vary across the class.  For example, an agreement without a specified price is unenforceable under the Court's interpretation of New Jersey law, yet enforceable under the laws of other jurisdictions, and the relevant statutes of limitations are triggered after a different number of years in different states.[8]  *Compare* D.E. 50 at 14 n.4 (holding that "it is questionable whether

---

[8] Plaintiffs argue that challenges based on the statutes of limitations cannot bar class certification.  Reply at 12.  However, in the case cited by Plaintiffs, the Third Circuit held that commonality was not undermined by variations in the fraudulent concealment defense to the statute of limitations.  *In re Linerboard, Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002).  Variations in defenses to the statutes of limitations pose less of a threat to commonality than variations within the statutes of limitations.

a court may appropriately supply an essential price term" under New Jersey law) *with Portercare Adventist Health Sys. v. Lego*, 312 P.3d 201, 206 (Colo. App. 2010), *rev'd on other grounds*, 286 P.3d 525 (holding that a price term may be supplied under Colorado law); *compare* Cal. Code Civ. Pro. § 339 (two-year statute of limitations under California law) *with* N.Y. C.P.L.R. § 213(2) (six-year statute of limitations under New York law).

Plaintiffs also fail to demonstrate that members of the PLP Class share a question of fact. Plaintiffs assert that the factual questions common to the national class—and to each of the state subclasses—are whether Quest can "justify its PLPs" and how Quest can determine "the reasonable value of the tests" it provides. Br. at 41.  However, since different states have different laws that govern implied-in-fact contracts without specified prices, the underlying factual questions that are material will also vary across the PLP Class.  In other words, the justification for PLPs and the reasonable value of tests are not equally material facts in all jurisdictions.  *See, e.g.*, *NEA-Coffeyville v. Unified Sch. Dist. No. 445, Coffeyville, Montgomery Cty.*, 268 Kan. 384, 400 (2000) (quoting the Restatement (Second) of Contracts **§** 204) ("'[W]here there is in fact no agreement, the court should supply a term which comports with community standards of fairness and policy . . . .'"). [9]

Although the Third Circuit has held that differences in state law do not defeat commonality, this is limited to circumstances "where the varying state laws can be grouped into common manageable patterns," and may be limited to the context of settlement class certifications. *Donachy v. Intrawest U.S. Holdings, Inc.*, 2012 WL 869007, at *10 (D.N.J. Mar. 14, 2012)

---

[9] Plaintiffs argue that "[t]he Restatement does not suggest (and Quest cites no case to suggest) that the methodology of setting missing price terms of tests in Kansas could be different from setting price terms in New Jersey or anywhere else."  Reply at 12 n.17.  However, it is Plaintiffs' burden to prove commonality across all jurisdictions, not Quest's burden to explain the differences between the standards of every state.

(applying *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 301-03 (3d Cir. 2011)); *see also Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 183 (3d Cir. 2014) (affirming the denial of class certification where "no effort [had] been made to demonstrate how Plaintiffs' claims of deception through overbilling could be proven under the statutes' varying elements of reliance, state of mind, and causation," and where there was "no indication as to how the jury could be charged in some coherent manner relative to the proposed grouping"). Here, Plaintiffs have made no showing that state laws can be grouped into manageable patterns. Plaintiffs' laundry list of case citations merely shows the recognition of implied-in-fact contracts and the possible existence of reasonableness considerations across jurisdictions, without any groupings or manageable patterns, let alone details regarding the elements in different states. *See* D.E. 145-7.[10]

Additionally, Plaintiffs have not demonstrated that the Easy Pay and Lipid Panel Subclasses share a question of law or fact. Plaintiffs assert that the common legal questions are whether failure to furnish an accurate estimate or otherwise disclose PLPs violates the consumer protection statutes of California, Colorado, Illinois, Maryland, and Pennsylvania, and whether charging PLPs for lipid panels violates the consumer protection statutes of Colorado and Florida. Br. at 41. Here too, the states' laws differ, yet Plaintiffs have made no showing that the statutes can be grouped into manageable patterns.[11] Instead, Plaintiffs have summarized the statutes with

---

[10] In fact, Plaintiffs explicitly ignore eight jurisdictions. *See id.* ("Plaintiffs were unable to find established case law for Delaware, Missouri, Montana, New Hampshire, Oklahoma, Rhode Island, Vermont and Wyoming.")

[11] There are material differences between the consumer protection laws of different states. *See Payne v. FujiFilm U.S.A., Inc.*, 2010 WL 2342388, at *9 (D.N.J. May 28, 2010) ("[O]nly thirty-three states have authorized injunctive relief under their consumer fraud statutes, thirty-four states require that a plaintiff plead an 'ascertainable loss' with regard to consumer fraud claims, and many states have varying statute of limitations periods applicable to such claims."); *Vista Healthplan, Inc. v. Cephalon, Inc.*, 2015 WL 3623005, at *36-37 (E.D. Pa. June 10, 2015) (finding material differences in the consumer protection laws of different states with respect to scienter, reliance, and public policy requirements, among other things); *Lyon v. Caterpillar, Inc.*, 194

parentheticals and cited a handful of cases, without supplying any groupings or comparative analyses of the elements in different jurisdictions. *See* Br. at 33-37. For this reason, the common factual questions offered by Plaintiffs also fail to satisfy the commonality requirement.

Nevertheless, Plaintiffs have demonstrated that the AWN and Duplicative Test Subclasses share questions of law and fact. Plaintiffs assert that the common legal questions are whether charging PLPs to patients advised on AWNs violates the Florida consumer protection statute, and whether double billing for duplicative tests violates the Colorado consumer protection statute. *Id*. Since the law of only one state is implicated by each legal question, there are no variations that threaten commonality. Similarly, the common factual questions raised by Plaintiffs satisfy the commonality requirement as well.[12]

### 3. The Typicality Requirement is Satisfied

To determine whether the typicality requirement has been satisfied, "courts must consider the attributes of the proposed representatives, the class as a whole, and the similarity between the proposed representatives and the class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d at 597. Among other things, "the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory . . . ." *Id.* at 599. In general, "a proposed class representative is not 'typical' under Rule 23(a)(3) if 'the representative is subject to a unique defense that is likely to become a major focus of the litigation.'" *Id.* at 598 (quoting *Beck v. Maximus, Inc.*, 457 F.3d 291, 297 (3d Cir. 2006)).

---

F.R.D. 206, 219 (E.D. Pa. 2000) ("State consumer protection acts vary on a range of fundamental issues.").

[12] Although it may not be possible to resolve the shared questions of law or fact on a class wide basis, such issues are "more appropriately analyzed" under another requirement, such as the predominance inquiry. *Jane v. Rodriguez*, 2020 WL 6867169, at *5 n.5 (D.N.J. Nov. 23, 2020).

Here, the representatives for the national class and for each state subclass bring claims that are generally the same as those of the classes. *See* D.E. 145-4 at 10-17 (chart outlining the lack of notice for each proposed class representative, along with outstanding balances and payments). Additionally, no proposed class representative is subject to a unique defense that is likely to become a major focus of the litigation. *See id.* Although Quest asserts that the proposed representatives for each state subclass are dissimilar to the classes, the challenges raised do not defeat the typicality requirement. The Court addresses each argument in turn.

Easy Pay Subclass. Quest asserts that the proposed representatives may not have received Easy Pay estimates and that one proposed representative ordered a test through a third party that may have provided coverage warnings. Opp'n at 38. However, the legal theory for the Easy Pay Subclass is that Quest violated consumer protection statutes by failing to disclose PLPs, and the non-receipt of Easy Pay estimates and the third-party provision of coverage warnings do not upset the factual circumstances underlying that theory. In fact, the non-receipt of Easy Pay estimates suggests a failure to disclose PLPs.[13] Moreover, the third-party provision of coverage warnings merely suggests disclosure of possible payment, not disclosure of PLPs.

Quest also asserts that some proposed representatives did not suffer injury under Colorado law because they never paid their bills. Opp'n at 38. But Colorado law does not specify that payment is required for a plaintiff to suffer injury. *See* Col. Rev. Stat. § 6-1-113(1). At most, Quest has demonstrated that a plaintiff must have "suffered injury in fact to a legally protected interest," *US Fax L. Ctr., Inc. v. iHire, Inc.*, 374 F. Supp. 2d 924, 929 (D. Colo. 2005), and that a plaintiff who has "received a refund" has not suffered injury, *Friedman v. Dollar Thrifty Auto.*

---

[13] Additionally, the Easy Pay Subclass includes anyone who was not informed of PLP, irrespective of Easy Pay estimates. Reply at 19.

*Grp., Inc.*, 304 F.R.D. 601, 612-13 (D. Colo. 2015).  Here, the proposed representatives have incurred debt that has not been cancelled.  *See* D.E. 145-4 at 10-17.

AWN Subclass.  Quest asserts that the proposed representative lacks first-hand knowledge of the relevant facts because she brings claims on behalf of her deceased daughter and was not present when the AWN was signed.  Opp'n at 42-43.  However, any evidentiary hurdles the proposed representative may face do not demonstrate meaningful differences in claims or defenses between the proposed representative and the AWN Subclass.

Duplicative Test Subclass.  Quest once again asserts that the proposed representative did not suffer injury under Colorado law because she did not pay her bills.  Opp'n at 50.  Here too, payment is not required for a plaintiff to suffer injury.  And as before, the proposed representative has incurred debt that has not been canceled.

Lipid Panel Subclass.  Quest asserts not only that a proposed representative did not suffer injury under Colorado law because she did not pay her bills, but also that the proposed representative had the opportunity to accept a lower price and refused.  Opp'n at 45-46.  However, even if the duty to mitigate damages is a defense to a violation of the Colorado consumer protection statute, that defense is unlikely to become a major focus of the litigation, as it only precludes recovery to the extent that the loss could have been avoided.  *Fair v. Red Lion Inn*, 943 P.2d 431, 437 (Colo. 1997).  Here, if the proposed representative had accepted the lower price, she still would have owed over $400.  *See* D.E. 162-46 at 4.

### 4.  *The Adequacy Requirement is Satisfied*

Named plaintiffs are adequate if they have "'the ability and the incentive to represent the claims of the class vigorously'" and if "'there is no conflict between the individual's claims and those asserted on behalf of the class.'"  *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir.

2010), *as amended* (Oct. 20, 2010) (citing *Hassine v. Jeffes*, 846 F.2d 169, 179 (3d Cir. 1988)). To satisfy the adequacy requirement, "the named plaintiff's interests must be sufficiently aligned with the interests of the absentees" and "the plaintiff's counsel must be qualified to represent the class." *Beneli v. BCA Fin. Servs., Inc.*, 324 F.R.D. 89, 98 (D.N.J. 2018).

Here, "[t]here are no conflicts between the named Plaintiffs and other Class Members because they all have the same interest: to pay only a reasonable amount." Br. at 43. Moreover, the named Plaintiffs have the ability and incentive to represent the claims of the classes because they have demonstrated that they are "committed to the success of the litigation."[14] *Id.* at 43-44. Thus, the named Plaintiffs' interests are sufficiently aligned with the interests of the absentees. Additionally, Plaintiffs' counsel is qualified to represent the classes, as outlined in declarations from Plaintiffs' attorneys. *See* D.E. 145-2 (Herrmann Decl.); D.E. 145-3 (Finkel Decl.).

### B. The National Class Does Not Satisfy Rule 23(b)(2)

"Since Rule 23(b)(2) class members lack the right to opt out of the class, significant, individualized issues in the class action can undermine the manageability of the class and its overall value as a litigation mechanism. Consequently, the Third Circuit has imposed the requirement that a Rule 23(b)(2) class action be cohesive . . . ." *In re Valsartan*, 2023 WL 1818922, at *28 (D.N.J. Feb. 8, 2023). "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Dukes*, 564 U.S. at

---

[14] Indeed, "Plaintiffs, over almost five years of litigation, have maintained regular contact with counsel; reviewed and verified information contained in significant Court documents, including the initial and amended complaints, and responses to motions to dismiss; produced documents in response to Quest's demands; answered multiple rounds of interrogatories; and sat for depositions." Br. at 43-44.

360 (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof,* 84 N.Y.U. L. Rev. 97, 132 (2009)).

The PLP Class does not satisfy the cohesiveness requirement of Rule 23(b)(2) because significant, individualized issues undermine the manageability of the class and its overall value as a litigation mechanism.  Specifically, individualized issues determine whether patients were billed PLP, whether patients agreed to be billed PLP, and whether the PLP billed to patients was reasonable.  Additionally, individualized issues result from differences in state law regarding implied-in-fact contracts.  Thus, the conduct of the PLP Class is not such that it can be enjoined or declared unlawful as to all the class members.

*1.  Individualized Issues Determine Whether Patients Were Billed PLP*

As an initial matter, it is not possible to determine whether patients were billed PLP without reviewing individual records.  D.E. 162-26 at 5-6 (Halpern Decl. ¶ 5).[15]  For example, patients might provide additional or different information to insurance companies following denials, which could lead to subsequent coverage, rather than PLP billing.  And patients without insurance or who face insurance denials might obtain subsequent discounts or payment plans from Quest, which could also result in the avoidance of PLP billing.[16]  Such information about subsequent coverage, discounts, or payment plans is unlikely to be reflected in any aggregate data regarding patients' insurance denials or patients without insurance.[17]

---

[15] Marc Halpern was Quest's Director of Pricing Strategy during the relevant period.

[16] Plaintiffs argue that such patients are (or could be) excluded from the PLP Class.  Reply at 2-3. However, review of individual records would still be necessary to isolate these patients and ensure their removal from the class.

[17] Additionally, information about subsequent discounts or payment plans might not be allocated to specific services, so it may not be possible to determine whether a particular test was billed at PLP, even with review of individual records.

Nor have Plaintiffs offered evidence that it is possible to determine whether patients were billed PLP without review of individual records.  Plaintiffs cite deposition excerpts from several employees, but this testimony either assumes review of individual records or is indeterminate.  Br. at 26 n.13, 28, 50; *see also* D.E. 146 at 76-77 (Pruitt Tr. 42:14-43:22); *id.* at 20-21 (McCabe Tr. 97:14-98:13); *id.* at 317-19, 359-60 (Lake Tr. 88:14-90:5, 209:21-210:5); *id.* at 152, 153 (Halpern Tr. 48:13-17, 49:11-18).[18]  Plaintiffs also assert that internal analyses performed by Quest illustrate the existence of aggregate data regarding patients who were billed PLP.  Reply at 4-5 & n.7-8.  These internal analyses demonstrate the existence of aggregate data regarding financial metrics from patients who were billed or paid PLP, including information about specific tests.  *See* D.E. 147 at 98; D.E. 156 at 521-40.  However, these internal analyses do not demonstrate the existence of aggregate data regarding the identity of patients who were billed PLP for particular tests.

Even if internal analyses imply that Quest can easily identify patients who were billed PLP, expert analysis suggests otherwise.  Dr. Bruce Strombom, an expert witness retained by Quest, reviewed a sample from the Quest billing system and found that the prices listed on bills often did not match the total billed amount, and that it was unclear from the face of the requisitions whether and which tests had been counted.[19]  D.E. 162-7 at 24-30 (Strombom Rpt. ¶¶ 34-45).  Dr.

---

[18] Pruitt's testimony implies that Quest could take a long time to identify patients who were billed PLP, which bolsters the idea that individual records must be reviewed.  Halpern's testimony concerns the aggregate number of patients who paid PLP, but explicitly does not concern the aggregate identification of patients who were billed PLP.  *See* 162-26 at 5-6 (Halpern Decl. ¶ 5).  The testimony from Pablo Lake (Quest's Leader of Revenue Services) implies that Quest can identify patients who were billed PLP through reject codes, but it does not convey certainty or appear to be based on personal knowledge.  Even if this testimony and the testimony from Gary McCabe (Quest's Executive Director of Health Plans) are taken together to suggest that aggregate data is available for coverage and denial of every service received by each patient, the identity of patients who were billed PLP could still be unidentifiable without review of individual records (as patients might be uninsured or receive subsequent coverage, discounts, or payment plans).
[19] Plaintiffs' attorney argues that each requisition reviewed by Dr. Strombom includes a single test price that matches the total billed amount.  Nicholas Decl.  However, Plaintiffs' attorney does not

Strombom also found that the total billed amount did not always reflect the total amount patients were responsible to pay, and that it was is unclear from the face of the requisitions whether and which tests had been discounted.[20]  *Id.*  Plaintiffs assert that this expert analysis has been rebutted by declarations from their attorney and their own expert witness, Dr. Zirui Song.  Reply at 5 n.9. However, the attorney declaration is inadmissible under Local Civil Rule 7.2(a) as argumentative; although it summarizes Dr. Strombom's opinions and testimony, it is interpretive in nature, as it compares the opinions to the testimony to imply that the opinions are rebutted by the testimony. *See* 164-1 (Nicholas Decl.); *Hutchins v. United Parcel Serv., Inc.*, 197 F. App'x 152, 158-59 (3d Cir. 2006) (excluding charts that were prepared by an attorney and that summarized produced documents because the charts compared different compensation levels in an organization to suggest employment discrimination).[21]  Nor does Dr. Song's declaration rebut Dr. Strombom's expert analysis; it defends a methodology used to determine the reasonable value of tests, but it does not address how to determine whether patients were billed PLP for tests.  *See* D.E. 164-4 at 615-38 (Song Reply. Decl.).

---

[20] explain why the total billed amount should automatically correspond to a single test price, as opposed to the sum of multiple test prices.

[20] While Dr. Strombom acknowledges that possibility of aggregate data regarding the identity of patients who pay PLP, he otherwise disclaims knowledge of such data, which has not been produced in this case.  D.E. 164-4 at 394-96 (Strombom Tr. 113:3-115:21).

[21] Additionally, the attorney declaration does not effectively rebut Dr. Strombom's expert analysis. First, the attorney declaration suggests that Dr. Strombom could have used a larger sample size, collected more information about Quest's billing system, or accumulated greater experience with other billing systems, but such suggestions do not amount to fatal flaws.  Second, the attorney declaration also suggests that Dr. Strombom could not conclusively rule out aggregate identification of patients who were billed or paid PLP, but such a suggestion does not undermine the demonstrated unlikelihood of aggregate identification.  Third, the attorney declaration suggests that Dr. Strombom could locate aggregate data regarding patient insurance, test coverage, and a single patient discount, but such suggestions do not demonstrate that Quest can identify insurance, coverage, and discounts for every service received by each patient, let alone that Quest can identify patients who were billed PLP (as patients might receive coverage following denials).  *See* 164-1 (Nicholas Decl.).

In a last-ditch effort to prove that Quest can easily identify patients who were billed PLP, Plaintiffs cite to a list of the top 20 tests denied by insurance, which includes revenues, total amounts billed and paid, and denial rates for each test.  Pls.' Supp. Br. at 4-5; *see also* D.E. 191-1 at 5-10.  However, even if Plaintiffs have demonstrated that Quest can discern the number of tests denied by insurance, Plaintiffs have not illustrated that Quest can determine the identity of patients billed at PLP, let alone the identity of patients without insurance.  Moreover, the produced document is unlikely to be helpful in any determination of whether patients were billed at PLP, as it is based on preliminary responses from insurance companies, not conclusive coverage determinations or discounts.  D.E. 201-2 at 3-4 (Sharkey Decl. ¶¶ 4–5, 7-8, 10).  In other words, individualized issues determine whether patients were billed PLP.

### 2.   *Individualized Issues Determine Whether Patients Agreed to Be Billed PLP*

To determine whether patients agreed to be billed PLP, individual circumstances must be considered.   For example, some patients might have signed valid Advanced Beneficiary Notifications ("ABNs") or valid AWNs, which would have provided information about insurance coverage.[22]  And other patients might have received estimates of financial responsibility via Easy Pay, OPLES, or RTE, which would have provided information about price.[23]  Only a consideration

---

[22] Plaintiffs argue that patients who signed valid ABNs are excluded from the PLP Class.  Reply at 3.  However, review of individual records would still be necessary to isolate these patients and ensure their removal from the class.  The employee testimony cited by Plaintiffs may imply that Quest can easily identify patients who signed ABNs, but it does not appear to be based on personal knowledge.  *See* Br. at 50; D.E. 146 at 317-19 (Lake Tr. 88:14-90:5).  Moreover, even if Quest can easily identify these patients, review of individual records would still be required to assess the validity of ABNs; Quest cannot rely upon the GA modifier appended to the CPT codes, as it does not reflect the independent judgment of Medicare.  D.E. 162-11 at 10; D.E. 171-2 at 3 (Lake Tr. 103:12-104:2).  In fact, the requisition sent to Dolores Herrmann included a GA modifier appended to the CPT codes, yet Plaintiffs suggest that the ABN was invalid, highlighting the inevitability of individualized review.  D.E. 162-34 at 3; *see also* Br. at 4-5 n.3.

[23] In addition to Easy Pay, OPLES and RTE are Quest systems that provide patients with estimates of financial responsibility.  D.E. 146 at 98-99 (Pruitt 86:13-87:19).  Plaintiffs argue that patients

of individual circumstances can determine whether any of these patients were informed of PLP billing.  The evidence cited by Plaintiffs to demonstrate the inaccurate and misleading aspects of Easy Pay merely serves to underscore the individualized nature of this determination.  *See* Br. at 21-23; D.E. 146 at 24-26 (McCabe Tr. 129:9-131:3); *id.* at 350-51 (Lake Tr. 180:21-181:2); D.E. 148 at 4 (Easy Pay Users' Guide); D.E. 149 at 4-6 (Easy Pay Sales Tutorial); D.E. 160 at 6 (Easy Pay Screen Shots).[24]  Likewise, Dr. Strombom found that the AWN indicator in sample data from the Quest billing system was unhelpful, which further indicates that individualized review is necessary to identify patients who were informed of PLP billing.  D.E. 162-7 at 37-38, 61-63 (Strombom Rpt. ¶¶ 60-61, 115-18).

Even if Quest can easily identify patients who were informed of PLP billing through valid ABNs or AWNs, or through Easy Pay, OPLES, or RTE estimates, individual circumstances must still be considered to determine whether patients orally agreed to be billed PLP.[25]  At best, the evidence offered by Plaintiffs suggests that Quest does not categorically share PLPs with patients

who received OPLES and RTE estimates are excluded from the PLP Class.  Reply at 3.  However, review of individual records would still be necessary to isolate these patients and ensure their removal from the class.  The employee testimony cited by Plaintiffs may imply that Quest can easily identify patients who received OPLES estimates, but it betrays uncertainty and does not concern RTE estimates.  *See* Br. at 28; D.E. 146 at 353-54 (Lake Tr. 186:24-187:8).

[24] The evidence supports—or is consistent with—the possibility that Easy Pay estimates informed patients of PLP billing, and individualized review is required to assess the frequency with which this possibility materialized.  Indeed, the evidence suggests that Easy Pay estimates were not as detailed as RTE responses, but still highly accurate; that Easy Pay did not generate noncovered responses, but Quest still learned whether patients were covered; that Easy Pay may not have disclosed all PLPs, but still disclosed estimates of patient responsibility; that Easy Pay did not disclose negotiated insurance rates; and that Easy Pay advertised pre-approved payment of non-covered charges after insurance processing.

[25] Plaintiffs imply that patients could only agree to be billed PLP in writing.  D.E. 173.  However, in the case cited by Plaintiffs, the court considered oral communications between the patient and the hospital, as well as testimony from both parties about the surrounding circumstances, to conclude that there was no awareness of price.  *French v. Centura Health Corp.*, 509 P.3d 443 (Colo. 2022).  Here too, oral communications and the surrounding circumstances must be considered to determine whether patients agreed to be billed PLP.

or doctors, that Quest does not provide patients with data regarding insurers' denial rates, that Quest instructs providers to not disclose prices negotiated with insurers, and that Plaintiffs may have been uninformed of PLPs. *See* Br. at 8-17. Importantly, this evidence does not suggest that patients were never informed of PLPs in oral communications with their providers.

Nevertheless, to illustrate that patients were generally uninformed of PLPs as a matter of policy, Plaintiffs assert that patients were not issued valid AWNs for Vitamin D in 2019, even though Quest knew that Aetna would not cover the test. Pls.' Supp. Br. at 6-8. However, the documents cited by Plaintiffs merely suggest that AWNs for Vitamin D were not "needed" under the contract with Aetna, but that AWNs still might be "activated" after Aetna stopped covering the test. *See* D.E. 191-1 at 22-23, 25-26.[26] Likewise, another document suggests that Quest still issued valid AWNs for Vitamin D after Aetna stopped covering the test and that Quest only ceased to do so after it learned that Aetna was not actually denying claims. D.E. 201-5 at 2-4. In any event, absence of disclosure regarding the coverage of a single test by a single insurer in a single year does not demonstrate that patients were never informed of PLP. And since individual circumstances must be considered to assess oral communications between patients and providers, individualized issues determine whether patients agreed to be billed PLP.

### 3. *Individualized Issues Determine Whether the PLP Billed to Patients Was Reasonable*

Individual circumstances must also be considered to determine whether the PLP billed to patients was reasonable. The individual circumstances to be considered include, among other things, patients' discounts, Quest's internal costs, and the nature and time frame of the services rendered. *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007). Since the

---

[26] These documents also suggest awareness that Aetna was likely to deny coverage for Vitamin D more often, not that Aetna was certain to deny coverage for the test in every instance.

reasonableness of prices charged to patients "is necessarily an individualized inquiry" that cannot be determined on a class wide basis, "individualized issues here overwhelm class cohesiveness."[27] *Id.*

Plaintiffs rely on Dr. Song for a class-wide approach to determine the reasonableness of PLP billed to patients, but the methodology he proposes is unsound. At a high level, Dr. Song offers several benchmarks to determine the reasonableness of prices charged to patients, including median private insurance rates and Medicare rates. D.E. 146 at 414-17 (Song Rpt. ¶¶ 47-51). However, Dr. Song's methodology does not account for any of the considerations listed above.[28] Moreover, his benchmarks are incomparable to PLPs because they do not account for all uncovered patients' costs. D.E. 162-7 at 111-20 (Strombom Rpt. ¶¶ 216-31). And there are insufficient data to apply most of the benchmarks on a class basis because the benchmarks do not govern enough patients, tests, years, or locations. *Id.* Thus, even if Dr. Song's benchmarks reflect certain market or regulatory conditions, his methodology is flawed and unworkable.[29] *Id.* at 111-21 (Strombom Rpt. ¶¶ 216-33).

---

[27] Plaintiffs imply that it is easy to determine the reasonableness of PLP. D.E. 173. However, the case cited by Plaintiffs involved a single set of services provided to a single patient on a single occasion, and the relevant question was whether a price term was incorporated by reference into an express contract under Colorado law. *French*, 509 P.3d 443. Here, there are thousands of sets of services provided to tens of millions of patients on countless occasions, and the relevant question is how to calculate reasonable prices in implied-in-fact contracts under various states' laws.

[28] For example, Dr. Song does not consider the "administrative cost of providing tests to individual patients, the likelihood of payment, and the cost of collections," nor does he consider the "relatively low volume of tests Quest expects to provide to patients without insurance coverage," or "competitors' prices" for tests. D.E. 162-7 at 98-99 (Strombom Rpt. ¶¶ 190-92).

[29] Plaintiffs argue that they were not required "to have selected a particular econometric model for demonstrating impact (or proving damages) at the class certification stage." Reply at 10 n.14. In the case cited by Plaintiffs, experts proposed several benchmarks to assess the antitrust injury of inflated linerboard prices on a class-wide basis, and the Third Circuit held that plaintiffs were not required to settle on a single benchmark. *In re Linerboard, Antitrust Litig.*, 305 F.3d 145, 155 (3d Cir. 2002). Here, Dr. Song has proposed several benchmarks to assess the reasonableness of prices

Dr. Song's methodology is also unsound because his use of median private insurance rates could lead to the exclusion of PLP Class members who were underbilled. As acknowledged by Dr. Song, the PLP billed to a patient may be deemed reasonable if it is lower than the median private insurance rate. D.E. 164-4 at 625-26 (Song Reply Decl. ¶ 18); D.E. 162-24 at 4-6 (Song Tr. 223:10-228:13). This possibility is problematic because it may result in the creation of a fail-safe class, which is improper. *Martinez v. TD Bank USA, Inc.*, 2017 WL 2829601, *12 (D.N.J. June 30, 2017). In a fail-safe class, "either the class members win or, if the defense prevails, no class exists, and the putative class members, unbound by the judgment, are free to pursue individual claims." *Martinez*, 2017 WL 2829601, at *12. If the PLP billed to a patient is deemed reasonable because it is lower than the median private insurance rate, then the patient will be excluded from the PLP Class, unbound by the judgment, and free to pursue individual claims. Accordingly, Plaintiffs cannot rely upon Dr. Song, and individualized issues will determine whether the PLP billed to patients was reasonable.

> 4. *Individualized Issues May Result from Differences in State Law Regarding Implied-in-Fact Contracts*

Even if Plaintiffs could resolve the individualized factual issues that undermine the cohesiveness of the PLP Class, individualized legal issues would still result from differences in state law regarding implied-in-fact contracts. Plaintiffs assert that "the law of the other 49 states is consistent with New Jersey's in restricting payment for a service to the reasonable value of the service in the absence of a price agreement." Br. at 40. However, the document that Plaintiffs submit in support of this assertion is a laundry list of case citations and parentheticals that merely shows the recognition of implied-in-fact contracts and the possible existence of reasonableness

---

billed under implied contracts, and even if Plaintiffs did not need to select a particular econometric model, they have not demonstrated that any single benchmark is adequate.

considerations across jurisdictions. *See* D.E. 145-7. The list does not "provide an extensive analysis of all fifty states' laws" or "address the commonalities and differences among the state laws . . . ." *In re Brinker Data Incident Litig.*, 2021 WL 1405508, at *11 (M.D. Fla. Apr. 14, 2021). Nor does the list provide a state-by-state comparison of "claims, defenses and forms of relief." *Sanders v. Johnson & Johnson, Inc.*, 2006 WL 1541033, at *5 (D.N.J. June 2, 2006).[30] In fact, the list explicitly ignores eight jurisdictions. Since Plaintiffs have not addressed differences in state law regarding implied-in-fact contracts, they have failed to demonstrate that the PLP Class is cohesive.[31]

### C. The State Subclasses Do Not Satisfy Rule 23(b)(3)

For many of the same reasons that the PLP Class fails to satisfy Rule 23(b)(2), the Easy Pay, AWN, Lipid Panel, and Duplicative Test Subclasses do not satisfy Rule 23(b)(3). Specifically, the state subclasses fail the predominance, ascertainability, and superiority requirements.

---

[30] *Sanders* involved multiple claims, defenses, and forms of relief, and the Court held that individual issues would predominate because the plaintiff merely offered a "cursory comparison of state law with respect to only one of the legal issues raised in this case." 2006 WL 1541033, at *5. Although the PLP Class concerns a single claim and form of relief, individualized issues will still arise, as Plaintiffs have only provided a cursory examination of state law regarding reasonableness in implied-in-fact contracts. Additionally, Quest has asserted multiple defenses, which may further complicate cohesion across jurisdictions. *See* D.E. 54 at 165-70.

[31] Quest argues that the PLP Class also fails to satisfy Rule 65(d) because the injunctive relief sought is not described in sufficient detail. Opp'n at 25-27. "At the class certification stage, the injunctive relief sought must be described in reasonably particular detail such that the court can at least conceive of an injunction that would satisfy [Rule 65(d)'s] requirements," but "this is not to say that plaintiffs are required to come forward with an injunction that satisfies Rule 65(d) with exacting precision at the class certification stage." *Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597, 605 & n.4 (10th Cir. 2008) (internal citations omitted). Since class certification cannot be authorized under Rule 23(b)(2), the Court need not decide whether the injunctive relief has been described with sufficient detail at this stage.

*1.   The Predominance Requirement is Not Satisfied*

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation, a standard far more demanding than the commonality requirement of Rule 23(a)." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310-11 (3d Cir. 2008) (internal citations omitted).  However, predominance does not require absolute identity of the underlying claims.  *See Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 304 (3d Cir. 2016) ("[I]f the court decides that the central, predominant issues in the case are common, then Rule 23(b)(3) is met despite the possibility that some subsidiary issues will require individualized evidence.").  Nevertheless, the predominance requirement is "less stringent than the cohesiveness requirement of Rule 23(b)(2)."  *Gates*, 655 F.3d at 269.

Since cohesiveness is more stringent than predominance, the state subclasses fail the predominance requirement for many of the same reasons that the national class fails the cohesiveness requirement.  In other words, because the state subclasses share individualized issues that undermine the national class's cohesiveness, predominance is likewise frustrated.  In fact, Plaintiffs suggest that these individualized issues predominate.  For example, Plaintiffs assert that unreasonable PLP billing is the overarching concern, not only for the national class, but also for the state subclasses.  Br. at 2.  Plaintiffs also imply that the AWN Subclass members are billed PLP.  *Id.* at 3.  Likewise, Plaintiffs define the Easy Pay Subclass members as patients who were billed unreasonable PLP without prior disclosure, and Plaintiffs define the Duplicative Test Subclass members as patients who were billed PLP for tests that insurance deemed duplicative.  Proposed Order at 2-3.  As detailed above, individualized issues determine whether patients were billed PLP, whether patients agreed to be billed PLP, and whether the PLP billed to patients was reasonable.

Ultimately, individualized issues predominate not only over merits determinations, but also over damages calculations.  Indeed, Plaintiffs have not provided a reliable model to calculate damages on a class-wide basis.  Plaintiffs' model is based on amounts billed, rather than amounts paid, but this approach does not accurately calculate damages for patients who made partial payments or patients who later received reimbursements or discounts.  D.E. 162-7 at 122-31 (Strombom Rpt. ¶¶ 234-52).  And even if their model had been reliable, Plaintiffs still could not calculate damages on a class-wide basis; if patients were billed for multiple tests but only made partial payments on their bills, Quest would encounter individualized issues in matching payments to tests.  Moreover, individualized issues would determine whether patients made partial payments or received reimbursements or discounts after being billed.  *Id.*  Thus, the state subclasses fail the predominance requirement with respect to both merits and damages.

The Easy Pay Subclass fails the predominance requirement for an additional reason: individualized issues will predominate over determinations of reliance and causation.  California, Maryland, Pennsylvania, Illinois, and Colorado law require proof of reliance or causation.  *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales, Pracs. & Prods. Liab. Litig.*, 890 F. Supp. 2d 1210, 1219 (C.D. Cal. 2011) (to state a claim under the California Consumers Legal Remedies Act, plaintiffs must plead reliance); *Kwikset Corp. v. Superior Ct.*, 246 P.3d 877, 888 (Cal. 2011) (to prevail on a claim for misrepresentation under the California Unfair Competition Law, plaintiffs must prove reliance); *Stewart v. Bierman*, 859 F. Supp. 2d 754, 768 (D. Md. 2012) (to state a claim under the Maryland Consumer Protection Act, plaintiffs must plead reliance and causation); *Pfendler v. PNC Bank, Nat'l Ass'n*, 765 F. App'x 858, 860 (3d Cir. 2019) (to prevail on a claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, plaintiffs must prove reliance and causation); *Mullen v. GLV, Inc.*, 488 F. Supp. 3d 695, 711 (N.D. Ill. 2020)

25

(to prevail on a claim for deceptive practices under the Illinois Consumer Fraud and Deceptive Practices Act, plaintiffs must prove proximate causation); *Martinez v. Nash Finch Co.*, 886 F. Supp. 2d 1212, 1216 (D. Colo. 2012) (to state a claim under the Colorado Consumer Protection Act, plaintiffs must plead causation).  In other words, Plaintiffs must plead and prove that each patient relied on the alleged non-disclosure of PLP or that the alleged non-disclosure of PLP caused each patient to sustain losses.  Such determinations will involve individualized issues.

Plaintiffs assert that individualized issues will not predominate for the Easy Pay Subclass because the relevant state laws provide objective standards for reliance.  Reply at 18-19.  However, in the California, Maryland, and Pennsylvania cases cited by Plaintiffs, reliance was only inferred or presumed based on the surrounding circumstances.  *See Mass. Mut. Life Ins. Co. v. Superior Court*, 119 Cal. Rptr. 2d 190, 198 & n.5 (Cal. App. 4th 2002) ("the record permits an inference of common reliance"); *Duffy v. Jerry's Chevrolet, Inc.*, 2001 WL 36140120 (Md. Cir. Ct. Aug. 29, 2001) ("reliance may be sufficiently established by inference or presumption from circumstantial evidence"); *Cave v. Saxon Mortgage Servs., Inc.*, 2013 WL 460082, at *1 (E.D. Pa. Feb. 6, 2013) ("[t]here are . . . circumstances in which a plaintiff who asserts a . . . claim that is based on a defendant's material omission may be entitled to a reasonable inference of reliance").  Moreover, in the Illinois case cited by Plaintiffs, the court held that "the finder of fact must . . . determine whether it was the intent of the defendant" to induce reliance, which is an individualized inquiry. *Tylka v. Gerber Prod. Co.*, 178 F.R.D. 493, 498-99 (N.D. Ill. 1998).  Accordingly, reliance determinations will involve individualized issues.

Likewise, the Lipid Panel Subclass fails the predominance requirement because causation determinations will involve individualized issues.  Proof of causation is required under both Colorado and Florida law.  *See Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App.

2006) (causation is an element of any claim under the Florida Deceptive and Unfair Trade Practices Act). But individualized issues will predominate over determinations of causation. For example, to determine whether Quest caused patients to sustain losses, the Court will have to consider each patient's knowledge of Quest's billing practices. *See Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1140 (Fla. Dist. Ct. App. 2008) (finding that individual issues would predominate over causation determinations because of individualized inquiries, such as "whether the purchaser had knowledge of the alleged brake defect and purchased the vehicle despite such knowledge").

The AWN Subclass also fails the predominance requirement because individualized issues will predominate over deceptiveness determinations. Specifically, the determination of whether patients were misled by the AWN language will involve individualized issues. *See O'Neill v. Home Depot U.S.A., Inc.*, 243 F.R.D. 469, 475-76 (S.D. Fla. 2006) (holding that the plaintiff "would have to demonstrate that each individual class member was misled" and that this inquiry "would require numerous individual verbal accounts as to what occurred and the conversations that took place").

Plaintiffs assert that individualized issues will not predominate for the AWN Subclass because Florida law assumes an objective standard for deceptiveness. Reply at 16-17. However, the deceptiveness standard under Florida law considers both reasonableness, which is an objective factor, and the surrounding circumstances, which is a subjective matter. *See Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. Dist. Ct. App. 2000) ("[T]he question is . . . whether the practice was likely to deceive a consumer acting reasonably in the same circumstances."); *Manetta v. Navient Corp.*, 2021 WL 2886115, at *5 (D.N.J. July 8, 2021) ("'[T]he plaintiff must show that "the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances."'"); *see also In re Mots. to Certify Classes Against Court Reporting Firms for*

*Charges*, 715 F. Supp. 2d 1265, 1281 (S.D. Fla. 2010) ("The modification of 'acting reasonably' by 'in the same circumstances' indicates a hybrid standard that may be objectively established as to mindset but subjectively established as to context."). Thus, for the AWN Subclass, "the reasonableness conclusion depends on numerous individualized inquiries that would fly in the face of the requirement that individual issues not predominate over those common to the class." *In re Mots. to Certify Classes Against Court Reporting Firms for Charges*, 715 F. Supp. 2d at 1281.

Relatedly, the Duplicative Test Subclass fails the predominance requirement because individualized issues will predominate over the identification of patients who received duplicative tests. Indeed, to identify patients who received duplicative tests, Esquibell had to collect bills, use a computer program to isolate bills with overlapping patients and test components, and manually review bills to determine insurance coverage and patient responsibility for each test component. D.E. 162-38 at 8-10 (Esquibell Decl. ¶¶ 17-23). Although this process involved a small sample of requisitions from a single day, Esquibell spent many hours at work. *Id.* at 10-11 (Esquibell Decl. ¶ 24). Replicating this process for the entire Duplicative Test Subclass would only entail greater burden.

### 2. *The Ascertainability Requirement is Not Satisfied*

To satisfy the ascertainability requirement, "the class must be defined with reference to objective criteria" and "there must be a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013) (quoting *Marcus*, 687 F.3d at 593-94). As detailed above, Plaintiffs have not demonstrated any aggregate methods to determine whether patients were billed PLP, whether patients agreed to be billed PLP, whether the PLP billed to patients was reasonable, whether patients obtained Easy Pay estimates, whether patients signed valid AWNs,

or whether patients received duplicative tests.  Thus, even if the state subclasses are defined with reference to objective criteria, class membership cannot be discerned through a reliable and administratively feasible mechanism.  In other words, for the same reasons that individualized issues predominate identification of the class members, the state subclasses are not ascertainable.

Nevertheless, Plaintiffs assert that a class is ascertainable even where individual records must be reviewed and voluminous data from multiple sources must be cross-referenced.  D.E. 199. As support for this proposition, Plaintiffs cite to the recent decision in *Kelly et al. v. RealPage Inc.*, where prospective tenants sued a credit reporting agency for failing to disclose the source of public information that was included in consumer reports shared with landlords.  47 F.4th 202 (3d Cir. 2022).  In *Kelly*, ascertainment of the class required determining which consumer reports contained public information and which prospective tenants requested and received consumer reports.  *Id.* at 223.  The district court found that it would be unfeasible to search for public information in each consumer report.  *Id.*  Additionally, the defendants argued that separate databases recorded consumer report requests and receipts from prospective tenants and that without a unique identifier, it would be unfeasible to match the records.  *Id.*  However, the Third Circuit reversed; it cited its own precedent to hold that "a straightforward 'yes-or-no' review of existing records to identify class members is administratively feasible even if it requires review of individual records with cross-referencing of voluminous data from multiple sources."  *Id.* at 224.  Here, Plaintiffs have not outlined any straightforward "yes-or-no" review of existing records that would allow the classes to be ascertained.  Thus, Third Circuit precedent does not demonstrate the ascertainability of the state subclasses.[32]

---

[32] *See Byrd*, 784 F.3d 154 (finding that it was administratively feasible to search public information for the addresses of potential household members who had already been identified and to match the results with other addresses that had already been identified); *City Select Auto Sales Inc. v.*

Plaintiffs further assert that Quest's inadequate recordkeeping should not bar class certification, even if the ascertainability of the classes is frustrated by the absence of certain aggregate data. Reply at 5 & n.10. However, in the cases cited by Plaintiffs, the defendant failed to maintain records "it was required to keep by law" and the class could otherwise be defined "as a matter of just and reasonable inference." *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 482 (3d Cir. 2020) (internal citations omitted); *see also Portillo v. Nat'l Freight, Inc.*, 2021 WL 3486894, at *7 n.16 (D.N.J. Aug. 9, 2021) ("*Hargrove* contemplated failure to maintain records which the employer 'was required to keep by law.'"); *Lewis v. Gov't Emps. Ins. Co.,* 2022 WL 819611, at *2-3, 11 (D.N.J. Mar. 17, 2022) ("Plaintiffs have proposed methods of managing the information gaps to ascertain the class 'as a matter of just and reasonable inference.'").[33] Here, Plaintiffs have not demonstrated that the absence of certain aggregate data violates the law or that the classes can otherwise be defined through inference. As such, Quest has not engaged in the sort of inadequate recordkeeping that would allow the state subclasses to overcome their lack of ascertainability.[34]

---

*BMW Bank of N. Am. Inc.*, 867 F.3d 434 (3d Cir. 2017) (finding that it was administratively feasible to review affidavits for "yes-or-no" information regarding fax transmission and to check a single database for confirmation); *Hargrove v. Sleepy's LLC*, 974 F.3d 467 (3d Cir. 2020) (finding that it was administratively feasible to review and match together contracts, pay statements, manifests, rosters, security gate logs, and affidavits because the identified data sets provided a comprehensive source of information); *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 138 (3d Cir. 2023) (finding the proposed matching technique to determine class membership unreliable because the court "would have to examine the underlying contractual relationships of each transaction to distinguish between class members and mere intermediaries").

[33] In *Lewis*, the Court did not specify that the inadequate recordkeeping was unlawful, but it made clear that the burden of identifying class members would be minimal in light of the evidence submitted by the plaintiffs. Here, Plaintiffs have not submitted evidence to demonstrate that the burden of identifying class members will be minimal.

[34] Plaintiffs also cited *Cox v. Spirit Airlines, Inc.*, 341 F.R.D. 349 (E.D.N.Y. 2022), but that case is inapposite because the Second Circuit does not demand administrative feasibility as part of the ascertainability requirement. *See In re Petrobras Sec.*, 862 F.3d 250, 265 (2d Cir. 2017) ("[W]e decline to adopt a heightened ascertainability theory that requires a showing of administrative feasibility."). Moreover, the plaintiffs in that case submitted evidence to demonstrate that the burden of identifying class members would be minimal. *Cox*, 341 F.R.D. at 370.

### 3. *The Superiority Requirement is Not Satisfied*

To determine superiority, the Court considers, among other things, "the likely difficulties in managing a class action." Fed. R. Civ. Pr. 23(b)(3). The superiority requirement "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533-34 (3d Cir. 2004) (internal citations omitted). For the same reasons that the state subclasses do not satisfy the predominance and ascertainability requirements, the class action will be difficult to manage. Put differently, the individualized issues and administrative unfeasibility that characterize the state subclasses will render the class action an inefficient method of adjudication.

Additionally, Plaintiffs have not proposed a trial plan to show how the class action can be managed efficiently despite variation in state consumer protection statutes. As detailed above, there are material differences between the consumer protection laws of different states. Yet Plaintiffs' proposed trial plan merely references the relevant state statutes, with brief parentheticals that broadly define each cause of action and high-level questions regarding liability and damages for the applicable subclasses. *See* D.E. 163 at 11-19. This showing is plainly insufficient, as it fails to account for differences in state law that threaten the efficient management of the class action. *See In re Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 165 (E.D. Pa. 2015); *Vista*, 2015 WL 3623005, at *40; *Lyon*, 194 F.R.D. at 220-21.[35]

---

[35] For example, although the proposed trial plan sketches a special verdict form for each cause of action, it does not show "what the jury instructions would look like" or explain "how the verdict form could be written to account for the nuanced differences in the state laws." *In re Egg Prods. Antitrust Litig.*, 312 F.R.D. at 164-65. Additionally, the proposed trial plan provides "a common core of basic elements from the various consumer protection laws" but "gloss[es] over material

**D.  The State Subclasses Do Not Satisfy Rule 23(b)(2)**

Plaintiffs have also expressed an intent to seek injunctive and declaratory relief for the state subclasses.  Br. at 4; Proposed Order at 2.  However, Plaintiffs offer no arguments in support of their request.[36]  In any event, "Rule 23(b)(2), in contrast to (b)(3), 'does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.'"  *Gates*, 655 F.3d at 262 (quoting *Dukes*, 564 U.S. at 360-61).  Relatedly, since the state subclasses do not satisfy the predominance requirement of Rule 23(b)(3), they also fail to satisfy the more stringent cohesiveness requirement of (b)(2).

## IV.  CONCLUSION

For the foregoing reasons, the motion for class certification will be **DENIED**.  An appropriate Order accompanies this Opinion.

Dated**:** June 8, 2023

Evelyn Padin, U.S.D.J.

---

differences."  *Vista*, 2015 WL 3623005, at *39-40.  Indeed, the proposed trial plan "does not attempt to categorize and explain the variations between the states' consumer fraud statutes" and "fails to address individual issues of causation and potential defenses to liability."  *Lyon*, 194 F.R.D. at 220-21.

[36] Plaintiffs do not even specify the form that any injunction would take, which could result in failure to satisfy Rule 65(d).